53

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DOROTHY HAWTHORNE-BURDINE

Case:2:15-cv-13285
Judge: Drain, Gershwin A.
MJ: Patti, Anthony P.
Filed: 09-16-2015 At 04:26 PM
CMP HAWTHORNE-BURDINE V. OAKLAND UN
IVERSITY ET AL (NA)

Plaintiff, Pro Se

v.

_____/

OAKLAND UNIVERSITY, a Michigan Public University;
OAKLAND UNIVERSITY POLICE DEPARTMENT;
MEDICOLEGAL SERVICES, LLC;
MARK SCHLUSSEL; RICHARD DEVORE;
MELISSA STOLICKER; MICHAEL KRAMER;
RIGHARD FLYNN; RONALD ROBINSON;
SCOTT KUNSELMAN; W. DAVID TULL;
GEORGE HYND; BETTY YOUNGBLOOD;
JAMES LENTINI; VICTOR ZAMBARDI;
CATHERINE RUSH; SAMUEL LUCIDO;
JANINE DEWITTE; MARK GORDON;
SARAH NEWTON; JOHN KRAUSS;
GLENN MCINTOSH; NANCY SCHMITZ;
JAMES FRANKLIN; KERRI SCHUILING;
GARY MOORE; DARLENE SCHOTT-BAER;
CHERYL MCPHERSON; CARLY SCHATZBERG;
CHERYL MICHELLE PISKULICH;
KATHLEEN WALSH SPENCER;
DOES 1-100, inclusive;
ALL individuals sued in official and personal capacity; and
ALL Defendants sued jointly and severally.

Defendants

_____/

1

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Dorothy Hawthorne-Burdine, RN, PhD, as Pro Se and files the following Complaint against Defendants, and demand a trial by jury of all issues and for causes of action alleges as follows:

## GENERAL

1. Plaintiff is a 63-year-old African-American woman who worked as an Associate Professor in the School of Nursing at the Defendant Oakland University (herein after referred to as "the University") from August 2010 to April 30, 2014.

2. On September 27, 2013, Plaintiff became the first African-American woman and the first senior nursing faculty with teaching honors in the history of the University to be served a *Persona Non Grata* (hereinafter referred to as "PNG") order; removed from the campus without notice; banned from making contact or interacting with students; subject to arrest for criminal trespass if she entered upon any of the University's greater than 1400 acreage of property; relieved of all professional duties and responsibilities; forced to submit to both a neurological and a psychological assessment (total of three exams); and denied a name-clearing hearing.

3. In 2013, Plaintiff was 61 years-old when the University denied her requests for disability accommodations and a name-clearing hearing after publicizing a PNG order had been served on her.

4.      Plaintiff was subjected to a racist, hostile work environment; accused of being a terrorist and openly threatening to kill another faculty; given two biased evaluations by persons not of African-American descent (hereinafter referred to as "NAAD") serving on tenure-review committees; terminated by NAAD University officials in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC"); and falsely accused of not fulfilling her professional responsibilities, being an immediate threat to campus safety that prevented notice; and engaging in unprofessional misconduct that  violated the University's Ordinance 6.02 on "Unlawful Individual Activities."

5.      After four days of arbitration hearings from eleven witnesses not including anyone from the School of Nursing except one alumnus, Carly Jaye Schatzberg, the allegations against the Plaintiff were found to be untrue.


## JURISDICTION AND VENUE

6.      Jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights of 1964, as amended, 42 U.S.C 2000e, et seq.; Title 1 of the Americans with Disabilities Act of 1990, 42 U.S.C, 12111, et seq.; Title V, Section 503 of the Act, 42 U.S.C 12203; the Age Discrimination in Employment Act of 1967,  as amended; the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"); and the Michigan Persons with Disability Civil Rights Act ("PWDCRA," MCL §37.1101 *et seq*).  Jurisdiction is also proper because the amount in controversy exceeds $75,000.

7.    Venue is proper in the Eastern District of Michigan, Southern Division, as it is the district where the events giving rise to Plaintiff's claims took place and where the primary Defendant, Oakland University, is located.

## PARTIES

8.    Plaintiff, Dorothy Hawthorne-Burdine, is a resident in Oakland County, Michigan, located in the Eastern District of Michigan.

9.    Defendant Oakland University is a federally funded State of Michigan Public University located in Oakland County with the primary campus having a mailing address of Rochester, Michigan, in the Eastern District of Michigan.

10.    Upon information and belief, Defendants appointed to Oakland University Board of Trustees by Michigan's Governor are all residents of counties within the Eastern District of Michigan.  Governor appointed members to the Board of Trustees include Mark E. Schlussel, Chair; Richard L. DeVore, Vice Chair; Richard Flynn; Michael Kramer; Scott G. Kunnelman; Ronald E. Robinson; Melissa Stolicker; and W. David Tull.

11.    Defendant George W. Hynd, President of Oakland University and an Officer of the Board of Trustees for Oakland University, is a resident in Oakland County, Michigan, located in the Eastern District of Michigan.

12.    Defendant Victor Zambardi, Vice President for Legal Affairs and General Counsel and Secretary to the Board of Trustees, is a resident in one of the counties located in the Eastern District of Michigan.

13.    Defendant Betty Youngblood, Former 2013-2014 Interim President of Oakland University, is a resident in one of the counties located in the Eastern District of Michigan.

14.    Defendant James P. Lentini, Senior Vice President for Academic Affairs and Provost for Oakland University, is a resident in one of the counties located in the Eastern District of Michigan.

15.     Defendant Oakland University Police Department is a State of Michigan Public University Police Department on the primary campus of Oakland University having a mailing address of Rochester, Michigan, in Oakland County in the Eastern District of Michigan.

16.     Defendant Mark Gordon, Chief of Police for Oakland University Police Department, is a resident in one of the counties within the Eastern District of Michigan.

17.     Defendant Samuel Lucido, Former Chief of Police for Oakland University Police Department and a part-time adjunct faculty at Oakland University, is a resident in one of the counties within the Eastern District of Michigan.

18.     Defendant Medicolegal Services, LLC does business in counties located within the Eastern District of Michigan.

19.     Upon information and belief, Defendants Glenn McIntosh, Vice President of Student Affairs; Nancy Schmitz, Dean of Student; James Franklin, Psychologist and Director of Training at Oakland University Counseling Center; and Police Chief Mark Gordon serving on the Behavioral Concerns Committee ("Committee") at Oakland University are all residents of counties within the Eastern District of Michigan.

20.     Defendant Cheryl Michelle Piskulich, Associate Provost for Academic Human Resources and Associate Professor of Political Science at Oakland University, is a resident in one of the counties within the Eastern District of Michigan.

21.     Defendant Catherine Rush, Assistant Vice President for Academic Human Resources at Oakland University, is a resident in one of the counties within the Eastern District of Michigan.

22.     Defendant Janine DeWitte, Academic Human Resources Administrator at Oakland University, is a resident in one of the counties within the Eastern District of Michigan.

23.     Defendant Kerri Schuiling, Former Dean of the School of Nursing at Oakland University (2011-2014), was a resident in one of the counties within the Eastern District of Michigan at the time the alleged actions were taken against the Plaintiff.

24.     Defendant Gary Moore, Interim Dean of Nursing and Former Associate Dean of Nursing, is a resident in one of the counties within the Eastern District of Michigan.

25.     Darlene Schott-Baer, Former Interim Dean and Associate Dean of Nursing, is a resident in one of the counties within the Eastern District of Michigan.

26.     Defendant Cheryl McPherson, Assistant to the Dean of Nursing for Finance and Management, is a resident in one of the counties within the Eastern District of Michigan.

27.     Defendant Kathleen Walsh Spencer, Visiting Assistant Professor in the School of Nursing, is a resident in one of the counties within the Eastern District of Michigan.

28.     Defendant Sarah Newton, Associate Professor of Nursing, Director of Undergraduate Nursing Studies, and Chair of the Nursing Committee for Advancement and Promotion ("NCAP") during the time of Plaintiff's tenure review, is a resident in one of the counties within the Eastern District of Michigan.

