# EXHIBIT P

**_PSYCHOLOGICAL SYSTEMS, INC._**

**32121 Woodward Ave.**
**Suite 201**
**Royal Oak, MI 48073**
**Phone (248) 398-2200**
**Fax (248) 398-2280**

*Specialists in Neuropsychology*

***W. John Baker, Ph.D., ABN***
**Diplomate, American Board of Professional Neuropsychology**
**Fellow, American College of Professional Neuropsychology**

March 10, 2014

**RE: Dr. Dorothy Hawthorne-Burdine**
**Date of Birth: 04/01/1952**

It was my pleasure to see Dr. Dorothy Hawthorne-Burdine, for an independent neuropsychological evaluation. At your request, she was seen on February 24, 2014 to assess for the presence or absence of signs or symptoms consistent with cognitive decline or brain disturbance. Personality testing was also conducted to assess in an objective fashion Dr. Hawthorne-Burdine's emotional states and personality traits. At the start of my examination of Dr. Hawthorne-Burdine, I explained the nature of this evaluation. She understood that there was no confidential relationship and that you requested my assessment. It was made clear that I would not be assisting in her care or treatment planning.

**Recent History**

Dr. Hawthorne-Burdine stated that her last day of work was September 27, 2013. There was an apparent dispute between her and her employer, Oakland University. She said that these problems dated back about one and one-half years, beginning with small conflicts between Dr. Hawthorne-Burdine and the administration. She said these conflicts, though small, developed and accumulated leading to an adversarial relationship. She described these conflicts as "little things." She was able to give a detailed account of at least one incident in April 2013 where an administrator berated her for agreeing to speak with a person who was being considered for a position at the University. This verbal confrontation ended when Dr. Hawthorne-Burdine ordered the administrative person out of

her office. Dr. Hawthorne-Burdine was then called to the dean's office over this conflict. Dr. Hawthorne-Burdine told me that she was in the middle of preparing two Power Point presentations for a national conference. She had been given a deadline of that night and was not yet finished. She did, however, go to meet with the dean and tried to clarify the conflict between herself and Dr. Cheryl McPherson, the administrator with whom she had the earlier conflict.

According to Dr. Hawthorne-Burdine, in June of 2013 an investigation was begun by administration regarding Dr. Hawthorne-Burdine's conflicts with Dr. McPherson. This resulted in reports and hearings and lawyers getting involved. Dr. Hawthorne-Burdine saw these issues as being designed to get rid of her because, as she believes, she was either a threat to the staff or disruptive to the staff. She later found out about police investigation that the administration had requested. On September 27, 2013, while Dr. Hawthorne-Burdine was meeting with a student in her office, the Chief of University Police and a Captain in the Oakland University Police came to her door. She finished with the student and then met with the police officers for about four hours by her report. Dr. Hawthorne-Burdine was given an order that identified her as persona non grata, which she understood to mean that she had done something so bad that she was no longer welcome on the University grounds. She said that the police informed her that this had something to do with a student complaint. Dr. Hawthorne-Burdine packed up her office and removed her belongings. She has not been back to work since that time.

**Medical Treatment History**

Dr. Hawthorne-Burdine receives her primary medical care from Dr. Walter Culver. The University sent her for an independent neurological examination with Dr. Hermann Banks and for an independent psychiatric evaluation with Dr. Elliot Wolf. Subsequent to Dr. Wolf's report of psychiatric disturbance, Dr. Hawthorne-Burdine's primary care physician referred her to Dr. Jolepalem a psychiatrist at St. Joseph's Mercy Hospital. Her current care is provided by Dr. Culver. Her medications are Lantus for diabetes, Lisinopril for hypertension, and NovoLog.

**Current Symptoms and Complaints**

I asked Dr. Hawthorne-Burdine about psychological or emotional symptoms that she might have developed as a result of this conflict, and she specifically denied symptoms of depression, anxiety, or panicky feelings. She did acknowledge feeling stressed over these events and her relationship with administrators. However, she also reported that during her last few months at work she experienced tightness or pressure sensation in her chest that she no longer experiences. By October 2013 her symptoms disappeared and she sees herself as more calm and happier than when working.

I asked Dr.. Hawthorne-Burdine about her cognitive functioning. She denied any problems with memory, concentration, or thinking.

There are no reported changes in her sleep, appetite, or other functions.

Essentially, Dr. Hawthorne-Burdine presented with no symptoms or complaints.