29.     Defendant John Krauss, Associate Professor in the School of Health Sciences and Chair of the Faculty Retention and Promotion Committee ("FRPC") during the time of Plaintiff's tenure review, is a resident in one of the counties within the Eastern District of Michigan.

30.     Defendant Carly Jaye Schatzberg, a registered nurse and graduate of Oakland University's baccalaureate program in nursing, is a resident in one of the counties within the Eastern District of Michigan.

31.     DOES 1-100, inclusive, true name and capacities, whether individual, corporate, or associate, or otherwise of Defendants named herein are unknown to Plaintiff who therefore sues as Defendants by such fictitious names, and Plaintiff will amend this complaint to state the true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and based thereon alleges that each fictitious Defendant designated herein as a DOE was responsible in some

6

actionable manner for the events and happenings referred to herein, which proximately caused injury to Plaintiff as hereinafter alleged.

32. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the Defendants were the agents, managers, supervisors, and employee of each and every other Defendant. In doing the things hereinafter alleged, were acting within the course and scope of such agency and employment and were acting with the knowledge, consent, permission, and authorization of each of the remaining Defendants. All actions of each Defendant hereinafter alleged were ratified and approved by the officers or managing agents of every other Defendant.

## ADMINISTRATIVE PROCEDURES

33. Plaintiff has exhausted administrative remedies by timely filing a grievance and completing both the grievance steps and arbitration proceedings described in the 2012-2015 Collective Bargaining Agreement (hereinafter referred to as "CBA") between Oakland University ("the University") and the Oakland University Chapter of the American Association of University Professors (hereinafter referred to as "the Association"), and filing an action with EEOC on June 23, 2014, alleging discrimination based on race, age, and disability; and, a retaliation charge was filed on September 10, 2014, alleging employment termination for filing the previous EEOC charge.

34.     Plaintiff received a dated June 11, 2015, Right-to-Sue-Notice (hereinafter

referred to as "the Notice") by Certified Mail on June 18, 2015, from the U.S.

Department of Justice Civil Rights Division that states:

> "Because you filed the above charge with the Equal Employment
> Opportunity Commission, and more than 180 days have elapsed
> since the date the Commission assumed jurisdiction over the
> charge, and no suit based thereon has been filed by this
> Department, and because you have specifically requested this
> Notice, you are hereby notified that you have the right to
> institute a civil action against the above-named respondent
> under Title I of the American with Disabilities Act of 1990, 42
> U.S.C. 1211, et seq., and Title V, Section 503 of the Act, 42
> U.S.C. 12203; and Title VII of the Civil Rights Act of 1964, as
> amended, 42 U.S.C. 2000e, et seq."

35.     Plaintiff timely filed this lawsuit on Wednesday, September 16, 2015,

generally alleging discrimination and retaliation under federal and state laws.

36.     All conditions precedent to the institution of this lawsuit have been fulfilled.


## STATEMENT OF FACTS, CLAIMS, AND VIOLATIONS

**Employment History**

37.     Plaintiff is an older African-American woman who was a senior faculty in the

School of Nursing holding the title of Associate Professor from August 2010 to the

end of her 4-year contract on April 30, 2014.  The University gave Plaintiff a new

contract on July 8, 2014 to start teaching courses in the fall 2014 term without

restrictions under the condition of a just-cause policy; however, the University

terminated her employment on August 12, 2014.

38.   Plaintiff was recruited by an African-American Dean of Nursing, Dr. Linda Thompson-Adams.  She was employed by the University to teach two terms (fall and winter) in eight months in an academic year.  Summer teaching required a separate contract.

39.   Dean Thompson-Adams resigned from the University prior to the start of Plaintiff's contract.  Diane Norris served as Interim Dean until her health failed in the early fall 2010 term.

40.   Beginning in the 2010 fall term until the end of the 2011 summer term, Darlene Schott-Baer served as the Interim Dean and Associate Dean in the School of Nursing until Kerri Schuiling became Dean in the fall 2011 term.  Both Darlene Schott-Baer and Kerri Schuiling are NAAD.

41.   And from the start of the fall 2011 term until the end of the spring 2014 term, Kerri Schuiling served as the Dean of Oakland University School of Nursing.

42.   After Schuiling's departure from the School of Nursing, Gary Moore became the Interim Dean.

43.   As of this date (September 16, 2015), Moore continues to serve as the Interim Dean in the School of Nursing.


Education and Qualification

44.   Plaintiff has three degrees in Nursing and 38 years of teaching experience in Nursing.

45.    In 1974, Plaintiff received a baccalaureate degree in nursing from Florida A & M University (FAMU).  FAMU is located in Tallahassee, Florida, and is one of the Nation's Historically Black Colleges and Universities ("HBCU").

46.    Plaintiff received a Master's of Nursing in 1977 and the PhD in Nursing in 1999.  Both graduate degrees were received from the University of Florida.

47.    Thereafter, the Plaintiff completed a 3-year post-doctoral fellowship in genetics at the University of Iowa and worked one year at Brenau University in Gainesville, Georgia, before working six years as an Assistant Professor of Nursing from 2010 to 2014 at the University of Pittsburgh.  Professor Hawthorne-Burdine's teaching dates back to 1977 and totals 38 years.


## Respected by Students

48.    During her time at Oakland University, Plaintiff earned the respect and admiration of her students.  Every year, Plaintiff's students nominated her for two teaching awards, the School of Nursing's Golden Apple Award and Oakland University's Teaching Excellence Award.

49.    Plaintiff's students nominated her twice for the School of Nursing's Golden Apple Teaching Award.  She received the Golden Apple Award during her second year at the University.  Students also nominated the Plaintiff twice for Oakland University's Teaching Excellence Award.

50.    During the year that Plaintiff became an unwanted person on campus under the PNG order issued by then Oakland University Police Chief Samuel Lucido, the

Plaintiff was the only faculty in the School of Nursing to receive a nomination from any one of over 1500 students for the University-wide Teaching Excellence Award.

51.    When the Plaintiff was nominated for the 2013-2014 Oakland University's Teaching Excellence Award, she had taught for four weeks during the entire 2013-2014 academic year.

52.    Oakland University required faculty/staff who were nominated for the Teaching Excellence Award to submit letters of support from two faculty members and a minimum of four students.

53.    Due to then Oakland University Police Chief Samuel Lucido banning the Plaintiff from making contact on and off campus with Oakland University's students, the Plaintiff was hamstrung in seeking support for her 2013-2014 Teaching Excellence Award nomination.


**Effects of University's Actions on Students and Plaintiff**

54.    Oakland University's decision to issue a PNG to the Plaintiff prevented the Plaintiff from using her knowledge and skills as a Nursing educator to help expand on the students' knowledge and therefore contribute to the intellectual growth of Oakland University's students.

55.    Oakland University's representatives stated in writing and to others that any work and/or awards that Plaintiff and/or her students do/or receive will not be supported/or acknowledged by Oakland University.

56.     In a memorandum dated January 10, 2014, Catherine Rush, Assistant Vice President for Academic Human Resources at Oakland University, informed the Association's Grievance Officer, Professor Kevin Murphy that "we do not expect the Provost [James Lentini] will award Professor Hawthorne-Burdine the Teaching Excellence Award even if recommended by the Committee [University Senate Committee on Teaching and Learning]."

57.     Plaintiff has assisted four students in writing and presenting their abstract at the National Level.

58.     Plaintiff has also assisted a student in applying and receiving an externally funded grant to conduct research at the Veteran Administration (VA) Hospital in Detroit on patient falls.

59.     The student work was featured in the School of Nursing's PULSE Magazine. The Plaintiff assisted the student in using his work on patient falls in order to write a scientific abstract.  The scientific abstract on patient falls was approved for a professional presentation at a national research conference.

60.     During the month of October 2013, Plaintiff nominated the student for the Undergraduate Distinguished Achievement Award due to his work and research on patient falls.