**Background Information**

Dr. Hawthorne-Burdine is a 61-year old, Ph.D. educated professor of nursing. She was divorced in 1985 and has one 31-year old daughter with whom she lives in Auburn Hills, Michigan. Born in Sebring, Florida and raised by her parents in the same area, Dr. Hawthorne-Burdine is the 8th child in a sibship of 13. Her developmental history and early childhood were reported as normal. Her adolescence was uneventful. Her prior medical history was significant for hypertension and diabetes. There is no history of head injury, loss of consciousness, stroke, seizures, or heart disease. She does not drink or use drugs. Her prior mental health history was significant for psychiatric counseling following her divorce and father's death in 1985. Her educational history indicates that she graduated from high school in Florida. She earned a Bachelor of Arts degree from Florida A&M in 1970, a Master of Arts degree from University of Florida in 1977, and she earned her Ph.D. from the University of Florida in 1995. Dr. Hawthorne-Burdine's occupational history indicates that she was working at Oakland University as an associate professor in the nursing department for

approximately three years. She has held similar positions at other universities. She has not worked since September 27, 2013.

**Mental Status and Behavior Observations**

Dr. Hawthorne-Burdine arrived for her appointment on time and alone. Dr. Hawthorne-Burdine's mental status examination was conducted via the clinical interview. Dr. Hawthorne-Burdine's physical appearance was that of a 5'2" tall, 255 pound, well groomed and well dressed individual. Her demeanor was pleasant and friendly. She was alert and fully oriented. Her gross attention and concentration was judged as normal, with no evidence of lapses throughout the entire interview. Dr. Hawthorne-Burdine's speech was spontaneous, fluent, well articulated, and judged to be of normal rate and volume. Her affect was full, bright, and appropriate. Her mood was cheerful. Her thought production was expansive, well organized, and logically connected.

Systematic observations of Dr. Hawthorne-Burdine's behavior were made by the technician during the testing sessions. Dr. Hawthorne-Burdine's motor and sensory functioning revealed no problems impacting test results. Her attitude toward the examiner was described as friendly. Dr. Hawthorne-Burdine's comprehension of instructions was achieved with occasional repeating. Her task persistence was rigid. Her response to difficult or challenging tasks was confident. She expressed mild frustration at times with more challenging tasks. Self-correction was noted and occasional encouragement was needed to assure adequate effort.

**Records Reviewed**

**Independent Neurological Evaluation by Dr. Hermann Banks**
**Independent Psychiatric Evaluation by Dr. Elliot Wolf**
**Letters, Memoranda and E-mails from Oakland University regarding Dr. Hawthorne-Burdine and complaints or conflicts at work**

Dr. Hawthorne-Burdine was seen for an independent neurological evaluation by Dr. Banks on November 11, 2013. She presented with no neurological symptoms or complaints. Her neurological examination was entirely normal. With regard to complaints of outbursts and

inappropriate behaviors, Dr. Banks found no neurological explanation for this. A psychiatric evaluation was also scheduled.

Dr. Wolf's report indicates that Dr. Hawthorne-Burdine was seen for an independent psychiatric evaluation on November 14, 2013. Dr. Wolf examined Dr. Hawthorne-Burdine, reviewed records, and offered diagnoses of paranoid and narcissistic personality traits, rule out personality disorder, rule out delusional disorder, with a secondary diagnosis of occupational problem. Dr. Wolf described Dr. Hawthorne-Burdine as defensive, angry, and paranoid. Whether this was related to longstanding personality traits or symptomatic of an acute problem was unclear to Dr. Wolf. He felt that Dr. Hawthorne-Burdine lacked insight when it came to her circumstances and concluded "she should be regarded as unfit to return to her teaching position at the present time." Based on Dr. Hawthorne-Burdine's denial of having any type of psychiatric symptoms or problems, she was not considered a candidate for therapeutic intervention.

**TESTS ADMINISTERED**

Booklet Category Test (BCT)
Category Exemplar Examination
California Verbal Learning Test-II (CVLT-II)
Controlled Oral Word Association Test (COWAT)
Finger Tapping
Grip Strength
Grooved Pegboard
Medical Symptom Validity Test (MSVT)
Minnesota Multiphasic Personality Inventory - Second Edition-Restructured Form (MMPI-2-RF)
Reliable Digit Span (RDS)
Rey Complex Figure
Sensory Perceptual Examination (Single & Double-simultaneous Stimulation)
Symbol Digit Modalities Test (SDMT)
Test of Memory Malingering (TOMM)
Trail Making Test, Parts A & B
Wechsler Abbreviated Scale of Intelligence - Second Edition (WASI-II)
Wechsler Memory Scale-Third Edition-Abbreviated (WMS-IIIA)
Wechsler Test of Adult Reading (WTAR)

Wide Range Achievement Test-Third Edition (WRAT-3)
Wisconsin Card Sorting Test (WCST)

## ASSESSMENT AND ANALYSIS

***Performance Validity Testing*** was examined throughout the evaluation with objective measures that have been validated as measures of performance effort while also shown to be insensitive to the effects of brain damage. Poor performance on these measures is indicative of poor effort. Dr. Hawthorne-Burdine scored in the acceptable range on 8 of the 9 measures contained in this battery. Her performance suggests adequate effort. The neuropsychological profile generated by this evaluation is judged valid and interpretable.