61.     According to Does 1-30 individuals who spoke with Provost Lentini, Provost Lentini stated that Oakland University would not acknowledge the student's research because the Plaintiff was the professor who helped him to receive the grant at the VA Hospital in Detroit.

12

## Indifferent Treatment towards Plaintiff

62.     After the only tenured African-American faculty in the School of Nursing retired in 2012, Plaintiff became the only full-time African-American faculty in the School of Nursing holding a PhD in nursing and the only African-American faculty in a tenure-track position in the School of Nursing.

63.     Although Oakland University School of Nursing has employed African-Americans in temporary and/or part-time positions as clinical instructors, the Plaintiff was the only African-American faculty in the School of Nursing, starting in the fall 2012 term, who taught a classroom of students on the primary campus whereby 95% were NAAD.

64.     On September 27, 2013, Oakland University with Dr. Betty Youngblood as Interim President gave Plaintiff, the only African-American faculty with a PhD in the School of Nursing, a PNG for what the University deemed was terroristic and threatening behavior towards faculty, staff, and students.  It must be noted that the arbitrator ruled that Plaintiff's behavior was not terroristic or threatening towards faculty, staff, and students.

65.     Oakland University, however, did not issue a PNG to NAADS who displayed threatening behavior.

66.     Plaintiff notified the former interim dean, Darlene Schott-Baer (NAAD), about a Nursing faculty, Sarah Newton (NAAD), who was loud and abrasive in an Undergraduate Curriculum of Instruction ("UCOI") committee meeting during the fall 2010 term.

13

67.     Sarah Newton ("Newton") displayed unprofessional conduct in the presence of all committee members and two students.

68.     During the meeting, Newton tightened her face and repeatedly screamed at the Doe faculty member that she was wrong about points to consider for changes in the curriculum as described by Darlene Schott-Baer.  Newton only eased up after she had won the "battle" over who was right and who was wrong.  All of this was done in front of students and Does 1-5 faculty serving on the committee.

69.     Plaintiff expressed to Darlene Schott-Baer that she was stunned that a senior faculty would behave in such a way, as done by Newton, in a meeting with faculty and students present to witness such unprofessional behavior.

70.     But unlike what was done to the Plaintiff, who was the only African-American School of Nursing faculty with a PhD, for reportedly engaging in unprofessional conduct, Newton (NAAD) was not disciplined in any way.

71.     Newton was not served a PNG by the University's Chief of Police.  Also, she was not police-escorted off campus; banned from interacting or making contact with students; forced to submit her body to neurological and psychological evaluations; or reported to Leigh Settlemoir Dzwik in Academic Human Resources for suspension, discharge, and she was not accused of violating the University's Ordinance 6.02 on "Unlawful Individual Activities."

72.     Instead, Darlene Schott-Baer (NAAD) promoted Newton (NAAD) to the position of Director of Undergraduate Studies in the School of Nursing.  Plaintiff inquired in email communications with Darlene Schott-Baer about why Newton,

who showed such unprofessional conduct during the Undergraduate Curriculum of Instruction ("UCOI) committee meeting, became the Director of Undergraduate Studies.

73.     In 2013 email communications with two African-American students seeking faculty representation by Plaintiff in a grievance against Newton, Plaintiff learned that Newton exhibited similar unprofessional and bullying behaviors in her interaction with students enrolled in her graduate-level course.

74.     Although Newton was the first recipient of the Golden Apple Teaching Award started by Dr. Linda Thompson-Adams, the two African-American students failed Newton's graduate-level course.  In emails, the students stated Newton has an "ineffective teaching style."

75.     In a December 2009 article published in *The Journal of The National Black Nurses Association*, Gary Moore and Sarah Newton addressed what they consider to be characteristics of African-American students that make them more unlikely to complete their nursing program of study at a *Predominately White Institution* (hereinafter referred to as "PWI"), such as Oakland University compared to White and other students who are NAAD.  Since Newton is aware of why African-American students are unsuccessful at a PWI as Oakland University, it seems she would teach in a way to support their learning style.

76.     In the published article, Gary Moore and Sarah Newton blame African-American students for their academic failure instead of an "ineffective teaching style" or cultural insensitivity to the various learning styles of African-Americans.

77.     The unprofessional conduct of Sarah Newton as a NAAD faculty, continues

without disciplinary or discharge actions.

Unprofessional Conduct and Bullying against Plaintiff

78.     During the 2010-2011 academic year, first year of Plaintiff's employment

with the University, a Doe clerical staff who is a NAAD individual in the Grants-

Research Office and one Doe staff in the School of Nursing, treated Plaintiff with

disrespect and talked down to her in demeaning and humiliating ways.

79.     Darlene Schott-Baer used these early incidents with the two Doe clerical

workers and one NAAD faculty (Doe) to stack Plaintiff's personnel file with

erroneous reports and to solicit support from Leigh Settlemoir Dzwik in Academic

Human Resources to engage in a Performance Evaluation and potentially discharge

the Plaintiff during the summer of 2011.  Also, Schott-Baer placed letters in

Plaintiff's personnel file that she admittedly never shared with Plaintiff.

80.     In a June 6, 2011 letter, Plaintiff was summoned back to the University's

campus by Leigh Settlemoir Dzwik for a Performance Review.

81.     The purpose of the Performance Review meeting was not to talk about the

Plaintiff's behaviors as noted by Daniel Bernard during the arbitration hearing, but

"to clarify processes, procedures and roles, specifically noting things such as

applications for external funding and reimbursement for travel."

82.     Plaintiff had completed her teaching contract for two terms during the 2010-

2011 academic year, and was away at her home in Pittsburgh at the end of the

2010-2011 term, since she was not on a summer contract.

83.    Plaintiff's health suffered during the travel back to the University for the June 14th meeting at 2:00 pm.  Her extremities became edematous (limbs filled with fluids).  Due to the excessive swelling and excruciating pain from the diabetic neuropathy, Plaintiff experienced difficulty walking.  Schott-Baer and Dzwik's harassing behaviors, during the meeting, stressed the Plaintiff out and caused her blood pressure to elevate above the normal levels.

84.    Plaintiff began to shake, experienced nervousness, and became clammy from a drop in her serum glucose.  She told everyone present in the meeting including Scott Barns, Executive Director of her Union, the Association, that her glucose had dropped and she felt very ill.  Plaintiff was not aware a police officer was posted outside the door of the meeting until revealed during the arbitration hearing.

85.    On August 25, 2011, Plaintiff met with Provost Virinder Moudgil who is an Indian American and his Administrative Secretary who is an African-American woman to discuss the behaviors of Schott-Baer and others in the School of Nursing toward her.

86.    Plaintiff described to Provost Moudgil the hostile and discriminatory work environment she was subjected to in the School of Nursing under the micro-managerial style used with her by Schott-Baer; and that NAAD faculty (Does 1-50) were not treated in this way.

87.    Plaintiff informed Provost Moudgil how Schott-Baer solicited letters over a 2-month period, or greater, of incidents that occurred 6 to 8 months earlier with NAAD faculty and staff (Does 1-50).

88.    The letters or "statements" were used to manufacture negative and erroneous reports about the Plaintiff's performance and behavior with NAADs (Does 1-50) so as to build a case for employment termination.

89.    NAAD senior nursing faculty, Does 1-10) were not subjected to this micro-managerial style, harassment, aggravation, nor labeled obstreperous by Schott-Baer and Leigh Dzwik in Academic Human Resources as was done against the Plaintiff.

90.    Provost Virinder Moudgil informed Plaintiff that he became informed of her situation through her blind-copied emails when Schott-Baer threatened to use her administrative position to withdraw the Plaintiff's grant application submitted to the National Institute of Health ("NIH").

91.    Schott-Baer threatened to withdraw the grant application, because the Plaintiff did not complete the University's internal application form for an external grant ("EGA").

92.    The NAAD clerical staff (Does 1-4) in the Grants' Office failed to inform the Plaintiff about the form, so the grant was submitted by the staff member without the University having a completed EGA form.