***Intellectual Status*** was assessed with the Wechsler Abbreviated Scale of Intelligence - Second Edition (WASI-II). Dr. Hawthorne-Burdine achieved a Verbal Comprehension Index score of 98, a Perceptual Reasoning Index score of 77, and a Full Scale IQ of 85. This is not consistent with her performance on the WTAR (102). A comparison of verbal and nonverbal scales revealed significant strengths in language based abilities. The 21-point discrepancy between verbal and nonverbal abilities is statistically and clinically significant. While this may reflect longstanding areas of strengths and weaknesses, it may also suggest some gradual decline in mental processing.

***Academic Achievement skills*** were assessed with the Wide Range Achievement Test- Third Revision (WRAT-3). She was able to read single words at a level exceeding 42% of the normative sample (high school equivalent). Her spelling skills were in the average range, exceeding 55% of her age-mates in the norm group. Dr. Hawthorne-Burdine's arithmetic skills were in the lower portion of the average range, and at the 25th percentile.

Taken together, Dr. Hawthorne-Burdine's IQ and achievement test scores suggest average cognitive development. These scores are below expectations based on her educational history. Dr. Hawthorne-Burdine's verbal reasoning abilities and academic skills appear below expectations based on her educational and vocational status. While it is more likely that these represent her long standing pattern of abilities, I cannot exclude the possibility of declining cognitive status.

***Neuropsychological Status***

Dr. Hawthorne-Burdine's overall or global cognitive status was in the normal range. Her Average Impairment Rating (AIR) was 1.20, which is in the average range. She scored below average on 27% of the tests contained in this extensive test battery. On those tests that are most sensitive to acute or acquired brain disturbance, Dr. Hawthorne-Burdine scored in the normal range. She completed Trails B in 99 seconds. Her raw score on the oral version of SDMT was 52. She made only 57 errors on the Booklet Category Test.

***Learning and memory skills*** were assessed with a number of measures. On the WMS-IIIA, Dr. Hawthorne-Burdine's Immediate Memory Index Score of 80 was in the lower portion of the low average range, exceeding 9% of the normal population. Her Delayed Memory Index Score of 82 was in the low average range and exceeded 12% of her same age peers. Her logical verbal memory was in the average range. Her delayed recall for the same material was mildly impaired. The difference between immediate and delayed recall was consistent with memory probleDr. Visual memory was assessed in the same manner. Dr. Hawthorne-Burdine's immediate score was in the mildly impaired range and her delayed score was mildly impaired as well. On a list-learning task (CVLT-II), Dr. Hawthorne-Burdine demonstrated a shallow learning curve consistent with weak verbal learning skills. Delayed recall of a list of words after five presentations was in the moderately impaired range. When recognition of the words on the list was assessed in a yes/no format, Dr. Hawthorne-Burdine correctly identified 15 words, with 21 false positive errors, giving her a d' score of -2.5. This performance is indicative of poor or incomplete effort.

Dr. Hawthorne-Burdine's ***language skills*** were in the normal range. Her reading and spelling skills were average. Her verbal fluency was in the average range. These findings were generally consistent with expectations based on Dr. Hawthorne-Burdine's achieved Verbal IQ but below her educational attainment.

***Visual spatial reasoning*** (the ability to reason with geometric shapes and perceptual skills) was measured in the low average to mildly impaired range. On the WASI, her Block Design score

was in the borderline impaired range. On the Rey Complex Figure Test, Dr. Hawthorne-Burdine received a copy score of 27/36 (mildly impaired range).

***Executive skills*** were assessed with measures of novel learning and mental flexibility. Verbal fluency was in the normal range. Mental speed and flexibility was intact. On the WCST, Dr. Hawthorne-Burdine achieved 6/6 categories, making 23 errors, only 12 of which were perseverative. These results are in the normal range.

***Motor skills*** were assessed with simple measures taken with each hand. Grip strength testing revealed an average score for the dominant (right) hand of 31.5 kilograms (superior range). Her nondominant grip strength was 28.5kilograms (average range). Elementary motor speed was assessed with the Finger Tapping test. She averaged 37.6 taps in 10-seconds with the dominant hand (superior range) and 42.3 taps with the nondominant hand (superior range). Fine motor dexterity was assessed with the Grooved Pegboard Test. Dr. Hawthorne-Burdine's performance with the dominant hand was in the average range (89 seconds). Her nondominant hand performance was in the average range (83 seconds). These results are normal. Sensory perceptual screening was normal.