93.    Provost Virinder Moudgil stated that completing the University's EGA form was a moot issue at this point, since staff in the Grants Office made so many calculation errors.  And, it was a waste of Plaintiff's time to input so many erroneous numbers into a form not required by NIH for submission to their institution.  NIH did not require the Plaintiff to submit the University's internal form with her application as insisted by Schott-Baer.

94.     Thus, Schott-Baer was wrong when she communicated in an email to Plaintiff that the University's EGA form was required by NIH.  (NAAD nursing administrators and faculty (Does 1-50) would become irritated when Plaintiff pointed out inaccuracies in their interpretation of established guidelines, procedures, and policies.  It was not unusual for NAAD nursing administrators and a few faculty to make up rules to fit whatever agenda they may have had at the time.  This insight by the Plaintiff planted the seed for administrators to work in concert to remove her from the University's workplace.)

95.     Plaintiff also reviewed issues with Provost Moudgil and his Administrative Secretary that were included in a written August 3, 2011 response to Leigh Settlemoir Dzwik's letter of July 14th about the June 14th meeting.  Provost Moudgil was provided a copy of the Plaintiff's August 3, 2011 letter prior to the meeting.

96.     Attention was given to how NAAD clerical staff in Nursing and in the Grants Office addressed the Plaintiff and how they talked down to the Plaintiff in a demeaning and humiliating way compared to how they treated and communicated with NAAD faculty and staff.

97.     Provost Virinder Moudgil informed the Plaintiff that Schott-Baer had been denied her bid to become the next Dean of Nursing, she was being removed from the School of Nursing into the Office of the Provost in an interim position over graduate studies, and that clerical staff (Does 1-20) will be told to acknowledge the Plaintiff by using her professional salutation of Doctor.

98.     After Provost Moudgil's intervention, Plaintiff noticed the NAAD clerical staff started referring to her as Dr. Hawthorne and talking to her in a soft and friendly tone without disdain and hatred.

99.     Knowing Plaintiff specialize in Children and Families, NAAD clerical staff started bringing their grandchildren to Plaintiff's office for short visits, and they shared family photos as they made small-talk.

100.    Provost Moudgil's intervention was effective in changing how the NAAD clerical staff interacted with Plaintiff.

101.    Plaintiff continues, however, to wear the scars of emotional traumatization and humiliation from being hated and discriminated against because of her African-American race.

102.    During the beginning of the 2015-2016 academic year, Oakland University President George Hynd and Provost James Lentini, returned Schott-Baer to the School of Nursing as the Director of Nursing Graduate Studies.  Schott-Baer is no longer the Interim VP of Graduate Studies for the University.


**March 26, 2013: Start of NAAD-Administrators Pitting African-Americans**

103.    On March 26, 2013, an African-American faculty candidate requested to speak to the Plaintiff during the hiring process.

104.    Ms. Cheryl McPherson, an African-American serving as Assistant to the Dean, went to the Plaintiff's office in an attempt to prevent her from meeting with the faculty candidate.

105.    Once Ms. McPherson's behavior became inappropriate and unprofessional, the Plaintiff open the door and told her to, "Get your ignorant ass out of my office."

106.    Ms. McPherson reported the incident that occurred in the privacy of the Plaintiff's office to Dean Kerri Schuiling and Associate Dean Gary Moore; and, the Plaintiff was summoned to a meeting with them by late afternoon on the same day.

107.    Plaintiff was assured by Dean Schuiling and Associate Dean Moore that she did need her Union's representation, since the meeting would not lead to any discipline or further investigation, they just wanted to know her side of the story; however, this was not true.

108.    Cheryl Michelle Piskulich in Academic Human Resources was notified by Schuiling and/or Gary Moore about the incident and a police investigation was initiated against the Plaintiff as a threat to a faculty in the School of Nursing.

109.    Does 1-20 faculty and staff identified as NAAD, were no longer supporting administrators in their efforts against the Plaintiff.  So, administrators worked in concert with a few African-Americans (e.g. Cheryl McPherson in Nursing and Glenn McIntosh in Student Affairs) to identify the Plaintiff as an immediate threat to campus safety.

110.    McPherson submitted a typed, undated statement to the University's Police Department describing the Plaintiff as a threat to her life and safety.

111.    McPherson stated the Plaintiff told others that she was a "bitch" and told her to "get your ignorant **black** ass out of my office."

112. These statements are untrue, since Plaintiff did not tell anyone that McPherson was a bitch and she never told McPherson to get her ignorant **black** ass (black was not mentioned by Plaintiff) out of her office; and, emails show that on three occasions, Plaintiff and McPherson went out to lunch at TGIF. McPherson never paid for any of her meals, the Plaintiff paid for all meals. McPherson should not eat with someone who is a threat to her life.

113. McPherson did not show up as a witness during arbitration to be examined and cross-examined about her statements made against the Plaintiff.

114. In an email on July 8, 2013, Scott Barns of the Association forwarded to Plaintiff an email received from Cheryl Michelle Piskulich about an investigation the University's Police Department conducted in response to an allegation that the Plaintiff made threats against another faculty member.

115. It was the first time Scott Barns and the Plaintiff heard about an investigation. Piskulich email of July 8, 2013 stated:

> "As required by Paragraph 66(c) of the 2012-2015 Agreement which states "In non-discharge actions, unless health or safety considerations prevent, Oakland shall give notice to the faculty member and to the Association prior to effecting the action," I am informing the Association of my intent to conduct an investigation in regard to allegations of unprofessional behavior by Dorothy Hawthorne-Burdine of the School of Nursing. Please note that the Oakland University Police Department has already conducted its own investigation related to an allegation that Ms. Hawthorne-Burdine made threats against another faculty member. The OUPD has determined she poses no immediate threat and turned the issue over to me. I will notify Ms. Hawthorne-Burdine of her Weingarten rights at the time I schedule her investigatory interview."

116.   The Plaintiff responded to Scott Barns by stating, "No police officer has approached me about any type of investigation…I cannot give you information about an incident that I was not a party to."

117.   Plaintiff was never interviewed by the University's Police Department and the investigation did not create a police report.  Former Chief Samuel Lucido testified during arbitration that there were no police report on Dr. Dorothy Hawthorne-Burdine in Oakland University's Police Department.

118.   Plaintiff, Scott Barns, and the Association never learned from Piskulich what specific incident triggered the police investigation nor the name of the faculty who made the allegation about threats.

119.   It was not until Judge Julia Stern issued a **Show Cause Order** in January 2014 against the University for their **Unfair Labor Practices** filed by the Association did McPherson's name become known and the names of other individuals interviewed during the investigation.

120.   Of notable interest is the fact that Cheryl McPherson is not a nurse, faculty, nor is she prepared at the doctoral level.  McPherson is an assistant to the Dean of Nursing as a staff member hired to manage the School of Nursing's finances, not to manage or supervise senior nursing faculty, such as Dr. Hawthorne-Burdine.  Thus, McPherson is not in Dr. Hawthorne-Burdine's administrative line and she is not a nurse colleague of Dr. Hawthorne-Burdine.

121.   Piskulich was wrong when she said Dr. Hawthorne-Burdine had threatened a faculty.  Dr. Hawthorne-Burdine never threatened a faculty nor a staff member.

122.   In an email dated June 14, 2013 from Captain Mark Gordon to Chief Lucido and copied to Lieutenant Terry Ross, witnesses included two African-American women (Topaz Morrison and Cheryl McPherson) and one male NAAD individual (Gary Moore) who was the Plaintiff's immediate supervisor.

123.   When Detective Shona Collins asked Moore why he had not counseled Plaintiff in his role as her immediate supervisor on her past actions, Moore stated, "[I] probably should have, but as of this date, [I have] not documented any of her behavior." In truth, Moore documented no behavior of Dr. Hawthorne-Burdine because there was nothing to document.

124.   Captain Gordon stated in his June 14, 2013 email that "...Hawthorne-Burdine thinks that everyone is out to get her and she believes she is being picked on due to her race. (She is African American)."