***Psychological Status***

Objective assessment of Dr. Hawthorne-Burdine's current emotional status was conducted with the MMPI-2-RF. Dr. Hawthorne-Burdine's responses to the validity scales indicate that the results are likely valid. There is no indication of inconsistent responding, over-responding, or defensiveness. Her RC scales profile was within normal limits. Mild elevation (still in the normal range) is noted on RC6. This subclinical elevation probably reflects the effect of the work place conflict. All other scales were normal. There is no indication of psychological disturbance, personality disorder, or abnormal reaction to stress.

## SUMMARY AND INTERPRETATION

Dr. Dorothy Hawthorne-Burdine is a 61-year old associate professor of nursing, who is

subject of a work place dispute. She has been dismissed from her job as a result of conflicts with coworkers and administrators in her department at Oakland University. She was referred for neuropsychological and psychological assessment to evaluate her current cognitive and emotional status regarding her interpersonal conflicts.

The results of this neuropsychological evaluation, though within normal limits, suggest some decline in cognitive functioning. Dr. Hawthorne-Burdine's ability to learn and recall novel information places her in the low average to mildly impaired range, far below expected levels given her personal history including education and professional development. There is no evidence of disturbance of executive functions. Mental speed, flexibility, novel problem solving, judgment and reasoning are all intact. Motor skills and sensory functioning are normal. Visual spatial skills appear mildly impaired. Performance validity measures indicate good effort and interview data reveals an absence of symptomatic complaints and strong motivation to perform well on testing.

In my best professional opinion, Dr. Hawthorne-Burdine's neuropsychological profile indicates mild decline in cognitive abilities primarily with regard to memory functioning. Her overall functioning is within normal limits. Though she does not appear to be disabled, this evaluation should serve as a baseline for future testing to monitor her status. If my assessment is correct, a gradual decline is expected. Follow up testing in one year's time will be instructive in this regard.

From a psychological standpoint, there is no psychological disturbance. There is no indication of personality disorder, emotional reaction to stress, or symptoms of depression or anxiety. Objective personality assessment yielded an entirely normal profile.

## DIAGNOSTIC IMPRESSIONS

- Age related cognitive changes versus early dementia.

## SPECIFIC COMMENTS AND RECOMMENDATIONS

1) With regard to work place conflicts, these are likely the result of Dr. Hawthorne-Burdine's interpersonal style and limited insight conflicting with the expectations and desires of her supervisors. This is a personality conflict. Dr. Hawthorne-Burdine is somewhat stubborn and her administrators find her hard to deal with. Dr. Hawthorne-Burdine lacks insight into this relationship though she has, of late, developed some understanding of her circumstances. By her own description, during the development of these conflicts she was largely unaware that anything was going on.

2) From a psychological perspective, Dr. Hawthorne-Burdine is not disabled and capable of functioning at her baseline level.

3) From a neuropsychological perspective, Dr. Hawthorne-Burdine's profile suggests some decline in her cognitive abilities. This may explain why she was having difficulty meeting the deadline for her Power Point presentations. I doubt that Dr. Hawthorne-Burdine has any insight into these factors. Generally speaking, individuals who are in the early phase of cognitive decline tend to be unaware of any changes. Certainly, her clinical presentation is consistent with this.

4) Because Dr. Hawthorne-Burdine's overall neurocognitive status is within normal limits, I do not see her as disabled or incapable of performing the duties of her job. However, I do anticipate a continued gradual decline that could result in disability before she reaches retirement age.

5) I recommend repeat neuropsychological testing in one year's time using the current data as baseline measure to determine whether or not there is any further decline in her neurocognitive status.

6) The issue at hand is essentially a work place dispute. Dr. Hawthorne-Burdine's employers have found her difficult to work with and they have sought a means to remove her from the

work place. Dr. Hawthorne-Burdine sees nothing wrong in her behavior and has very little insight regarding her conflicts with administration. However, I suspect that Dr. Hawthorne-Burdine's apparent mild decline in cognitive abilities may have had some role to play in her difficulties completing the Power Point assignment.

Thank you for the opportunity to contribute to the assessment of this individual. If any records become available which might impact my findings and opinions, I would appreciate the opportunity to review them. If you have any questions or concerns, please feel free to contact me at your convenience.

Very truly,

W. John Baker, Ph.D., ABN
Clinical Psychologist
Board Certified Clinical Neuropsychologist

cc: file