125.   Chief Lucido's findings provided by Captain Gordon in an email dated June 14, 2013 was sent to Piskulich and five other people that included Captain Mark Gordon, Lieutenant Terry Ross, Detective Shona Collins, VP of Finance John Beaghan, and Attorney Joi Cunningham. Chief Lucido stated he found "the issues do not require immediate police attention or review by the Behavioral Concerns Committee."

126.   No senior nursing faculty identified as NAAD has ever been subjected to a police investigation with or without their knowledge. This is discriminatory treatment based on the Plaintiff's race of African-American.

## NAAD-Administrators Ostracized Plaintiff and Postured Plaintiff to be a Threat

127.    Plaintiff was ostracized by NAAD-Administrators, Dean Kerri Schuiling and Associate Dean Gary Moore; and they postured the Plaintiff to be a threat to faculty, staff, and students in the School of Nursing.

128.    Dated email of June 13, 2013 show Plaintiff sought information from Topaz Morrison, part-time secretarial support staff under the supervision of Administrative Secretary Bonnie Koch, on why administrators failed to tell faculty on the second floor that they had moved her to an office on the third floor just outside the Dean's suite.

129.    Dated emails of June 14, 2013 between Captain Mark Gordon and Chief Lucido show Topaz Morrison was "a witness" in an investigation about Plaintiff being a threat.

130.    Unlike Cheryl McPherson, Topaz Morrison did not provide a typed (or hand-written) statement to substantiate what Captain Gordon said she said.

131.    Within a few days of Topaz Morrison's move to the third floor, Michelle Kluka (a NAAD faculty who had become friendly with the Plaintiff) was moving out of her office.

132.    Over a weekend in the month of June 2013, Plaintiff went to her office on campus to work for a few hours and found Michelle Kluka and her husband packing up Michelle's office.  Michelle's office was just next door to the Plaintiff's office. Michelle told Plaintiff that Gary Moore said her office was needed for a new faculty and they would provide her with space on an as-need basis.  No new faculty moved

into Michelle's office and it remained vacant for some time after Plaintiff received the PNG order.

133. On visits to the third floor, Plaintiff would occasionally stop by to speak to Topaz Morrison. And, Gary Moore on every occasion would come out of his office to stand next to Plaintiff with his hands on his hips in a guarding and protecting fashion. At some point, Plaintiff realized that Gary Moore did not want her interacting with Topaz, so Plaintiff ignored Topaz and ceased interacting with her.

134. No nursing faculty identified as NAAD were treated as the Plaintiff about how they interacted with people inside and outside their offices. No NAAD senior nursing faculty had ever been subjected to a police investigation with or without their knowledge. This is discriminatory treatment based on the Plaintiff's race of African-American.

135. The Administration sought to take action against Dr. Hawthorne-Burdine through the Committee regarding nothing more than rumors of her not getting along with coworkers. The then-Captain Mark Gordon did not interview Dr. Hawthorne-Burdine and his investigation did not create a police report.

136. Both of these failures by then-Captain Gordon are inconsistent with a past incident involving a faculty who was NAAD. The faculty was interviewed and a police report was generated.

<u>August 27, 2013:  Denial of Disability Accommodations</u>

137.   Plaintiff is a qualified individual with a disability under Title 1 of the Americans with Disabilities Act of 1990, 42 U.S.C, 12111, et seq.

138.   Plaintiff has an endocrine health disorder that is permanent.

139.   She has Diabetes Type-2 and takes Lantus and Novolog Insulins on a daily basis using a sliding scale.

140.   Due to her diabetic health condition, Plaintiff has painful diabetic neuropathy (DPN).  Plaintiff also has vascular insufficiency with 4+ dependent edema in lower extremities and bilateral knee osteoarthritis.  These health conditions limit Plaintiff's walking and standing.

141.   Plaintiff is also morbidly obese with hypertension and has a handicapped placard.

142.   During the winter 2013 term, Plaintiff's supervisors, Associate Dean Gary Moore, assigned Plaintiff to new locations miles away from campus to teach and supervise undergraduate students in clinical instruction.

143.   Plaintiff was the first and only senior nursing faculty to be assigned to clinical instruction with undergraduate students.

144.   Plaintiff was a senior faculty with greater years of teaching experience than any of the other three faculty in her specialty area, pediatrics.  Also, Plaintiff was nearly two decades older than two of the three faculty sharing her field of specialty; all three of the faculty are NAAD and they were in better health than the Plaintiff.

145.   Plaintiff and her primary physician completed, signed, and dated the University's *Reasonable Accommodation Request Form* required for requesting disability accommodation.

146.   Plaintiff's attending physician also wrote a separate letter providing greater detail to support the requested accommodation.

147.   On August 27, 2013, however, Cheryl Michelle Piskulich informed Plaintiff that her request for accommodation for a person with a disability dated May 16, 2013 was denied.

148.   Piskulich falsely stated that the medical documentations Plaintiff provided by her primary physician of June 12, 2013 gave no support for the requested accommodation.

149.   The accommodation provided by Piskulich on August 27, 2013 was not adequate.

<u>September 27, 2013:  PNG Order Served on Plaintiff</u>

150.   On Friday, September 27, 2013, the University's Police Department, on the recommendation of its Behavioral Concerns Committee ("the Committee"), served a *persona non grata* ("PNG") letter upon the Plaintiff, Professor Hawthorne-Burdine, and removed her from campus.  The Human Health Building housing the School of Nursing was surrounded inside and outside by University's police officers.  Acts by the University's Police Department with the Plaintiff was witnessed by all students, faculty, staff, visitors, and any others in the vicinity that day.

151.   Dr. Hawthorne-Burdine was in with a student when then-Chief Samuel Lucido and then-Captain Mark Gordon knocked on her office door.  She was allowed to complete her work with the student as the Chief and Captain waited outside of her office door.

152.   Although shocked and surprised about the PNG, she complied fully with the police and the University took this lack of protest as acquiescence or that she expected the removal.  Such a position demonstrates a level of cultural insensitivity both in terms of current events between police and African-Americans and more concretely the understanding in the African-American community as to how to act in the presence of police officers.

153.   Dr. Hawthorne-Burdine explained during the arbitration hearing:

> "Coming from a family with seven boys, some were very good but some were pretty rowdy there, my father had to talk to the boys. He wasn't talking to the girls, but I was there in the environment.
>
> He said when the police come, you don't give these people a hassle, you cooperate, you be pleasant, cordial, polite... The objective is to stay alive, to live to tell your story.  So being oriented, coming from that home environment, it was just a reflex."

154.   The PNG letter, signed by then-Chief Samuel Lucido, required Professor Hawthorne-Burdine to undergo a psychological and neurological evaluation (also referred to as assessment) before she could return to campus.

155.   In a November 5, 2013 dated memo to Kevin Grimm, President of the Association, Michelle Piskulich stated:

29

"Unless [Dorothy Hawthorne-Burdine] completes those [neurological and psychological] assessments in a timely manner, the University will convert her employment to an unpaid status effective November 30, 2013... The University will not consider allowing [Dorothy Hawthorne-Burdine] to return to her duties or campus until neurological and psychological assessments are completed and appropriately evaluated."

156.   The three health assessments ordered by the University were completed by February 24, 2013 and all three cleared Dr. Hawthorne-Burdine to return to work, so she elected not to seek another opinion under Appendix L of the Contract Agreement.

157.   The Association President, Dr. Kevin Grimm, stated that Dr. Hawthorne-Burdine should have been interviewed and that the directive that she undergo a medical review should have come from the Provost's office, not the Chief of Police.

158.   Cheryl Michelle Piskulich said in arbitration, "that it wasn't an employment issue, that this was an issue that was related to health and safety based on an audiotape [unauthorized and used for malicious acts against the professor] of the class lecture made by an [undergraduate] student [Carly Jaye Schatzberg]. So, it came under a different process."

159.   Arbitrator Robert McCormick stated, "The evidence persuades the Arbitrator that however one may define the term "discipline" in the abstract, the University itself, as well as the Association, viewed the matter as disciplinary in character at the time."

160.   Carly Schatzberg's audio recording (with several clicks and breaks while she laughed and giggled), Mr. Glenn McIntosh asserted in arbitration, was the sole

basis for the Behavioral Concerns Committee's decision to recommend to Chief Lucido to issue the PNG letter and remove her from campus.

161.    Under the University's legal guidance headed by Victor Zambardi and with Betty Youngblood as Interim President, the final decision was made for the then-Chief Lucido to serve Dr. Hawthorne-Burdine with a PNG order, remove her from campus, ban her from contacting and interacting with students, and order her to submit to neurological and psychological evaluations.

162.    Dr. Jamie Franklin, a clinical psychologist on the Committee, found Dr. Hawthorne-Burdine's conduct to present a potential risk, that it "might represent a psychotic break, a severe and intense manifestation of a personality disorder."

163.    The Committee met one day after the class, September 26th, and Dr. Hawthorne-Burdine was served the PNG on Friday, September 27th.

164.    Nancy Schmitz, Dean of Students, served on the Committee and testified in arbitration that zero students were interviewed.

165.    Glenn McIntosh stated they did not interview Carly Schatzberg, Dr. Hawthorne-Burdine, or any of the more than forty other witnesses in the class. And, he admitted he did not listen to the entire recording.

166.    Further, McIntosh testimony in arbitration shows he believed Dr. Hawthorne-Burdine repeatedly asked one student what her name was. This was the only item that he could recall as threatening and he was simply wrong because the Committee never asked Dr. Hawthorne or any student about the context of the

recording.. Therefore, the BCC ("the Committee") misinterpreted the recording to Dr. Hawthorne-Burdine's detriment.

167.    The University states Dr. Hawthorne-Burdine's recent behavior had caused them concern, however, she was also a senior faculty member who had been nominated for, and awarded, teaching honors in recent years. And, there were no threats of harm or physical violence on the recording; and this was admitted by all parties during arbitration including Carly Schatzberg, Glenn McIntosh, Jamie Franklin, Michelle Piskulich, and Mark Gordon.

168.    Arbitrator McCormick stated in his Opinion that "It is undisputed that the recording revealed no overt threat and no demonstration of intent or ability to carry out an action that would require the University to act immediately and without notice."

169.    The University kept the Association in an information blackout, since it did not describe the classroom events of September 25th or the existence of Schatzberg's audio recording which gave rise to the University's actions until it was forced to do so under a **Show Cause order** issued by Judge Julia Stern in January 2014

170.    The PNG actions and subsequent actions by the University violated Professor Hawthorne-Burdine's rights under the Collective Bargaining Contract ("CBA").

171.    John Coughlin in eLearning and Instructional Support was contacted about the Plaintiff's faculty property and informed Dr. Hawthorne-Burdine that Gary Moore and the other two faculty teaching her courses did indeed have improper possession of her faculty intellectual property on Moodle. These faculties were to

remove all of Dr. Hawthorne-Burdine's work from within the Moodle classroom settings that they had possession of.

172.    Gary Moore and the other two faculty failed to do so even after Kevin Grimm notified Michelle Piskulich in a dated letter of November 14, 2013 that faculty were to cease and desist their use of Dr. Hawthorne-Burdine's intellectual property.

173.    Kathleen Spencer notified Kerri Schuiling in a December 12, 2013 email with information that showed she used Dr. Hawthorne-Burdine's intellectual materials throughout her nine weeks of teaching the course. With Kathleen Spencer's permission, Kerri Schuiling sent Spencer's email to Michelle Piskulich.

174.    In total, these incidents show the Administration's concerted effort and treatment against Dr. Hawthorne-Burdine and demonstrate the egregious actions of the University.


## Release of Health Information without Authorization

175.    Without an authorized release of information from the Plaintiff, the University provided copies of Plaintiff's private and sensitive documents including her *Health Information* located within the University's *Reasonable Accommodation Request Form* to Medicolegal Services, and then for distribution to their selected physicians to perform the medical evaluations ordered by Chief Lucido of Oakland University Police Department. Medicolegal's physicians addressed their assessments of Dr. Hawthorne-Burdine to Ms. Janine DeWitt in Human Resources.

176. The University's *Reasonable Accommodation Request Form* includes the following statement on privacy and confidentiality:

> "This information will be kept confidential and shared only with those directly involved and on an as needed basis. Information may also be provided in emergency situations to medical personnel assisting the faculty or staff member or as required by law."

177. In a February 6, 2013 dated letter, Medicolegal Services LLC wrote:

> "To whom it may concern: Attached you will find the documentation received from Oakland University for the medical evaluation of Dorothy Hawthorne-Burdine. Both Dr. Hermann Banks and Dr. Elliott Wolf reviewed such documentation. If you need further assistance regarding this information please do not hesitate to contact Medicolegal Services LLC."

## Biased Tenure Reviews

178. While under the PNG order, Dr. Hawthorne-Burdine was reviewed and denied by two tenure-review entities, the Nursing Committee on Advancement and Promotion ("NCAP") chaired by Sarah Newton and the University's Faculty Retention and Promotion Committee (FRPC) shared by John Krauss.

179. Both the NCAP and FRPC submitted biased reviews and failed to follow established guidelines and procedures.

180. The second review, FRPC dated May 1, 2014 was received around May 5, 2014. Dr. Hawthorne-Burdine provided rebuttals to both negative review entities to show how she met the requirements to be reemployed with tenure.

181. The environment in which Dr. Hawthorne-Burdine underwent tenure review had been tainted and she had been stigmatized by her removal from campus under

the PNG order served on her by the University's Chief of Police for violating a University Ordinance.

## New Employment Contract

182.   In spite of being denied tenure by two review entities, Dr. Hawthorne-Burdine received in USA mail on Saturday, July 12, 2014, an *Employment Contract Letter* with *just-cause* conditions from the University.  The letter was dated with two different dates (July 2, 2014 on last two pages and July 8, 2014 on first page).

183.   The new *Employment Contract Letter* came greater than 70 days past April 30, 2014, the end of her 4-year contract.

184.   The *Employment Contract Letter* signed by Cheryl Michelle Piskulich stated in part:

> "The University has considered each of Oakland's Medical Opinions carefully.  The Opinions indicate that there is no underlying medical condition that precipitated your behavior, and in that regard they are satisfactory enough to allow you to resume your teaching and other faculty duties without restrictions.  You will be assigned to teach in Fall semester 2014.  Please contact Joann Denby to make arrangements to have your computer connected and any other office needs necessary to prepare for instruction this Fall."

185.   By July 28, 2014, Dr. Hawthorne-Burdine responded to the University's letter of contract by accepting it and she began to prepare to teach starting the fall 2014 term.  She contacted Ms. Joann Denby and Dr. Gary Moore as directed by the contract letter.

Employment Retaliation and Terminated

186.    The Plaintiff's four-year contract employment period with the University ended on April 30, 2014.

187.    During the early part of May 2014, she had been denied her bid for reemployment with tenure by two University review entities, NCAP and FRPC.

188.    On June 23, 2014, the Plaintiff faxed her completed EEOC/MDCR Intake Questionnaire to the Detroit EEOC office.

189.    On June 25, 2014, the Plaintiff received a phone call from Ms. Deanna Wooten, Federal Investigator, to discuss her charge of discrimination against the University.

190.    In a dated letter of July 1, 2014, Ms. Wooten informed the Plaintiff that the University had been notified of her charge of discrimination against them.

191.    On July 11, 2014, Plaintiff received the University's contract letter informing her to return to work without restrictions and that she will be assigned to teach starting the 2014 fall term.

192.    On July 12, 2014, Saturday, Plaintiff faxed her notarized EEOC/MDCR Charge of Discrimination form to the attention of Ms. Frances Angiano, Federal Investigator.

193.    On July 28, 2014, Plaintiff mailed a response to the University's contract letter and started preparing to teach in the fall 2014 term.

194.   In a dated letter of August 12, 2014, Provost James Lentini stated the Plaintiff's "faculty employment at Oakland University will terminate at the end of [her] current employment contract on August 14, 2014.

195.   In a meeting with Ms. Frances Angiano on September 8, 2014, she informed Plaintiff that she needed to file a new and separate charge (retaliation) against the University, since their Board of Trustees terminated Plaintiff's employment after their administrators stated, "You will be assigned to teach courses in the fall term," the start of a new academic year.

196.   Plaintiff faxed the notarized EEOC/MDCR Charge of Retaliation form to Ms. Frances Angiano on September 12, 2014.

197.   The University refused to engage in mediation procedure.

## COUNT 1

### VIOLATIONS UNDER
### THE AMERICANS WITH DISABILITY OF 1990

198.   Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 197 as set forth herein and above by reference.

199.   Plaintiff is an individual covered by the American with Disabilities Act of 1990, as amended.

200.   Defendant Oakland University violated the ADA in regards to its conduct and omissions toward Plaintiff Hawthorne-Burdine in the following manner:

    a. Requiring Plaintiff to undergo both neurological and psychological examinations and inquiries that were neither job related nor consistent with medical necessity;

37

b. Releasing Plaintiff's medical records to third parties without her authorization;

c. Failing to promptly assess Plaintiff's disability once a request to accommodate had been made;

d. Failing to provide prompt accommodation of Plaintiff's need for a reasonable accommodation;

e. Never reasonably accommodating Plaintiff's endocrine disability of Diabetes with neuropathy, vascular insufficiency, and lower extremity edema. (Plaintiff also has hypertension, bilateral knee osteoarthritis, and morbid obesity);

f. Denying the recommendations based on the evaluation performed by Plaintiff's attending physician;

g. Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of Title 1 of the Americans with Disabilities Act of 1990, 42 U.S.C, 12111, et seq., and its accompanying regulations; and

h. As a result of Defendants' discriminatory conduct, Plaintiff suffered and continues to suffer damages

## COUNT II

### VIOLATIONS UNDER
### TITLE VII OF THE CIVIL RIGHTS OF 1964
### RACIAL DISCRIMINATION

201.   Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 200 as set forth herein and above by reference.

202.   Plaintiff is an African-American woman who suffered an "adverse employment action" and suffered damages when her new employment contract of July 8, 2014 was terminated or constructively terminated by Defendant Oakland University at its Board of Trustees' meeting on August 12, 2014.

203.   The discrimination denied Plaintiff her right to enter into an employment contract as guaranteed by 42 U.S.C 2000e, et seq.

204.   Specifically, Plaintiff's race motivated Defendant to deny Plaintiff tenure and terminate her employment.

205.   Defendant's actions denying Plaintiff the same rights as those enjoyed by White individuals not of African-American descent were willful, malicious, and egregious actions done in concert with Defendant's agents, employees, and officers in bad faith for improper motives.

206.   Defendant's illegal conduct has caused, and will continue to cause Plaintiff emotional distress, especially outrage, loss of reputation, embarrassment, and social stigmatization associated with being an unwanted person on over 1400 acreage of federal-state employment property.

207.   Plaintiff has suffered economical damages and her physical health has deteriorated from the unnecessary stress and financial hardship from job loss.

## COUNT III

### VIOLATIONS UNDER THE
### AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

208.   Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 207 as set forth herein and above by reference.

209.   Plaintiff is 63 years old.  She was 61 years old in 2013 at the time Defendant made her an unwanted person, *persona non grata*, on over 1400 acreage of federal-state employment property.  She was 62 years when Defendant terminated her employment.

210.   Defendant's administrators often told Plaintiff to retire at the end of her 4-year contract, since she will be age 62 in April 2014 when her contract ends.

211.   Defendant took adverse employment actions against Plaintiff based on her age.  Younger aged faculty were given preferential treatment over Plaintiff in course assignment.

212.   The denial of plaintiff employment with tenure for which she was qualified and the constructive termination of Plaintiff's employment constituted adverse employment actions.

213.   This age discrimination was intentional, motivated by Dr. Hawthorne-Burdine's age, and done in concert.

214.   As a result of Defendant's acts, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

## COUNT IV

### VIOLATIONS UNDER
### THE AMERICANS WITH DISABILITY OF 1990
### (RETALIATION)

215. Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 214 as set forth herein and above by reference.

216. Plaintiff is an individual covered by the Americans with Disabilities Act of 1990, as amended.

217. Defendant notified Plaintiff in a dated July 8, 2014 contract letter to return to work without restrictions and that she will be assigned to teach starting the 2014 fall term.

218. Plaintiff filed an EEOC Charge of Discrimination on July 12, 2014 alleging discrimination against Defendant due to her African-American race, 62 years of age, and her disability.

219. On August 12, 2014, Defendant terminated Plaintiff's employment.

220. Plaintiff believes she was terminated in retaliation for filing a previous charge of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the American with Disabilities Act of 1990.

221. As a result of Defendant's action, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

## STATE LAW CLAIMS – SUPPLEMENTAL JURISDICTION

## COUNT V

## DISABILITY DISCRIMINATION IN VIOLATION OF THE
## MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

222.  Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 221 as set forth herein and above by reference.

223.  Plaintiff is an individual covered by the American with Disabilities Act of 1990, as amended.

224.  Defendant Oakland University violated the ADA in regards to its conduct and omissions toward Plaintiff Hawthorne-Burdine in the following manner:

    a.  Requiring Plaintiff to undergo both neurological and psychological examinations and inquiries that were neither job related nor consistent with medical necessity;

    b.  Releasing Plaintiff's medical records to third parties without her authorization;

    c.  Failing to promptly assess Plaintiff's disability once a request to accommodate had been made;

    d.  Failing to provide prompt accommodation of Plaintiff's need for a reasonable accommodation;

    e.  Never reasonably accommodating Plaintiff's endocrine disability of Diabetes with neuropathy, vascular insufficiency, and lower extremity

edema. (Plaintiff also has hypertension, bilateral knee osteoarthritis, and morbid obesity);

f.  Denying the recommendations based on the evaluation performed by Plaintiff's attending physician;

g.  Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of Title 1 of the Americans with Disabilities Act of 1990, 42 U.S.C, 12111, et seq., and its accompanying regulations; and

h.  As a result of Defendants' discriminatory conduct, Plaintiff suffered and continues to suffer damages

## COUNT VI

### RACIAL DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

225.   Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 224 as set forth herein and above by reference.

226.   Plaintiff is an African-American woman who suffered an "adverse employment action" and suffered damages when her new employment contract of July 8, 2014 was terminated or constructively terminated by Defendant Oakland University at its Board of Trustees' meeting on August 12, 2014.

227.   The discrimination denied Plaintiff her right to enter into an employment contract as guaranteed by 42 U.S.C 2000e, et seq.

228.   Specifically, Plaintiff's race motivated Defendant to deny Plaintiff tenure and terminate her employment.

229.   Defendant's actions denying Plaintiff the same rights as those enjoyed by White individuals not of African-American descent were willful, malicious, and egregious actions done in concert with Defendant's agents, employees, and officers in bad faith for improper motives.

230.   Defendant's illegal conduct has caused, and will continue to cause Plaintiff emotional distress, especially outrage, loss of reputation, embarrassment, and social stigmatization associated with being an unwanted person on over 1400 acreage of federal-state employment property.

231.   Plaintiff has suffered economical damages and her physical health as deteriorated from the unnecessary stress from job loss.

## COUNT VII

### AGE DISCRIMINATION IN VIOLATION OF THE
### MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

232.   Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 231 as set forth herein and above by reference.

233.   Plaintiff is 63 years old.  She was 61 years old in 2013 at the time Defendant made her an unwanted person, *persona non grata*, on over 1400 acreage of federal-state employment property.  She was 62 years when Defendant terminated her employment.

234.    Defendant's administrators often told Plaintiff to retire at the end of her 4-year contract, since she will be age 62 in April 2014 when her contract ends.

235.    Defendant took adverse employment actions against Plaintiff based on her age.  Younger aged faculty were given preferential treatment over Plaintiff in course assignment.

236.    The denial of plaintiff employment with tenure for which she was qualified and the constructive termination of Plaintiff's employment constituted adverse employment actions.

237.    This age discrimination was intentional, motivated by Dr. Hawthorne-Burdine's age, and done in concert.

238.    As a result of Defendant's acts, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress

## COUNT VIII

### RETALIATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

239.    Plaintiff repeats, re-alleges, and incorporates paragraphs 1 through 238 as set forth herein and above by reference.

240.    Plaintiff is an individual covered by the Americans with Disabilities Act of 1990, as amended.

241.   Defendant notified Plaintiff in a dated July 8, 2014 contract letter to return to work without restrictions and that she will be assigned to teach starting the 2014 fall term.

242.   Plaintiff filed an EEOC Charge of Discrimination on July 12, 2014 alleging discrimination against Defendant due to her African-American race, 62 years of age, and her disability.

243.   On August 12, 2014, Defendant terminated Plaintiff's employment.

244.   Plaintiff believes she was terminated in retaliation for filing a previous charge of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the American with Disabilities Act of 1990.

245.   As a result of Defendant's action, Plaintiff was harmed and continues to be harmed, in that she has suffered economic loss, damage to her professional reputation, and emotional distress.

## COUNT IX

### HOSTILE WORK ENVIRONMENT – HARASSMENT
### IN VIOLATION OF MICHIGAN ELLIOTT-LARSEN ADA AND PWDCRA

246.   Plaintiff repeats, re-alleges and incorporate paragraphs 1 through 245 as set forth here and above by reference.

247.   Defendant Oakland University and its agents, managers, supervisors, and employee of each and every other Defendant violated the ADA in regards to its

conduct and omissions toward Plaintiff Hawthorne-Burdine in the following manner:

    a.  Harassed Plaintiff about subjecting her body to both neurological and psychological examinations and inquiries that were neither job related nor consistent with medical necessity;

    b.  Harassed Plaintiff with threats of converting her employment to an unpaid status unless she completed both the neurological and psychological examinations in a timely manner while under the *persona non grata* order issued by Defendant's Chief of Police;

    c.  Releasing Plaintiff's medical records to third parties without her authorization;

    d.  Harassing Plaintiff with disciplinary suspension for false workplace violations;

    e.  Causing Plaintiff severe anxiety, emotional distress, and depression, by refusing to promptly evaluate her request for accommodation;

    f.  Never reasonably accommodating Plaintiff with her disability of Diabetes with painful neuropathy and vascular insufficiency with lower extremity dependent edema and bilateral knee osteoarthritis;

    g.  Ignoring the evaluations and recommendation performed by Plaintiff's attending physician for disability accommodation; and

    h.  Creating work conditions under terms and conditions which denied Plaintiff continued employment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Dorothy Hawthorne-Burdine, respectfully requests this Court to enter a judgment in her favor and against Defendants as follows:

A.  Legal Relief

    a.  Compensatory damages including damages for pain and suffering, for injuries suffered as a result of Defendant's failure to comply with the requirements of Title I of the ADA and whatever amount she is found to be entitled;

    b.  Punitive damages in whatever amount she is found to be entitled;

    c.  Back pay and front pay, including the value of fringe benefits lost;

    d.  Out of pocket medical expenses;

    e.  Damages for mental and emotional distress, including humiliation and embarrassment; and

    f.  An award of interest, costs and fees.

B.  Equitable Relief

    a.  An injunction prohibiting any further acts of wrongdoing, discrimination or retaliation;

    b.  An order prohibiting Defendant Oakland University from requiring its employees to undergo neurological or psychological (medical) examinations without proof the examinations are job related and consistent with business necessity; and

48

c. Whatever other equitable relief appears appropriate at the time of final judgment.

Respectfully Submitted,

By: _/s/ Dorothy Hawthorne-Burdine_
     2654 Lantern Lane, Apt. 102
     Plaintiff, Pro Se
     Auburn Hills, MI 48326
     (319) 400-3803

Dated: September 16, 2015

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

County in which action arose **Oakland**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dorothy Hawthorne-Burdine

## DEFENDANTS

Oakland University, et al.

Case:2:15-cv-13285
Judge: Drain, Gershwin A.
MJ: Patti, Anthony P.
Filed: 09-16-2015 At 04:26 PM
CMP HAWTHORNE-BURDINE V. OAKLAND UN
IVERSITY ET AL (NA)

**(b)** County of Residence of First Listed Plaintiff **Oakland**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Oakland**

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Dorothy Hawthorne-Burdine, Pro Se
2654 Lantern Lane, Apt. 102, Auburn Hills, MI 48326

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C 2000e, et seq, 42 U.S.C, 12111, et seq, 42 U.S.C 12203

Brief description of cause:
Title VII of the Civil Rights of 1964, Title 1 of the ADA of 1990, Title V, Section 503 of the Act, ADEA of 1967, PWDRA, ELCRA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
September 15, 2015

SIGNATURE OF ATTORNEY OF RECORD
*Dorothy Hawthorne-Burdine*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.　　　　Other than stated above, are there any pending or previously　　☐ Yes
　　　　　discontinued or dismissed companion cases in this or any other　☒ No
　　　　　court, including state court? (Companion cases are matters in which
　　　　　it appears substantially similar evidence will be offered or the same
　　　　　or related parties are present and the cases arise out of the same
　　　　　transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes : _____

# New Lawsuit Check List

**Instructions: Put a check mark in the box next to each appropriate entry to be sure you have all the required documents.**

☑ Two (2) completed **Civil Cover Sheets.**

☑ Enter the number of defendants named in your lawsuit in the blank below, add 2 and then enter the total in the blank.

___31___ + 2 = __33__ **Complaints.**
# of Defendants        Total

Received by Clerk: N A  Addresses are complete: N A

Case:2:15-cv-13285
Judge: Drain, Gershwin A.
MJ: Patti, Anthony P.
Filed: 09-16-2015 At 04:26 PM
CMP HAWTHORNE-BURDINE V. OAKLAND UNIVERSITY ET AL (NA)

☐ If any of your defendants are government agencies:
Provide two (2) extra copies of the **complaint** for the U.S. Attorney and the Attorney General.

| If Paying The Filing Fee: | If Asking That The Filing Fee Be Waived: |
|---|---|
| ☐ Current new civil action filing fee is attached.<br><br>Fees may be paid by check or money order made out to:<br><br>**Clerk, U.S. District Court**<br><br>Received by Clerk: _____ Receipt #:_____ | ☑ Two (2) completed **Application to Proceed in District Court without Prepaying Fees or Costs** forms.<br><br><br><br>Received by Clerk: N A |

## Select the Method of Service you will employ to notify your defendants:

| Service via Summons by Self | Service by U.S. Marshal<br>(Only available if fee is waived) | Service via Waiver of Summons<br>(U.S. Government cannot be a defendant) |
|---|---|---|
| ☑ Two (2) completed **summonses** for each defendant including each defendant's name and address.<br><br><br><br><br><br>Received by Clerk: | ☐ Two (2) completed **USM – 285 Forms** per defendant, if you are requesting the U.S. Marshal conduct service of your complaint.<br><br>☐ Two (2) completed **Request for Service by U.S. Marshal form.**<br><br>Received by Clerk: _____ | ☐ You need not submit any forms regarding the Waiver of Summons to the Clerk.<br><br>Once your case has been filed, or the Application to Proceed without Prepaying Fees and Costs has been granted, you will need:<br>• One (1) **Notice of a Lawsuit and Request to Waive Service of a Summons** form per defendant.<br>• Two (2) **Waiver of the Service of Summons** forms per defendant.<br><br>Send these forms along with your filed complaint and a self-addressed stamped envelope to each of your defendants. |

**Clerk's Office Use Only**

Note any deficiencies here:

Rev. 4/13