LABOR ARBITRATION PROCEEDING

OAKLAND UNIVERSITY,

        Employer,

and

OAKLAND UNIVERSITY CHAPTER,
AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS,

        Union.

Grievance No. 2013-2
(Dorothy Hawthorne-Burdine)

Robert McCormick, Arbitrator

---

### Motion to Dismiss Grievance

Oakland University hereby moves for dismissal of the pending grievance captioned above, for the following reasons.

### Introduction

This matter arises out of the University's September 27, 2013, decision to temporarily remove a faculty member from campus as a result of her threatening and bizarre behavior. The faculty member left campus on the condition that she obtain satisfactory neurological and psychological assessments in order to return.

Since the union's grievance was filed on November 7, 2013, subsequent events have rendered each of their requested remedies moot. Accordingly, the grievance and pending arbitration should be dismissed.

### Pertinent Facts

Oakland University is an institution of higher education established pursuant to Article VIII, § 6 of the Michigan Constitution of 1963 and MCL 390.151 et seq. Oakland and the AAUP are parties to a Collective Bargaining Agreement (CBA, Exhibit A).

Dorothy Hawthorne-Burdine was hired by Oakland University as an associate professor in the School of Nursing in August 2010. Over the next year, she was involved

in a series of altercations with faculty and staff, descriptions of which are attached collectively as Exhibit B.  Consequently, in June 2011, Hawthorne-Burdine was called to a meeting with the Assistant Vice President for Academic Affairs, the Interim Dean, and the Executive Director of the AAUP, to discuss (1) Hawthorne-Burdine's confrontational interactions with staff, (2) her refusal to complete forms necessary for the submission of grant proposals, and (3) her demeanor during interactions with staff and faculty. (Exhibit C).  The Interim Dean noted:

> Dorothy was so obstreperous during the meeting that the next day, several staff and faculty members inquired whether everything was ok.  Likewise, a police officer posted outside the meeting room afterward stated that because Dorothy was so loud, he had twice been tempted to intervene.  (Id. at 2).

On the same day as the meeting, the Interim Dean provided Hawthorne-Burdine with a performance evaluation noting serious deficiencies in three areas.  (Exhibit D).  Of particular interest is the following, which put Hawthorne-Burdine on notice of University Ordinance 6.02:

> 3.    Deficiency:   Creating a disturbance in the SON administrative suite outside the Dean's Office (specifically, in relation to travel reimbursement) that caused employees to come out of their offices and report the incident to Human Resources.
>
> Action:       Follow all Oakland University ordinances, including 6.02:
>
> *No person shall engage in any activity, individually or in concert with others, which causes or constitutes a disturbance, noise, riot, obstruction, or disruption which obstructs or interferes with the free movement of persons about the campus or which interferes with the free, normal, and uninterrupted use of the campus for educational programs, business activities, and related residential, food service, and recreational activities, nor shall any person in any way intimidate, harass, threaten, or assault any person engaged in lawful activities on the campus.*  (Exhibit D, emphasis in original).

The Assistant Vice President for Academic Affairs wrote to Hawthorne-Burdine following the June 2011 meeting, summarizing the meeting and reminding her of

Oakland's expectations.   (Exhibit E).   This letter was copied to the AAUP. (Id.). Hawthorne-Burdine responded in a letter, also copied to the AAUP, taking issue with the word "obstreperous" and stating in part:

> The term "obstreperous" is an antiquated and embarrassingly negative word used by few modern-day administrators and has been used to show gross disrespect and to unduly sanction employees who fail to be controlled and "blindly" follow irrational and unethical policies and practices.  In using this term, "obstreperous", I feel that you and Dr. Schott-Baer [Interim Dean] have inadvertently exposed the type of people you *really* are.  This includes *your* antiquated administrative styles, *your* discriminatory actions, and *your* unethical, disregard for my due process.  (Exhibit F at 2, emphasis in original).

Despite her obvious hostility toward the Assistant Vice President and the Interim Dean, the University remained hopeful that Hawthorne-Burdine would behave responsibly.   These hopes were not rewarded, however, as Hawthorne-Burdine's inappropriate and inexplicable behavior continued.   For example, in October 2011, Hawthorne-Burdine disrupted two committee meetings, verbally abusing another committee member and, on one occasion, screaming "get out" over and over at a fellow faculty member.  (Exhibit G).  In March 2013, Hawthorne-Burdine told the Assistant Dean of the School of Nursing to "get your ignorant black ass out of my office."  (Exhibit H).  As the Assistant Dean reported:

> This incident has made me very uncomfortable because it seems that Dr. Hawthorne was not in control of her emotions and her behavior towards me after this incident seems to display emotional instability.  *  *  * One day, I came around the corner in the hallway on the third floor of the Human Health Building and I heard her mention my name and she [kept] repeating the word "bitch".  Shortly after the incident, two School of Nursing employees asked me what happen[ed] with Dr. Hawthorne and told me she was calling me a "bitch".  This frightens me because Dr. Hawthorne has displayed explosive behavior on several occasions not just with me but others.  (Exhibit H).

## June 2013 Review by the Police Department

In June 2013, the Oakland University Police Department reviewed concerns expressed by several witnesses regarding Hawthorne-Burdine's behavior.   In one

instance, Hawthorne-Burdine was heard to threaten another faculty member, saying she would "tear her apart" and "no one will be able to pull her off." (Exhibit I). The employee making this report also stated that she is "constantly cornered by Hawthorne-Burdine and has to listen to her outbursts about how unhappy she is and how she perceives that everyone hates her." (Id.). The Assistant Dean also stated that "she has felt threatened by [Hawthorne-Burdine] on several occasions and has left the area just to get away from her." (Id.).

Despite these concerns, the Police Department recommended that Hawthorne-Burdine's behavior be dealt with as a disciplinary issue, rather than as a safety issue through the Behavioral Concerns Committee. (Id.). That recommendation soon changed.

## The Behavioral Concerns Committee

Matters with Hawthorne-Burdine finally reached the tipping point in September 2013, when a student recorded Hawthorne-Burdine in a long, rambling, bizarre rant in class. The University then convened a meeting of its Behavioral Concerns Committee (BCC) to review Hawthorne-Burdine's history of threatening behavior.

In 1999, the United States Department of Education and the Secret Service began a "Safe School Initiative" to explore the potential for adapting the threat assessment investigative process, developed by the Secret Service, to the problem of targeted violence. One of the primary tenets of this "threat assessment investigative process" is the establishment of a threat assessment committee, which was satisfied by Oakland's establishment of the BCC. Oakland's BCC was formed as part of an Emergency Management for Higher Education (EMHE) grant received from the United States Department of Education, which grant required a written plan for preventing violence on campus by *assessing* and *addressing* the mental health needs of persons who may be at risk of campus violence by harming themselves or others. Part of the grant was used for

4

Comprehensive Threat Assessment Team Training by the National Center for Higher Education Risk Management (NCHERM).

The BCC's charge is to address incidents and/or individuals that may be deemed potential threats to the campus community, including, without limitation, individuals who may be experiencing mental or emotional instability.

On Thursday, September 26, 2013, the University Police Chief notified the BCC that concerns regarding Hawthorne-Burdine raised by faculty, staff, and student reports of her classroom and non-classroom behavior had risen to a level that warranted BCC review.  The BCC thereafter assembled, consisting of Dr. Jamie Franklin, a psychologist and Director of Training at the University's Counseling Center; Captain Mark Gordon of the Oakland University Police Department; Nancy Schmitz, Assistant Vice President for Student Affairs and Interim Dean of Students; and Glenn McIntosh, the Interim Vice President for Student Affairs and Enrollment Management.

Since the reported behavior involved a faculty member, Dr. Michelle Piskulich, the Associate Provost, attended the meeting as the Office of Academic Human Resources' representative. Dr. Piskulich shared Hawthorne-Burdine's history of erratic behaviors when interacting with colleagues and students. She also provided the BCC with the audio recording in which Dr. Hawthorne-Burdine verbally chastised and berated students in unrestrained fashion for an extended period of time.  The recording was made by a student enrolled in the course, and the BCC members listened to the recording.

The committee immediately recommended that (1) Hawthorne-Burdine be temporarily relieved of all classroom teaching assignments, (2) Hawthorne-Burdine complete neurological and psychological assessments; and, (3) Hawthorne-Burdine be directed to remain off campus until the neurological and psychological assessments were completed.

5

On September 27, 2013, Hawthorne-Burdine was notified in writing that she was not to return to campus and that satisfactory neurological and psychological assessments were required before Oakland would consider allowing her to return.  (Exhibit J).  During the time period she was removed from campus, Hawthorne-Burdine continued to receive her full pay and benefits.

Hawthorne-Burdine was removed from campus pursuant to an Oakland University ordinance consistent with state law.  MCL 752.581 *et seq* defines conduct that is specifically prohibited on university campuses, including but not limited to constituting "a clear and substantial risk of physical harm or injury to other persons or of damage to or destruction of the property of the institution."  MCL 752.582.

Oakland University ordinance no. 9.04 states:

> 9.04 Denial of Access to Campus.  Any individual who violates these ordinances and whose actions pose a threat to the health and/or safety of the university community, or to university property, or whose actions constitute trespass may also be referred to the university administrator designated by the president for a hearing which may result in an order denying the offending individual access to the campus for a specified period of time.

*The Neurological and Psychological Assessments*

On November 11, 2013, Dr. Hermann Banks, a board-certified neurologist, conducted a neurological assessment of Hawthorne-Burdine.  (Exhibit K).  He found no organic reason for her behavior, and, aware of a forthcoming psychiatric assessment, also recommended neuropsychological testing.  (Id.).

Hawthorne-Burdine underwent a psychiatric assessment on November 14, 2013, by Dr. Elliott Wolf.  (Exhibit L).  Dr. Wolf concluded:

> Dorothy Hawthorne-Burdine presented in clinical interviews as defensive, angry, and paranoid, reminiscent of the way in which she was described in some of the documents provided for review.  Whether or not this manner of presentation represents a longstanding aspect of Ms. Hawthorne-Burdine's personality as opposed to being symptomatic of an acute problem is not

6

clear to the undersigned. She appears to be entirely lacking in insight when it comes to self-observation regarding her current situation and in my opinion she should be regarded as unfit to return to her teaching position at the present time. (Exhibit L at 7-8).

Eventually, Hawthorne-Burdine was evaluated by neuropsychologist Dr. W. John Baker, who opined, in part, that although Dr. Hawthorne-Burdine's profile suggests some decline in her cognitive abilities, she is not disabled and is capable of functioning at her baseline level. Dr. Baker found Hawthorne Burdine's overall neurocognitive status to be within normal limits, but he anticipates a "continued gradual decline[.]" Dr. Baker recommended repeating the neuropsychological testing in a year to determine whether Hawthorne-Burdine experienced any further decline in her neurocognitive status. (Exhibit M).[1]

On July 2, 2014, based on the findings of the various medical professionals who evaluated her, the University returned Hawthorne-Burdine to her teaching and other faculty duties "without restrictions." (Exhibit N).

*Hawthorne-Burdine's Grievance*

Following Hawthorne-Burdine's removal from campus on September 27, 2013, the faculty union requested certain information on October 14, 2013. In response to that request, the University invited the union and Hawthorne-Burdine to attend a meeting with the Behavioral Concerns Committee on October 17, 2013 to discuss the information and events that led to Hawthorne-Burdine's removal. The union refused to meet. (Exhibit O). Subsequently, on November 5, Oakland advised the union in part:

Briefly, for about the last year and a half, Professor Hawthorne-Burdine has exhibited very aggressive behavior, including verbal tirades, which have caused other AAUP bargaining unit faculty members, staff and administrators to feel threatened by her to the point of fear. Those

---

[1] Interestingly, one of the observations Dr. Baker made was that Hawthorne Burdine's scores on learning and memory skills tests were in the "mildly impaired" range, and that her performance was "indicative of poor or incomplete effort." (Exhibit M at 7).

individuals indicate that Professor Hawthorne-Burdine's aggressive behavior, such as openly threatening to kill another professor, has increased and borders on violent behavior, and that they are now afraid for their personal safety.

Most recently, a student reported Professor Hawthorne-Burdine berating and castigating students to such a degree that the University's Behavior Concerns Committee was consulted. That Committee's review led it to decide that Professor Hawthorne-Burdine should be removed immediately from her duties and campus pending further neurological and psychological assessment.

Professor Hawthorne-Burdine's conduct is evidence not only that she has failed to fulfill her professional responsibilities but also that faculty, staff and students are afraid of her and concerned for their own personal safety. (Exhibit O).

The union, despite having been kept advised of the issues centering around Hawthorne-Burdine's threatening behavior and having declined to attend a meeting at which further information was to be shared with the union and with Hawthorne-Burdine herself, nevertheless filed a grievance on November 7, 2013, six weeks after Hawthorne-Burdine was removed from campus.

All of the remedies requested by the union are either moot or barred by the collective bargaining agreement.

<u>Discussion</u>

I.   THE UNION'S REQUESTED REMEDIES ARE EITHER MOOT OR BARRED BY THE COLLECTIVE BARGAINING AGREEMENT.

In its grievance (Exhibit P), the union requested the following remedies:

1.   That Oakland rescind the actions taken against the Grievant including the removal from campus, the order barring interaction with students, and the order for a neurological and psychological assessment.

2.   That Oakland provide necessary and requested information to the Association upon demand.

3.   That Oakland restore the Grievant to full employment duties and privileges.

4.    That Oakland take actions to ensure that the actions taken do not interfere with the Grievant's tenure review.

5.    That the Association be reimbursed for all costs and attorney fees sustained in this matter.

A.    <u>Oakland Has Already Withdrawn Its Order Removing Hawthorne-Burdine From Campus Since She Obtained Satisfactory Neurological And Psychological Assessments.</u>

The union's first requested remedy is that "Oakland rescind the actions taken against the Grievant, including the removal from campus, the order barring interaction with students, and the order for a neurological and psychological assessment." This has already been accomplished. On July 2, 2014, the University returned Hawthorne-Burdine to her teaching and other faculty duties "without restrictions." (Exhibit N). As of that date, Hawthorne-Burdine was no longer barred from campus or from interaction with students, and the neurological and psychological assessments had been completed. Accordingly, there is no further remedy in this regard.

B.    <u>The Union Has Already Litigated The Issue Of Whether The University Has Provided Necessary And Requested Information.</u>

The union's next requested remedy is that "Oakland provide necessary and requested information to the Association upon demand." As part of its litigation strategy in this matter, the union filed an unfair labor practice charge with the Michigan Employment Relations Commission, alleging that the University had refused to provide the union information regarding Hawthorne-Burdine's grievance. After the University responded to MERC and demonstrated the extent to which it had, in fact, responded to the union's requests for information, the union withdrew its complaint. (Exhibit Q). Accordingly, the remedy seeking "necessary and requested information" is moot. To the extent that the union might allege that it fears future requests for information will not be

granted, such fears are merely hypothetical and cannot form the basis for a grievance or a remedy to an existing grievance.

### C.   The Grievant Was Restored To Full Employment And Privileges.

The union also requested that "Oakland restore the Grievant to full employment duties and privileges." This is nothing more than a restatement of the union's first requested remedy and, likewise, is moot. The University's return-to-work notification (Exhibit N) makes clear that Hawthorne-Burdine was being returned to her teaching and other faculty duties "without restrictions."

In addition to already having been restored to her full duties, Hawthorne applied for tenure in accordance with the collective bargaining agreement between the University and the union. Unfortunately for her, her application was denied, triggering paragraph 38.c of the collective bargaining agreement, which provides in relevant part:

> Employment without tenure in the rank of associate professor for a person not previously employed by Oakland as a faculty member shall be for an initial term of four years, after which an associate professor not granted tenure by Oakland shall not be re-employed as a full-time faculty member. (Exhibit A at 14).

Hawthorne-Burdine came to Oakland University as an associate professor in 2010. Her four-year term ended in August 2014 and, when her tenure application was denied, she was contractually barred from continuing to be employed as a full-time faculty member.

Accordingly, this request is also moot.

### D.   The Grievant's Tenure Review Was Completed As Scheduled.

The union next requested that "Oakland take actions to ensure that the actions taken do not interfere with the Grievant's tenure review." As the union is aware, Hawthorne-Burdine's tenure review took place as scheduled. Beyond ensuring that there was no interference with the tenure review, the University reimbursed Hawthorne-Burdine

approximately $2000 in costs related to copying and assembling her tenure application dossier. Moreover, the University intervened to require the School of Nursing to accept and consider Hawthorne-Burdine's tenure application despite the fact that it was submitted after the School's internal deadline.[2]

### E.   The CBA Does Not Authorize Awarding Attorney Fees Or Costs.

The union's final request is that the "Association be reimbursed for all costs and attorney fees sustained in this matter." Such a request is, however, barred by the collective bargaining agreement, paragraph 194, which states in relevant part:

> The parties will bear their own expenses individually and share the arbitrator's fee and expenses equally.  (Exhibit A at 84).

Paragraph 195 of the CBA further provides in part that the "arbitrator will have no authority to (a) add to, subtract from, or in any way modify this agreement[.]" (Id.).

### Conclusion

"[T]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v Mich. High Sch. Athletic Ass'n*, 119 F3d 453, 458 (6th Cir 1997) (en banc) (internal quotations marks omitted); *see also Bowman v Corr. Corp. of America*, 350 F3d 537, 550 (6th Cir 2003). *See also Int'l Bhd., Local Union No. S-251 v Thyssenkrupp Elevator Mfg.*, 365 F3d 523, 527-28 (6th Cir 2004) (declining to enforce arbitrator's award reinstating union employee where second basis for employee's termination rendered moot the basis challenged in the grievance).

---

[2] The School of Nursing's internal deadline for tenure applications to be submitted is earlier than that set by the collective bargaining agreement. Hawthorne-Burdine submitted her tenure application to the School after the School's deadline, but before the contractually set deadline. The University advised the School of Nursing that it had to abide by the contractual deadline and accept and consider Hawthorne-Burdine's tenure application, which it did. Hawthorne-Burdine's tenure application was then processed in a timely fashion through the School, the University-wide review committee, and Oakland's review.

In this case, Oakland effectively rescinded its September 2013 persona non grata letter in July 2014, when it notified Hawthorne-Burdine that she was eligible to return to her regular duties without restriction. At that point, she was permitted to interact with students, and there was no continuing requirement that she obtain neurological or psychological assessments. She was thus restored to her full employment privileges until her tenure application was denied, at which time, by operation of the CBA, she was barred from further employment as a full-time faculty member. Though it was denied, her tenure application was processed as required by the collective bargaining agreement, and neither Hawthorne-Burdine nor the union has filed a grievance contesting the tenure denial.[3] Finally, the union's request for costs and attorney fees is expressly prohibited by paragraph 194 of the collective bargaining agreement.

For the foregoing reasons, Oakland University respectfully requests that the arbitrator dismiss the pending grievance for the reason that all of the union's requested remedies are either moot or barred by the collective bargaining agreement.

Respectfully submitted,

LAW OFFICE OF DANIEL J. BERNARD

By:

Daniel J. Bernard (P34225)
18557 Canal Road, Suite 2
Clinton Township, MI 48038
586-315-2009
Dated:  January 12, 2015          Attorney for Oakland University

---

[3] Any grievance contesting the tenure denial is now time-barred. The initial time period for filing such a grievance was extended twice by agreement between the University and the union. The last such extension expired on October 24, 2014. There have been no further extensions, and no grievance has been filed relating to the denial of Hawthorne Burdine's tenure application.

# EXHIBIT A

# 2012-2015 AGREEMENT



Oakland
UNIVERSITY



**Between Oakland University
and
The Oakland University Chapter,
American Association of University Professors**

## TABLE OF CONTENTS

Page

Agreement----------------------------------------------------------------------------------------------4
Preamble -----------------------------------------------------------------------------------------------4
Article
I.      Definitions------------------------------------------------------------------------------------4
II.     Recognition-----------------------------------------------------------------------------------5
III.    Work of the Bargaining Unit ---------------------------------------------------------------5
IV.     Academic Titles ------------------------------------------------------------------------------5
V.      Association Rights ---------------------------------------------------------------------------8
VII.    University Management ---------------------------------------------------------------------11
VII.    Faculty Employment, Re-Employment, and Tenure -----------------------------------12
            Employment Procedures --------------------------------------------------------12
            Appointment of Department Chairpersons -----------------------------------12
            Periods of Employment ---------------------------------------------------------12
            General Provisions --------------------------------------------------------------16
            Review of Instructors -----------------------------------------------------------20
            Review of Assistant Professors ------------------------------------------------21
            Review of Associate Professors -----------------------------------------------25
            Committee on Appointment and Promotion (CAP) -------------------------25
            Faculty Re-employment and Promotion Committee (FRPC) ---------------26
            Arbitration of Tenure Decisions -----------------------------------------------28
            Optional Review for Tenure ----------------------------------------------------28
            Review for Promotion of Tenured Faculty ------------------------------------29
            Internal Review Commission ---------------------------------------------------30
            Review of Special Instructors --------------------------------------------------31
            Review of Faculty on Layoff----------------------------------------------------31
            Grievance Procedures -----------------------------------------------------------31
VIII.   Layoff and Recall -----------------------------------------------------------------------32
            Types of Layoff------------------------------------------------------------------32
            FTE Computations --------------------------------------------------------------33
            Order of Layoff ------------------------------------------------------------------34
            Layoff Procedures ---------------------------------------------------------------35
            Notice of Layoff -----------------------------------------------------------------37
            Monetary Entitlement -----------------------------------------------------------37
            Recall-----------------------------------------------------------------------------38
IX.     Discipline and Discharge ------------------------------------------------------------------41
X.      Professional Responsibilities---------------------------------------------------------------43
            Outside Professional Work -----------------------------------------------------43
XI.     Salary for Full-Time Non-Visiting Faculty ----------------------------------------------44
            Regular Annual Salary ----------------------------------------------------------44
            Pay Groups ----------------------------------------------------------------------47
            Salary for Chairpersons --------------------------------------------------------48
            Salary for Coordinators --------------------------------------------------------49
            Summer Rate of Pay -------------------------------------------------------------50
            Online/Distance Instruction----------------------------------------------------51
            Intellectual Property -------------------------------------------------------------51
            Fall/Winter Overload Teaching ------------------------------------------------52
XII.    Compensation for Visiting Faculty -------------------------------------------------------52
XIII.   Compensation for Special Lecturers ------------------------------------------------------53
XIV.    Duration of Salary ---------------------------------------------------------------------------54
XV.     Faculty Salary Payment Option -----------------------------------------------------------54
XVI.    Insurances ------------------------------------------------------------------------------------54
            Health Care ----------------------------------------------------------------------55
            Dental ----------------------------------------------------------------------------58
            Vision ----------------------------------------------------------------------------58

i

|  |  | Life ----------------------------------------------------------- 58 |
|  |  | Travel --------------------------------------------------------- 59 |
|  |  | Accidental Death and Dismemberment ------------------------ 59 |
|  |  | Professional Liability ------------------------------------------ 59 |
|  |  | Long-Term Disability ------------------------------------------ 60 |
| XVII. | Enrollment in Courses ------------------------------------------------- 61 |
| XVIII. | Retirement --------------------------------------------------------------- 62 |
|  |  | Multiple Option Program -------------------------------------- 62 |
|  |  | Supplemental Retirement Plans ------------------------------- 63 |
|  |  | Reduced Work Schedule Prior to Retirement --------------- 63 |
|  |  | Privileges and Benefits for Retired Faculty----------------- 64 |
| XIX. | Faculty Travel ----------------------------------------------------------- 67 |
| XX. | Leaves with Pay-------------------------------------------------------- 69 |
|  |  | Sabbatical Leaves---------------------------------------------- 70 |
|  |  | Research Fellowships and Grants ---------------------------- 72 |
|  |  | Professional Development and Research Leaves------------- 73 |
|  |  | Absence/Sick --------------------------------------------------- 73 |
| XXI. | Unpaid and Partial Leaves -------------------------------------------- 75 |
|  |  | Leave of Absence ---------------------------------------------- 75 |
|  |  | Family & Medical Leave Act --------------------------------- 76 |
|  |  | Long Term Disability ------------------------------------------ 80 |
|  |  | Permanent Reduction in Workload---------------------------- 81 |
| XXII. | Academic Librarians ---------------------------------------------------- 81 |
| XXIII. | Work or Business Interruption ---------------------------------------- 82 |
| XXIV. | Grievance Procedure --------------------------------------------------- 82 |
| XXV. | Guarantee of Rights ---------------------------------------------------- 84 |
|  |  | Access to Personnel Files ------------------------------------- 85 |
| XXVI. | Department Chairperson ----------------------------------------------- 85 |
| XXVII. | Appointment Dates------------------------------------------------------ 86 |
| XXVIII. | Past Practices ------------------------------------------------------------ 86 |
| XXIX. | University Calendar ----------------------------------------------------- 87 |
| XXX. | Miscellaneous Provisions---------------------------------------------- 88 |
|  |  | Meeting---------------------------------------------------------- 88 |
|  |  | Interest Succession -------------------------------------------- 88 |
|  |  | Agreement Construction -------------------------------------- 88 |
|  |  | Separability----------------------------------------------------- 88 |
|  |  | Employee Conditions ------------------------------------------ 88 |
| XXXI. | Minimum Terms---------------------------------------------------------- 89 |
| XXXII. | Amendment --------------------------------------------------------------- 89 |
| XXXIII. | Exchange of Information------------------------------------------------ 89 |
| XXXIV. | Effective Date and Duration ------------------------------------------- 90 |
| XXXV. | Appendices --------------------------------------------------------------- 90 |
|  | A. | Research and Full-Time Adjunct Faculty --------------------- 92 |
|  | B. | Student-Faculty Ratio------------------------------------------- 95 |
|  | C. | Travel Reimbursement Rates --------------------------------- 97 |
|  | D. | University Standards for Re-employment, Promotion and Tenure ----------------------- 98 |
|  | E. | Report of Compensated Outside Professional Work-------------------------------------- 102 |
|  | F. | Employee Right to Know Act---------------------------------- 103 |
|  | G. | Location of Personnel Records ------------------------------- 105 |
|  | H. | Oakland University William Beaumont School of Medicine ("OUWBSOM")------------ 106 |
|  | I. | Fall Semester Calendars --------------------------------------- 107 |
|  | J | Other Qualified Adults and Their Dependents -------------- 108 |
|  | K. | Employee Rights and Responsibilities Under the Family and Medical Leave Act --- 109 |
|  | L. | Medical Examinations and Dispute Resolutions------------------------------------------- 110 |
|  | M. | Health Care Coverage ------------------------------------------ 111 |

ii

## AGREEMENT

Agreement between the Board of Trustees of Oakland University, Rochester, Michigan, and the Oakland University Chapter of the American Association of University Professors.

## PREAMBLE

The parties recognize that the purpose of the University is to provide a facility for higher education to serve those who seek to avail themselves of, and contribute to, teaching, research, and public service.

The parties recognize that employees described below are entitled to fair and reasonable conditions of employment, and to methods of fair and peaceful adjustment of all disputes that may arise in the course of their employment.  Therefore, the parties have negotiated an agreement setting forth the terms of employment with respect to wages and working conditions for such employees.  The parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.    As used in this Agreement, except as its context otherwise may require:

   a.  "Oakland" means the Board of Trustees of Oakland University, Rochester, Michigan, a state institution of higher education chartered by the State of Michigan, and administrative agents of said Board.

   b.  "Association" means the Oakland University Chapter, American Association of University Professors.

   c.  "Bargaining Unit Faculty" means the employees, collectively, covered by Article II.  "Bargaining Unit Faculty Member" means an individual bargaining unit member as defined in Article II.  (References in the contract to "faculty members" shall mean bargaining unit faculty members.)

   d.  "Academic units" are comprised wholly of bargaining unit faculty members represented by the Association whose primary appointments are in the corresponding department, school, Eye Research Institute, or the Library.

   e.  Departments are organizational entities established by Oakland and are not academic units as defined for purposes of this Agreement.

   f.  CAP is the Committee on Appointment and Promotion for a school, library, or college; FRPC is the Faculty Re-employment and Promotion Committee.

- 4 -

**ARTICLE II**
**RECOGNITION**

2. Pursuant to and in accordance with applicable provisions of Acts 176 and 336 of the Public Acts of 1939 and 1947, as amended, Oakland recognizes the Association as exclusive bargaining representative for all full-time and regular part-time faculty members who engage in teaching of credit courses, professional library service, academic research, or some combination thereof, and who are granted academic titles specified in Article IV, paragraphs 5, 6, 7, and 9 but excluding (a) executive or supervisory employees, (b) the researchers described in paragraph 8, (c) faculty of the Oakland University William Beaumont School of Medicine (OUWBSOM) and (d) all other persons employed by Oakland. For purposes of this Agreement, academic department chairpersons, coordinators, and program directors are not considered executive or supervisory, and are represented by the Association.

**ARTICLE III**
**WORK OF THE BARGAINING UNIT**

3. All professional library service and teaching of credit courses shall be exclusively the work of members of the bargaining unit except that:

   a. persons excluded from the bargaining unit pursuant to Article II who hold academic titles set forth in Article IV, paragraphs 5 and 6, may teach no more than one course per academic year unless otherwise approved by the academic unit in which the teaching is to occur. Such persons shall not vote on academic-unit-level personnel recommendations. Such persons shall not vote on department-level policy recommendations. Such persons may participate in department-level meetings if invited to do so by the department.

   b. persons holding academic titles set forth in Article IV, paragraph 10, may perform bargaining unit work.

**ARTICLE IV**
**ACADEMIC TITLES**

4. Only persons holding an academic title under this Article IV may engage in teaching of credit courses, academic research, or professional library service. Students progressing toward a degree may engage in academic research or professional library service. Graduate students progressing toward a degree, upon recommendation of the academic unit, and with the approval of Oakland, may teach, but graduate assistants may not teach more than four (4) credits in each of the fall and/or winter semesters and/or summer sessions. Post-doctoral fellows, research assistants, and research associates also may engage in academic research. No academic titles shall be granted except those set forth in

- 5 -

this Article IV.  All academic titles shall be granted in accordance with this Agreement, whether or not the person granted the title is a member of the bargaining unit.  Any title granted shall be accompanied by a specification of primary appointment.

5.   The titles "professor," "associate professor," "assistant professor," and "instructor" are granted subject to the Tenure Review Process in Article VII.

6.   The title "special instructor" is granted subject to the review procedures in Article VII.  This title may be granted to full-time faculty members whose academic qualifications are different and distinct from those required of faculty members pursuant to paragraph 5.  Professional responsibilities assigned to special instructors generally will place emphasis on teaching. Special instructors are entitled to all perquisites of faculty membership and employment including sabbatical leaves.

7.   "Visiting" titles with the ranks listed in paragraphs 5 and 6 may be granted to persons employed full-time for periods of no more than four years, except that such periods may be extended with the approval of both the respective academic unit and the Association.  Persons employed as visiting faculty shall have professional qualifications associated with the corresponding titles in paragraphs 5 and 6.  A visiting faculty member has no right to continuation of employment following the expiration of his or her term of appointment.

8.   The titles "senior research scientist," "associate research scientist," and "assistant research scientist" may be granted to individuals solely engaged in externally funded research not as principal investigators and whose salaries are primarily supported by grants and/or contracts.  Persons holding these titles are not represented by the Association and do not have any rights under this Agreement.  The continuation of such positions is subject to the availability of funds.

9.   Regular part-time employment is defined as teaching 16 or more credits in a calendar year, at least 8 of which must be taught during either the fall or winter semester.  A person rendering such service shall be titled "special lecturer" and shall be represented by the Association during such period.  Employment periods shall be one year, commencing August 15, renewable indefinitely.  After four years of such service, employment periods shall be two years, renewable indefinitely.  For the purposes of identifying special lecturers, it will be assumed that employees who have taught in the summer sessions immediately preceding the August 15 commencement of the employment period will teach the same number of credits in the following summer sessions.

10.  Persons rendering part-time teaching services not meeting the criterion of paragraph 9, or providing applied skills instruction on a part-time basis, shall be

granted an appropriate descriptive title (e.g., lecturer or applied music instructor). Employment periods for such persons shall be one fall/winter semester or summer session in length, renewable indefinitely.

11. **Honorary Titles**.  Academic appointments of an honorary nature may be granted by Oakland.  Each academic unit, as listed in paragraph 41a.(7), shall have the right to make recommendations concerning honorary appointments and reappointments. Except for appointments referenced in paragraphs 12 and 13, honorary titles containing the word "professor" may be granted only with the recommendation of the appropriate academic unit.  Each unit shall develop procedures for making recommendations to Oakland.  Conditions of such honorary appointments are:

    a.  Appointments shall not exceed five years, renewable indefinitely.

    b.  The appointee shall receive only token or no compensation unless part-time teaching services are rendered or an appointment under paragraph 5, 6, or 7 above is held.  Appointees rendering such part-time teaching services shall be paid and represented by the Association as described in paragraphs 9 and 10 above.

12. A "professor" may be named a "distinguished professor" with such designation to continue for the duration of the individual's active service at Oakland (except for removal for cause).  An annual award stipend to be determined by Oakland may accompany such designation.  Prior to the granting of this title, Oakland shall consider the recommendation of the candidate's academic unit and that of the FRPC.

13. The title "emeritus (a) professor" may be awarded to faculty members who are tenured and have at least fifteen years of continuous service at the time of retirement; those whose initial appointments were at the level of associate professor or professor must have been tenured at Oakland University for at least 10 years.

    Nominations for the title "emeritus (a) professor" may be made by any department or by any faculty member and submitted to the appropriate dean or director. Nominations initiated by academic units will follow procedures established by the academic unit. The decision to bestow the title is Oakland's and is not subject to grievance.

    A professor emeritus(a) shall be listed in appropriate university catalogs; receive, upon request and payment of the processing fee, an identification card indicating emeritus(a) title; be invited to attend all University ceremonials, processions, commencements and convocations; have the right to attend meetings open to the faculty as a non-voting member.

14.     **Primary Appointment**.  Each faculty member shall have a primary appointment in an academic unit, as listed in paragraph 41a.(7).  A faculty member shall participate in governance only in the unit of his or her primary appointment unless Oakland and the Association, upon request by the non-primary unit, agree to participation in the non-primary unit. The primary appointment may be transferred subject to the following:

a.  The receiving academic unit shall have an opportunity to make a recommendation on the proposed transfer.  If the academic unit recommends against the transfer, Oakland may accept this recommendation or, with the approval of the faculty member, refer the matter to FRPC for its review and recommendation.  Oakland shall then determine to make or not make the transfer.

b.  A tenured faculty member will maintain his or her tenure status.

c.  The faculty member's salary shall be maintained unless the faculty member and Oakland agree to a different salary.

d.  Accrued leave eligibility will be retained.

**ARTICLE V**
**ASSOCIATION RIGHTS**

15.     Oakland shall not discriminate against any faculty member because of his or her membership or non-membership in the Association.

16.     **List of Unit.**  On September 1, October 20 and February 1, Oakland shall provide the Association with electronic spreadsheets consisting of:

a.  the name, date of hire, mailing address, email address, academic unit and salary of all faculty members.  The October 20 and February 1 reports shall also include academic rank, tenure status and adjunct status.

b.  all non-bargaining unit faculty (name, date of hire, academic unit and salary for teaching) and courses they are teaching

In addition, any changes to the data above (other than mailing addresses) shall be provided to the Association on the first business day of the month following the change.

17.     **Association Membership**.  All faculty members covered in paragraph 2 shall be required, as a condition of continued employment, to become members of the Association and tender to the Association the periodic dues required for the acquisition and retention of Association membership, or to tender to the Association the agency fee, that portion of membership dues applicable to

collective bargaining, contract administration, or grievance adjustment, within thirty days of the later of the effective date of this Agreement or employment in the bargaining unit.

18.     Association membership, or status as an agency fee payer, shall be established by filing a signed payroll deduction authorization with Oakland.  Such authorization form will be provided by the Association through Oakland at the time an offer of appointment is tendered.  All authorizations shall remain in effect during the lifetime of this Agreement and any successor Agreements, except as provided below.

Bargaining unit members may revoke their payroll deduction authorization only during the 30 day period from November 1 to November 30 in each calendar year.  Revocation requires written notification to Oakland and the Association by the faculty member by certified or registered mail.  Such revocation will remain in effect only until the member signs a new authorization form.  Revocation does not relieve faculty members of their obligation to pay dues or fees.

19.     The Association shall provide to Oakland a rate schedule adopted pursuant to its bylaws for periodic professional dues, agency fees and any general membership assessments for use in implementing the provisions of this article.  Oakland will implement any changes made in this schedule by the Association within thirty days.

20.     **Professional Dues Deduction**.  Once monthly during the term of this Agreement, or until further notified by the Association, Oakland will, for each faculty member who on the payroll date of the month involved has earned sufficient compensation and has authorized Oakland to do so, deduct from the faculty member's compensation and remit to the Association an amount equal to the periodic professional dues or agency fee levied by the Association according to the current rate schedule.  Oakland will have no obligation to deduct or remit the amount payable for any faculty member whose withholding authorization reaches the payroll department after the tenth of the month or who does not have sufficient compensation due on the payroll date of any month to pay the faculty member's levy due the Association.  The Association will indemnify Oakland against all liability Oakland may incur by reason of any dues deduction or remittance pursuant to this paragraph.  The Association is obligated under this Agreement to conduct its dues collection activities in a constitutional manner and it agrees that it is doing so and will continue to do so.

21.     All sums deducted by Oakland shall be remitted to the Association's financial officer on a timely basis each month together with a list showing the amount of professional dues or agency fee deducted from each faculty member.  Any claim for refund of dues or fees remitted to the Association shall be made by the claimant directly to the Association.

22.   Oakland shall not be liable to the Association by reason of this Article for remittance or payment of any sum other than that constituting actual deductions made from pay earned by the faculty member.

23.   The Association shall have 30 days from the receipt of the list required by paragraph 16 to encourage faculty members named on the list to file the required deduction forms.

24.   Faculty members who fail to pay the periodic professional dues or agency fees or who fail to file a payroll deduction form within 30 days of the effective date of their appointment shall be subject to suspension and penalty in accordance with the following procedure.  The Association shall notify the faculty member by certified or registered mail that he or she is delinquent in not tendering the professional dues or agency fee, specify the current amount of the delinquency, and warn that unless delinquent professional dues or agency fees are paid and a properly executed deduction form is tendered, the faculty member shall be reported to Oakland and a penalty shall be levied against him or her.  The faculty member shall have 30 days to correct the delinquency and tender the appropriate form.

25.   If after 30 days the faculty member has not complied with the provisions of paragraph 24, the Association shall give a copy of the above letter and the following written notice to Oakland at the end of the 30 day period:

> The Association certifies that _____(Name)_____ has failed to tender the periodic professional dues or agency fees required as a condition of continued employment under the 2012-2015 Faculty Agreement and demands that, under the terms of this Agreement, Oakland penalize the faculty member.

26.   If a full-time faculty member fails to tender the dues or fees required, Oakland shall deduct the greater of (1) an amount equal to 4/365 of the faculty member's regular annual salary, or (2) 125% of the current annual Association dues, fees, and general membership special assessments, from any salary due the faculty member, and shall suspend such person for the requisite period.  Such reductions in salary shall cause reductions in salary-related fringe benefits.

> If a full-time adjunct, visiting or part-time faculty member refuses to tender the dues or fees required, such faculty member shall not be re-employed to teach credit courses at Oakland during the next academic year until such dues or fees are paid. The Association shall provide periodic lists of persons who are delinquent.

27.   The Association shall protect and hold Oakland harmless from any and all claims, demands, and other forms of liability by reason of action taken in compliance with this Article as long as Oakland shall cooperate with the Association in the defense of any such claims, demands, and potential liabilities.

- 10 -

Any legal defense required against such claims, demands and liabilities shall be controlled by the Association.

28. **Association Use of Facilities and Services**.  The Association may use Oakland's facilities and services for transaction of official Association business at reasonable times, provided such utilization does not interrupt normal Oakland operations.  Oakland may charge the Association for such use at a rate not to exceed that charged to academic departments for the same use, provided that no charge will be made for joint meetings with representatives of Oakland's administration.

29. **Association Office Space**.  Oakland shall provide separate office space for the Association's use at no charge to the Association.

30. Oakland shall permit the Association to designate individuals to have reduced primary work assignments.  The sum of all reductions shall not exceed ten four-credit courses or equivalent during the three academic years of this Agreement.  The Association shall inform Oakland of its designations in sufficient time that necessary adjustments in class schedules may be made. The Association may purchase, at replacement costs based on the average part-time faculty compensation for the affected department, up to four additional four-credit course reductions during the term of the agreement for the purpose of collective bargaining.

31. Subject to carrier approval, the Association may designate any of its current or retired employees to participate in the medical, dental and optical insurance programs described in paragraphs 107 through 115, with no expense to Oakland.

## ARTICLE VI
## UNIVERSITY MANAGEMENT

32. **General**.  Subject only to terms of this Agreement, Oakland has the legal responsibility and the right to select, implement, and manage its academic and non-academic operations and programs.  As part of these rights and responsibilities, Oakland shall have the right to (a) hire, assign, promote, schedule, layoff, recall, discipline and discharge its faculty members; (b) determine the schedule of the academic year; (c) locate, relocate, and remove its equipment and facilities; and (d) control all of its property.

33. **Management Practices**.  Oakland's existing rights, privileges, and responsibilities to manage its academic and non-academic operations not specifically delineated by this Agreement shall continue in full force and effect.  If specific terms of this Agreement conflict with such rights, privileges, and responsibilities, then the specific terms of this Agreement shall be controlling to the extent necessary to resolve such conflict; but this Agreement in all cases

- 11 -

shall be interpreted so as not to deprive Oakland of its legal authority to control all final decisions regarding its academic and non-academic programs.

## ARTICLE VII
## FACULTY EMPLOYMENT, RE-EMPLOYMENT, AND TENURE

34.   **Employment Procedures**.  Each academic unit shall have the right to make recommendations concerning initial employment within the corresponding unit of all persons with academic titles specified in Article IV, including a recommendation concerning whether such employment shall be with or without tenure, as appropriate.  Each academic unit shall develop its own procedures and criteria for making such recommendations to Oakland, which shall initiate all offers of employment.  In the case of employment of a faculty member with tenure, FRPC shall have the opportunity to make an employment recommendation to Oakland.  In the case of employment of a faculty member with job security, the appropriate CAP shall have the opportunity to make an employment recommendation to Oakland.  At the time of employment, Oakland shall determine the value of any prior experience for the purposes of paragraph 38b below; the faculty member shall be notified as to the valuation.

35.   **Appointment of Department Chairpersons**.  Department chairpersons are appointed by Oakland for a three-year term, which term may be renewable, or may be extended for one year.  An acting chairperson may be appointed for up to a one-year term, which term may be renewable.  Each academic unit will establish procedures for making chairperson recommendations to the dean. Using these procedures, the department will recommend to the dean individuals for the position of department chairperson.  After any further consultation he/she finds necessary, the dean shall appoint the chairperson of the department.  If the dean chooses to appoint as department chairperson a faculty member other than one of those recommended, he/she shall meet with the department to explain the decision.  In unusual circumstances, Oakland may appoint an executive officer over a department, after consultation with all other department chairpersons in the relevant school or college.

36.   Oakland may withdraw its appointment of a department chairperson only after Oakland consults with all tenured faculty members in the department.  In departments with fewer than five tenured faculty, the five highest ranking members of the department (or all members if there are fewer than five members) must be consulted.  Oakland may also consult with such other persons as Oakland deems appropriate.

37.   **Non-Tenured Employment**.  A faculty member employed by Oakland shall serve without tenure or job security until granted tenure or job security by Oakland pursuant to the processes described below.  These processes are not applicable to visiting and part-time faculty.  However, each academic unit shall establish and publish a statement of its procedures and criteria for making

recommendations on employment and re-employment of visiting and part-time faculty.

38.   **Non-Tenured Employment Periods**.  A faculty member subject to the Tenure Review Process may be employed and/or re-employed by Oakland in rank according to the following schedule:

a.  <u>Instructor</u>.  Employment as instructor shall be for a term of three years after which an instructor not promoted to the rank of assistant professor shall not be re-employed as a full-time faculty member.  A faculty member reviewed and promoted shall be further reviewed under the schedule for second and subsequent re-employments pursuant to subparagraph 38b.(1) below.

b.  <u>Assistant Professor</u>.  An assistant professor subject to the Tenure Review Process may be employed and/or re-employed by Oakland in rank according to the following schedule:

(1) Except as noted below, employment as assistant professor shall be for an initial term of three years.  A faculty member may be reappointed to two additional terms of two years each, after which an assistant professor not re-employed with tenure shall not be re-employed as a full-time faculty member.

(2) Prior experience at another college or university or at Oakland may reduce the period of untenured employment by up to three years:

(a)  Unless Oakland and the faculty member agree to a lesser value, fulltime teaching experience at another college or university or at Oakland with visiting or instructor titles shall be counted at full value. Extensive part-time teaching experience at another college or university or at Oakland may be counted toward full-time prior teaching experience.

(b) Extensive post-doctoral research experience at another college or university or at Oakland or other appropriate professional experience may be counted as prior experience.

(c)  During the first year of employment, Oakland and the faculty member may agree to a lesser value for prior credit.  The options in this subparagraph shall be presented in writing to the faculty member at the time of appointment.  The review schedule in this paragraph also may be modified pursuant to paragraph 38f. below.

(3) For individuals with two years of prior experience under the provisions of subparagraph 38b.(2) above, the initial term shall be waived, the second term shall be three years, and the final term shall be two years.

(4) For individuals with three years of prior experience under the provisions of subparagraph 38b.(2) above, the initial term shall be waived, the second term shall be two years, and the final term shall be two years.

(5) An assistant professor re-employed with tenure shall be promoted simultaneously to associate professor.  Faculty members in the Library who were tenured as assistant professors prior to September 1, 2000 shall retain tenure at that rank.

(6) A faculty member employed pursuant to 38b.(1) shall be reviewed during the first term under review procedures 41c.(1), during the second term under review procedures 41c.(2) and during the third term under review procedures 41c.(4).  A faculty member employed pursuant to schedule 38b.(3) shall be reviewed during the first term under review procedures 41c.(2) and during the second term under review procedures 41c.(4).  A faculty member employed pursuant to schedule 38b.(4) shall be reviewed during the first term under review procedures 41c.(3), and during the second term under review procedures 41c.(4).

c. <u>Associate Professor</u>.  Employment without tenure in the rank of associate professor for a person not previously employed by Oakland as a faculty member shall be for an initial term of four years, after which an associate professor not granted tenure by Oakland shall not be re-employed as a full-time faculty member.  No person previously employed by Oakland as a full-time non-visiting faculty member may be promoted to the rank of associate professor without being granted tenure.

d. <u>Special Instructor</u>.  Employment in the rank of special instructor shall be for an initial term of three years.  Such faculty member may be re-employed for two additional terms of two years after which a special instructor shall not be re-employed as a full-time faculty member unless granted job security.

e. <u>Transfer to Special Instructor</u>.  A faculty member employed pursuant to 38a. or 38b. above may be considered for re-employment as a special instructor rather than for re-employment as specified in those subparagraphs if the following conditions are met:

(1) The faculty member, his or her academic unit, and Oakland agree to the transfer, and

(2) Such agreement is reached prior to the earlier of the following:  the third anniversary of the faculty member's initial full-time employment or the commencement of the faculty member's 41c.(2) or 41c.(3) review.

- 14 -

If these conditions are met, the faculty member will be reviewed at the next normal review date, but under provisions of subparagraph 42a.  If such review results in re-employment such re-employment shall be for a term of two years or such greater period which when added to his or her previous period(s) of employment as a faculty member totals five years.  During such employment term, a special instructor will be reviewed under review procedures 42b.  If such review does not result in re-employment with job security, such person shall not be re-employed as a full-time faculty member.

    f.   <u>Provision for Change in Review Schedule</u>.  Circumstances may make it desirable to postpone or advance the review schedule for a faculty member.  Examples of such circumstances might include extended absence due to illness, injury, or disability (including complications related to surgery or pregnancy); appointments that begin shortly after August 15; reassessment of the prior experience awarded under paragraph 38b.; unforeseen significant changes in the faculty member's activities during paid or unpaid leaves; or any partial leave.  Under such circumstances, the faculty member may submit a written request to the dean to postpone or advance the review schedule by one year.  The dean shall respond, in writing, to such a request within 10 working days of receiving it.  If the faculty member chooses to grieve a denial of the request, then the timelines in paragraphs 190 through 193 shall be shortened by half.

39.   **Tenured Employment**.  A faculty member may be employed by Oakland with tenure according to the following schedule.

    a.   <u>Associate Professor</u>.  Employment in the rank of associate professor for a person previously employed by Oakland as a full-time non-visiting faculty member shall be with tenure from the date of his or her re-employment as an associate professor.  Employment in the rank of associate professor for a person not previously employed by Oakland as a faculty member may be with or without tenure from the date of his or her employment as Oakland shall in its sole discretion determine.

    b.   <u>Professor</u>.  Employment in the rank of professor shall be with tenure from the date of a faculty member's employment in that rank.

40.   **Employment With Job Security**.  Employment in the rank of special instructor shall be with job security from the date of a faculty member's third re-employment as special instructor except as provided in paragraph 38e.

41.   **Re-employment, Promotion, and the Tenure Review Process**.  The pursuit of knowledge and learning manifests itself in different ways in various disciplines such as the sciences, arts, humanities, and professional fields.  Faculty within each of these disciplines are well situated to recommend specific criteria to evaluate work within their discipline.  The framework for this evaluation is a

- 15 -

combination of the University Standards for Re-employment, Promotion and Tenure and the academic unit's criteria for implementation of those Standards. The University Standards for Re-employment, Promotion and Tenure provide the foundation for the academic unit's criteria.   Academic unit criteria, therefore, must be consistent with the University Standards for Re-employment, Promotion and Tenure (see Appendix D); must specify appropriate discipline-related benchmarks; and must articulate how academic units will apply the University Standards.  After proposal by the academic unit, consideration by CAP, approval by FRPC, and approval by Oakland, the written academic unit criteria together with the University Standards, and academic unit review procedures described in paragraph 41a.(3) will constitute the Review Statement that forms the basis for all evaluations.  Consistent with the provisions set forth herein, the final decision as to whether or not a faculty member will be re-employed, promoted, and/or tenured, will be Oakland's.  Oakland will make all decisions at the designated points in the following Tenure Review Process.

a.  <u>General Provisions</u>.

   (1)  Oakland shall inform each faculty member subject to the tenure review process of the area or areas of professional responsibility within which the faculty member will be judged with respect to future employment, promotion, tenure, and job security.

   (2)  University Standards for Re-employment, Promotion and Tenure: see Appendix D.

   (3)  Academic Unit Criteria and Procedures

   Each academic unit shall propose a Review Statement which includes the University Standards, the academic unit's criteria described in paragraph 41a.(1) above, and the procedures it will use for each level of review.  The procedures in the Review Statement shall be consistent with paragraph 199.  In particular, the faculty member shall have access to all materials in the files generated during the review, and shall not be required and/or solicited to enter into any waiver of the right to examine any and all letters of evaluation.  Until the file is submitted to the relevant CAP, the faculty member under review may add any new material to her/his file.   Once a file is submitted to CAP and through the balance of the review cycle, the faculty member only may update information contained in the file (i.e., changes in publication status or approval of grant requests previously submitted).

   Each academic unit headed by a chairperson shall develop a revised Review Statement which shall be submitted to the appropriate CAP by September 15 of the academic year before the academic year in which the revised statement is to be effective. In academic units not headed by

a chairperson, CAP shall develop its own revised Review Statement.  If a CAP does not approve a revised statement, the unit shall have the opportunity to review and resubmit its statement.  If CAP does not approve the resubmitted statement or the academic unit chooses not to further revise its statement, at least two members of each body (chosen by their own internal procedures) shall meet and try to reach agreement.  Any revised statement developed through this consultation shall be submitted to both the unit and CAP for approval.

The final revised statement, whether or not approved by CAP, along with CAP's comments, shall be submitted by the unit to FRPC by November 15 of the academic year before the academic year in which the revised statement is to be effective.  Initial FRPC review of any revised statement shall be completed by February 1.  If FRPC does not approve of a revised statement, the unit shall have the opportunity to resubmit its statement.  If FRPC does not approve the resubmitted statement, or the academic unit chooses not to further revise its statement, at least two members of each body (chosen by their own internal procedures) shall meet and try to reach agreement. Any revised statement developed through this consultation shall be submitted to both the unit and FRPC for approval.  If FRPC and the academic unit are still unable to reach agreement, the final decision shall lie with FRPC, such decision to be reached by March 15.

The final revised statement as approved by FRPC shall be submitted to Oakland by March 15 of the academic year before the academic year in which the revised statement is to be effective.  Initial Oakland review of any revised statement shall be completed by May 15. If Oakland does not approve of a revised statement, the unit shall have the opportunity to resubmit its statement.  If Oakland does not approve the resubmitted statement, or the academic unit chooses not to further revise its statement, at least two members of each body (chosen by their own internal procedures) shall meet and try to reach agreement.  Any revised statement developed through this consultation shall be submitted to both the unit and Oakland for approval.  If Oakland and the academic unit are still unable to reach agreement, the final decision shall lie with Oakland, such decision to be reached by June 1.

A new academic unit shall establish and publish a Review Statement with the approval of such Review Statement following the sequence and timing noted above.

The criteria and procedures sections of each academic unit's Review Statement shall be reviewed every five (5) years. During this review, conducted by the unit, the dean (after conferring with the provost) may request, in writing, that a unit consider changes in existing criteria and

procedures. At the conclusion of its review, the unit shall inform the dean of the results of the review.

If the dean still identifies major concerns (such as those mandated by changes in standards of accreditation) with an academic unit's Review Statement, a meeting shall be scheduled with the academic unit for the purpose of discussing and resolving these concerns. If the concerns remain after this meeting, the dean may specify, in writing, her/his concerns and require the academic unit to propose changes to address these concerns in criteria and procedures, or a portion thereof, for approval using the steps articulated in this section.

If the dean identifies substantive concerns outside of the periodic review schedule, a meeting shall be scheduled with the academic unit for the purpose of discussing and resolving these concerns.

The periodic review of an academic unit's Review Statement may be waived if both the academic unit and Oakland concur that such a review is not necessary.

The academic unit shall provide each of its members with a copy of the current Oakland approved Review Statement.  If an academic unit fails to establish and/or publish a Review Statement, such event shall not be grievable.

(4) All recommendations specified in the Tenure Review Process regarding re-employment, promotion or tenuring of a faculty member shall be written and forwarded to the faculty member concurrently with forwarding such recommendations to the subsequent review step. Reviewing entities also have the responsibility to provide the Association, within three days of such recommendation, the name of any individual not being recommended for re-employment, promotion, or tenure.

(5) Any faculty member aggrieved by any recommendation in the course of his or her review or believing a violation of an approved procedure has occurred, shall have the right to submit a written objection (including evidence the candidate deems relevant) to the subsequent review entity. A copy of the objection shall be sent to the person, committee, or entity that made the recommendation.  The objection must be made within 20 working days of the recommendation.  The 20 working day period shall run concurrently with the subsequent review period and failure to object during that period shall not prevent that review or subsequent reviews from occurring.  The objection shall become a part of the faculty member's record for the remainder of the Tenure Review Process.

- 18 -

If Oakland decides not to re-employ, promote or tenure a faculty member, the faculty member shall be entitled to receive, within 20 working days of that decision, an oral statement of the reasons upon which that decision is based, and, if requested by the faculty member, a written statement within 20 working days following said request.

If Oakland decides to re-employ a faculty member to a term appointment subject to a subsequent review for re-employment, promotion, or tenure, Oakland shall send the faculty member, within 60 working days of that decision, a statement commenting on the faculty member's record to date and Oakland's future expectations of the faculty member.  A copy of the statement shall be included in the faculty member's dossier for the subsequent review.

(6)  A faculty member being reviewed by an academic unit, CAP, or FRPC shall have the right to be present when oral testimony is taken from anyone not a member of the reviewing body.  A faculty member shall have the right to be accompanied or represented by another faculty member of the University when such testimony is taken.

(7)  For purposes of this Agreement, the academic units are:
Eye Research Institute
Library
School of Business Administration
School of Engineering and Computer Science
School of Education and Human Services
School of Health Sciences
School of Nursing
Department of Art and Art History
Department of Biological Sciences
Department of Chemistry
Department of Communication and Journalism
Department of English
Department of History
Department of Linguistics
Department of Mathematics and Statistics
Department of Modern Languages and Literatures
Department of Music, Theatre and Dance
Department of Philosophy
Department of Physics
Department of Political Science
Department of Psychology
Department of Sociology and Anthropology
Department of Writing and Rhetoric

- 19 -

(8)  Prior to each November 1, Oakland shall provide to the Association prior to each review round a list of faculty members who must be reviewed.

(9)  For the purposes of reviews for re-employment, promotion and tenure, recommendations by departments (and their chairpersons) that are not academic units shall be treated the same as departments that are academic units.

b.  <u>Instructor</u>.

(1)  Oakland shall review a faculty member during his or her non-tenured term as instructor to determine whether the faculty member will be re-employed and promoted to assistant professor without tenure.

The decision to re-employ may be made conditional upon degree completion by the faculty member by a specified date; in the School of Nursing it may be made conditional upon matriculation in a doctoral program by a specified date.

The review shall consist of the following steps:

(a)  On or before December 1 of the year proceeding the final year of an employment term, Oakland shall notify the faculty member and his or her academic unit that the faculty member is being reviewed with respect to future employment at Oakland.

(b)  Following receipt of such notice the faculty member and/or his or her academic unit shall gather such information regarding the faculty member's professional qualifications as either of them deems appropriate, including, but not limited to, the faculty member's curriculum vitae and letters of recommendation.  The academic unit shall conduct a review of the candidate in accordance with its approved Review Statement and shall forward the assembled information along with its recommendation regarding re-employment to the appropriate dean (or official designated by Oakland) on or before February 1.  In academic units headed by a chairperson, in the event that the chairperson disagrees with the recommendation of the academic unit, he or she may include a dissenting letter; however, such a letter is independent from the recommendation of the academic unit.

(c)  Oakland shall then review the candidate according to the approved Review Statement, considering the information and recommendation submitted by the academic unit, and, if separate, the recommendation by the departmental chairperson.  Oakland may seek further advice by forwarding the assembled information and

- 20 -

recommendation to the appropriate CAP and soliciting CAP's recommendation if the CAP has not been previously involved.  Prior to rendering a decision contrary to the recommendation of the academic unit, Oakland shall solicit the recommendation of the CAP if the CAP has not been previously involved.  Oakland shall then make its re-employment decision and will notify the faculty member, the academic unit, the department chairperson, if any, and the Association of its decision at least one year prior to the expiration of the faculty member's employment period.

(d) CAP solicitations shall be made prior to April 1. CAP shall conduct a review of all candidates submitted to it by Oakland in accordance with CAP's approved procedures.

(2) Exceptions:

(a) a faculty member completing degree requirements normally associated with employment as assistant professor in his or her discipline shall be promoted automatically at Oakland's earliest administrative convenience to the rank of assistant professor for a term of three years, minus time served as instructor.

(b) a faculty member in the School of Nursing matriculating in a doctoral program during the second year of the instructional term shall be reviewed on schedule.  If the review results in a decision to promote, such promotion shall be effective on the August 15 following the review, thereby reducing the length of the instructional term.  The review schedule applied thereafter shall be the same as that used for a person employed pursuant to paragraph 38b.(2).

c.  <u>Assistant Professor</u>.

(1) <u>First Re-employment for Persons Employed Pursuant to Schedule 38b.(1)</u>.  Oakland shall review a faculty member during his or her first non-tenured term as assistant professor to determine whether the faculty member will be re-employed for a second non-tenured term.

The review steps shall be the same as those listed in 41b.(1).(a)-(d) above.

(2) <u>Second Re-employment for Persons Employed Pursuant to Schedule 38b.(1)</u>.  Oakland shall review a faculty member during his or her second non-tenured term as assistant professor subject to a 38b.(1) schedule to determine whether the faculty member will be re-employed for a final non-tenured term and considered eligible for employment in a tenured position.

- 21 -

The review shall consist of the following steps:

(a) On or before December 1 of the year proceeding the final year of an employment term, Oakland shall notify the faculty member and his or her academic unit that the faculty member is being reviewed with respect to future employment at Oakland.

(b) Following receipt of such notice the faculty member and/or his or her academic unit shall gather such information regarding the faculty member's professional qualifications as either of them deems appropriate, including, but not limited to, the faculty member's curriculum vitae and letters of recommendation. The academic unit shall conduct a review of the candidate in accordance with its approved Review Statement and forward the assembled information along with its recommendation to the appropriate CAP on or before February 1. In academic units headed by a chairperson, in the event that the chairperson disagrees with the recommendation of the academic unit, he or she may include a dissenting letter; however, such a letter is independent from the recommendation of the academic unit. The CAP shall conduct a review of the candidate in accordance with its approved procedures and shall forward the assembled information along with its recommendation regarding re-employment to the appropriate dean (or official designated by Oakland) on or before March 15.

(c) Oakland shall then review the candidate according to the approved Review Statement, considering the information and recommendation submitted by the academic unit, and, if separate, the recommendation by the departmental chairperson, and CAP. Oakland may seek further advice by forwarding the assembled information and recommendation to FRPC and soliciting FRPC's recommendation. Prior to rendering a decision contrary to the CAP recommendation, Oakland shall solicit the recommendation of FRPC. Oakland shall then make its re-employment decision and will notify the faculty member, the academic unit, the department chairperson, if any, and the Association of its decision at least one year prior to the expiration of the faculty member's employment period.

(d) FPRC solicitations shall be made prior to April 1. FPRC shall conduct a review of all candidates submitted to it by Oakland in accordance with established procedures and shall forward the assembled information along with its recommendation to Oakland within thirty days of the solicitation.

(3) <u>First Re-employment for Persons Employed Pursuant to Schedule 38b.(4)</u>. Oakland shall review a faculty member during his or her first

- 22 -

non-tenured term as assistant professor subject to a 38b.(4) schedule to determine whether the faculty member will be re-employed for a second non-tenured term.

The review steps shall be the same as those in 41c.(2) above except that:

(a)  The review shall begin on or before September 1.

(b)  The unit recommendation to CAP shall be made by October 1; and CAP shall recommend to Oakland by November 1.

(c)  Oakland's decision shall be announced following the first meeting of the calendar year of the Board of Trustees, but in no event later than March 1.

(d)  FRPC solicitations shall be made by December 1.

(4)  Re-employment with the Granting of Tenure.  Oakland shall review a faculty member during his or her final non-tenured term as assistant professor to determine whether the faculty member will be re-employed and granted tenure.

The review process shall consist of the following steps:

(a)  On or before December 1 of the year proceeding the final year of a faculty member's employment term, Oakland will notify the faculty member and his or her academic unit that the faculty member is being reviewed with respect to future employment at Oakland.

(b)  Following receipt of such notice the faculty member and/or his or her academic unit shall gather such information regarding the faculty member's professional qualifications as either of them deems appropriate, including, but not limited to, the faculty member's curriculum vitae and letters of recommendation.  The academic unit shall conduct a review of the candidate in accordance with its approved Review Statement and forward the assembled information along with its recommendation to the appropriate CAP on or before February 1.  In academic units headed by a chairperson, in the event that the chairperson disagrees with the recommendation of the academic unit, he or she may include a dissenting letter; however, such a letter is independent from the recommendation of the academic unit. CAP shall conduct a review of the candidate in accordance with its approved procedures and shall forward the assembled information along with its recommendation regarding re-employment to FRPC on or before March 15.

- 23 -

(c) FRPC shall review the materials submitted to it regarding the faculty member's professional qualifications and, on or before May 1, shall make a recommendation to Oakland as to whether the faculty member should be re-employed with tenure, re-employed with tenure and promoted, or not re-employed as a full-time faculty member.

(d) Oakland shall then review the candidate according to the approved Review Statement, considering the information and recommendation submitted by the academic unit, and, if separate, the recommendation by the departmental chairperson, CAP and FRPC. Oakland shall notify the faculty member, the academic unit, the department chairperson, if any, and the Association of its decision concerning re-employment with tenure at least one year prior to the expiration of the faculty member's employment period.  If the decision is to tenure, the tenure (and promotion, if applicable) shall be effective on August 15 of the calendar year in which the review occurred.

(e) If the Association is aggrieved by the decision reached by Oakland, it may, as a matter of right, demand prior to October 1 that the case be:

1) Reviewed through the grievance procedure. If a grievance is pursued to arbitration, the arbitrator shall render a written decision either (a) awarding the faculty member re-employment with tenure, or (b) terminating the faculty member from further employment at Oakland as a full-time faculty member or (c) initiating a re-review as defined in sub-paragraph 2) below, with the understanding that if such re-review can not be completed within the year of notice, then the grievant will be re-employed pending the outcome of the re-review.

Or

2) Re-reviewed under the provisions of paragraph 41c.(4). (a), (b), and (c). Oakland shall notify the faculty member, the academic unit, the department chairperson, and the Association of its decision concerning re-employment with tenure.

a. The re-review shall take place during the year of notice following the unfavorable review; provided, however, that if an arbitrator remands a matter for re-review, and the re-review can not take place during the year of notice, then it shall take place on an expedited basis as soon as practical.

b.  In preparation for the re-review, the faculty member may update his/her dossier to provide information on teaching, scholarship and service contributions through October 1 of the

- 24 -

year of the re-review; update the status of publications and grant proposals listed in the dossier; and must include any written statements requested from and issued by Oakland per paragraph 41.a(5). The CAP and FRPC recommendations rendered during the first review shall be added to the re-review materials.  At Oakland's discretion, the academic unit may solicit additional letters of evaluation of the faculty member's scholarship, teaching, and service to add to those received during the review.

c. The faculty member shall waive the right to further one-year notice by Oakland and the right to any further review through the grievance procedure.

d. The deadline dates for the recommendations in 41c.(4), (a),(b), and (c) shall be adjusted so that the chair or unit recommendation is submitted to CAP by November 1; the CAP recommendation is forwarded to FRPC by December 1; FRPC is to forward its recommendation to Oakland by January 5; and Oakland shall announce its decision by April 15.

d. <u>Associate Professor</u>.

   <u>Re-employment and the Granting of Tenure</u>.  Oakland shall review a faculty member during his or her non-tenured term as associate professor to determine whether the faculty member will be re-employed and granted tenure.  That review process shall consist of the same steps identified in paragraph 41c.(4).

e. <u>CAP</u>. Each of the Schools, the College of Arts and Sciences, and the Library shall have a CAP. Each CAP shall be structured and shall function as determined by the faculty members holding primary appointments in its area (except in the case of the School of Health Sciences, where members of the Eye Research Institute also participate), subject to the following:

(1) Membership shall be for three-year staggered terms commencing August 15, with elections conducted during the preceding winter semester.  A majority of CAP members shall be tenured.  Election results shall be submitted to the Association in writing.

(2) Only bargaining-unit faculty members holding academic titles described in Article IV, paragraphs 5 and 6, may be elected to serve on a CAP or vote in the election of its members.

(3) Oakland may designate one non-voting member to each CAP.

- 25 -

(4)   Each CAP shall have a chairperson elected by and from the voting members of the CAP.

(5)   Two or more faculty members with primary appointments in the same department may not serve concurrently on the CAP in the College of Arts and Sciences.  No faculty member may serve concurrently on two CAPs.

(6)   Each CAP shall maintain records of its deliberations.

(7)   Each CAP shall submit annually by November 1 for Oakland's approval a statement of the procedures it will use in the Tenure Review Process.  If Oakland does not approve such procedures, Oakland shall state by November 15 its reasons, and the corrections it will require to meet its objections.  If a CAP fails to submit a statement of procedures by November 1, or Oakland and a CAP fail to reach agreement on a statement of procedures, such event shall not be grievable.

(8)   Each CAP shall establish and publish its procedures and policies governing its operation by November 30 each year.  A policy determination of a CAP may be overturned by a vote of the appropriate faculty in a referendum called by petition of 10 percent of the appropriate faculty members, or of four faculty members, whichever is greater.  Such petition must be filed within two weeks of publication of the disputed policy.  An affirmative vote of a majority of those voting is required to overturn a policy decision.

(9)   Before a CAP can recommend contrary to a unit recommendation, it must invite a spokesperson from the academic unit to defend orally the recommendation at a CAP meeting.

f.   FRPC.

(1)   The FRPC shall consist of tenured faculty members:  one each elected by the School of Business Administration, the School of Engineering and Computer Science, the School of Education and Human Services, the School of Nursing, and the Library; one from the School of Health Sciences–Eye Research Institute; and five elected by the College of Arts and Sciences (one from the science and mathematics area, one from the social science area, one from the humanities area, one from the language and literature area, and one at-large member).  Only full-time non-visiting faculty members may vote in FRPC elections.  Faculty members are eligible to vote in elections for members to represent their school, college, institute, or library of primary appointment, as listed above.  If the list of schools and other units above changes, Oakland and the Association shall meet to determine appropriate representation.

If any school or other unit listed above has fewer than two tenured faculty members, faculty members with primary appointment in such school may nominate a slate of up to six eligible tenured faculty members who have primary appointments inside or outside the school and elect from this slate a person to fill the school seat.  No member of any CAP may serve concurrently on FRPC.

(2)  Membership shall be for three-year staggered terms commencing August 15, with elections conducted during the preceding winter semester.  Any member whose term expires shall have the option of remaining a member until a replacement has been elected.  Vacancies shall be filled by election of a replacement to serve the remainder of the term.  During the period between the occurrence of a vacancy and the holding of an election, an interim replacement may be appointed by the appropriate school or college.

(3)  FRPC shall elect a chairperson and a secretary from its own membership for a one-year term commencing August 15.

(4)  FRPC shall maintain a record of its deliberations.

(5)  Seventy percent of the FRPC membership shall constitute a quorum. A quorum must be present for official action to occur, but a lesser number may adjourn meetings.  A vote of the majority of those present and voting shall be required for any FRPC action.

(6)  FRPC shall establish and publish policies governing its operation, including recommended format of the dossier, by September 15 each year.  A policy determination of FRPC may be overturned by a referendum called by a petition of ten percent of the faculty members eligible to vote in the FRPC election.  Such petition must be filed within one month of the publication of the disputed policy.  A majority of those voting is required to overturn a policy decision.

(7)  The Association shall conduct all elections and referenda required by subparagraphs (1), (2), and (6) above.  Oakland shall be notified of all such elections and referenda and shall have the right to designate observers to be present at polling places, if any, and at the counting of ballots.  The Association shall certify the membership and chairpersonship of FRPC for the subsequent year to Oakland no later than June 30.

- 27 -

(8) No faculty member shall be entitled to file any grievance against Oakland based upon any policy, procedure, or recommendation adopted, instituted, or implemented by FRPC and neither shall any faculty member be entitled to file any grievance against Oakland as a result of any act or omission of FRPC.

(9) Secretarial support and storage space for FRPC shall be provided by the Office of the Senior Vice President for Academic Affairs and Provost.

g. Arbitration of Tenure Decisions.  If a tenure decision resulting from the procedures described above in 41c.(4) results in a grievance, and such grievance goes to arbitration, the selection of an arbitrator shall follow the guidelines described in paragraph 193.

h. Optional or Early Granting of Tenure with or without Promotion.  Review of an untenured faculty member for tenure or for optional promotion and tenure may occur ahead of the schedule set forth above.  The review process shall consist of the following steps, except that a negative recommendation at any two review steps shall terminate the process.

(1) The review shall be initiated on or before December 1 either by Oakland or the faculty member's academic unit.

(2) Following initiation of the review, the faculty member and/or his or her academic unit shall gather such information regarding the faculty member's professional qualifications as either of them deems appropriate, including, but not limited to, the faculty member's curriculum vitae and letters of recommendation.  The academic unit shall conduct a review of the candidate in accordance with its approved Review Statement and forward the assembled information along with its recommendation to CAP on or before February 1. In academic units headed by a chairperson, in the event that the chairperson disagrees with the recommendation of the academic unit, he or she may include a dissenting letter; however, such a letter is independent from the recommendation of the academic unit.  The CAP shall conduct a review of the candidate in accordance with its approved procedures and shall forward the assembled information along with its recommendation as to re-employment to FRPC on or before March 15.

(3) FRPC shall review the materials submitted to it regarding the faculty member's professional qualifications and shall, on or before May 1, make a recommendation to Oakland as to whether the faculty member should be promoted and/or granted tenure.

(4) Oakland shall then review the candidate according to the approved Review Statement, considering the information and recommendation

submitted by the academic unit, and, if separate, the recommendation by the departmental chairperson, CAP and FRPC. Oakland shall notify the faculty member, the academic unit, the department chairperson, if any, and the Association of its decision concerning promotion and/or granting of tenure by August 15. If promotion and/or tenure is granted, it shall be effective on the August 15 recommended by the academic unit.

(5) Oakland's decision in such cases shall be final; there shall be no right to further review in the grievance procedure or otherwise.

(6) A decision not to grant tenure or promotion and tenure resulting either from two negative recommendations or from Oakland's action precludes the initiation of a promotional review by the faculty member's academic unit in the subsequent year, but shall not prevent a mandated review.

i. <u>Promotion in the Case of Tenured Faculty</u>. A promotion review for a tenured faculty member may be initiated by the faculty member's academic unit or by Oakland. Such a review process shall consist of the following steps, except that a negative recommendation at any two review steps shall terminate the process:

(1) The review shall be initiated on or before September 1, either by Oakland or by the faculty member's academic unit.

(2) Following initiation of the review, the faculty member and/or his or her academic unit shall gather such information regarding the faculty member's professional qualifications as either of them deems appropriate, including, but not limited to, the faculty member's curriculum vitae and letters of recommendation. In case Oakland initiates such review, Oakland may provide review materials at this step. The academic unit shall conduct a review of the candidate in accordance with its approved Review Statement and forward the assembled information along with its recommendation to the appropriate CAP on or before October 15. In academic units headed by a chairperson, in the event that the chairperson disagrees with the recommendation of the academic unit, he or she may include a dissenting letter; however, such a letter is independent from the recommendation of the academic unit. CAP shall conduct a review of the candidate in accordance with its approved procedures and shall forward the assembled information along with its recommendation regarding promotion to FRPC on or before November 15.

(3) FRPC shall review the materials submitted to it regarding the faculty member's professional qualifications and shall, on or before January 15, make a recommendation to Oakland as to promotion.

- 29 -

(4)  Oakland shall then review the candidate according to the approved Review Statement, considering the information and recommendation submitted by the academic unit, and, if separate, the recommendation by the departmental chairperson, CAP and FRPC.  Oakland shall notify the faculty member, the faculty member's academic unit, the department chairperson, if any, and the Association of its decision concerning promotion by April 15. Promotions shall be effective on August 15 of the calendar year in which the review occurred.

(5)  Oakland's decision in such cases shall be final except as provided in (7) below.

(6)  Determinations not to promote made in two successive years resulting from any combination of Oakland's actions, Internal Review Commission (see subparagraph 41j.) decisions, or negative recommendations at any two review steps preclude the initiation of a promotional review by the faculty member's academic unit in the subsequent year.

(7)  In cases involving promotion in which Oakland has twice in a five-year period not awarded a promotion recommended by FRPC, the faculty member aggrieved by such action has a right to demand within 30 days of Oakland's decision that the case be reviewed by an Internal Review Commission.  (see subparagraph 41j.) The demand shall include a statement explaining why the faculty member is aggrieved.

(8)  Following a timely call to have the case considered by an Internal Review Commission, Oakland and the Association shall establish such commission no later than May 1.

(9)  Following its review, the Internal Review Commission shall render before July 1 a written decision either (a) awarding the faculty member promotion, which decision shall be binding on all parties to this Agreement, or (b) continuing the faculty member in rank.

j.  <u>Internal Review Commission</u>.  The Internal Review Commission shall be a six-member body consisting of three members selected by Oakland and three members selected by the Association.  At least two of the three members named by each party must not have participated formally at any stage of the most recent review of the case to be considered. A new commission may be appointed for each case to be reviewed, and each commission shall be entitled to establish its own rules governing procedures and presentation of evidence.

- 30 -

42.   **Review of Special Instructors and the Granting of Job Security**.

   a.   <u>First Re-employment for Persons Employed Pursuant to Schedule 38d</u>. Oakland shall review a faculty member during his or her first term as special instructor without job security to determine whether the faculty member will be re-employed without job security.  The review steps shall be those contained in paragraph 41b.(1).(a)-(d).

   b.   <u>Second Re-employment for Persons Employed Pursuant to Schedule 38d</u>. Oakland shall review a faculty member during his or her second term as special instructor without job security to determine whether the faculty member will be re-employed for a final term without job security.  The review steps shall be those contained in paragraph 41b.(1). (a)-(d).

   c.   <u>Re-employment with the Granting of Job Security</u>. Oakland shall review a faculty member during his or her final term as special instructor without job security to determine whether the faculty member will be re-employed and granted job security.  The review steps shall be those contained in paragraph 41c.(2). (a)-(d).  If the decision is to re-employ with job security, the job security shall be effective on August 15 of the calendar year in which the review occurred.

   d.   Special instructors with job security may be reviewed for promotion to the rank of associate professor with tenure in accordance with the procedures set forth in paragraph 41h., except that such review shall not be initiated by an academic unit if so initiated in the previous two years.  This promotion provision is not available to special instructors who transferred to special instructor pursuant to subparagraph 38e.

43.   **Review of Faculty on Layoff**.  A faculty member on layoff status shall not be reviewed during the period of layoff.  If recalled, a full-time non-visiting faculty member who does not have either tenure or job security shall have the employment term in which he or she was serving at the time layoff became effective extended by the smallest whole number of calendar years greater than or equal to the length of the layoff.

44.   Oakland will not, during the term of this Agreement, establish a policy limiting the ratio of tenured to non-tenured faculty members, either in any specific academic unit or the University as a whole, to any specific number or set of numbers.  However, when making a tenure decision on any specific faculty member, Oakland may consider the impact of such decision upon the tenure ratio of the respective academic unit and upon the tenure ratio of the University.

45.   **Grievance Procedures**.  The Association and/or an individual full-time faculty member or group of full-time faculty members shall have the right to enforce,

through the grievance procedures established in this Agreement, those portions of the Tenure Review Process in which Oakland has an affirmative duty to take action. For purposes of this paragraph Oakland shall not be deemed to have any affirmative duty to take action with regard to any function of academic units, CAPs, FRPC, or the Association.

## ARTICLE VIII
## LAYOFF AND RECALL

46.   Oakland recognizes that a University achieves and maintains distinction through the excellence of its faculty and that faculty can make their greatest contribution in an environment that values academic freedom and tenure.  Oakland further recognizes that when reduction of faculty positions in any academic area is contemplated, any plan will place a high priority on maintaining the quality of instructional programs and minimizing unnecessary loss of faculty.  With its diversity of intellectual and professional resources, the University offers the potential for creative problem-solving through the application of the combined capabilities of its constituencies.  Therefore, if Oakland determines that reductions or reallocations of faculty positions are necessary under the provisions of this Article, a committee with representation from Oakland, the Association, and the affected academic unit(s) will be established to develop a plan for addressing the problem.  This plan, to be submitted to Oakland within 60 days from the date that Oakland calls for the committee to be established, shall consider such alternatives to layoff as attrition, in-load summer teaching, retraining, retirements, less-than-full-pay leaves, reassignment of teaching responsibilities, assignment of non-teaching duties, or reduced appointments. Nevertheless, having considered this plan, if Oakland determines that the alternatives do not meet the needs for reduction and reallocations in faculty positions, or if a plan is not timely submitted, layoffs of full-time faculty may be instituted in accordance with the following paragraphs of this Article.

47.   Oakland may lay off and recall its faculty members and determine the academic unit or units in which such layoff shall occur.  The two circumstances in which layoff may occur are described in paragraph 48, Over-Ratio Layoff, and paragraph 49, Position-Shift Layoff.  However, no full-time faculty member shall cease working due to layoff in any academic unit where part-time persons other than students are doing unit work if the full-time faculty member is qualified, as determined by Oakland, to do that work.  Oakland will make every reasonable effort not to lay off special lecturers during the terms of their respective individual employment contracts.  For purposes of this Article, a faculty member shall be considered as holding the highest title for which he or she has been approved by Oakland on the date Oakland notifies the Association of its intention to institute a layoff, whether or not the date on which that title will become effective has been reached.  However, if a faculty member is approved by Oakland for a title in paragraph 54f., g., or h. subsequent to the notification in subparagraph 57a., the

faculty member will be considered as being in the categories described in subparagraphs 54f., g., or h. for purposes of paragraphs 62 and 63 only.

48. **Over-Ratio Layoff**.  The layoff procedure may be started when the actual FTE exceeds by more than six the sum of the number of FTE required by Appendix B and the FTE value for faculty supported with federal or special funding.  The maximum number of faculty members that may be laid off is given by the following:

Actual FTE:  minus   FTE required by Appendix B
             minus   6
             minus   FTE credit for faculty supported by federal or special
funding
             minus   number of over-ratio layoff notices in effect
             minus   FTE credit calculated for laid-off faculty members

49. **Position-Shift Layoff**.  Position-shift layoffs may occur in any academic unit which Oakland has notified of an overstaffing condition, but Oakland shall simultaneously authorize in other academic units an equal number of new full-time positions to be filled with bargaining unit persons, except as noted below, and shall notify the Association of such authorizations.  If, when Oakland initiates a position shift layoff, the total number of FTE faculty is greater than that required by Appendix B, as measured over the four semesters immediately preceding the current semester, the number of new positions may be up to two less than the number of layoffs.  In determining whether the new positions authorization has been met, the filling of positions that are vacated after Oakland notified the Association of its intent to institute a position-shift layoff, either by full-time non-visiting faculty members or by visiting faculty members wholly paid by the General Fund, shall not be counted.  Any full-time faculty member laid off pursuant to this paragraph shall be entitled to the procedural rights specified in paragraph 58 and to the notice of layoff specified in paragraph 59.  No position authorized to comply with the terms of this paragraph shall be filled until such time as the corresponding layoff is effective and the faculty member ceases to receive salary monies from Oakland, unless Oakland elects an earlier date.  Such new positions may be filled with non-bargaining unit persons if the department chairperson in an academic unit headed by a chairperson or the dean in other cases so recommends, and both the Association and Oakland concur.  Notification of position shift layoffs shall be made by January 16 of the year preceding the year in which the layoff process is initiated and the notification shall include a general statement concerning the degree of overstaffing.

50. **FTE Computations**.  For the purpose of determining the possibility of over-ratio layoffs and/or salary reduction under this Article, ratio computations shall be made three times during each fiscal year; between October 15 and December 1; between February 15 and April 1; and between June 15 and August 15.  The period covered by such computations shall include both the three semesters

immediately preceding the semester in which the computation is made and the semester in which the computation is made.

**51.** **Salary Reduction from Extreme Over-Ratio Condition**.  If the actual number of FTE exceeds the number required by Appendix B by more than 10 percent and there has been a decline of at least 10 percent in the number of FYES for a fall or winter semester compared to the FYES in the corresponding fall or winter semester one year earlier, the salaries of all faculty members may be at Oakland's discretion immediately and automatically reduced by the ratio:

$$\frac{\text{Actual FTE minus (1.10 x FTE required by Appendix B)}}{\text{Actual FTE}}$$

**52.** Such salary reduction shall remain effective until the date of the next FTE computation indicated in paragraph 50, at which time a new salary reduction ratio, if any, shall be computed.

**53.** The salary reduction specified in paragraph 51 will be adjusted so that the effect of the salary reduction will be the same for all faculty members.

**54.** **Order of Layoff**.  Faculty members shall be laid off according to the title they hold at the time individual notices are issued in the following order:

a.  Faculty members who are subject to the Tenure Review Process and who have received notice that they will not be re-employed following the expiration of their current contract;

b.  Full-time adjunct faculty;

c.  Visiting faculty members;

d.  Special instructors without job security, instructors;

e.  Assistant professors in other than their final probationary term;

f.  Assistant professors in their final probationary term, special instructors with job security, and associate professors without tenure;

g.  Assistant professors with tenure;

h.  Associate professors with tenure;

i.  Professors.

The order of layoff above is subject to Oakland's determination of the ability of remaining faculty members to perform adequately all remaining primary work

- 34 -

responsibilities assigned to the academic unit, with such determination being made at the time of Oakland decisions specified in subparagraphs 57f. and 57i.

55. In those instances where more than one title is listed in the ranking of layoff, they shall be treated as a single category for the purposes of this layoff procedure.

56. Within each category above, faculty members shall be laid off in the following order:

   a. faculty members without tenure shall be laid off in whatever order determined appropriate by Oakland.

   b. faculty members holding tenured positions shall be laid off in inverse order of their seniority with Oakland.  Seniority is defined as the total length of continuous employment at Oakland, beginning with the first employment with a title set forth in paragraphs 5 or 6.

57. **Layoff Procedures:  Over-ratio Layoff**.  The following procedures will be used if Oakland institutes an over-ratio layoff under the provisions of paragraph 48.  If by the end of each period specified in paragraph 50 Oakland has not instituted an over-ratio layoff based on the calculation for the period ending on the prescribed dates, then no over-ratio layoff may be instituted based on that calculation.  However, subsequent layoffs, at the prescribed times, may be instituted using some of the same data.

   a. Oakland shall notify the Association and the academic units affected of its decision to institute a layoff and of the number of faculty members to be laid off and the academic unit(s) in which the layoff is to occur.

   b. Following receipt of the notice required by subparagraph 57a., tenured faculty members of each academic unit in which a layoff is to occur shall meet to determine a recommended order of layoff between and within categories in paragraph 54, subject to the restraints set forth in paragraphs 54, 55, and 56. The recommendations of the tenured faculty members of each affected academic unit shall be forwarded to Oakland within 30 days of the date the academic unit was notified of its layoff pursuant to this paragraph 57.  If there are fewer than three tenured faculty members in an affected academic unit, Oakland shall designate enough additional tenured faculty members from other academic units to provide such academic unit with a committee of three tenured faculty members to participate in the recommendatory process of this subparagraph.

   c. During the period specified in subparagraph 57b., the faculty, through appropriate formal consultative processes such as the University Senate, shall have the opportunity to offer advice on the educational impact of the

proposed layoffs, and may propose different layoff plans or other alternatives thereto.

d. Following expiration of the thirty-day period provided in subparagraph 57b., within 15 days Oakland shall notify the Association and the academic units affected of its final decision of the number of faculty members to be laid off and the academic unit(s) in which layoffs are to occur.  The number of faculty members to be laid off shall be no greater than the number specified in the notice required in subparagraph 57a.  The academic unit(s) in which layoffs are to occur shall be limited to those specified pursuant to subparagraph 57a. and those proposed by the University Senate in an alternative layoff plan pursuant to subparagraph 57c.

e. Any additional academic units notified under subparagraph 57d. because of a modified layoff plan shall comply with the provisions of subparagraph 57b. except that the period prescribed in subparagraph 57b. shall be seven days.

f. With respect to academic units notified under subparagraph 57a., following the expiration of the thirty-day period provided in subparagraph 57b., within 15 days Oakland shall (1) adopt the recommendation of the tenured faculty members and issue layoff notices to the faculty members in the order set forth in said recommendation or (2) modify the order of layoff and submit its modified order of layoff to FRPC for its review and comment.  If no recommendation has been received by Oakland from the academic unit pursuant to subparagraph 57b., within 15 days, Oakland shall submit its own order of layoff to FRPC.

g. With respect to academic units notified under subparagraph 57d., following expiration of the seven-day period provided in subparagraph 57e., within 15 days Oakland shall follow the provisions of subparagraph 57f.

h. If Oakland submits an order of layoff to FRPC pursuant to the provisions of subparagraph 57f., FRPC shall complete its review of the order within seven days of the date the order was submitted to it and shall within the same time period make recommendations to Oakland as to the appropriate layoff order.

i. Following expiration of the seven-day period established in subparagraph 57h., Oakland shall make its final decision on the order of layoff and issue layoff notices.

j. Layoff notices must be issued within 15 days of Oakland's adoption of the recommendations of the tenured faculty members pursuant to subparagraph 57f. or within 30 days of Oakland's submission of an order of layoff to FRPC pursuant to subparagraph 57h., whichever is applicable.

- 36 -

k. Any calendar days in the period between the day after the end of final examinations for the fall semester and the day before the first day of (regular) registration for the winter semester, may not apply in counting the time periods specified in this paragraph 57, if so elected by the party to whom the time constraint is applicable.  The number of such days that do not count may not exceed 20 days, however.

58. **Layoff Procedures:  Position Shifts**.  Position shifts shall follow the procedures outlined in paragraph 57 except:

   a. Notification of such shifts pursuant to subparagraph 57a. shall be made in the period January 1 through January 15.

   b. The thirty-day period in subparagraph 57b. shall be extended to 60 days.

   c. Layoff notices under subparagraph 57j. shall be issued on or after May 1.

59. **Notice**.  Full-time faculty members laid off pursuant to this Article shall be entitled to the following minimum notice period prior to the commencement of their layoff:

   a. Over ratio layoff:

   Visiting faculty = 180 days

   Non-visiting faculty members = 365 days

   b. Position shift layoff:

   All faculty = 365 days

   No faculty member shall be entitled to commence teaching in any semester that would not be completed before the day said layoff commences.  No faculty member shall be employed for a longer period due to layoff than would otherwise have been the case because of other provisions of this contract.

   Oakland may choose at any time to pay a faculty member all amounts of pay due under this Article in lieu of notice or a portion of notice, if the faculty member assents.

60. **Compensation Entitlement During Notice Periods**.  Faculty members laid off pursuant to this Article shall be entitled to full compensation for all days worked prior to their being laid off computed on a pro rata basis.  The proration of annual salary shall be the ratio of the number of calendar days until the layoff date to the total number of days in the time period from two days before the start of classes in the fall semester to through the last day of the final examination period in the winter semester.

- 37 -

61. **Salary Entitlement after Layoff**.  Laid-off faculty members who were approved by Oakland for titles in categories f. through i. of paragraph 54 on the date Oakland notified the Association of its intention to institute a layoff under subparagraph 57a., whether or not the appointment date on which that title was to become effective had been reached as of the date of notice to the Association, shall be entitled to receive one half of regular annual salary at the rate in effect on the date layoff commences, paid over a period of six months; and either of the following, as applicable:

   a. For a faculty member entitled to 180 days notice of layoff pursuant to paragraph 59, the following shall apply:

      (1) For a period of six months,

      (2) Oakland shall continue to pay toward medical insurance (described in paragraphs 107 through 110) whatever amount Oakland was actually paying for that faculty member on the date the faculty member ceases to receive salary monies from Oakland, if

      (3) The faculty member pays the difference between Oakland's payment and the actual cost of such benefits.

      (4) The faculty member may elect continuation of such medical benefits fully at his or her own expense for an additional six months beyond the first six months specified in (1) above.

   b. For a faculty member who is entitled to 365 days notice of layoff pursuant to paragraph 59 the following shall apply:

      (1) for a period of six months,

      (2) the faculty member may elect continuation of whatever medical benefits (described in paragraphs 107 through 110) he or she was receiving on the date the faculty member ceases to receive salary monies from Oakland, if

      (3) the faculty member pays the cost of these benefits.

62. **Recall**.  When Oakland determines that a position is available, full-time faculty members laid off pursuant to this Article shall be subject to recall on the following basis:

   a. Faculty members holding titles specified in subparagraphs 54d. and 54e. shall be eligible for recall until such time as their contract of employment with Oakland expires.

b. Except for special instructors with job security, all faculty members, holding titles specified in subparagraph 54f. shall be eligible for recall for two academic years beyond the expiration date of their employment contracts with Oakland.  A special instructor with job security shall be eligible for recall until the third anniversary of the effective date of his or her layoff.

c. A faculty member holding a title specified in subparagraphs 54g. through 54i. shall be eligible for recall until the seventh anniversary of the effective date of layoff.

d. Faculty members shall be recalled by Oakland in inverse order of layoff by category and then within category by inverse order of their layoff date, subject to the ability of the recalled faculty member to perform, as judged by the academic unit and with the concurrence of Oakland, the professional responsibilities assigned to the academic unit in which the recall is occurring.

e. Faculty members shall notify Oakland's Office of the Senior Vice President for Academic Affairs and Provost in writing every July following the layoff date of their availability for recall.  Failure to provide such notice by a faculty member shall release Oakland from any obligation to recall that faculty member. Oakland's obligation to notify a faculty member of his or her recall shall be satisfied by sending a registered letter to the faculty member at the last address filed with Oakland's Office of the Senior Vice President for Academic Affairs and Provost by the faculty member.  If the recalled faculty member does not notify Oakland of acceptance of recall within 30 days of the date the notice is sent, he or she shall be deemed to have refused recall and terminated employment with Oakland.

f. Faculty members laid off and then subsequently recalled pursuant to this paragraph 62 shall be entitled to the across-the-board salary increase and average merit salary increase beyond the salary held at the date layoff commenced if such date was after December 31 and before August 15 and such increase is permitted under Article XI.  If layoff commenced after August 15 but prior to January 1, the recalled faculty member shall be entitled to maintain the same salary held at the time of layoff.

g. No person shall be hired in an academic unit where a layoff has commenced until such time as all faculty members eligible for recall in that academic unit have been offered recall.

h. If part-time employment becomes available in an academic unit in which laid-off full-time faculty members are eligible for recall, such faculty members shall be offered the opportunity to perform the part-time employment if they are judged qualified to do so by the academic unit and by Oakland.  The rejection of such opportunity shall not modify the faculty member's right to

recall under this paragraph, nor prevent Oakland from hiring other persons to perform the available part-time employment.

i.  If a laid-off full-time faculty member is employed in a part-time or visiting position, such employment shall not be considered recall.

j.  All faculty members subject to recall have the right to enforce through this Article the grievance procedure established in this Agreement except where otherwise specified.

63.  A full-time faculty member with recall rights may be employed by Oakland in an academic unit other than the one from which he or she was laid off, under the following procedures:

a.  Oakland shall notify the Association of any full-time faculty employment opportunities, prior to the commencement of recruiting.

b.  Within 15 days of such notification, the Association shall provide a written list to Oakland and to the relevant academic unit of any laid-off faculty members who desire to be considered for such employment.

c.  If the majority of the faculty members in an academic unit judges any of the laid-off faculty member applicants to be qualified for the employment opportunity, the unit shall recommend, within seven days, whether or not Oakland should employ the faculty member to fill the vacancy.  If Oakland decides not to employ a faculty member recommended by an academic unit, Oakland shall give its reasons in writing to the academic unit and to the Association; financial considerations shall be sufficient reason.  If no recommendation is made to Oakland by the academic unit, there shall be no requirement to employ.

d.  If the majority of faculty members in an academic unit judges none of the laid-off faculty member applicants to be qualified for the employment opportunity and this judgment is challenged within seven days by a tenured laid-off faculty member as to his or her own case, the issue of his or her qualifications shall be reviewed by FRPC, which shall within seven days advise Oakland on the applicant's qualifications.  If Oakland decides not to employ a tenured faculty member whose employment was recommended by FRPC, Oakland shall give its reasons for this decision in writing to FRPC and to the Association; financial considerations shall be sufficient reason.  If no recommendation is made by FRPC to Oakland, there shall be no requirement to employ.

e.  If Oakland determines that employment of a faculty member is appropriate, it shall offer such employment to the faculty member.  His or her tenure status shall be maintained.  The initial salary in the new academic unit shall not be

- 40 -

less than his or her salary at time of layoff unless the faculty member, Oakland, and the Association agree to a different salary.

f.  A faculty member accepting employment under the terms of this paragraph 63 retains his or her recall rights in the academic unit from which he or she was laid off.

g.  Failure of Oakland to recall a faculty member recommended by an academic unit or by FRPC under this paragraph 63 shall not be grievable.

64.   A full-time faculty member who (a) has received notice of layoff pursuant to paragraph 57 but has not yet been laid off, or (b) has been laid off and is eligible for recall under paragraph 62 shall be entitled while in such status to receive a refund for tuition charges paid for credit courses successfully completed at Oakland University by said member for the purpose of retraining.

## ARTICLE IX
## DISCIPLINE AND DISCHARGE

65.   **Basis**.  Oakland will discipline or discharge a faculty member only for just cause. For purposes of this paragraph "just cause" shall be interpreted in the context of the principles of academic freedom and academic responsibility and shall be limited to:

a.  Failure to fulfill professional responsibilities.

b.  Professional misconduct.

c.  Conduct punishable as a felony under Michigan or Federal Law.

d.  Conduct violating Article XXIII of the Agreement.

Discharge shall be deemed to refer only to termination of a faculty member's current employment agreement prior to its expiration date or to the termination of tenured employment.

66.   **Notice of Representational Rights and Opportunity to Respond**. Oakland shall provide the following to the faculty member and/or the Association:

a.  If Oakland intends to conduct an investigatory interview with a faculty member which may reasonably lead to discipline or discharge, Oakland will notify the faculty member of its intent, and will notify the faculty member of the right to choose to be represented by the Association at such interview.  The faculty member is free to choose not to be represented by the Association, but in that event, shall sign a written waiver.

- 41 -

b. Prior to effecting discharge, Oakland will provide to the faculty member and the Association a written statement of the reason(s) for the discharge, with an explanation of the basis for the reason(s), and a reasonable opportunity for the faculty member and/or the Association to respond.

c. In non-discharge actions, unless health or safety considerations prevent, Oakland shall give notice to the faculty member and to the Association prior to effecting the action.

d. Oakland shall state in writing to the faculty member and to the Association any disciplinary or discharge action, including reasons for such action.

e. A faculty member who contests the action has the right to be represented by the Association.  Oakland's action in discipline or discharge cases may be contested by the faculty member or the Association as specified in the grievance procedure.

67.  **Evaluation of Faculty Performance**.  If Oakland determines that a serious deficiency exists in the performance by a faculty member of his or her professional responsibilities, it may, without instituting any disciplinary or discharge action against the faculty member pursuant to paragraph 65, take the following action to correct the faculty member's performance.  Oakland shall state in writing to the faculty member (a) the areas in which Oakland finds the faculty member's performance deficient, (b) the actions Oakland wishes the faculty member to take to cure the deficiency, and (c) the proposed penalties Oakland would impose if the faculty member fails to take the requested action.  Within 30 days of Oakland's written communication to a faculty member, either the faculty member or Oakland may request FRPC to review the statements made by Oakland regarding the faculty member's performance and report to Oakland and the faculty member as to whether (1) the faculty member's performance is in fact deficient, (2) whether the suggested corrective measures are appropriate to cure the alleged deficiency, (3) whether the proposed penalties for failure to cure the deficiencies are appropriate, and (4) any modifications in (b) or (c) it would recommend.  If an evaluation request is made to FRPC, FRPC shall make a written report to Oakland and the faculty member involved within 30 days of the date on which the request was made.  If FRPC fails to make its report within the thirty-day period, Oakland may proceed as if such report was timely made.  Oakland shall then have the right to take any action with regard to the faculty member it determines to be in the best interest of the University.  Any action taken by Oakland to impose penalties against a faculty member as a result of this evaluation procedure will be subject to the "just cause" standards of paragraph 65, the required notification of paragraph 66, and to the grievance procedure provided in this Agreement.

68.  A faculty member being evaluated who concurs with paragraph 67 (a) and (b) above, within 15 days of Oakland's written communications to him or her, may

- 42 -

object to having further review by FRPC, and Oakland may not then request FRPC to review the charges.

## ARTICLE X
## PROFESSIONAL RESPONSIBILITIES

69.   The professional responsibilities of the faculty are consistent with the mission of the university and include teaching, research and creative activity, and service. Active participation in all three aspects of the workload is the standard for Oakland University faculty.

Each academic unit shall have a Workload Policy that details the expectations and responsibilities of the academic unit in all three areas: teaching, research and creative activity, and service. The Workload Policy, which is subject to the approval of Oakland, is developed and reviewed by the academic unit in consultation with the appropriate dean or director.  Workload Policies shall be reviewed upon request by Oakland at least once every five years.  Workload policies should be consistent with the academic unit's approved Review Statement and the procedures used to assign merit salary increases.  The Association shall receive copies of all approved Workload Policies within thirty (30) working days of Oakland approval.

70.   Faculty members have additional professional responsibilities in such areas as counseling and advising; orientation; registration; service on academic committees; keeping regular posted office hours scheduled at times most beneficial to students; and participation in ceremonial academic functions such as convocation and commencement.  Faculty members shall not be asked to spend an excessive or unfair amount of time on such additional services, recognizing that there may be different considerations for tenured and non-tenured faculty.

71.   Nothing in this Agreement shall be construed to require either a specific number of hours of service to the University by faculty members or to give faculty members the right to additional compensation based upon the number of hours of service performed for the University, except as specifically provided for in this Agreement.  Further, there shall be no fixed scheduling of the time faculty members shall be required to discharge their professional responsibilities, except as required for the scheduling of classes and the fixed scheduling of other events faculty members are required to attend by this Agreement.

72.   **Outside Professional Work of Full-Time Faculty**.  Recognizing that Oakland University is a faculty member's full-time employer, faculty members may engage in compensated outside professional activities, provided such activities do not interfere with satisfactory performance of the faculty member's work obligation.  If Oakland determines that such activities conflict with the satisfactory performance of the faculty member's obligations, it will notify the faculty member in writing of

- 43 -

its determination and may require the faculty member to cease such activities. Faculty members contesting such determination may file a grievance regarding Oakland's action before severing the outside relationship or ceasing such work. The grievance must be filed within 30 days after receipt of the written notice from Oakland.

The following shall apply to such activities:

a. The faculty member shall notify his or her department chairperson, or the dean or director in units without chairpersons, of compensated outside professional activity, including self-employment, by October 1 each year (see Appendix E for recommended form). Faculty who begin employment during the life of this Agreement shall make such notice in advance of employment or within 30 days of employment. Types of activities that need not be reported include, but are not limited to, book royalties; fees for peer review, honoraria, or speaking fees; and reimbursement for travel to/from professional conferences.

b. Any and all use of Oakland's equipment, facilities, personnel, supplies and services in conjunction with the faculty member's outside activity must be approved by Oakland, in writing, in advance of such use.

c. Arrangements for the use of university equipment, facilities, personnel, supplies or services shall provide for reimbursement of costs and overhead to Oakland.

d. Faculty members who work with any outside employer shall notify the employer in writing within 30 days of employment that outside work is performed by the faculty member in an individual capacity and not on behalf of Oakland. Oakland shall receive a copy of such notification.

## ARTICLE XI
## SALARY FOR FULL-TIME NON-VISITING FACULTY

73. Full-time non-visiting members of the bargaining unit shall receive salaries and other payments as provided for in this Article.

For the purposes of calculating the daily pay rate for faculty, the period of full-time service begins two days before the start of classes in the Fall semester and extends through the last day of final exams of the Winter semester.

74. **Regular Annual Salary**. Each faculty member's regular annual salary shall be paid in monthly installments equal to one-ninth (1/9) of the regular annual salary, except as provided in Article XV. Faculty salary for the August 15 to August 14 year is paid out from August 1 to April 30. This pay distribution does not change

- 44 -

the effective dates of appointments contained in this Agreement. The minimum salary will be $38,274 in 2012-13, $39,154 in 2013-14, and $40,055 in 2014-15.

**75.** On August 15 during each year of this Agreement, except for faculty members first assigned a salary effective on or after January 1 of the prior academic year, each faculty member shall receive any applicable annual salary adjustment as provided in Paragraphs 77 and 81 of this Agreement.

**76.** a. Oakland may increase the salary of a faculty member at any time. Such salary increases are permanent. Reasons for such salary increases may include, but are not limited to, internal equity, market conditions or extraordinary performance. Oakland's determination to grant or not to grant salary increases under this subparagraph shall not be grievable.

b. Job-secured special instructors, tenured associate professors and professors, may apply for a salary increase as follows:

(1) A job-secured special instructor may be awarded three (3) salary increases under this subparagraph, and may apply for that increase with the first application at least six (6) years from the date of promotion to or hire as a job-secured special instructor and the subsequent applications at least six (6) years of the previous award under this subparagraph. A tenured associate professor may be awarded one (1) salary increase under this subparagraph, and may apply for that increase after at least three (3) years from the date of promotion to or hire as a tenured associate professor, but not within three (3) years prior to application for promotion to professor. A professor may be awarded up to three (3) such increases under this subparagraph, with the first application at least six (6) years from the date of promotion to or hire as professor, and any subsequent application at least six (6) years from the date of the prior award under this subparagraph. If an application for a salary increase is denied, reapplication can take place only after three (3) years from the denial and only as otherwise permitted under this subparagraph.

(2) Within each pay group (as defined in Paragraph 79), and rounded up to the next whole person, no more than twenty percent (20%) of the job-secured special instructors, no more than twenty percent (20%) of the tenured associate professors and no more than twenty percent (20%) of the professors may apply for salary increases under this subparagraph per academic year. If more than these limits apply, the applications selected for consideration shall be chosen on the basis of seniority of the faculty members in question in the applicable unit, as defined by Paragraph 56b. Any tie in seniority shall be resolved by the applicable unit.

- 45 -

(3) Prior to March 1 each year, an eligible special instructor or tenured faculty member may submit an application, including an extended *curriculum vitae* and a description of the faculty member's record since the later of the member's date of hire, last promotion, or salary increase under this paragraph to the member's department chair, or designee of the academic unit in academic units without chairs.  The department chair or designee (as applicable), who may be advised by a departmental committee, shall make a recommendation and forward it with the application to the appropriate dean (or other official designated by Oakland) by the following April 1.  Oakland will then review the application, considering the information and recommendation submitted by the department chair or designee (as applicable), and may consult with other persons and consider other factors it determines necessary for making a final decision, including but not limited to the recency of any award under subparagraph 76a.

(4) Salary increases granted by Oakland under this subparagraph shall be at least $1,250 for special instructors, at least $3,000 for associate professors, and at least $5,000 for professors.  These increases shall be effective the following August, shall be permanent, and shall be in addition to any other salary increases otherwise provided at that time.

(5) Oakland shall notify the faculty members and the Association of its decisions by July 1 each year.  Unsuccessful applicants shall receive a letter explaining the denial.  Oakland's determination to grant or not to grant salary increases under this subparagraph shall not be grievable.

**77.**	A faculty member will receive a $2,000 raise in salary when promoted from special instructor to special instructor with job security; a $2,800 raise in salary when promoted from instructor to assistant professor or from special instructor with job security to associate professor; a raise of $5,000 from assistant professor to associate professor; and will receive a $7,500 raise in salary when promoted from associate professor to professor.   These salary increases are in addition to increases provided under paragraph 81.

The letter of offer to faculty members hired as associate professors without tenure shall state that they are not eligible for a promotional raise in salary when they are awarded tenure.

**78.**	Paragraphs 73 through 78 shall apply to faculty members exercising leave provisions of this Agreement and receiving at least 50 percent of their annual salary.  They shall apply equally to faculty members receiving less than 50 percent of their annual salary and exercising any leave that Oakland has approved for professional and scholarly purposes, and faculty on a reduced work schedule under paragraph 134 or 183.  Notwithstanding the provisions of paragraph 81, faculty members who elect to have a one-year leave of absence

- 46 -

without pay not count as part of the probationary period shall not receive the across-the-board salary increase during the year of leave.

79.  **Pay Groups**.  Each academic unit shall constitute a pay group with the exception that when a school constitutes the academic unit it may consist of more than one pay group.

Eye Research Institute

Library

School of Business Administration

School of Engineering and Computer Science
School of Health Sciences

School of Education and Human Services
        Reading and Language Arts
        Teacher Development and Educational Studies
        Educational Leadership
        Counseling
        Human Development and Child Studies
        Human Resource Development

School of Nursing

College of Arts and Sciences
        Department of Art and Art History
        Department of Biological Sciences
        Department of Chemistry
        Department of Communication and Journalism
        Department of English
        Department of History
        Department of Linguistics
        Department of Mathematics and Statistics
        Department of Modern Languages and Literatures
        Department of Music, Theatre and Dance
        Department of Philosophy
        Department of Physics
        Department of Political Science
        Department of Psychology
        Department of Sociology and Anthropology
        Department of Writing and Rhetoric

80. Faculty members in each pay group shall assign, through their own procedures, a merit salary increase, if any, to each faculty member in the pay group (excluding department chairperson(s)).

81. The total salaries for faculty members in a pay group, excluding the salary of chairperson(s), must equal the salary pool assigned to the pay group, which consists of the prior year salaries of the faculty members in the pay group, adjusted by the total raise percentage for all faculty (across-the-board and merit salary increases), plus the value of any promotional raises within the pay group. Faculty appointed to begin chairperson assignments at the start of a new academic year are to be included in this faculty member pool.  For purposes of the calculations of this paragraph, only continuing faculty members, including continuing visiting faculty, not on a full-year unpaid leave are to be included. When a faculty member returns from a full-year leave without pay his or her salary shall be adjusted to include the across-the-board and contractual merit increases for the period of the leave without pay, if the purpose of the leave was directly related to the faculty member's employment at Oakland.  For the years covered by this Agreement, the total increases are as follows:

| Year | Across-the-board | Merit |
|------|------------------|-------|
| 2012-2013 | 1.80% + $1,000 for each continuing full-time faculty member | 0.00% |
| 2013-2014 | 2.30% | 0.00% |
| 2014-2015 | 2.30% | 0.00% |

82. Assignments of merit salary increases under this Agreement shall be made on or before the June 30 of the preceding academic year.

83. Each individual merit salary increase shall be subject to approval by Oakland. Disapproval by Oakland shall be delivered to the department chairperson, or other person designated by members of the pay group in academic units without departments, within 10 days after receipt by Oakland of initial assignment or said disapproval shall be void.  Disapproval of any merit salary increase by Oakland shall permit the reassignment of all merit salary increases by faculty members in the pay group.  Upon request of the chairperson, or other designated person in academic units without departments, Oakland shall indicate in writing why the list was not approved.  The merit salary increase assigned to a faculty member is not grievable.

84. **Base Salary for Chairpersons**.  Faculty members designated by Oakland to act as chairpersons will receive across-the-board and merit salary increases, if any, each year. Included in this pool shall be chairpersons scheduled to return to regular faculty positions at the beginning of the academic year covered by this salary adjustment.  The total salaries for chairpersons in each school or college with chairpersons must equal the salary pool assigned to the chairpersons, which consists of the prior year salaries of the chairpersons, adjusted by the total raise

- 48 -

percentage for all faculty (across-the-board and merit salary increases listed in paragraph 81), plus the value of any promotional raises within the chairperson group.  The merit salary increases will be assigned at the sole discretion of Oakland.  The merit salary increase assigned to a chairperson is not grievable.

85.   **Salary for Chairpersons**.  In addition to base salary, Oakland will pay each faculty member designated as department chairperson, for performance of duties required by such assignment, the following:

twelve percent (12%) of his or her salary, plus an amount equal to "x" times "y" divided by "z" where

x =   four percent (4%) of the salaries of all chairpersons in the respective school or college,

y =   the number of full-time faculty members in the chairperson's department at the beginning of the fall semester, plus one-half the number of part-time faculty members as of the prior October 1, and

z =   the total number of full-time faculty members in all departments in the respective school or college at the beginning of the fall semester, plus one-half the number of part-time faculty members as of the prior October 1.

The determination of "y" and "z" will be made by Oakland by September 1 of each year and will not be grievable.  Such additional salary will be paid on the following basis:

a.  Each chairperson will discharge all assigned duties from August 15 through August 14 of the following year.

b.  The additional pay will be earned over four periods of the year as follows: fall=1/3; winter=1/3; each of the two eight-week summer sessions=1/6.

86.   Each chairperson shall have the option to teach one course section during the spring or summer session provided a course he or she is qualified to teach is offered.  The spring/summer pay rate specified in paragraph 89 will be based on regular annual salary.

87.   If the duties of a department chairperson are performed by an Oakland-approved acting chairperson, the acting chairperson will be paid at the rate specified for a chairperson in paragraph 85. The chairperson shall not be paid in the above case.

88.   **Salary for Coordinators**.  For any school with coordinators rather than chairpersons, plus the Library, Oakland will provide an annual amount equal to at

least $400 times the number of full-time faculty members in that school. Oakland will distribute this amount at its discretion among coordinators in the school as compensation for coordinating duties, based on Oakland's determination of how the full-time faculty members are apportioned among these coordinators. The determination of the number of full-time faculty members in each school will be made by Oakland by September 10 and will not be grievable.

89.    **Summer Rate of Pay**.  A faculty member who teaches credit courses during a summer session shall receive additional pay.  For each section of four credits, the pay will be the amount shown below plus eight and one-half percent (8.5%) of the faculty member's regular annual salary, up to a maximum as shown below.

|           | Amount  | Maximum  |
|-----------|---------|----------|
| 2012-2013 | $4,000  | $12,000  |
| 2013-2014 | $4,092  | $12,276  |
| 2014-2015 | $4,186  | $12,558  |

The figures above and regular annual salary are those determined under this article for the academic year preceding such summer session.  Salary for sections other than four credit hours will be computed as the ratio of the actual number of credit hours divided by four, times the amount computed above.

Faculty members teaching in summer sessions shall perform related professional responsibilities.  Whenever possible, courses in the summer sessions will be taught by bargaining unit faculty members.

90.    Departments or schools wishing to schedule summer teaching as part of regular teaching assignments rather than for extra salary may do so with the consultation and approval of the dean and the individual faculty member involved.  For persons teaching in-load in summer, this Agreement shall be interpreted as follows:

a.  References to summer sessions in paragraphs 89 and 98 and in item #6 of Appendix B, shall be replaced by "off-term."

b.  References to fall/winter and academic year in paragraphs 91 and 94 shall be adjusted to reflect the change in regular service schedules.

c.  Item #2 in Appendix B is considered such that the faculty member will be valued at 1.0 FTE for in-load scheduled teaching.

d.  The tenure review schedule, if applicable, will apply as written.

91.    Except as noted in paragraph 94, credit courses taught by faculty members during the academic year shall be taught as part of their regular assignment.  No faculty member shall be required to teach more than three such courses in the

evening or on weekends. Teaching schedules, generally, shall be established so that the time between the end of the last assignment and the beginning of the first assignment on the following day is no shorter than twelve (12) hours. If a bargaining unit faculty member is required to teach on a schedule that he/she believes does not provide an appropriate time break between assignments, then he/she may request a conference with the dean or, if the dean has determined the schedule, with a representative from the Office of the Senior Vice President for Academic Affairs and Provost.

92. **Online/Distance Instruction.**  Faculty may voluntarily engage in the development and delivery of courses for credit to be delivered online, through distance learning methods, using technologically innovative methods and/or through the use of emergent technology.  Oakland shall notify the Association of credit hours delivered by such courses, and of arrangements made for the internal/external delivery of Oakland credits by these courses.

The following shall apply to online/distance instruction:

a.  Faculty members shall develop online/distance learning credit courses that are at least of the same quality and rigor as similar courses for credit delivered by historically traditional means.

b.  The development, review and approval processes for each online/distance learning course for credit shall be the same as the development, review and approval processes for courses for credit delivered by historically traditional means.

c.  Faculty may receive stipends to develop new courses.  In addition, Oakland and individual faculty members may enter into written agreements for experimentation with new delivery formats.   Said agreements may delineate such items as form of compensation, recapture by Oakland of design and/or production costs, royalties to be paid, ownership of copyrights, and preparation of accompanying materials.   The Association shall receive copies of all such agreements within 30 working days of signing.

d.  The delivery of such courses shall be consistent with the Workload Policy of the faculty member's academic unit.

93.  **Intellectual Property.**  The parties acknowledge that intellectual property issues are becoming increasingly complex, and that shared participation in the development of new practices and approaches to the rights and responsibilities of both faculty and Oakland is important to fostering a campus climate that encourages such work.  To this end, the parties agree that:

a.  Oakland, in keeping with academic tradition, generally does not claim for itself copyrightable material, such as books, articles, theses, papers,

- 51 -

lectures, novels, poems, musical compositions, computer software, and similar works which are intended to disseminate knowledge, such as the results of academic research, scholarship, and artistic expression of its faculty.  Exceptions to this policy would be works subject to third-party contractual obligations (such as sponsored research agreements) or works produced under specific written agreements between a faculty member and Oakland.

b. With respect to patentable work and trade secrets, Oakland and the faculty members involved generally have a shared interest in the property rights. Prior to application for patents, Oakland and the faculty member shall agree in writing on the ownership and shared rights and responsibilities of the parties.  Oakland shall respond in writing within thirty (30) working days. Any such written agreements must take into account Oakland's contribution of resources to the project and appropriate third-party interests, such as requirements of research grants.

c. At the beginning of each fall semester Oakland shall supply the  Association with this list of all current intellectual property agreements.  The faculty member shall have the right to share a copy of the agreement with the Association.

**94.** **Fall/Winter Overload Teaching.**  At its sole discretion, Oakland may determine that certain courses are overload and any faculty member teaching such courses shall receive additional salary at a minimum rate of $400 per credit hour taught. Courses that may qualify for this overload provision may include courses taught at off-campus locations, distance learning courses taught at multiple locations, or executive programs.

## ARTICLE XII
## COMPENSATION FOR VISITING FACULTY

**95.** Paragraphs 95 through 100 apply only to visiting faculty.

**96.** New visiting faculty members shall be assigned a salary.  Visiting faculty members whose continuous service goes back further than the beginning of the previous winter semester shall receive an across-the-board salary increase as described in paragraph 75 and a merit salary increase as described in paragraph 80.

Oakland, at its sole discretion, may approve additional salary increases for visiting faculty members.

**97.** When a visiting faculty member is shifted to a non-visiting full-time position, the salary assigned by Oakland shall not be lower than it would have been if the person had continued in a visiting position.

98.   **Summer Rate of Pay**.  A visiting faculty member who teaches credit courses during summer shall receive additional compensation on the same basis as a non-visiting full-time faculty member, as specified in paragraph 89. Visiting faculty members teaching in summer shall perform related professional responsibilities.

99.   **Fringe Benefits**.  A visiting faculty member may participate in the fringe benefit programs specified in Article XVI, and the enrollment in courses in Article XVII, as specified in those articles.

100.   **Retirement**.  A visiting faculty member may participate in the retirement programs in paragraphs 130 after two full years of service as a visiting faculty member.  Oakland may waive all or part of the service requirement.  For visiting faculty members, Oakland shall contribute to said plan, over and above all other compensation, 14% of the salary paid to the visiting faculty member under the provisions of paragraphs 95-97 during their third and fourth years as a visitor.

**ARTICLE XIII**
**COMPENSATION FOR SPECIAL LECTURERS**

101.   **Salary for Special Lecturers**.

a.   The minimum salary per credit hour taught for faculty members employed as special lecturers will be determined by the aggregate number of years of prior experience as a special lecturer, as shown below.

| | 2012-13 | 2013-14 | 2014-15 |
|---|---|---|---|
| Less than 4 years of experience | $1,124 | $1,150 | $1,176 |
| Four or more year of experience | $1,212 | $1,240 | $1,269 |
| Eight or more years of experience | $1,307 | $1,337 | $1,368 |

b.   In assessing the number of years of prior experience, Oakland will count each academic year during which the faculty member had an appointment as special lecturer or as a full-time visiting faculty member.  For appointments preceding 1988, each semester appointment as a special lecturer shall be counted as 0.5 academic years.  Summer sessions do not apply toward this compilation.

102.   Special lecturers are eligible to participate in the medical and vision programs described in paragraphs 107 through 110 and 115 for the year of appointment. For each enrolled special lecturer, Oakland shall make a monthly contribution equal to a percentage of the cost of such programs up to a percentage of the maxima listed in paragraph 107.  The percentages are based on years of service as a special lecturer: up to 4 years, 60%; more than 4 years, 65%.  Oakland will deduct the additional cost through payroll deduction if authorized by the special

lecturer.  Failure to make such authorization shall result in ineligibility to participate in the health care plan.

103.   A special lecturer shall be eligible to take up to eight credits per year during his or her current term of appointment under the provisions of paragraph 129.

## ARTICLE XIV
## DURATION OF SALARY

104.   Nothing in this Agreement shall be construed to mean that full payment for all services rendered during any academic year will have been received by faculty members during any academic year.  The parties agree that full-time faculty members are paid on a monthly basis for the duration of their appointments.  The appointment periods for all full-time faculty members, except those made after the beginning of the academic year and those visiting appointments of less than one year, are 12 months in length.  Full-time faculty members may elect to receive their salary in twelve monthly installments pursuant to Article XV.

## ARTICLE XV
## FACULTY SALARY PAYMENT OPTION

105.   Any full-time faculty member may elect a twelve-month pay option by filing the appropriate form with Oakland by August 10 for the following academic year.  Thereafter, the faculty member shall continue on the twelve-month pay schedule unless he or she advises Oakland prior to August 10 of any subsequent year that he or she wishes to revert to the regular nine-month basis.

A faculty member exercising this option will have his or her regular annual salary divided into twelve equal monthly installments, with the first payable on August 31.

## ARTICLE XVI
## INSURANCES

106.   Every new faculty member will receive a full set of written descriptions of applicable benefit programs, and continuing faculty members may secure any of the available descriptions at the Benefit Services Office or through the Benefit Services web site.  Faculty may access information regarding their personal benefit programs through Oakland's online service (Web For Employees).

A faculty member shall have the right to enroll in insurance benefits either upon initial employment as a faculty member or during open enrollment periods.  If employment begins on August 15, insurance coverage will not be effective until September 1 of that year, and runs through the twelve month period ending August 31 of the following year unless the faculty member terminates his/her employment prior to the conclusion of the academic year, in which case

- 54 -

coverage will end at the end of the month in which employment terminates. Faculty whose appointments begin at other times of the year should confirm the starting dates of their insurance coverages with the Benefit Services Office

Yearly open enrollment periods for insurance benefit coverage shall occur in the Fall semester, with the effective date for any coverage addition or change taking place January 1 of the following year.

107.   Employees are eligible to participate in comprehensive health insurance plan options as described in paragraphs 108, 109, and 110 below.

For calendar year 2013, for each enrolled full-time faculty member, Oakland agrees to a monthly benefit equal to the monthly cost of the most expensive Health Maintenance Organization outcomes plan described in paragraph 110, for the respective level of coverage (single, two-party, or family).  For calendar year 2014, for each enrolled full-time faculty member, Oakland agrees to a monthly benefit contribution equal to one hundred ten (110%) percent of the least expensive Health Maintenance Organization outcomes plan described in paragraph 110, for the respective level of coverage (single, two-party, or family). Thereafter, for each enrolled full-time faculty member, Oakland agrees to a monthly benefit contribution equal to ninety-five (95%) percent of the least expensive Health Maintenance Organization outcomes plan described in paragraph 110, for the respective level of coverage (single, two-party, or family). To the extent the monthly cost of the selected health care plan exceeds Oakland's contribution as described above, Oakland will deduct the additional cost through payroll deduction.  The monthly cost of the health care plan that exceeds Oakland's contribution will be treated as a Premium Conversion under section 125 of the Federal Internal Revenue Code.

If a program of national health care coverage becomes available, Oakland shall be required to pay no more toward national health insurance and the health care coverage described under this Article than it has agreed to pay in this paragraph 107.

No changes shall take place in the plans listed in paragraphs 108 through 110 during the period of this agreement without consultation with the Association; changes not mandated by the insurance providers may only be implemented with consent of the Association.

108.   **Blue Cross Standard Plan.**  Available only to faculty members enrolled in this plan as of January 1, 2012, and who remain continuously enrolled in this plan.  This plan is currently the Blue Cross/Blue Shield Comprehensive Hospital Care--Semi-Private and Blue-Shield MYF-1 Preferred (medical services).

109.   **Community Blue PPO.**  This plan is Blue Cross and Blue Shield of Michigan's

- 55 -

Community Blue PPO Option 1 with riders reducing annual maximum co-pay and co-pays for mental health care and emergency treatment. Additional riders provide hearing coverage as well as prescription drugs (including mail order) for a $10/$20 co-pay; a $50.00 co-pay for outpatient hospital emergency room visits; and a $15.00 co-pay for office visits in a network physician's office. This PPO (Preferred Provider Organization) plan provides comparable benefits to the Plan described in paragraph 108, with reduced premium rates and with reduced out-of-pocket expenses for the participants. However, the participant is expected to choose the hospital or physician for health care from the Blue Preferred Plan Directory. When services are provided by a Blue Preferred Plan provider the participant pays only for services not covered under the Community Blue Plan or for liabilities such as co-pays required by the Plan. If eligible services are received from a provider who is not a member of the Blue Preferred Plan network, Community Blue pays eighty percent (80%) of the reasonable amount as determined by BC/BSM after deductibles, and the participant is responsible for the remaining charges. Specific policy terms are those in the executed insurance contract with Blue Cross/Blue Shield of Michigan.

Oakland currently offers participation in the Blue Cross and Blue Shield of Michigan's Community Blue PPO Option 3. This PPO provides similar benefits to those under the Community Blue PPO Option 1 except for the following:

> $20 co-pay for office/urgent care visits in a network physician's office.
> Calendar year deductibles of $250/$500 in network and $500/$1,000 non-network
> Annual out of pocket of $1,250/$2,500 in network and $3,500/$7,000 non-network

When services are provided by a Blue Preferred Plan provider, Community Blue pays eighty percent (80%) of the reasonable amount as determined by Blue Cross/Blue Shield of Michigan after deductibles, and the participant is responsible for the remaining charges. If services are received from a provider who is not a member of the Blue Preferred Plan network, Community Blue pays sixty percent (60%) of the reasonable amount as determined by Blue Cross/Blue Shield of Michigan after deductibles, and the participant is responsible for the remaining charges. Specific policy terms are those in the executed insurance contract with Blue Cross/Blue Shield of Michigan.

110. **Health Maintenance Organization.** Oakland and the Association may agree to participate in or dissociate from federally qualified Health Maintenance Organization (HMO) plans as alternatives to the health care coverage provided above. In calendar year 2013, 2014 and 2015, three outcome based HMO plans are to be offered: Priority Health's Health by Choice Achievements HMO; HAP's Achieve HMO; and BCN's Healthy Blue Living Rewards HMO. Each of these HMO plans will offer two levels of benefits – Enhanced and Standard, and BCN

- 56 -

will offer a third level Intermediate.  The chart below contains the key features of these three HMO plans.  A summary chart of these plans is also provided in Appendix M, for informational purposes, only (and shall not be the basis of a grievance).  A detailed description including how members qualify for the level coverage, will be provided in the annual open enrollment materials that are distributed to each eligible faculty member.  Each of these HMO plans shall contain riders for Other Eligible Adults including Dependent Children of Other Eligible Adults.

|  | Enhanced | BCN Only Intermediate | Standard |
|---|---|---|---|
| Deductible (Single/Family) | $0 | $100/$200 | $200/$400 |
| Co-Insurance | N/A | 90%/10% | 80%/20% |
| Out-of-Pocket Max (including deductible) | N/A | $1,100/$2,200 | $2,200/$4,400 |
| Office/Urgent Care Co-Pay | $20 | $25 | $30 |
| *Prescription Co-Pay |  |  |  |
| Generic | $7 | $10 | $10 |
| Preferred Brand Name | $15 | $20 | $20 |
| Non-Preferred Brand Name | $30 | $40 | $50 |

*The Priority Health Standard Prescription co-pay matches the Enhanced Prescription co-pay.

Information about Plan benefits, plan design and open enrollment materials may be obtained from the Benefit Services Office and will be provided by the medical carriers. All benefits of the HMO plans are subject to specific HMO policy provisions and the Group Operating Agreements between Oakland and the HMO.

**111.**   Under applicable federal law, Oakland has established a pre-tax medical insurance premium payment plan.  Each faculty member who has medical insurance coverage under paragraphs 107-110 automatically shall be considered to have elected participation in the pre-tax medical insurance premium payment plan to the extent permitted by law.

**112.   Medical Savings Account Match**.  Oakland shall provide a medical savings account match each calendar year for full-time faculty as follows:

$100, if the individual contributes $100 through $124 to his/her plan;
$125, if the individual contributes $125 through $174 to his/her plan;
$175, if the individual contributes $175 or more to his/her plan.

**113.   Medical Waiver Payment.**  A full-time faculty member who chooses not to participate in any of the medical care coverage options described in paragraphs 108, 109 or 110 will be paid $1,000 annually, as follows: faculty paid their base

salaries over a 12 month period shall receive $83.33 per month for each month the faculty members do not participate in any of these medical coverage options; faculty paid over a 9 month period shall receive $83.33 per month for each month the faculty members do not participate in any of these medical coverage options during that 9 month period, plus $249.99 in the faculty member's pay for April (to cover the May, June and July benefit), if applicable.  Oakland, at its sole discretion, may increase this payment.

To be eligible, the faculty member must complete a medical waiver payment form at the time of hire or during a period of open enrollment.  The medical waiver form shall include a statement attesting to the faculty member's participation in another medical insurance plan.  The medical waiver payment form and medical coverage statement shall remain in force until changed by the faculty member.

The faculty member may enroll in one of the plans described in paragraph 108, 109 or 110 during the plan year if he/she experiences a change of status event.  Such events are defined by IRS statute 1.125-4 and may include (without limitation) changes in legal marital status, number of dependents, employment status, dependents satisfying or ceasing to satisfy eligibility requirements, residence, and adoption assistance.  Proof of the change of status event may be required for enrollment.  Enrollment must occur within 30 days of the loss of other coverage.

114. **Dental Insurance.**  A full-time faculty member shall have the right to enroll upon initial employment for either single, two-party or full-family coverage under the Delta Dental Plan, providing one hundred percent (100%) of the cost of in-network class I and class II benefits if by a Delta Dental approved participating provider (and 50% otherwise). Class III benefits will provide 50% of the cost. The maximum benefit per person per contract year shall be $1,000 with no deductible for class I, II and III.  Charges for preventative and diagnostic services will not count against the $1,000 annual maximum benefit.  Class IV benefits will provide 50% of the cost, up to a lifetime maximum of $1,500 per eligible person.  The plan shall provide for full coordination of benefits with other dental plans. Oakland shall provide this plan at no cost to the faculty member.

115. **Vision Insurance.**   Faculty members have the option of selecting the A-80 vision coverage through Blue-Cross Blue-Shield plan (or essentially similar plan), or the Davis Optical plan (or essentially similar plan) offered to other Oakland employees.   Oakland shall provide this coverage at no cost to the faculty member.

116. **Life Insurance.**  Oakland shall provide each full-time faculty member with term life insurance equivalent to one times their regular annual salary, rounded up to the next $1,000 (up to a $250,000 limit).  This benefit reduces to 67% of regular annual salary ($167,500 maximum) at age 65, 45% of regular annual salary ($112,500 maximum) at age 70, and 30% of regular annual salary ($75,000

maximum) at age 75.  Faculty members must complete an enrollment card before coverage can be effective.  Oakland will pay the full cost of such coverage.

117.   For those faculty members enrolled in the insurance program described in paragraph 116, Oakland shall also make available optional additional life insurance benefits up to $200,000, provided the faculty member furnishes evidence of insurability satisfactory to the insurance carrier.  Premiums for such additional coverage shall be paid by the faculty member and deducted from his or her compensation.

The rates are those established by the carrier and may vary depending on participation rates.  For information purposes only, the rates at the beginning of the current Faculty Agreement are:

| Attained Age | Rate per $1,000 |
|---|---|
| less than 30 | 0.05 |
| 30 but less than 35 | 0.06 |
| 35 but less than 40 | 0.08 |
| 40 but less than 45 | 0.13 |
| 45 but less than 50 | 0.21 |
| 50 but less than 55 | 0.33 |
| 55 but less than 60 | 0.51 |
| 60 but less than 65 | 0.77 |
| 65 but less than 70 | 1.19 |
| 70 and over | 3.00 |

118.   **Travel Accident Insurance**.  Oakland shall provide all full-time faculty members travel accident insurance coverage under the master policy of insurance underwritten by Mutual of Omaha, or equivalent coverage written by any company.  All accident insurance coverage provided pursuant to this paragraph shall be in effect for full-time faculty members and cover them against all risks delineated in said master policy whether or not they are in the course of Oakland's business at the time of their insured loss.  Oakland shall pay the full cost of such insurance.

119.   **Accidental Death and Dismemberment Insurance**.  Full-time faculty members may elect to purchase additional optional insurance coverage known as the Accidental Death and Dismemberment Insurance.  All premiums for such additional insurance will be paid by the faculty member through payroll deduction.  Those wishing to purchase additional insurance must enroll for coverage within 60 days of their employment date or during a scheduled open enrollment.

120.   **Professional Liability Insurance Coverage**.  Oakland shall provide a professional liability insurance program.  Coverage shall consist of $1,000,000 arising out of any one occurrence because of personal injury or property damage

or any combination thereof; to a maximum of $1,000,000 arising out of all occurrences during each policy year.  Professional liability coverage does not include medical malpractice.  Oakland shall pay the full cost of such insurance.

121.  **Long-Term Disability Plan**.  Oakland shall provide long-term disability insurance to all full-time faculty members through CIGNA Insurance (group policy LK-962558) or equivalent coverage underwritten by any other company.  Subject to policy conditions, after 180 days of total disability the benefit will be sixty percent (60%) of the faculty member's covered monthly salary, but not to exceed $5,000 monthly and attendant retirement program coverage to the selected vendor (if enrolled).  Policy conditions include an annual three percent (3%) inflation adjustment and reductions in benefits for Social Security disability payments and/or Worker's Compensation benefits.  Faculty members must complete an enrollment card before coverage can be effective.  Oakland shall pay the full cost of such coverage.

122.  **Availability of Faculty Benefit Information**.  Oakland shall make written descriptions of benefit programs available to faculty members and participating retired faculty including:  health care coverage, medical waiver information, medical savings account information, optical insurance, mail-order prescription drug options, dental plan coverage, travel accident insurance, group life insurance, professional liability insurance, multiple option retirement plans, long-term disability insurance, and accidental death and dismemberment insurance.  Oakland also provides coverage for Worker's Compensation, Unemployment Compensation and Social Security (FICA). Information about these programs may be obtained from the respective agencies. Prior to the period of open enrollment, Oakland shall mail such descriptions to participating retired faculty members and all special lecturers.

123.  Subject to the provisions contained in this Article XVI and paragraph 211, medical, dental, and vision insurance coverage are available to those faculty members, dependents, and Other Qualified Adults and Dependent Children of Other Qualified Adults (see APPENDIX J) subject to the applicable definitions, terms and conditions contained in Oakland´s respective third-party insurance plan contracts, including without limitation those terms and conditions applicable to eligibility, coverage, preconditions and administration. Oakland will impute income, withhold taxes and otherwise account for the provision of all medical, dental, and vision insurance coverage as required by federal or state law or regulation, or the decision of any court of competent jurisdiction or administrative agency having jurisdiction.

124.  Oakland shall deliver electronically to the Association by October 20 of each year a list of eligible faculty members who have not enrolled in the following benefit programs:  health care coverage, vision coverage, dental plan coverage, travel accident insurance, group life insurance, multiple option base and supplemental retirement plans, and long-term disability insurance.

**125.**   **Special Options**.  When, and if, Oakland offers to all its employees special programs such as pre-tax reimbursement accounts or long-term care insurance, faculty members shall be eligible to participate at their own expense.

**126.**   **Co-operative Insurance Program**.  If Oakland enters into a co-operative venture with other state universities to provide cost-effective health care coverage, faculty will be eligible to participate.

**127.**   During the life of the Agreement, Oakland and the Association may agree to changes in the types and amounts of optional additional life insurance available (paragraph 117). Such changes may be occasioned by federal regulations relating to tax liability under the current plan or by the availability of other plans which are more beneficial to faculty members and to Oakland.

**ARTICLE XVII**
**TUITION BENEFIT**

**128.**   **Faculty Retraining**.  A faculty member may enroll in any Oakland credit courses. For each such enrollment in a given section, the maximum enrollment for that section shall be increased by one, except where equipment limitations prohibit such adjustment.  In no case shall such enrollments displace other students.  No tuition shall be charged for such enrollment, but usual fees shall be charged. Any credit hours generated by such enrollments under the provisions of this paragraph shall be excluded from the calculations in Appendix B.  A faculty member who voluntarily terminates his or her employment with Oakland within one (1) year of completing a course in which he or she was enrolled under this paragraph shall pay Oakland the full amount of tuition for each such course so enrolled during that year within thirty (30) days of the last day of employment.

**129.**   **Tuition Waiver Benefit**.  The spouse of any faculty member, dependent children, and/or Other Qualified Adult and Dependent Children of Other Qualified Adults (see Appendix J), if admitted to the University through its normal procedures, may enroll in any credit courses. For the purpose of this paragraph 129, the Internal Revenue Service's definition of dependent child for federal income tax purposes shall apply.  For each such enrollment in a given section, the maximum enrollment for that section shall be increased by one, except where equipment limitations prohibit such adjustment.  In no case shall such enrollments displace other students.  This paragraph also shall apply to:

a.   the spouse, dependent children, and/or Other Qualified Adult and Dependent Children of Other Qualified Adults (see Appendix J) of a deceased or disabled full-time non-visiting faculty member, if the faculty member died or was disabled while employed as a full-time faculty member at Oakland, and

- 61 -

b. any dependent child of a retired faculty member and/or Other Qualified Adult and Dependent Children of Other Qualified Adults (see Appendix J), if such child was enrolled and attending classes in the academic year session or semester immediately preceding the retirement date of the faculty member. The tuition waiver for the dependent child shall be available for up to five (5) years from the date of retirement or until the completion of the degree for which the child was enrolled, whichever first occurs.

Oakland shall waive the applicable tuition, defined by the undergraduate lower, undergraduate upper, graduate and doctoral rates as published by Oakland for the semester or the summer session in question, but usual fees shall be charged. In the absence of a fee schedule, the student shall be charged a fee proxy equal to ten (10%) percent of the in-state lower division undergraduate tuition rate for the number of credits enrolled. For programs that charge tuition rates higher than those described above, the tuition waived will be limited to the rates defined above. Program specific fees shall be the responsibility of the student. Any credit hours generated by such enrollments shall be excluded from the calculations in Appendix B.

A special lecturer may transfer all or part of his/her tuition waiver benefit described in paragraph 103 to his/her spouse, dependent children and/or Other Qualified Adult and Dependent Children of Other Qualified Adults (see Appendix J).

The tuition waiver shall not apply to the programs of the OUWBSOM. If isolated courses or modules for credit are developed by the OUWBSOM, they shall be eligible for the tuition waiver benefit.

## ARTICLE XVIII
## RETIREMENT

130. **Multiple Option Retirement Program**. Oakland shall offer a Multiple Option Retirement Program for all full-time faculty members, except as noted in paragraph 139. Oakland shall contribute to the Multiple Option Retirement Program as follows:

a. For each participating non-visiting faculty member hired without tenure or job security: until such person has attained two years of full-time service and has been approved by Oakland for continued employment subsequent to the initial term of hire, Oakland shall contribute to said plan, over and above all other compensation, an amount equal to fourteen percent (14%) of the salary paid to each faculty member under the provisions of paragraphs 74-88; and shall pay contributions as provided in paragraph 153.

- 62 -

For faculty hired without tenure or job security after September 14, 2003, and who satisfy the conditions set forth above, Oakland shall contribute to said plan, over and above all other compensation, an amount equal to fifteen percent (15%) of the salary paid to each faculty member (as defined above) for the next two years of the faculty member's employment term.

b. <u>For each participating full-time visiting faculty member hired after September 14, 2003:</u>  in the third and fourth year of employment, Oakland shall contribute to said plan, over and above all other compensation, an amount equal to fourteen percent (14%) of the salary paid to each such faculty member.

c. <u>For other participating faculty members:</u> Oakland shall contribute to said plan, over and above all other compensation, an amount equal to sixteen percent (16%) of the salary paid to each faculty member under the provisions of paragraphs 74-88; and shall pay contributions as provided in paragraph 153.

Two tax-deferred retirement plans are available:  TIAA-CREF and Fidelity. Information regarding these plans is available from the Benefit Services Office. Oakland and the Association may agree to add other plans or to disassociate from any of the above-named plans.  As new options from these vendors become available, Oakland shall make such options available to faculty.

**131.** **<u>Supplemental Retirement Plans</u>**.  Oakland shall provide all faculty members the option of investing, at their expense, in supplemental retirement tax-deferred vehicles as identified in paragraph 130 above, subject to conditions established by the respective companies.

**132.** For the purposes of this Agreement, a retired faculty member is defined as a faculty member who is at least 58 years old, has at least 15 years of continuous full-time service at Oakland and has terminated active employment.

Periods of unpaid leave shall not be included in establishing years of service, but unpaid leaves do not constitute a break in service.

Individuals wishing to retire prior to age 58 may do so, provided they are at least 55 years old and have at least 15 years of continuous full-time service at Oakland, but the provisions of paragraphs 135 and 136 do not apply.

**133.** To meet special needs Oakland may re-employ a retired faculty member at any age.  If such employment would cause the faculty member to be represented by the Association, the terms and conditions of such employment of such a person must have the approval of the faculty member, the Association, and Oakland. None of the provisions of Article XVI shall be applicable to such employment unless specifically agreed upon by the parties.

134. **Reduced Work Schedule Prior to Retirement**.  With the approval of Oakland, a full-time non-visiting faculty member who will have attained the age of 58 and who has fifteen years of service may undertake a reduced work schedule for a period not to exceed three academic years, following the completion of which the faculty member shall retire under the provisions of this article.  The reduction in work schedule shall not exceed 50%, and the faculty member shall be entitled to receive that fraction of his or her regular annual salary represented by the reduced work schedule. The retirement contribution specified in this Article XVIII shall also be based on the reduced salary. The reduced work schedule is subject to the approval of Oakland.  None of the provisions of Article XVI except paragraphs 106-110 and 115 shall be applicable during the period of the reduced work schedule unless specifically agreed upon by Oakland and the faculty member.

135. **Privileges and Benefits for Retired Faculty Members**.  In recognition of their past service and their ability to continue to contribute to the mission of the University, Oakland will encourage retired faculty members to remain a part of the academic community through a variety of benefits.  Each retired faculty member may receive a Retired Faculty Photo ID card upon request and payment of the $10 processing fee, and shall have the right to participate in academic processions and convocations.  A retired faculty member shall be entitled to receive the following items to the extent accorded full-time non-visiting faculty members:  use of recreational facilities, faculty discounts, and use of the Graham Health Center.  Library (including off-campus access to library resources, as available to active faculty members and as otherwise economically and technologically feasible) and e-mail privileges shall be extended under terms and conditions to be established by Oakland.  A retired faculty member may attend classes without credit, tuition, or the need to follow regular enrollment procedures, although approval to attend must be granted by the instructor, subject to space availability. In addition, limited tuition waiver benefits are available for certain dependents of retirees, under the provisions of paragraph 129.

136. Retired faculty members shall be entitled to participate in the health care coverages in paragraphs 107, 108, 109, or 110 and 115. Oakland's contributions to such coverage are specified in paragraphs 137 and 143.  Subject to federal regulations, when the retiree (and/or spouse) becomes eligible for coverage through Medicare, coverage through the aforereferenced group medical insurance programs would be available solely as a supplement to Medicare. Retirees eligible for Medicare may choose to participate in a Blue Cross/Blue Shield Medicare Complementary Option 2-1 (with riders GPC-D, GPC-SAT II, Master Medical 65, MM 65-AL, MMC-PD, Prescription Drug $10, PD-MAC instead of the exact fill Medicare Complementary versions of the coverages in paragraphs 107,108,109, or 110 and 115).

137.  For faculty members who retired between January 1, 2001 and
      September 1, 2006, or have committed to a phased retirement approved prior to
      August 14, 2006, Oakland shall contribute toward retiree medical and vision
      benefits as follows:

   a.  Oakland's contributions to retiree medical and vision insurance shall be
       limited to those individuals who retired with 25 years of service at any age or
       with 15 years of continuous full-time service and attained at least 62.

   b.  Until the retired faculty member reaches age 62, he or she will be
       responsible for all costs.

   c.  For those retired faculty members who have reached the age of 62, Oakland
       shall make a contribution toward the health care coverages as provided in
       paragraphs 107, 108, 109, or 110 and 115.  This contribution shall be subject
       to the limitations of paragraph 107, except the maximum contribution shall be
       for one-party coverage.  If the monthly cost of health care coverage for which
       this retiree is enrolled exceeds the amount of Oakland's contribution, the
       retiree shall remit payment for the additional cost to the Staff Benefits Office
       prior to coverage.  Oakland's contribution shall end when and if the retiree
       becomes eligible for health care coverage through Medicare.

   d.  When the retired faculty member becomes eligible for health care coverage
       through Medicare, Oakland shall contribute $160.10 monthly in calendar year
       2013 toward single party coverage and $320.23 monthly in calendar year
       2013 toward two-party coverage for a retired faculty member in accordance
       with procedures established by Oakland.  This amount shall be increased
       annually by 4%.  Such funds may be used to continue participation in the
       faculty health plans contained in this Article, or may be used to purchase
       independent health insurance plans.

138.  For full-time non-visiting faculty who retired between September 2, 2006 and
      December 31, 2007, Oakland shall contribute toward retiree medical and vision
      benefits as follows:

   a.  Oakland's contributions to retiree medical and vision insurance shall be
       limited to those individuals who retired with 25 years of service at any
       age or with 15 years of continuous full-time service and attained at least
       62.

   b.  Until the retired faculty member becomes eligible for health care coverage
       through Medicare, he or she will be responsible for all costs.

   c.  When the retired faculty member becomes eligible for health care coverage
       through Medicare, Oakland shall contribute $160.10 monthly in calendar year

2013 toward single party coverage and $320.23 monthly in calendar year 2013 toward two-party coverage in accordance with procedures established by Oakland.  This amount shall be increased annually by 4%.  Such funds may be used to continue participation in the faculty health plans contained in this Article, or may be used to purchase independent health insurance plans.

**139.** For full-time non-visiting faculty who were active on August 31, 2006 and who retire on or after January 1, 2008, Oakland shall contribute towards retiree medical and vision benefits as follows:

    a.  Oakland's contributions to retiree medical and vision insurance shall be limited to those individuals who retired with 25 years of service at any age or with 15 years of continuous full-time service and attained at least 62.

    b.  Until the retired faculty member becomes eligible for health care coverage through Medicare, he or she will be responsible for all costs.

    c.  For those faculty members hired prior to September 1, 2006, who elected to remain at the December 2007 retirement contributions of Paragraph 130(a) (fourteen percent) or Paragraph 130(c) (fifteen percent), when the retired faculty member becomes eligible for health care coverage through Medicare, Oakland shall contribute $160 monthly toward single party coverage and $320 monthly toward two-party coverage in accordance with procedures established by Oakland.  Such funds may be used to continue participation in the faculty health plans contained in this Article, or may be used to purchase independent health insurance plans.

    d.  For those faculty members hired prior to September 1, 2006, who elected to receive a one-time additional retirement contribution of $2000 in January 2008, Oakland shall make no contribution toward health care after retirement.

    e.  Documentation of faculty elections in (c) and (d) above shall be kept on file in the Academic Human Resources Office.

**140.** For those faculty members hired on or after September 1, 2006, Oakland shall make no contribution toward health care after retirement.

**141.** A retired faculty member and spouse otherwise eligible for the university contribution toward retiree health insurance coverage under Paragraphs 138c or 139c , including those faculty members who waived coverage under the provisions of paragraph 113, may elect to use the university contribution to purchase independent health plans.

**142.** Subject to carrier conditions, retired faculty members and their spouses shall be eligible to enroll in the Delta Dental Plan offered to other retired university employees. The retired faculty member shall pay the full cost of such coverage.

**143.**  Subject to carrier conditions, retired faculty members and their spouses shall be eligible to enroll in Vision Insurance offered to other retired university employees. The retired faculty member shall pay the full cost of such coverage, except as provided for in paragraph 137.

**144.**  In order to be eligible to participate in the university group health, dental, and vision plans listed above, a retiree must have remained in the respective university group plan continuously from the date of retirement.

**145.**  Retired faculty members participating in the university group health, dental and vision plans shall remit payment for the costs to the Staff Benefits Office prior to coverage.

**ARTICLE XIX**
**FACULTY TRAVEL**

**146.**  **Travel for Professional Development.**  Oakland may reimburse a full-time faculty member for expenses incurred in attending professional or scholarly meetings.  If an application for travel reimbursement is denied, Oakland shall state its reason for denial to the faculty member.

**147.**  If Oakland elects to reimburse a faculty member for expenses incurred in attending professional or scholarly meetings, such reimbursement shall be according to the rates contained in Appendix "C" of this agreement.

**148.**  Oakland may establish procedures to process applications for reimbursement. For the purpose of distributing available travel funds over a broad range of worthwhile travel, the College, the schools, the Library and the Eye Research Institute may promulgate guidelines (such as maximum reimbursements for any single trip and maximum reimbursements to any faculty member during the fiscal year).

**149.**  **Travel on University Business**.  A faculty member may be requested by Oakland to travel on University business as part of his or her regular assignment or as an additional obligation, and shall be reimbursed for such travel in accordance with Oakland's provisions for administrative travel.

A faculty member who is scheduled to teach at off-campus locations during the Fall and/or Winter semesters and is also required to be on the main campus the same day is entitled to reimbursement for mileage at the standard University rates.

Mileage will be reimbursed only for the distance actually traveled between off-campus locations and the main campus and/or between the off-campus locations.  Travel between the faculty member's home and any work location will

not be reimbursed.  Faculty members are responsible for documentation and submission of travel reimbursement forms.  Requests for reimbursement must be made within thirty days of travel.  For the purposes of this paragraph, faculty members are required to be on the main campus only to perform assigned functions, teach courses, and attend scheduled department, school or college, and/or University meetings.

150.   Oakland agrees that a minimum of $460,000 will be available for travel under the provisions of paragraph 146 during the 2012-13 fiscal year, $480,000 during the 2013-14 fiscal year, and $500,000 during the 2014-15 fiscal year.  Funds will be allocated on a per faculty basis by School, the College, the Kresge Library and the Eye Research Institute.

Travel funds shall be allocated to a faculty member by the dean or director using allocation guideline approved by the School or the College Executive Committee or other applicable committee and the dean or director.  In accordance with Oakland travel policies, the faculty member must submit the travel expense summary within 30 days of the date of return of their travel or within 15 days of their return if a travel advance was issued.  Subject to the policies established by Oakland, advances on travel funds may be obtained prior to an authorized trip.  Compliance with submission of receipts and other documentation for authorized expenditures is required.

Oakland agrees that if sufficient applications are submitted consistent with these provisions, the entire amount shall be expended.  Faculty are required to declare their intention to travel by February 1 of each fiscal year.  Unused or unencumbered travel funds will be available for use by faculty members for approved travel that had not previously been funded or for new approved requests for travel that will be completed before July 1.  If by April 1 travel funds have not been expended or encumbered, the balance will be available for distribution among the faculty in the unit for unpaid expenses associated with approved travel, but not to exceed the total cost of each faculty member's travel.  If any unit has funds exceeding $100 that have not been expended or encumbered on May 1, these funds shall be reallocated to other units that have already expended or encumbered their annual allocation.

By September 1 of the following fiscal year, Oakland will provide to the Association an electronic report for the previous fiscal year of contractual travel funds allocated and expended for each School, the College, the Kresge Library and the Eye Research Institute.  If a remaining balance greater than $100 exists for any of the units listed, the report must also contain the number of requests fully funded, partially funded and not funded.

## ARTICLE XX
## LEAVES WITH PAY

151. Oakland shall make available leaves with pay to full-time non-visiting faculty. Leaves with pay are intended for the mutual benefit of Oakland and the faculty member granted such leave.  A leave with pay may be granted if there is reasonable expectation that it might result in:

   a. Scholarly enrichment and increased professional competence of the faculty member.

   b. Increased value of the faculty member to Oakland.

   c. Enhancement of Oakland's reputation in the academic community.

152. Two types of leaves with pay shall be available:

   a. Sabbatical leaves (see paragraphs 162 through 167).

   b. Professional Development and Research leaves (see paragraph 170).

153. **Financial Conditions**.  If a faculty member is on a half pay leave, Oakland's contribution to the Multiple Option Retirement Program on behalf of the eligible faculty member shall continue as if the faculty member were not on leave. However, Oakland's contribution will be limited to the maximum employer pension contribution that is non-taxable, as permitted by applicable Federal tax regulations.

154. Oakland shall continue all other contributions to fringe benefits provided in Article XVI, Insurance, during the leave period regardless of duration or rate of pay.

155. A faculty member on leave with pay is permitted to receive money from grant, contract, or other external sources for approved study or research without prejudice to his or her receipt of income from Oakland, provided that the total remuneration from all sources does not exceed his or her remuneration from Oakland for a comparable period.

156. A faculty member on paid leave automatically shall be entitled to the across-the-board salary increase and any merit salary increase as determined under paragraph 81, and any increase in the benefit program granted to the bargaining unit.

157. A faculty member on paid leave shall be subject to the Layoff and Recall procedures in Article VIII.

158.   Faculty members on paid leave shall be eligible for reimbursement of travel expenses incurred in attending professional or scholarly meetings in accordance with the provisions of Article XIX.

159.   **Department Staff Adjustments**.  The absence of a faculty member normally entails disruption of the teaching or research pattern.  Such disruption will be taken into account by Oakland when considering applications for leave with pay.

160.   If a leave with pay is granted at less than full pay, Oakland may authorize the appointment of a replacement.  A decision to deny a particular request for replacement of a faculty member on leave shall not be subject to the grievance procedures established in this Agreement.  If Oakland determines not to replace the faculty member, internal adjustments shall be made.

161.   If a leave with full pay is granted, internal adjustments will be made without replacement.

162.   **Sabbatical Leave**.  Sabbatical leave may cover a wide range of professional activities, including but not limited to research, the study of teaching methods, and the study of cognate disciplines.

163.   Three types of sabbatical leave shall be made available:

   a.   A half-year sabbatical leave at half pay for the period of the leave, after three years of service (i.e., resulting in 75% of annual salary for the year).

   b.   A half-year sabbatical leave at full pay after six years of service.

   c.   A full-year sabbatical leave at half-pay after six years of service.

164.   **Sabbatical Leave:  Eligibility and Definitions of Service**.

   a.   Sabbatical leaves are available only to full-time non-visiting faculty members.

   b.   Years of service, including years as a visitor at Oakland, shall be computed from the initial date of full-time appointment or from the termination date of the previous sabbatical leave except as provided in subparagraph 164e. and subparagraph 175b.(5).  All leaves of absence shall be excluded in determining years of service, except as otherwise determined by Oakland.

   c.   A recipient of a sabbatical leave is obligated to return to Oakland for two regular semesters following his or her leave.

   d.   A faculty member without tenure or job security shall not be granted a sabbatical leave if Oakland's employment decision at the time of the

application for the sabbatical does not permit compliance with paragraph 164c. This subparagraph (d) may be waived at Oakland's sole discretion.

e. A faculty member may request to postpone his or her sabbatical leave and credit service during the postponement period to the next sabbatical leave. To do so, the faculty member must be eligible for a sabbatical leave in accordance with the provisions of paragraphs 163 and 164. The faculty member must request the extension of leave in accordance with the provisions of paragraph 167. If the next sabbatical leave is authorized under the provisions of paragraph 163a., a maximum of one-half year may be credited. Otherwise a maximum of one year may be credited.

f. A faculty member who fails to apply for a sabbatical leave when eligible, or who postpones a sabbatical leave not in compliance with subparagraph 164e. above, may not credit any service during the ensuing period toward his or her next sabbatical leave except as provided in subparagraph 164g. below.

g. If a faculty member is requested by Oakland or by his or her department chairperson with Oakland's prior concurrence to postpone a sabbatical leave until the next academic year, the year of service during which the postponement occurred shall be credited toward the faculty member's subsequent sabbatical leave. Only one such year of postponement may be so credited toward any one sabbatical leave. A faculty member shall not be requested to postpone a sabbatical leave for more than one year.

h. Years of service shall not accrue during layoff. If a faculty member receives payments pursuant to paragraph 61 for years of service since the last sabbatical, such service shall not count toward eligibility for sabbatical leave after such faculty member's recall from layoff.

165. **Sabbatical Leave: Criteria**. Although a simple accumulation of service does not guarantee the granting of a sabbatical leave, Oakland shall make every effort to accommodate a faculty member's application for a sabbatical leave if the application meets the policy objectives stated in paragraph 151. No sabbatical leave will be granted for the purpose of teaching at another institution, unless such teaching is an integral part of a research project; nor will a leave be granted for travel for reasons unrelated to the development of professional skills necessary for fulfillment of the faculty member's work and professional obligations required by this Agreement.

166. The leave proposal will be judged by the chairperson of the applicant's department (who may be advised by a departmental committee charged with this responsibility) and/or by the dean or director of the college or appropriate academic unit (who may be advised by a faculty committee charged with this responsibility). Judgments involving scholarly criteria shall not be grievable.

167. **Sabbatical Leave:  Procedures for Application and Report**.

   a. An application for sabbatical leave is initiated by an eligible faculty member. The application must be filed with the department chairperson, or in those academic units without chairpersons, the dean, at least eight months before the commencement of the proposed leave.  A detailed written statement of the purpose of the leave and the nature of the professional activity proposed should accompany the application.

   b. The application and the chairperson's recommendation shall be forwarded to the appropriate dean at least seven months before the commencement of the proposed leave.

   c. The applicant shall receive written notification of Oakland's decision at least five months prior to the commencement of the proposed leave.  A faculty member may withdraw, without prejudice, an application for sabbatical leave at any time prior to Oakland's decision with the approval of his or her department chairperson.  Once Oakland has approved a sabbatical application, the faculty member may withdraw the application only with the approval of Oakland.

   d. If an application is rejected, the faculty member shall receive notification in writing from Oakland of the reasons for rejection.

   e. At the completion of the sabbatical leave, the faculty member shall submit to Oakland by the end of the first semester after return from leave a written report summarizing the activities during the leave and their relationship to the written statement submitted under paragraph 167a.

168. **Research Fellowships and Grants**.  There shall be available a limited number of research fellowships and grants.  The research fellowships and grants will be funded at a level specified by the University Research Committee up to a maximum determined by Oakland.  Application for these fellowships and grants may be made at any time in a faculty member's employment with Oakland.  The Committee will establish a system of applications for research fellowships and grants, will referee proposals, and will monitor fellowship and grant activity. Research fellowships and grants are intended to support accomplishment of specific scholarly or scientific projects, and they will be granted on the basis of the judgment by qualified scholars in the discipline of the application as to the value of the proposal and the likelihood of its completion.  Faculty research fellowships and grants shall be awarded only to bargaining unit members for the support of their research or other scholarly/creative activities deemed appropriate by the University Research Committee.

**169.** Oakland agrees that it will provide $260,000 for research fellowships during 2012-13. For 2013-14, the amount will be $275,000, and for 2014-15 it will be $290,000.

**170.** **Professional Development and Research Leaves**.

   a. In order to meet future staffing needs and to utilize existing faculty resources more effectively, Oakland shall make available at least one professional development or research leave each year of this agreement, either one-half year or full year, with full pay.

   b. The purposes of these leaves may include, but are not limited to, projects to develop new areas of research competence, ongoing research projects requiring extensive dedicated activity, and retraining opportunities that provide a faculty member with teaching competencies in new areas.

   c. There shall be a Joint Committee consisting of six members, three appointed by the Association and three appointed by Oakland; these appointments shall be made by October 15.  Subject to the approval of Oakland, the committee shall establish guidelines for faculty professional development and research leaves. The committee shall review leave applications and forward, on or before February 15, its recommendations to Oakland and to each applicant.

   d. To be considered for such leaves, a faculty member shall submit an application to the Joint Committee, along with a copy to the faculty member's department chairperson and dean or director.  In accepting or rejecting a recommended leave, Oakland may base its decision, in whole or in part, on current or projected staffing needs.  Oakland shall notify each applicant of its decisions on or before March 15.  These leaves are limited to full-time non-visiting, tenured or job-secured faculty members. Full-time non-visiting faculty hired prior to September 1, 2006, however, are also eligible for leaves under this paragraph 170 regardless of their tenure or job-security status.  A faculty member granted such leave shall be required to return to Oakland for two regular semesters following the leave.

   e. At the completion of the professional development or research leave, the faculty member shall submit to the co-chairs of the Joint Committee a written report summarizing the activities undertaken during the leave and their relationship to the application submitted under paragraph 170(d).  This report is due no later than by the end of the first semester after return from leave.

**171.** **Absence**.  Three kinds of absence are described in this paragraph:

   a. Faculty members excused from teaching responsibilities for short periods of time in order to attend professional or scholarly meetings, or for any other

reasons recommended by their chairperson, if any, and approved by Oakland.  In such a case the faculty member's teaching responsibilities shall be covered by another faculty member or by an appropriate assignment to the class.

b.  A faculty member requiring bereavement leave for the death of a spouse, child, parent, parent-in-law, sibling, or sibling-in-law, or Other Qualified Adult and Dependent Children of Other Qualified Adults (see Appendix J) shall receive three (3) days of leave.  This may be extended to five (5) days with notification and approval of the department chair (in those units that have chairs) and dean.

c.  Faculty members not on layoff status who are unable to work because of illness, injury, or disability (including but not limited to disabilities relating to pregnancy).  A full-time leave of absence under this subparagraph 171c of six (6) consecutive weeks or longer due to the faculty member's medical condition and/or reasons of childcare/childrearing shall extend the probationary period for review purposes by one (1) year unless, at least one month prior to the commencement of the previously scheduled review, the faculty member provides Oakland with a written request to waive the extension.

Disabilities relating to pregnancy and childbirth are among the conditions covered by Oakland's disability leave policy.  Under this policy, eligibility for leaves must be supported by the faculty member's healthcare provider and otherwise be processed and approved in accordance with Oakland's leave policies, and may include periods of disability arising pre-partum and/or post-partum.

Faculty members not on layoff status and unable to work because of illness, injury, or disability shall notify Oakland promptly.  Upon receipt of such notice, Oakland shall continue to provide compensation under this Agreement to any full-time faculty member unable to work due to illness, injury, pregnancy, or disability for periods as specified below provided that if said faculty member is receiving disability insurance or worker's compensation benefits during any such period of absence, Oakland shall pay the difference between any such benefits and his or her regular compensation.

| | |
|---|---|
| Full-time non-visiting faculty: | A period not to exceed six months. |
| Visiting faculty: | Up to seven days total during a fall or winter term, with a maximum accumulation of 56 days. |

As a condition of eligibility for the leave and as a condition of return from the leave, a faculty member shall provide Oakland with a statement from a licensed physician regarding the nature and severity of the faculty member's condition and

- 74 -

a prognosis of the date the faculty member may be expected to return to work.

Additionally, Oakland may require the faculty member to submit to an examination at Oakland's cost by a physician chosen by Oakland.  The faculty member shall have the right to appeal the findings of this examination by submitting findings from a physician of his or her choice at his or her expense.  If there is a conflict between the findings of the two physicians, the faculty member shall have the right to request an examination at Henry Ford Hospital or other medical provider approved by Oakland, the costs of such examination to be shared equally by the faculty member and Oakland.  The results of this examination shall be binding upon the faculty member, the Association, and Oakland.

The custom of collegiality, the practice of a colleague teaching in the place of an absent faculty member, shall not affect the right of any faculty member to benefits associated with absence described in subparagraph c. above.  No faculty member shall be compelled to teach in place of the absent colleague for a period of more than two (2) weeks.

172. **Miscellaneous Provisions**.  Faculty members granted a paid leave pursuant to this Article XX will be entitled to the continuation of employment conditions provided in paragraph 212, Employee Conditions.  Faculty members who wish to have the availability of an office, suitably equipped for their use while on paid leave, may request the use of such an office at the same time they make their application for the paid leave pursuant to the provisions of this Article XX.  The determination as to whether or not the faculty member will receive an office and the extent to which that office will be equipped shall be made through the same process that determines whether or not the faculty member will be granted the leave.  The use of an office shall be granted if it is consistent with the purpose of the leave.

## ARTICLE XXI
## UNPAID AND PARTIAL LEAVE

173. **Leave of Absence**.  Except as otherwise required by the FMLA, a leave of absence shall be granted to any full-time non-visiting faculty member upon the recommendation of his or her department chairperson, if any, and upon approval by Oakland.  Two kinds of leaves of absence are described in this Article:

a. Unpaid leave of absence for either an academic year or for the fall or winter semester.

b. Partial leave of absence during which time a faculty member will receive a reduction in teaching load.

Such leaves may be used for a variety of purposes, including, but not limited to,

such things as child care, care of a spouse or parent, care of an Other Qualified Adult and Dependent children of Other Qualified Adults (see Appendix J), professional development activities, including where appropriate pursuit of advanced degrees, or special professional opportunities of limited duration. Except to the extent relating to a partial or reduced-load leave, if a leave is granted for reasons not related to the faculty member's position at Oakland or as otherwise a part of the approved leave application, the faculty member shall not work during the leave period.

Faculty who may require leave due to pregnancy related disabilities and/or childcare/childrearing of new born or newly adopted children may be eligible for paid leave under Article XX, the FMLA and partial leaves under this Article, or a combination of such leaves, in accordance with Oakland's policies and procedures. Faculty contemplating requiring such leave should contact the Office of Academic Human Resources for information as soon as they become aware of a possible need for leave under this provision to review their leave options given their particular circumstances.

174. **Family and Medical Leave Act (FMLA).**  Notwithstanding any other provisions of this Agreement, including leave of absence provisions, Oakland will provide to faculty members all leave and medical benefits prescribed by the Family and Medical Leave Act of 1993 (FMLA).  To the extent that FMLA requires greater benefits than this Agreement, FMLA shall be followed.  To the extent that this Agreement provides greater benefits than FMLA, this Agreement shall be followed.  Otherwise, administration of Agreement provisions and FMLA provisions shall be coordinated in accordance with procedures adopted by Oakland consistent with FMLA.  If any FMLA requirement conflicts with this Agreement, the FMLA shall be followed and the contrary Agreement provisions shall not be effective.  An FMLA leave shall run concurrently with any other leaves granted for the purposes covered by the FMLA.  In all other instances, FMLA leaves will run consecutively.

a. An FMLA leave may be used for any qualifying event defined by the FMLA or its amendments at the time of the leave request. Typical qualifying events are for: the birth of and care of a child; for the placement of a child for adoption or foster care; to care for a spouse, child, or parent with a serious health condition; a serious health condition of the faculty member; to care for an injured servicemember who is recovering from a serious illness or injury sustained in the line of active duty as defined by the FMLA; and for qualifying exigencies within the FMLA related to a covered family members' call to active duty status in a military unit as described in the FMLA and in support of a contingency operation.  The current, complete list of qualifying events can be obtained from the Academic Human Resources Office or from the U.S. Department of Labor's website (www.dol.gov).

b. Notwithstanding the above, if a faculty member has used FMLA leave due to

her/his serious health condition, an unpaid leave of up to twelve weeks (including any unused FMLA leave) will be granted by Oakland to care for the faculty member's spouse, child, or parent with a serious health condition.

c. Spouses, both of whom are employed by Oakland, are limited to a combined total of twelve (12) workweeks of unpaid leave granted by Oakland during any twelve (12) month period for the birth/care of their child, placement of a child with a faculty member for adoption or foster care, or for the care of a parent with a serious health condition. However, each faculty member may use up to twelve (12) workweeks of unpaid leave granted by Oakland during any twelve (12) month period to care for her/his child or spouse who is suffering from a serious health condition.

d. All FMLA leaves and leave requests must be supported by the timely submission of forms required by Oakland, some of which must include medical certifications. Oakland may require updated certifications as allowed by the FMLA. All forms for FMLA leaves may be obtained from the Academic Human Resources Office.

e. A faculty member normally has the right to return to work after completing an FMLA leave. Exceptions may apply, as allowed by the FMLA, for key employees (as defined by the FMLA) and in the event of position elimination unrelated to the leave. As allowed by the FMLA, the failure to return to work after completing an FMLA leave may result in the faculty member having to reimburse Oakland for the premiums Oakland paid during the leave.

f. Additional information regarding an employee's rights under the FMLA (as applicable as of August 1, 2012) may be found in Appendix K.

## 175. <u>Non-FMLA Unpaid Leaves.</u>

a. Non-FMLA unpaid leaves of absence may be granted for either a twelve-month period commencing on August 15, or the fall or winter semester. A faculty member shall receive no compensation from Oakland during the period of an unpaid leave; however, a faculty member electing a one-semester leave shall receive one-half of the yearly compensation provided under Article XI. Where exceptional circumstances require, a faculty member may request special unpaid leave for a period longer than 12 months or shorter than a semester. Oakland shall notify the Association quarterly of approval of all unpaid leaves of absence.

b. Partial leaves of absence may be granted for either a twelve-month period commencing on August 15, or the fall or winter semester. Prior to granting a partial leave of absence, Oakland shall consult with the respective department and/or school, the Library or the Eye Research Institute. Partial leaves may be renewable at Oakland's discretion.

(1)  A leave shall involve no more than fifty percent (50%) released time.

(2)  Before approving a partial leave, Oakland shall specify in writing the duties to be performed during the leave period and the percent of released time agreed to. The duties shall be consistent with the percent of released time agreed to.

(3)  The salary of a faculty member who takes a partial leave shall be reduced by the same percentage as the percent released time involved. Salary related fringe benefits will be based on the reduced salary.

(4)  The employment terms of a faculty member without tenure or without job security who takes a partial leave may be adjusted as specified in subparagraph 38f.

For a faculty member without tenure or without job security who takes more than one partial leave in pursuit of an advanced degree, the released time of the partial leave shall not be counted in his or her employment terms.  Only the fractional values of accumulated service shall be counted and scheduled reviews will be conducted when at least the normal levels of service have been accumulated by the previous August 15.  Such adjustments may not exceed three years in aggregate.

(5)  For purposes of retirement eligibility and accruing sabbatical eligibility, years of service during such leaves shall be prorated, based on percent of time worked.

c. Leaves that are counted under the FMLA will be granted for up to twelve (12) weeks in duration on a rolling calendar basis.

**176.**  **Return.**  A faculty member must return to the paid employ of Oakland for a period of one academic year following a leave of absence before he or she may be granted any further leave, unless special circumstances warrant as in paragraph 175.  Exceptions to this provision shall be made only with the concurrence of the department chairperson, if any, and Oakland.

**177.**  **Application**.

a. Except as to FMLA leaves as provided above, a faculty member wishing a leave shall normally submit a written request to his or her department chairperson (or dean or director in academic units without chairpersons) at least eight months before the beginning of the proposed leave.  Where circumstances require, the request may be submitted at a later time.

b. If approved by the chairperson the request shall normally be forwarded to the appropriate dean at least seven months before the commencement of the leave.  Where circumstances require, the request may be forwarded at a later time, but within 30 days of the chairperson's receipt of the request.

c. The applicant shall normally receive written notification of Oakland's decision on the granting of the leave five months prior to the commencement of the proposed leave.  In situations where a request has been delayed, the applicant shall receive written notification of Oakland's decision within 60 days.  A faculty member may withdraw, without prejudice, an application for a leave at any time prior to Oakland's decision.  Once Oakland has approved a leave, the faculty member may withdraw the application only with the approval of Oakland.

d. If an application is rejected, the faculty member shall receive from his or her dean or director notification in writing of the reasons for rejection.

e. If an unpaid leave is granted, Oakland may approve the temporary replacement of the faculty member.

## 178.  Contributions by Oakland.

a. During any unpaid leave of absence, Oakland's contributions to a faculty member's retirement program or other benefit programs are suspended, but the faculty member may continue contributions voluntarily.

b. A faculty member on a partial leave may continue all benefits set forth in Article XVI in which he or she was previously enrolled, so long as the faculty member shall pay a prorated premium through payroll deduction for benefits not based on a percent of salary. Failure to make such payroll deduction authorization shall result in ineligibility to continue in such programs. Other specific arrangements regarding fringe benefits may be agreed upon by Oakland and the faculty member, provided that no increase costs shall be incurred by Oakland.

## 179.  Leaves During Probationary period.

a. A leave of absence for less than one year shall count as part of the probationary period for review purposes, while a full-year leave shall not count, unless:

(1) a faculty member taking a full-year leave elects to have the year count as part of the probationary period by notifying Oakland in writing prior to taking the leave; and

     (2)  the faculty member and Oakland agree otherwise, as specified in paragraph 38f.

b.  Notwithstanding the above subparagraph, leaves under this Article of six (6) consecutive weeks or longer due to the faculty member's medical condition and/or for reasons of childcare shall extend the probationary period for review purposes by one (1) year unless, at least one month prior to the commencement of the previously scheduled review, the faculty member provides Oakland with a written request to waive the extension.  A faculty member may so extend his or her probationary period under this provision only once.

c.  A faculty member on unpaid leave shall be subject to the Layoff and Recall provisions of Article VIII.

**180.  Request for Extension.** Requests for extension of any leave of absence must be made in writing to the faculty member's department chairperson, if any, and the appropriate dean or director at least six months prior to the end of his or her leave.  Extensions shall be granted upon approval by the department chairperson, if any, and Oakland.

**181.  Failure to Return.** All faculty members who take any leave described in this Article XXI shall continue to be deemed bargaining unit faculty members of Oakland, and shall be entitled to return to their previous employment upon expiration of their leave except as modified by the Layoff and Recall provisions of Article VIII.  If a faculty member fails to return to paid employment with Oakland for the regular semester immediately following the expiration of a leave of absence, he or she shall be deemed to have voluntarily resigned his or her position.  However, this assumption of voluntary resignation will not apply if the faculty member is unable to return to work because of illness, injury, or disability.

**182.  Long Term Disability.**

a.  In the event that a bargaining unit member has exhausted any paid leave of absence due to illness, injury, or disability under paragraph 171 and the bargaining unit member applies for an unpaid leave of absence due to extended illness, injury, or disability, pursuant to Article XXI, the parties agree as follows:

     (1)  Oakland will approve up to three one-year unpaid leaves of absence.

     (2)  If the bargaining unit faculty member is still in need of additional unpaid leave, then Oakland will approve a final six-month unpaid leave of absence, with notice to the bargaining unit member that at the expiration of this final leave, the faculty member shall not be entitled to return to his

or her previous employment and any employment rights will be terminated.

    (3)  In extraordinary circumstances, upon mutual agreement by Oakland and the Association, leaves beyond the four years may be granted.

b.  The parties further agree that individuals who, as of August 15, 2000, are on extended unpaid leaves of absence due to illness, injury, or disability are not covered by the provisions above.  They will continue to be on leave without pay.

c.  Nothing herein shall preclude a faculty member terminated under paragraph 182a.(2) above from applying and being considered for open positions for which the faculty member may be qualified.

**183.  Permanent Reduction in Workload.**  A faculty member with tenure or job security may request a permanent reduction in workload, with prorated reduction in salary.  After consulting with the respective department and/or school, the Library or the Eye Research Institute, Oakland may grant such a request.  Appropriate work arrangements are to be determined by Oakland and the faculty member prior to granting the request.  Once granted a workload reduction, a faculty member shall have no right to return to full-time status or to change the percent of time worked, unless Oakland specifically agrees to a change.  A faculty member on permanent workload reduction shall be eligible for only those benefits, including participation in retirement options, agreed to by Oakland and the faculty member at the time the workload reduction is approved.  Years of service for sabbatical eligibility purposes shall not accrue during the period of reduced workload.

## ARTICLE XXII
## ACADEMIC LIBRARIANS

**184.**  Full-time librarians shall be obligated to work the following periods:  the fall semester (two days before the first day of class through the last day of the examination period), and the winter semester (two days before the first day of class through the last day of the examination period).

**185.**  Librarians may be scheduled by Oakland to work on holidays or recesses that are normally non-working days; in such cases equivalent compensatory time off shall be granted.

**186.**  Full-time librarians scheduled to work during an eight-week summer session (two days before the first day of class through the last day of the examination period(s)) shall be compensated at the rate equivalent to a four-credit course, as specified in paragraph 89.  The last sentence of paragraph 89 shall not apply in the scheduling of summer assignments.  Provisions of paragraph 90 apply to full-

time librarians, except that Oakland may assign displacement schedules to full-time library faculty if it determines there are insufficient voluntary displacement agreements to provide an appropriate number of full-time librarians during the summer sessions.

## ARTICLE XXIII
## WORK OR BUSINESS INTERRUPTION

**187.** During the period of this Agreement, the Association will not cause or permit its members, nor will it encourage, cause, or sanction other members of the bargaining unit, to take part in any strike, work stoppage, work interruption, or other activity which would violate Act 336 of Public Acts of 1947, as amended. Oakland will not engage in any lockout during the period of this Agreement.

## ARTICLE XXIV
## GRIEVANCE PROCEDURE

**188.** **Scope.**  Except as otherwise specifically provided for herein, any grievance the Association, a faculty member, or a group of faculty members other than the Association, may have in relation to employment at Oakland, arising from the application, or interpretation of this Agreement, will be adjusted as stated in this Article XXIV.  Any individual faculty member or group of faculty members other than the Association at any time may present a grievance to Oakland and have the grievance adjusted without intervention of the Association if the adjustment is not inconsistent with the terms of this Agreement and the Association has been given an opportunity to participate in such adjustment.

**189.** **Construction.**  Nothing in this Article XXIV will prevent informal adjustment of any grievance and the parties intend that, so far as reasonably possible, every grievance will be resolved between the faculty member and the dean or director or other representative of Oakland immediately involved.  Steps One and Two of the grievance procedure, as set forth in paragraphs 190 through 191 of this Agreement, shall be pursued to completion before any application for arbitration may be made under paragraph 192 unless the parties enter into a written waiver of those steps and agree to proceed directly to arbitration.  The term "days" as used in this Article XXIV excludes Saturdays, Sundays, and all other days in which Oakland does not conduct business, including, but not limited to, holiday recesses and closures for inclement weather.

**190.** **Initiation.**  A faculty member, including any person who was a faculty member during any time covered by this Agreement, a group of faculty members, or the Association may initiate a grievance by serving written notice of it on Oakland's designated representative within thirty (30) days after the grievance arises.  Such notice shall be filed within thirty (30) days after the occurrence of the event upon which the grievance is based or within thirty (30) days after the time when either the faculty member or the Association knows or should have known of said

- 82 -

event; provided, however, that in no event shall any such grievance be filed any later than sixty (60) days after the occurrence of the event upon which the grievance is based.  In no case shall any retroactive damages or other relief be awarded for any period prior to thirty (30) days from the date on which the grievance is filed. Such notice shall state the facts upon which the grievance is based, the paragraph(s) of this agreement alleged to be violated, and shall specify the relief and remedy sought.

191. **Step One.**  Oakland shall designate a representative to discuss the grievance with the grieving party.  The representative shall schedule a Step One meeting and notify the Association of the time and place of the meeting.  The Step One discussion, unless extended by written agreement for a specified period, will be completed within ten (10) days after the grievance is filed.  Within ten (10) days after the Step One meeting, Oakland shall provide the Association with a written answer to the grievance.

192. **Step Two.**  If the answer at Step One is not satisfactory to the Association, it shall request within ten (10) days of receipt of the answer at Step One that the grievance be heard by a representative of the Office of the Senior Vice President for Academic Affairs and Provost.  Such request shall specify any paragraphs of the Agreement the Association believes have been violated that are additional to those specified in the notice of grievance.  Oakland shall schedule a hearing on the grievance within ten (10) days after receipt of notice.   By written agreement of the parties, this discussion may be continued from time to time.  Oakland shall provide a written answer to said grievance within ten (10) days after the hearing, or the last day of the hearing if the hearing is extended.

193. **Arbitration Initiation.**  If the answer to the grievance at Step Two is not satisfactory, the Association, within thirty (30) days of its receipt, may notify Oakland that it desires to proceed to Arbitration.  Upon receipt of said notice, the parties shall confer and attempt to select an Arbitrator.  If no agreement is reached within ten (10) days, the Association shall institute the procedures of the American Arbitration Association for selecting an Arbitrator.  If Oakland agrees, the Association may substitute the procedures of the Federal Mediation and Conciliation Service for those of the American Arbitration Association.

With regard to tenure review grievances only, the parties agree to the following current members of a rotating panel of arbitrators:

1 William Daniel
2 Mario Chiesa
3 Paul Glendon
4 Robert McCormick
5 _____
6 _____

If one or more of these arbitrators becomes permanently unable to serve on the panel, the parties shall mutually agree to a replacement(s).  When panel membership changes, a new addendum shall be added to the contract reflecting the change.

194.    **Arbitrator's Decision and Compensation.**  The arbitrator will render a written decision within one (1) month (or such additional time as the parties may by writing agree) after any grievance has been submitted to him or her, and the decision, when so rendered as required by law, will be final and binding on the parties, and may be enforced in any court of competent jurisdiction.  The parties will bear their own expenses individually and share the arbitrator's fee and expenses equally.

195.    **Limitation of Arbitrator's Authority.**  The arbitrator will have no authority to (a) add to, subtract from, or in any way modify this Agreement, (b) interpret any policy, practice, or rule not relating to wages, hours or conditions of employment, (c) formulate or add any policy or rule, and (d) substitute his or her judgment for academic judgment in the establishment of the classification or change in classification of any faculty member.  The arbitrator shall not have jurisdiction to consider any claim of which the adverse party has not had reasonable notice prior to the arbitration hearing.

196.    **Extension of Time Limits.**  Time limits in this Article XXIV may be extended by written mutual consent of the parties concerned.  Failure of Oakland to abide by the time limits set forth herein shall result in the automatic advancement of the grievance to the next level.  Failure of the grievant or the Association to advance a grievance within the time limits set forth herein shall result in the grievance being denied and further proceedings on the matter shall be barred.

197.    **Association Rights.**  The Association shall have the right to be present at any meeting conducted under the provisions of paragraphs 191 through 193.

## ARTICLE XXV
## GUARANTEE OF RIGHTS

198.    There shall be no discrimination against any faculty member or against any applicant for employment in the bargaining unit by reason of age, race, creed, marital status, color, sex, religion, national origin, citizenship, sexual orientation, political affiliation, or handicap not related to ability to perform professional duties.  Notwithstanding any other provision of this Agreement, the parties recognize the necessity for Oakland to comply with federal and state civil rights laws and agency regulations issued relative thereto.  Therefore, in order to insure compliance with the above laws, orders, and regulations, Oakland may establish procedures and require adherence to them so that its operations are in compliance with these laws and regulations.  If such policy or procedure is in conflict with an existing policy or procedure developed by a faculty entity

- 84 -

pursuant to this Agreement, the Association shall be given the opportunity to comment on the Oakland procedures prior to implementation.

199. **Personnel Records**.  A faculty member, or former faculty member, has the right to know of the existence and location of personnel records maintained by Oakland (See Appendix G).  Such an individual shall have access to all materials placed in those personnel records except initial employment references, confidential materials placed in personnel files prior to August 15, 1979, and those materials subject to confidentiality under the 1979-82 Faculty Agreement, and those records excluded from the statutory definition of personnel record (see Appendix F).

On giving reasonable notice, the individual shall have access to these files during normal business hours under conditions which protect the integrity of the files, and shall have the right to copies of non-confidential materials in his or her files at his or her own expense.  He or she may designate in writing a representative to examine the files subject to the access restrictions of this paragraph 199 or be accompanied by a representative of his or her choice at the time he or she examines the files.  Oakland and the individual may agree to correct or remove information from the files.  If agreement is not reached, the individual may add any appropriate and reasonable explanatory materials to these files.  If Oakland removes from these files materials to which the explanatory materials refer, the explanatory materials also shall be removed.
If a faculty member's personnel record is subpoenaed, Oakland shall send timely notice of the subpoena to the faculty member.

A basic summary of an employee's rights under the Bullard-Plawecki Employee Right to Know Act is provided in Appendix F of this Agreement, for reference.

A faculty member shall not be required, and/or solicited directly or indirectly, to enter into any waiver, either expressed or implied, of the right to examine any and all letters of evaluation.  Any letter of evaluation submitted anonymously or with the condition of confidentiality shall be returned to the author or destroyed.

## ARTICLE XXVI
## DEPARTMENT CHAIRPERSON

200. In addition to the professional responsibilities prescribed for all other faculty members in this Agreement, a department chairperson, or a faculty member designated by Oakland as a chairperson of a department that is not an academic unit, shall have the responsibility for exercising academic leadership in the teaching, scholarship, planning, and other activities of the department.  The duties shall include, but are not limited to, the following:

   a.  Chairpersons are responsible for developing course and teaching schedules and assigning members of their department to these activities.

b. Chairpersons are responsible for implementing university regulations within their departments and for resolving, when possible, problems, disagreements, and non-bargaining unit faculty member grievances, among faculty, departmental employees, students who interact with the department, or other interested persons, at the departmental level.

c. Chairpersons are responsible for monitoring the attendance and time commitments of their departmental employees, where appropriate, and reviewing, as specified in this Agreement, the proper discharge of faculty responsibilities.

d. Chairpersons are responsible for instructing new faculty members on the responsibilities of their positions.

e. Chairpersons are responsible for submitting budget requests, establishing expenditure priorities, and administering the departmental budget within the policies established by Oakland.

f. Except as otherwise provided in this Agreement, Chairpersons are expected to make independent judgments and recommendations on all departmental faculty appointments, re-appointments, and promotions; faculty salaries; leaves of absence; travel authorizations; and other relevant departmental personnel functions, including discipline and discharge. Chairpersons are also expected to make independent judgments and recommendations on all departmental employees as appropriate.

## ARTICLE XXVII
## APPOINTMENT DATES

201. Employment of a full-time non-visiting faculty member may commence at any time. However, if the period from employment to the next August 15 is less than one year, it shall not be taken into account in determining the review schedule listed in paragraph 38, unless Oakland and the faculty member agree otherwise, as provided in paragraph 38f. All re-appointments and promotions resulting from reviews under paragraph 41 and 42 will take effect on August 15.

## ARTICLE XXVIII
## PAST PRACTICES

202. **Educational Policy**. The enumeration of faculty members' rights, responsibilities, and privileges in this Agreement shall not be construed to deny or diminish existing rights, privileges, and responsibilities of faculty members to participate directly in the formation and recommendation of educational policy within the University and schools, college, Library or Eye Research Institute, as these rights, privileges, and responsibilities are described under the appropriate

- 86 -

constitutional processes of the schools, college, Library or Eye Research Institute and the University.  Such participation shall be accomplished through the traditional procedures, policies, and practices of the University Senate, schools, college, Library or Eye Research Institute.  Changes or modifications in such procedures shall be governed by the procedures established in such processes.

203.  Existing procedures, policies, and practices of faculty members and Oakland as outlined by the constitutions of the University Senate and the several schools and colleges and as established by Oakland shall be continued.

204.  **Faculty Members' Rights and Responsibilities**.  The following existing rights, privileges, and responsibilities not specifically delineated by this Agreement, or by the University, schools, college, Library or Eye Research Institute constitutions or processes, or by Oakland's present operating documents shall not be abrogated or changed by either party without mutual consent:

    a.  The rights, privileges, and responsibilities of individual faculty members in the conduct of their teaching and research, including, but not limited to, the principles of academic freedom and academic responsibility.

    b.  The rights, privileges, and responsibilities of faculty members serving as department chairpersons to participate in and be responsible for the internal organization and governance of academic departments and in representing the interests of the academic department in its relations with the schools, college, Library and Eye Research Institute and the University.

205.  In the event of conflict between such established rights, privileges, and responsibilities and the provisions of this Agreement, the terms of this Agreement shall control.

206.  This Agreement shall supersede any contrary or inconsistent terms contained in any individual faculty member's contract heretofore in effect.  All future faculty members' contracts shall be made expressly subject to the terms of this Agreement.

## ARTICLE XXIX
## UNIVERSITY CALENDAR

207.  The regular academic year shall consist of two semesters, each of which shall be a maximum of 16 calendar weeks in duration.  All academic instruction (including examinations) will be completed within said 16 week period except that the winter semester may be extended by one week to accommodate a winter break.  At least one study day shall immediately follow the last day of instruction.  For the fall semester commencing with the 2014-15 academic year, see Appendix I.

Classes for the winter semester shall begin after New Year's Day, include a week-long break following the seventh week of classes and the semester shall end no later than April 30. In addition to the regular academic year, summer sessions shall be scheduled and shall include both a sixteen-week session and two eight-week sessions. Further, Oakland may schedule individual classes at times different from the normal semesters and sessions. If Oakland promulgates a calendar extending beyond the current Agreement, the Association reserves the right to bargain changes in said calendar during subsequent contract negotiations.

### ARTICLE XXX
### MISCELLANEOUS PROVISIONS

**208.** **Meeting**. The parties will confer at such reasonable times as either party may request to consider problems concerning this Agreement or other matters of mutual concern.

**209.** **Interest Succession**. This Agreement will bind and inure to the benefit of the parties and their respective legal heirs, successors, and assigns.

**210.** **Agreement Construction**. The paragraph titles throughout this Agreement are editorial identifications of their related text and do not limit or control that text.

**211.** **Separability**. If any provisions of this agreement are declared invalid or illegal by any court of competent jurisdiction or administrative agency having jurisdiction, or rendered invalid or illegal through federal or state law, decision, or regulation, that provision shall be void. All remaining provisions shall remain in full force and effect. Upon the request of either party, both parties shall enter into negotiations for the purpose of attempting to arrive at a mutually satisfactory replacement for the void provision.

**212.** **Employee Conditions**.

    a. <u>Keys</u>. Upon written request, Oakland will provide each full-time non-visiting faculty member with a key to his or her office, and with access to the building in which the office is housed by providing a key to the building, or by providing an alternative means for immediate access. Said key(s) must be returned upon termination of employment with Oakland.

    b. <u>Faculty Member Office</u>. Oakland will provide each full-time non-visiting faculty member with an adequate, suitably equipped office. Such offices need be kept in a fully serviced condition only during those hours they are needed for regular use in connection with teaching or research.

    c. <u>Assignment of Assistants</u>. Following assignment by Oakland, undergraduate or graduate assistants may be assigned to faculty members by their

departments for the purpose of assisting faculty members in carrying out professional responsibilities.

d. <u>Parking</u>.  Adequate parking space will be provided for all faculty members at no cost.

e. <u>Professional Supplies and Services</u>.  Oakland will provide the professional supplies and equipment, including laboratory facilities, computer hardware, software, network infrastructure, support services and training at levels adequate for performance of professional responsibilities required of faculty members by this Agreement.  Oakland and the Association agree that maintaining technological services can be costly, and such requirements are ever-changing.

## ARTICLE XXXI
## MINIMUM TERMS

**213.** This Agreement states minimum terms and conditions for employment or continued employment of a faculty member, and Oakland shall not employ a faculty member on terms less favorable than those stated herein.  If Oakland wishes to employ or continue employment of a faculty member on terms more favorable than those specified herein, it may do so in the following manner:

a. In the case of a full-time non-visiting faculty member already employed by Oakland, increases in compensation or other benefits that exceed the terms of this Agreement shall be given only with the prior agreement of the Association.

b. In the case of a prospective faculty member, Oakland may offer employment on terms and conditions of compensation or other benefits that exceed those provided by this Agreement so long as the Association is notified of the terms and conditions of such employment.

## ARTICLE XXXII
## AMENDMENT

**214.** In reaching this Agreement Oakland and the Association have had the opportunity to consider all matters lawfully subject to collective bargaining.

**215.** This Agreement may be amended or supplemented only by further written agreement between the parties.  A party desiring amendment or supplement will notify the other party in writing, stating the substance of the amendment or supplement desired, but the other party will not be obligated to agree to any proposed amendment or supplement.

## ARTICLE XXXIII
## EXCHANGE OF INFORMATION

216. Oakland shall make available to the Association, within a reasonable time after receiving a request, all information reasonably required or legally necessary for negotiation and implementation of a collective bargaining agreement. Nothing in this paragraph shall be construed to require Oakland to compile information and statistics in the form requested if such data are not already compiled in the form requested.

217. **Notices and Addresses**. Any notice required to be served on Oakland under this Agreement will be delivered to Oakland's Office of the Senior Vice President for Academic Affairs and Provost. Any notice required to be served on the Association will be delivered to the Association's Office in 201 Pryale Hall or at such other place as the Association and Oakland may direct by written notice served upon the opposite party.

218. Any notice required to be served on a faculty member under this Agreement will be mailed to his or her campus address.

## ARTICLE XXXIV
## EFFECTIVE DATE AND DURATION

219. This Agreement will be effective from 12:01 a.m. (prevailing Rochester time) August 15, 2012, to midnight (prevailing Rochester time) August 14, 2015, subject to reopening by either party on or after May 15, 2015, or as otherwise agreed to by the parties.

## ARTICLE XXXV
## APPENDICES

220. Appendices A, B, C, D, E, F, G, H, I, J, K, L and M shall be part of this Agreement and shall be fully enforceable under this Agreement.

221. The signatures hereon shall be applicable to each of the various written agreements to which each party has committed itself in the same manner and in the same effect as if physically subscribed hereon.

222. The parties hereto, each by its duly authorized officials and representatives, hereby accept this Agreement and each and all terms and conditions thereof.

OAKLAND UNIVERSITY CHAPTER      BOARD OF TRUSTEES OF
AMERICAN ASSOCIATION OF         OAKLAND UNIVERSITY
UNIVERSITY PROFESSORS

by   _____   by   _____
      Karen A.J. Miller, President         John W. Beaghan, Vice President
                                     For Finance and Administration,
                                     Treasurer to the Board of Trustees

by   _____
      Michael A. Latcha, Chief Negotiator

Date: _____

- 91 -

## APPENDIX A
## RESEARCH AND FULL-TIME ADJUNCT FACULTY

Oakland and the Association recognize that there may be opportunities to advance our common missions through the hiring of individuals on a full-time basis even though the qualifications of the individuals do not lead to appointments under the terms of paragraphs 4 and either 5 or 6.  Such appointments will fall into one of two categories: individuals who can help advance the institution's commitment to research and/or creative endeavor, or individuals who can complement the full-time faculty's expertise in instruction.

(1)     The titles "Research Professor", "Research Associate Professor" and "Research Assistant Professor" may be granted to individuals solely engaged in research as principal investigators or co-principal investigators and whose salaries are primarily supported by grants, contracts or other forms of external funds.

(2)     The titles "Adjunct Professor", "Adjunct Associate Professor", "Adjunct Assistant Professor" and "Adjunct Instructor" may be granted to individuals who complement the instruction of the full-time faculty, for example expert practitioners, clinical instructors or field supervisors for students. Notwithstanding the provisions of paragraph 11, Oakland may employ adjunct faculty members on a full-time basis.

The following conditions apply to the appointments described in (1) and (2) above:

a.      Individuals hired under this provision shall have the rights and responsibilities specified in this Faculty Agreement except as limited or otherwise provided for in this Appendix A, and provided, however, that Oakland's decisions as to whether to renew such appointments, and as to the length of any such renewal, shall not be subject to the grievance procedure.

b.      In consultation with the Association, Oakland shall develop standard letters of offer.

c.      The initial appointment to such positions shall be for two years, and such appointment shall be renewable with the length of each subsequent term not to exceed five years.  For research professors, the continuation of employment is subject to availability of funds.

d.      The initial appointment is subject to the provisions of paragraph 34.

e.      Each academic unit shall develop criteria and procedures for review of such faculty.  Prior to renewal by Oakland, the respective unit shall conduct a review and make a recommendation to Oakland on re-

- 92 -

appointment; in the case of full-time adjunct faculty, the recommendation of the respective CAP will also be requested.

Full-time research professors and adjunct faculty members shall be hired only after the unit criteria and procedures have been established.

f.      The review specified above shall occur during the fall semester of the final year of the appointment, and Oakland shall notify the research professor or full-time adjunct faculty member by January 15 of a re-appointment.

g.      Based on criteria and procedures established by the unit, the respective unit and CAP shall make recommendations to Oakland for consideration of promotion of full-time adjunct faculty.

h.      The number of research professors shall not exceed fifteen (15). The number of full-time adjunct faculty shall not exceed seven (7%) percent (rounded up to the next whole person) of the total full-time tenure-track faculty, excluding the School of Nursing and the School of Health Sciences, as of September 1 of the preceding year. In addition, the School of Nursing and the School of Health Sciences shall be entitled to twelve (12) full-time adjunct faculty positions, combined. Such positions shall be incremental and shall not replace existing tenure track lines.

i.      For layoff purposes, individuals hired under this provision shall be placed in the layoff order immediately following paragraph 54a in the Faculty Agreement.  Research professors, supported exclusively by non-general funds, are not subject to this provision.

j.      Except as noted below, references in the Faculty Agreement to "full-time" faculty members shall apply to the full-time adjunct faculty and research professors.  Full-time adjunct faculty will be in the pay area pools for raise determination.  Research professors will not be included in the pay area pools.  Their salaries will be determined each year by Oakland. Retirement benefits for full-time adjunct faculty and research professors will be that noted in paragraph 100 of the Faculty Agreement for visiting faculty.

k.      Full-time adjunct faculty and research professors will not be eligible to participate in contractual sabbatical leave, developmental leave, faculty travel, and research fellowships (paragraphs 146 through 170).  They will be excluded from the numerator and  denominator in the allocation of faculty travel dollars.  They will not be eligible for phased retirement (paragraph 137).

- 93 -

l.      Full-time adjunct faculty positions shall be filled in accordance with Oakland's hiring policies.  Oakland shall notify the Association when a full-time adjunct position is approved for filling.

**APPENDIX B**
**STUDENT-FACULTY RATIO**

Oakland agrees to maintain a student-faculty ratio for each fiscal year calculated as follows:

$$\frac{\text{Fiscal Year Equated Students (FYES)}}{\text{Full-Time Equivalent Faculty (FTE)}} = 20.7$$

The FYES figure shall include every hour of credit delivered by Oakland during the fiscal year except hours delivered by applied music instructors and hours earned through the tuition waiver program.  One FYES = 30 undergraduate credits = 24 master's level credits = 16 doctoral credits.

The faculty (FTE) shall be calculated as follows:

1.     Faculty supported from all sources are eligible for inclusion in accordance with items 2-7 below.

2.     Faculty appointed full-time for fall and winter are valued at 1.0 FTE for the period, except as provided in items 5-7 below.

3.     Part-time faculty appointed as Special Lecturers or Lecturers are valued based on the number of credits taught (each credit by a Special Lecturer = 0.040 FTE and each credit taught by a Lecturer = 0.025 FTE), regardless of salary paid, with these exceptions:  Applied music instructors and supervisors of student teachers are not included in the FTE count.

4.     Graduate students who are assigned as part of their assistantship to teach credit courses are valued based on the number of credits taught (each credit = 0.025 FTE).

5.     Administrators (such as deans or associate deans) holding academic titles defined by Article IV, paragraphs 5 and 6, are counted at .04 FTE for each credit taught.

6.     Full-time faculty receiving overload payments for off-campus teaching in fall or winter semesters are valued in excess of 1.0 FTE.  The excess valuation is .04 FTE for each credit taught.

7.     Full-time faculty receiving supplemental payments for teaching in spring or summer terms are valued in excess of 1.0 FTE.  The excess valuation is 0.040 FTE per credit taught.

8.     Full-time faculty on paid or unpaid leave for part or all of the academic year, except those on research leaves, are included at the proportionate value their

remuneration bears to full-time remuneration.  Faculty on research leaves whose duties are assumed by others during the absence are to be excluded. Faculty members who are laid off shall be included at the proportionate value their actual remuneration bears to their annual remuneration.

The calculated ratio and the FYES and FTE data, both actual and projected for the fiscal year and all data on which Oakland's calculations are based will be delivered electronically by Oakland to the Association on the last day of final exams of the fall, winter, and spring terms.

No grievance shall be permitted if the FTE required by Appendix B plus the FTE supported with federal or special funding exceeds the actual number of FTE during any fiscal year by six or fewer FTE.

Oakland and the Association agree that the appropriate Senate Committee shall receive periodic reports from the Office of the Senior Vice President for Academic Affairs and Provost concerning the current status of the student-faculty ratio, that it should inform itself of the process used in allocating faculty positions, and it shall make recommendations to the Senior Vice President for Academic Affairs and Provost concerning ways of avoiding an over-ratio condition and/or overstaffing conditions in individual academic units.

**APPENDIX C**
**TRAVEL REIMBURSEMENT RATES**

The reimbursement rates and related information listed below will change from time to time as modifications are made to the travel policies in the Oakland University Administrative Policies and Procedures, http://www.oakland.edu/policies/.  A summary of the policies as of September 1, 2012 is reflected below:

<u>**Transportation**</u>

| | |
|---|---|
| Use of Personal Vehicle: | Standard IRS reimbursement rate per mile |
| Common Carrier (limited to cost of coach air fare) | Lowest Cost Alternative |
| Rental Vehicle (not for personal convenience) | Lowest Cost Alternative |
| Taxi, Shuttle, Limousine Car Service | Lowest Cost Alternative |
| Tolls | Actual cost |
| Parking | Actual cost |
| Airline Checked Luggage Fee (1st bag) | Actual Cost |
| Hotel Internet Access for University Business Only | Actual Cost |
| <u>**Lodging**</u>  (single rate or conference lodging) | Actual cost |
| <u>**Per Diem**</u> (for meals, tips and other incidental expenses) | GSA Per Diem Rate |

<u>**Other Expenses**</u>

| | |
|---|---|
| Conference Expenses (receipt and conference brochure required) | Actual cost |
| Telephone Calls for University Business Only | Actual cost |

***Original Receipts Required For Non-Meal Expenditures In Excess Of $25.00***

- 97 -

**APPENDIX D**
**UNIVERSITY STANDARDS FOR RE-EMPLOYMENT, PROMOTION AND TENURE**

The "University Standards for Re-employment, Promotion and Tenure" are established by Oakland University and form the basis of all recommendations and decisions regarding faculty re-employment, promotion and tenure. Oakland has the legal responsibility and right, at its discretion, to amend or modify the University Standards. Should Oakland, after prior consultation with the Association, choose to modify these standards, a copy of the revised document will be distributed to the Association and to all faculty members.

## *University Standards for Re-employment, Promotion and Tenure*

In all reviews for tenure and promotion Oakland will consider the candidate's entire record, emphasizing efforts and accomplishments since attainment of current rank. The candidate's record at Oakland University generally will be of particular importance. Oakland's evaluation of the candidate will consider:

- the programmatic and institutional setting of the candidate's work at Oakland and the nature of the candidate's assignments and responsibilities;

- the quality of the candidate's accomplishments;

- the relation of all these factors to the objectives of the area or department, the goals of the college or school or institute, and the mission and long range vision of the university.

Oakland's evaluation focuses on the candidate's efforts and accomplishments in three areas:

- teaching or performance as a university librarian, as appropriate to the appointment;

- intellectual contributions such as scholarship, research, and creative activities;

- service.

### Teaching and University Librarianship

The term "teaching" refers to all instruction and advising activities that affect or support the academic progress of students. These activities include classroom, laboratory, studio, field, and clinical teaching and evaluation; the supervision of research, writing, independent study, practica, and performance; individual and group advising and mentoring; preparation of courses; development of curricular and instructional materials; instructional innovations; and application of new educational technologies.

- 98 -

The phrase "performance as a university librarian" refers to initiating, planning, organizing, and implementing library programs, including application of technology and effective communication with and service to library users.

A candidate for tenure must show substantial evidence of achievement in teaching and/or performance as a university librarian.  Such evidence must be obtained through use of systematic procedures for student and peer review.  Evidence may include, but is not limited to, assessments of the instructor's preparation through peer review of syllabi, reading lists, class and library handouts, tests, examinations, and other course and library materials in all formats; student appraisals such as course evaluations and solicited and unsolicited letters; evidence of student achievement; and success in sharing teaching philosophies and methodologies and in obtaining grant support relating to teaching and/or university librarianship.

### **Intellectual Contributions – Scholarship, Research and Creative Endeavors**

Because of the comprehensive and diverse nature of Oakland University's mission, Oakland recognizes in its reviews a broad range of intellectual contributions.  Such contributions improve theory and practice and support the present and future quality of instruction at Oakland University.

Scholarship and research include:

- basic, theoretical or applied research;

- scholarship that applies the research to the betterment of society, institutions, groups, and individuals;

- peer recognition of the above as reflected in publications in refereed journals, other peer-reviewed publications, and critical reviews as appropriate to the discipline;

- successful efforts in securing competitive or professionally significant external funding in disciplines where research is traditionally supported by grants;

- scholarship that interprets, draws together, and brings new insights to bear on original research, gives meaning to isolated facts and puts them in perspective,  or creates connections across disciplinary lines;

- scholarship that involves not only transmitting knowledge but transforming and extending it as well through carefully planned and continuously examined pedagogical procedures that stimulate active learning and encourage students to be critical and creative thinkers with the capacity to go on learning after their college days are over.

"Creative activities" refers to works of artistic expression, production, or performance, and includes such activities as composing, writing, directing, performing, and conducting.

The most important evidence of scholarship, research, and creative activities is that authorities in the discipline(s) or field(s), including authorities outside the institution, have critically evaluated the work as meeting high standards (e.g., publications in refereed journals, grants and other funded research proposals).  A candidate for tenure is expected to have made substantial progress toward maturity as a scholar or creative artist and to have established the presumption of continued growth in these areas.

## Service

The term "service" refers to the following activities:

- public, institutional, and professional service through work that grows out of the university's programs and mission and has the potential for substantial and positive effects on a community, profession, or external perceptions of the university, and that draws upon the candidate's professional competence.  Such service includes not only contributions to the organizational work of academic professional associations and societies at all levels but also activities that extend Oakland's scholarly and instructional capabilities into various external agencies and communities.

- university service through committee work or governance activities in the area, department, school, institute, college, or the university; for faculty, university service includes service as a role model and mentor for colleagues and students.

Documentation of the candidate's service should recognize these distinctions and, particularly in the case of public, institutional, and professional service, should indicate the relationship of the candidate's service activities to the programs and mission of the university and to the candidate's instruction, intellectual contributions, and professional responsibilities.  A candidate's involvement in university service should reflect an appropriate sharing of general faculty obligations in university governance.

Evidence of service should speak to its magnitude, complexity, and duration and may be derived from the testimony of those served; from evaluations provided by others involved in service work; from reports, articles, instructional materials and other documents produced through service; and from grants and funded projects, honors, and awards received in recognition of service.

Oakland regards teaching or performance as a university librarian and intellectual contributions as the most crucial areas of development for candidates for non-tenured reemployment or for tenure.  Oakland normally will expect the record of candidates for tenure to show some accomplishments in service.

## Candidacy for Promotion to Full Professor

Beyond their achievements at the time of tenure all candidates for professor are expected to have continued their development in teaching or performance as a university librarian and in intellectual contributions and service.  In addition, candidates for professor are expected to have demonstrated excellence and creativity in teaching or performance as a university librarian including application of technology, or to have achieved wide recognition beyond the institution as authorities or leaders in intellectual contributions or wide recognition in public, institutional, and professional service.  In disciplines where research is traditionally supported by grant support, external funding is desirable for consideration of promotion to professor.  In addition, candidates for professor must demonstrate potential for sustained involvement in teaching, research, and service.

**APPENDIX E**
**REPORT OF COMPENSATED OUTSIDE PROFESSIONAL WORK**

A faculty member engaged in compensated outside professional employment must notify his or her department chairperson, or the dean or director in units without chairpersons, of such activity, including self-employment, by October 1 each year, or within 30 days of such employment.

Types of activities that need not be reported include, but are not limited to, book royalties; fees for peer review, honoraria, or speaking fees; and reimbursement for travel to/from professional conferences.

Name: _____

Department or Unit: _____

Date: _____

Brief description of the nature of the compensated outside professional work:

_____

_____

_____

Employer: _____

Duration of contract (if appropriate):_____

Approximate number of weekday hours spent on this activity each week: _____

- 102 -

## APPENDIX F
## BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT (EXCERPT)

423.501.        Short title; definitions.

Sec. 1.  (1)  This act shall be known and may be cited as the "Bullard-Plawecki employee right to know act."

(2)     As used in this act:

    (a)     "Employee" means a person currently employed or formerly employed by an employer.

    (b)     "Employer" means an individual, corporation, partnership, labor organization, unincorporated association, the state, or an agency or a political subdivision of the state, or any other legal, business, or commercial entity which has four or more employees and includes an agent of the employer.

    (c)     "Personnel record" means a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action.  A personnel record shall include a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record as provided in this subdivision.  A personnel record shall not include:

        (i)     Employee references supplied to an employer if the identity of the person making the reference would be disclosed.

        (ii)     Materials relating to the employer's staff planning with respect to more than one employee, including salary increases, management bonus plans, promotions, and job assignments.

        (iii)     Medical reports and records made or obtained by the employer if the records or reports are available to the employee from the doctor or medical facility involved.

        (iv)     Information of a personal nature about a person other than the employee if disclosure of the information would constitute a clearly unwarranted invasion of the other person's privacy.

        (v)     Information that is kept separately from other records and that relates to an investigation by the employer pursuant to section 9.

        (vi)     Records limited to grievance investigations which are kept separately and are not used for the purposes provided in this subdivision.

        (vii)     Records maintained by an educational institution which are directly related to a student and are considered to be education records under section 513 (a) of title 5 of the family educational rights and privacy act of 1974, 20 U.S.C. 1232g.

- 103 -

(viii)   Records kept by an executive, administrative, or professional employee that are kept in the sole possession of the maker of the record, and are not accessible or shared with other persons.  However, a record concerning an occurrence or fact about an employee kept pursuant to this subparagraph may be entered into a personnel record if entered not more than six months after the date of the occurrence or the date the fact becomes known.

423.509.   Record of investigation of criminal activity of employee which may result in loss or damage to employer's property; record of criminal justice agency involved in investigation of criminal activity of employee.

Sec. 9. (1)   If an employer has reasonable cause to believe that an employee is engaged in criminal activity which may result in loss or damage to the employer's property or disruption of the employer's business operation, and the employer is engaged in an investigation, then the employer may keep a separate file of information relating to the investigation.  Upon completion of the investigation or after two years, whichever comes first, the employee shall be notified that an investigation was or is being conducted of the suspected criminal activity described in this section.  Upon completion of the investigation, if disciplinary action is not taken, the investigative file and all copies of the material in it shall be destroyed.

*P.A. 1978, No. 397, §1, Eff. Jan. 1, 1979.*

**APPENDIX G**
**LOCATION OF PERSONNEL RECORDS**

The following is a list of offices that may contain personnel records. The list is not exhaustive, although an attempt has been made to identify all such offices.

1.　**OFFICE OF THE SENIOR VICE PRESIDENT FOR ACADEMIC AFFAIRS AND PROVOST**
Employment application/curriculum vitae; academic transcripts; letters of offer; pay forms; change of status forms; leave/return from leave forms and letters; sabbatical leave records; annual salary adjustment records; FMLA records; medical records; materials concerning evaluations, re-employment, promotion, and tenure; disciplinary records; I-9 employment eligibility records; visa/immigration records; recognition and award letters; retirement or resignation records; employment verification documents; unemployment claim records; tuition benefit plan records.

2.　**DEAN'S OR DIRECTOR'S OFFICE**
Employment application/curriculum vitae; academic transcripts; letters of offer; pay forms; change of status forms; leave/return from leave forms and letters; sabbatical leave records; annual salary adjustment records; materials concerning evaluations, re-employment, promotion, and tenure; disciplinary records; I-9 employment eligibility records; visa/immigration records; recognition and award letters; retirement or resignation records; travel forms; grant applications.

3.　**DEPARTMENT / PROGRAM OFFICE**
Employment application/curriculum vitae; academic transcripts; letters of offer; pay forms; change of status forms; leave/return from leave forms and letters; sabbatical leave records; annual salary adjustment records; materials concerning evaluations, re-employment, promotion, and tenure; disciplinary records; I-9 employment eligibility records; visa/immigration records; recognition and award letters; retirement or resignation records; travel forms; grant applications.

4.　**UNIVERSITY HUMAN RESOURCES, BENEFIT SERVICES OFFICE**
Benefit plan selection records, dependent and beneficiary records, letters of offer, disability certificates or letters, Workers' Compensation claim records; FMLA records; medical records.

5.　**PAYROLL**
Payroll history reports; pay forms, W-2 forms, W-4 forms, direct deposit forms, and pay stub copies.

**APPENDIX  H**
**OAKLAND UNIVERSITY WILLIAM BEAUMONT**
**SCHOOL OF MEDICINE ("OUWBSOM")**

1.    The faculty of the OUWBSOM constitute a separate community of interest from the bargaining unit and are not represented by the Association. All references in this Agreement to the schools of Oakland University shall exclude the OUWBSOM.

2.    The letter of agreement between Oakland and the Association dated January 20, 2009 instituting the OUWBSOM as an academic unit and pay group expired with the ratification of the 2009-2012 Faculty Agreement by the Association and the Board of Trustees of Oakland University.

3.    Individuals originally employed as bargaining unit faculty members who have been appointed to the OUWBSOM may continue to teach in their previous academic units until replacements are employed or the charter class matriculates in the OUWBSOM, whichever occurs first. Such individuals shall be counted at 0.04 FTE for each credit taught.

4.    Oakland may invite bargaining unit faculty members to move to the OUWBSOM, or may invite faculty members of the OUWBSOM to move to an academic unit. Such moves shall be voluntary with no guaranteed right to return. The receiving academic unit shall have an opportunity to make a recommendation to Oakland on the proposed move.

5.    When reporting data such as, but not limited to, salary, head count, compensation, benefits and tenure to external agencies, Oakland shall distinguish bargaining unit faculty members from the faculty of the OUWBSOM.

**APPENDIX  I**
**FALL SEMESTER CALENDARS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Labor Day | Sept 1 | Sept 2 | Sept 3 | Sept 4 | Sept 5 | Sept 6 | Sept 7 |
| Classes begin | Sept 3 | Sept 4 | Sept 5 | Sept 6 | Sept 1 | Sept 2 | Sept 3 |
| Classes end | Dec 6 | Dec 7 | Dec 8 | Dec 9 | Dec 5 | Dec 6 | Dec 7 |
| Study Day | Dec 7 | Dec 8 | Dec 9 | Dec 10 | Dec 6 | Dec 7 | Dec 8 |
| Final Exams begin | Dec 8 | Dec 9 | Dec 10 | Dec 11 | Dec 7 | Dec 8 | Dec 9 |
| Final Exams end | Dec 13 | Dec 14 | Dec 15 | Dec 16 | Dec 13 | Dec 14 | Dec 15 |
| Grades due | Dec 15 | Dec 16 | Dec 17 | Dec 18 | Dec 15 | Dec 16 | Dec 17 |

## APPENDIX J
## OTHER QUALIFIED ADULTS AND THEIR DEPENDENTS

The parties intend that the terms and conditions that apply to faculty and their dependents apply equally to Other Qualified Adults and Dependent Children of Other Qualified Adults, and this Agreement shall in all cases be interpreted and applied so as to give effect to that intent.

An **Other Qualified Adult** means an individual who meets all of the following eligibility requirements, to Oakland's satisfaction, at the time a faculty member makes a request for the tuition waiver benefit, a leave with pay or an unpaid or partial leave:

(1)　is not the spouse of the faculty member;
(2)　has shared a residence with the faculty member for eighteen (18) continuous months prior to a request for one of the aforementioned benefits;
(3)　is neither an employee of the owner of the residence in which the faculty member resides, nor a landlord, tenant or border;
(4)　is at least twenty-six (26) years of age;
(5)　is financially interdependent with the faculty member;
(6)　has no familial relationship to the faculty member;
(7)　is not married to someone other than the faculty member;
(8)　is not a dependent of the faculty member as defined by the Internal Revenue Code as amended from time to time and the regulations promulgated thereunder; and
(9)　is not an undocumented immigrant.

A Dependent of an **Other Qualified Adult** means an individual who meets all of the following eligibility requirements to Oakland's satisfaction:

(1)　is a dependent of the Other Qualified Adult as defined by the Internal Revenue Code as amended from time to time and the regulations promulgated thereunder; and
(2)　is not married.

- 108 -

# APPENDIX K
## EMPLOYEE RIGHTS AND RESPONSIBILITIES UNDER THE FAMILY AND MEDICAL LEAVE ACT

**Basic Leave Entitlement**

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible employees for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;
- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son or daughter, or parent, who has a serious health condition; or
- For a serious health condition that makes the employee unable to perform the employee's job.

**Military Family Leave Entitlements**

Eligible employees with a spouse, son, daughter, or parent on active duty or call to active duty status in the National Guard or Reserves in support of a contingency operation may use their 12-week leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is a current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty that may render the servicemember medically unfit to perform his or her duties for which the servicemember is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list.

**Benefits and Protections**

During FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work. Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

**Eligibility Requirements**

Employees are eligible if they have worked for a covered employer for at least one year, for 1,250 hours over the previous 12 months, and if at least 50 employees are employed by the employer within 75 miles.

**Definition of Serious Health Condition**

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to a pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Use of Leave**

An employee does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

**Substitution of Paid Leave for Unpaid Leave**

Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

**Employee Responsibilities**

Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures.

Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**

Covered employers must inform employees requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the employees' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**

FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA;
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Enforcement**

An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

**FMLA section 109 (29 U.S.C. § 2619) requires FMLA covered employers to post the text of this notice. Regulations 29 C.F.R. § 825.300(a) may require additional disclosures.**



**For additional information:**
1-866-4US-WAGE (1-866-487-9243) TTY: 1-877-889-5627
**WWW.WAGEHOUR.DOL.GOV**



U.S. Wage and Hour Division

WHD Publication 1420 Revised January 2009

## APPENDIX L
## MEDICAL EXAMINATIONS AND DISPUTE RESOLUTION

1.   **Required Examinations.**  In addition to any right to require a faculty member to undergo an examination under this Agreement or Oakland's policies and procedures, if the Office of the Provost has good reason to believe that the faculty member's health may be impairing his or her ability to fully and properly perform his or her duties, it may require in writing (including the specific reason(s) for the examination) and with notice to the Association, that a faculty member undergo an examination at Oakland's expense by physician or other appropriate health care provider chosen by Oakland.  Additionally, Oakland may require an examination at its expense to verify the existence of a disability as raised by the faculty member seeking an accommodation of that disability, and the extent that disability may impact the faculty member's ability to perform his or her job.

2.   **Dispute Regarding Examinations.**  A faculty member examined in accordance with the above shall have the right to appeal the findings of that examination by submitting findings from a physician or other appropriate health care provider of his/her choice, at his/her expense.  If there is a conflict between the findings of the two health care providers, the faculty member shall have the right to request an examination at Henry Ford Hospital or another medical provider approved by Oakland, the costs of such examinations to be shared equally by the faculty member and Oakland.  The results of this examination shall be binding upon the faculty member, the Association, and Oakland.

# APPENDIX M
# HEALTH CARE COVERAGE

Benefits Summary
January 2013

**AAUP**

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Calendar Year Deductible:** | | | | | | | |
| Employee | $0 | $200 | $0 | $100 | $200 | $0 | $200 |
| Family | $0 | $400 | $0 | $200 | $400 | $0 | $400 |
| **Co-insurance (for most covered services):** | | | | | | | |
| Percent: | N/A / See applicable co-pays | 80% / 20% | N/A / See applicable co-pays | 90% / 10% | 80% / 20% | N/A / See applicable co-pays | 80% / 20% |
| **Calendar Year Limits:** | | | | | | | |
| Employee | N/A | $2,000 | N/A | $1,000 | $2,000 | N/A | $2,000 |
| Family | N/A | $4,000 | N/A | $2,000 | $4,000 | N/A | $4,000 |
| **Calendar Year Out-of-Pocket Maximum: (Includes deductible and co-insurance)** | | | | | | | |
| Employee | N/A / See applicable co-pays | $2,200 | N/A / See applicable co-pays | $1,100 | $2,200 | N/A / See applicable co-pays | $2,200 |
| Family | N/A | $4,400 | N/A | $2,200 | $4,400 | N/A | $4,400 |
| **Office Visits:** | | | | | | | |
| Medically Necessary | $20 co-pay | $30 co-pay | $20 co-pay | $25 co-pay | $30 co-pay | $20 co-pay | $30 co-pay |
| Routine / Preventive | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Well Baby / Child Care | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

Priority Health refers to their Enhanced benefit level as "Choice".

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

# AAUP

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Office Visits: (continued)** | | | | | | | |
| Immunizations | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Well Woman Care | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Prescription Drugs:** | | | | | | | |
| Retail | Up to 30 day supply | Up to 30 day supply | Up to 30 day supply | Up to 30 day supply | Up to 30 day supply | Up to 30 day supply | Up to 30 day supply |
| Generic | $7 co-pay | $10 co-pay | $7 co-pay | $10 co-pay | $10 co-pay | $7 co-pay | $7 co-pay |
| Preferred Brand | $15 co-pay | $20 co-pay | $15 co-pay | $20 co-pay | $20 co-pay | $15 co-pay | $15 co-pay |
| Non Preferred Brand | $30 co-pay | $50 co-pay | $30 co-pay | $40 co-pay | $50 co-pay | $30 co-pay | $30 co-pay |
| Retail—up to 90 day supply | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay |
| Mail order – up to 90 day supply | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay | 2x retail co-pay |
| Generic Enforcement | Applies | Applies | Applies | Applies | Applies | Applies | Applies |

Generic Enforcement applies on all pharmacy plans.  For HAP, BCN, and Priority Health, you are responsible for the difference in cost between the generic and brand name drug when you elect a brand in lieu of a generic.

# AAUP

Benefits Summary January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Hospital Services:** | | | | | | | |
| Room & Board | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Inpatient Physician Visit | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| **Ancillary Services:** | | | | | | | |
| General Nursing | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Diagnostic X-ray and Laboratory | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Mammogram Screening | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Emergency Room Visits | $100 co-pay | $150 co-pay | $100 co-pay | $100 co-pay | $150 co-pay | $100 co-pay | $150 co-pay |
| Urgent Care Facility | $20 co-pay | $30 co-pay | $20 co-pay | $25 co-pay | $30 co-pay | $20 co-pay | $30 co-pay |
| Ambulance | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 100% |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.
Priority Health refers to their Enhanced benefit level as "Choice".
This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

# AAUP

**Benefits Summary**
**January 2013**

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Surgical Services:** | | | | | | | |
| Inpatient | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Outpatient | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Surgeon Fees | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| Anesthesiologist | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |
| **Maternity:** | | | | | | | |
| Pre & Post Natal Care | $20 co-pay | $30 co-pay | $20 co-pay | $25 co-pay | $30 co-pay | $20 co-pay | $30 co-pay |
| Delivery | 100% | 80% after deductible | 100% | 100% after deductible for professional | 100% after deductible for professional | 100% | 80% after deductible |
| Newborn Nursery Care | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% | 80% after deductible |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.
Priority Health refers to their Enhanced benefit level as "Choice".
This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

# AAUP

**AAUP EMPLOYEES Medical Plan Comparison**

Benefits Summary January 2013

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Therapy:** | | | | | | | |
| Physical, Speech & Occupational Therapy | 100% / 60 visits combined per year | 80% after deductible / 60 visits combined per year | $20 co-pay / 60 consecutive days per episode for a combination of therapies; subject to significant improvement within 60 days | $25 co-pay / 60 consecutive days per episode for a combination of therapies; subject to significant improvement within 60 days | $30 co-pay / 60 consecutive days per episode for a combination of therapies; subject to significant improvement within 60 days | $20 co-pay / 50 visits combined per year for Physical and Occupational; Separate 50 visit limit for Speech | $30 co-pay / 50 visits combined per year for Physical and Occupational; Separate 50 visit limit for Speech |
| Chiropractic Care (spinal manipulation only) | Not Covered | Not Covered | $20 co-pay with referral | $25 co-pay with referral | $30 co-pay with referral | $20 co-pay / combined with 50 visit Physical Therapy maximum | $30 co-pay / combined with 50 visit Physical Therapy maximum |
| **Miscellaneous:** | | | | | | | |
| Allergy Testing and Therapy | 100% | 100% | 100% | 100% after deductible | 100% after deductible | 100% | 100% |
| Human Organ Transplants (subject to limitations) | 100% | 80% after deductible | 100% | 90% after deductible | 80% after deductible | 100% Approved facilities only | 80% after deductible Approved facilities only |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

Priority Health refers to their Enhanced benefit level as "Choice".

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

# AAUP

Benefits Summary
January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP — Achieve HMO | | Blue Care Network — Healthy Blue Living Rewards HMO | | | Priority Health — HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Miscellaneous: (continued)** | | | | | | | |
| Skilled Nursing Facility Care | 100% / 730 day maximum / renewable after 60 days | 80% after deductible / 730 day maximum / renewable after 60 days | 100% / 730 day lifetime maximum | 90% after deductible / 45 day maximum per year | 80% after deductible / 45 day maximum per year | 100% / 730 day lifetime maximum  45 day maximum per year for inpatient rehabilitation and hospice facility combined. | 80% after deductible / 730 day lifetime maximum  45 day maximum per year for inpatient rehabilitation and hospice facility combined. |
| Home Health Care | 100% | 80% after deductible | $20 co-pay | $25 co-pay | $30 co-pay | 100% | 100% after deductible |
| Hospice | 100% / 210 day lifetime maximum | 80% after deductible / 210 day lifetime maximum | 100% | 100% after deductible | 100% after deductible | 100% / 45 day maximum per year for inpatient rehabilitation and hospice facility combined. | 80% after deductible / 45 day maximum per year for inpatient rehabilitation and hospice facility combined. |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

Priority Health refers to their Enhanced benefit level as "Choice".

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

# AAUP

Benefits Summary
January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | HAP Achieve HMO | | Blue Care Network Healthy Blue Living Rewards HMO | | | Priority Health HealthbyChoice Achievements HMO | |
|---|---|---|---|---|---|---|---|
| | ENHANCED | STANDARD | ENHANCED | INTERMEDIATE | STANDARD | CHOICE | STANDARD |
| **Mental / Nervous: (authorization required)** | | | | | | | |
| Inpatient Care | 100% | 80% after deductible | 100% when authorized | 90% after deductible when authorized | 80% after deductible when authorized | 100% when authorized | 80% after deductible when authorized |
| Outpatient Care | $20 co-pay | $30 co-pay | 100% | $25 co-pay | $30 co-pay | $20 co-pay when authorized | $30 co-pay when authorized |
| **Alcoholism / Substance Abuse: (authorization required)** | | | | | | | |
| Inpatient Care | 100% | 80% after deductible/ | 100% when authorized | 90% after deductible when authorized | 80% after deductible when authorized | 100% when authorized | 80% after deductible when authorized |
| Outpatient Care | $20 co-pay | $30 co-pay | 100% | $25 co-pay | $30 co-pay | $20 co-pay when authorized | $30 co-pay when authorized |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

Priority Health refers to their Enhanced benefit level as "Choice".

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

For a more detailed explanation of benefits, please refer to the Benefit Description located on the internet.  Any discrepancies between these benefits and the benefits provided by our carriers, the carrier benefits will prevail.

- 117 -

# AAUP

Benefits Summary
January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | Blue Cross Blue Shield PPO Plan A | | Blue Cross Blue Shield PPO Plan B | | BCBSM Traditional Plan |
|---|---|---|---|---|---|
| | IN-NETWORK | OUT-OF-NETWORK | IN-NETWORK | OUT-OF-NETWORK | |
| **Calendar Year Deductible:** | | | | | |
| Employee | $0 | $250 | $250 | $500 | $100 |
| Family | $0 | $500 | $500 | $1,000 | $200 |
| **Co-insurance:** | | | | | |
| Percent: | N/A / See applicable co-pays | 80% / 20% | 80% / 20% | 60% / 40% | 90% / 10% |
| Calendar Year Limits: | | | | | |
| Employee | N/A | $1,000 | $1,000 | $3,000 | $1,000 |
| Family | N/A | $2,000 | $2,000 | $6,000 | $1,000 |
| **Calendar Year Out-of-Pocket Maximum: (includes deductible and co-insurance)** | | | | | |
| Employee | N/A / See applicable co-pays | $1,250 | $1,250 | $3,500 | $1,100 |
| Family | N/A | $2,500 | $2,500 | $7,000 | $1,200 |
| **Office Visits:** | | | | | |
| Medically Necessary | $15 co-pay | 80% after deductible | $20 co-pay | 60% after deductible | 90% after deductible |
| Preventive | 100% | Not covered | 100% | Not covered | 100% - participating provider only |
| Well Baby / Child Care | 100% | Not covered | 100% | Not covered | 100% - participating provider only |
| Immunizations | 100% | Not covered | 100% | Not covered | 100% - participating provider only |
| Well Woman Care | 100% | Not covered | 100% | Not covered | 100% - participating provider only |
| **Prescription Drugs:** | | | | | |
| Retail | Up to 30 day supply | Reimbursed 75% after: | Up to 30 day supply | Reimbursed 75% after: | Up to 30 day supply |
| Generic | $10 co-pay | $10 co-pay | $10 co-pay | $10 co-pay | $15 co-pay |
| Preferred Brand | $20 co-pay | $20 co-pay | $20 co-pay | $20 co-pay | $15 co-pay |
| Non Preferred Brand | $20 co-pay | $20 co-pay | $20 co-pay | $20 co-pay | $15 co-pay |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

**AAUP**

Benefits Summary
January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | Blue Cross Blue Shield PPO Plan A | | Blue Cross Blue Shield PPO Plan B | | BCBSM Traditional Plan |
|---|---|---|---|---|---|
| | IN-NETWORK | OUT-OF-NETWORK | IN-NETWORK | OUT-OF-NETWORK | |
| **Prescription Drugs (continued) :** | | | | | |
| Retail – up to 90 day supply | 1x retail co-pay | 1x retail co-pay | 2x retail co-pay | 2x retail co-pay | $15 co-pay |
| Mail order – up to 90 day supply | 1x retail co-pay | No coverage | 2x retail co-pay | No coverage | $15 co-pay |
| Generic Enforcement | Applies without DAW | Applies without DAW | Applies without DAW | Applies without DAW | Applies without DAW |
| **Hospital Services:** | | | | | |
| Room & Board | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Inpatient Physician Visit | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| **Ancillary Services:** | | | | | |
| General Nursing | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Diagnostic X-ray and Laboratory | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Mammogram Screening | 100% | 80% after deductible/ | 100% | 60% after deductible | 100% |
| Emergency Room Visits (some limitations) | $50 co-pay | $50 co-pay | $50 co-pay | $50 co-pay | $50 co-pay |
| Urgent Care Facility | $15 co-pay | 80% after deductible | $20 co-pay | 60% after deductible | 90% after deductible |
| Ambulance | 100% | 100% | 80% after deductible | 80% after deductible | 90% after deductible |
| **Surgical Services:** | | | | | |
| Inpatient | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Outpatient | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Surgeon Fees | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Anesthesiologist | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.

This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization may be required.

**AAUP**

## AAUP EMPLOYEES Medical Plan Comparison

| | Blue Cross Blue Shield PPO Plan A | | Blue Cross Blue Shield PPO Plan B | | BCBSM Traditional Plan |
|---|---|---|---|---|---|
| | IN-NETWORK | OUT-OF-NETWORK | IN-NETWORK | OUT-OF-NETWORK | |
| **Maternity:** | | | | | |
| Pre & Post Natal Care | 100% | 80% after deductible | 100% | 60% after deductible | 90% after deductible |
| Delivery | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Newborn Nursery Care | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| **Therapy:** | | | | | |
| Physical, Speech & Occupational Therapy | 100% / 60 visits combined per year | 80% after deductible / 60 visits combined per year | 80% after deductible / 60 visits combined per year | 60% after deductible / 60 visits combined  per year | 100% / up to 60 consecutive days of treatment/ Additional benefits covered at 90% after  deductible. |
| Chiropractic Care **(spinal manipulation only)** | 100% / 24 visits per year | 80% after deductible / 24 visits per year | $20 co-pay / 24 visits per year | 60% after deductible / 24 visits per year | 90% after deductible / up to 20 visits first 90 days, then 2 visits per month |
| **Miscellaneous:** | | | | | |
| Allergy Testing and Therapy | 100% | 80% after deductible | 100% | 60% after deductible | 90% after deductible |
| Human Organ Transplants (subject to limitations) | 100% / specified organ transplants | 100% / specified organ transplants are covered in designated facilities only | 100% / specified organ transplants | 100% / specified organ transplants are covered in designated facilities only | 100% / specified organ transplants are covered in designated facilities only |
| Skilled Nursing Facility Care | 100% / 120 day maximum per year | 100% / 120 day maximum per year | 80% after deductible / 120 day maximum per year | 80% after in-network deductible / 120 day maximum per year | 100% / 730 day lifetime maximum |
| Home Health Care | 100% | 100% | 80% after deductible | 80% after in-network deductible | 100% |
| Hospice | 100% / some limitations | 100% / some limitations | 100% / some limitations | 100% / some limitations | 100% / some limitations |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.
This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization ma be required.

# AAUP

Benefits Summary
January 2013

## AAUP EMPLOYEES Medical Plan Comparison

| | Blue Cross Blue Shield PPO Plan A | | Blue Cross Blue Shield PPO Plan B | | BCBSM Traditional Plan |
|---|---|---|---|---|---|
| | IN-NETWORK | OUT-OF-NETWORK | IN-NETWORK | OUT-OF-NETWORK | |
| **Mental / Nervous** | | | | | |
| Inpatient Care | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Outpatient Care | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 90% after deductible |
| **Alcohol and Substance Abuse:** | | | | | |
| Inpatient Care | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |
| Outpatient Care | 100% | 80% after deductible | 80% after deductible | 60% after deductible | 100% |

An office visit copay could apply for items shown at 100% coverage when services are rendered during an office visit.
This benefit summary is not meant to address all covered services, nor does it address all limitations, exclusions, or instances where prior authorization ma be required.

All benefits paid out-of-network are subject to "reasonable and customary" limitations.  For a more detailed explanation of benefits, please refer to the Benefit Description located on the Internet.  Any discrepancies between these benefits and the benefits provided by our carriers, the carrier benefits will prevail.

- 121 -

# INDEX

Academic Titles ......................................................5-7
Academic Unit-Criteria and Procedures...........................16-18
Academic Units-definition ............................................... 4
Academic Units...................................................... 19
Accidental Death and Dismemberment Insurance.....................59
Adjunct Faculty-Full-Time...........................................92-94
Appendices............................................................92-121
Appointment Dates ...................................................... 86
Arbitration ......................................................28, 83-84
Assistant Professor non- tenure ..................................13-14
Assistant Professor-review..........................................21-25
Assistant Research Scientist............................................ 6
Associate Professor-non tenured .................................... 13
Associate Professor-review.............................................. 25
Associate Research Scientist............................................ 6
Association-definition..................................................... 4
Bargaining Unit Faculty-definition...................................... 4
Blue Cross Standard Plan .............................................. 55
Blue Care Network ...................................................... 56
Calendar-University ...............................................87,107
CAP (Committee on Appointment & Promotion)....................4, 25-26
Chairperson-department ................................................ 85
Chairperson-salary ..................................................48-49
Chairperson-summer teaching .......................................... 49
Community Blue PPO Option 1...................................55-56
Coordinators' Salaries..............................................49-50
Dental Insurance ....................................................... 58
Department Chairperson ................................................ 85
Department Chairperson Appointment................................ 12
Discipline and Discharge.............................................41-42
Distance Instruction ................................................... 51
Distinguished Titles ..................................................... 7
Dues-non payment ...................................................9-11
Dues-to Association...................................................9-11
Duration of Salary ...................................................... 54
Early Promotion ........................................................ 28
Emeritus(a) Titles ....................................................... 7
Employment Procedures .............................................. 12
Enrollment in Courses ..........................................41, 54, 61-62
Evening Courses-teaching .............................................. 50
Exchange of Information ................................................ 89
Faculty Benefit Information-Location.................................... 54
Faculty Retraining....................................................... 61
Faculty Travel .....................................................67-68, 97
Fall/Winter Overload Teaching.......................................... 52
FRPC (Faculty Re-employment & Promotion Committee)..........4, 26-28
Full Time Adjunct Faculty..........................................92-94
Grievance Procedure.................................................82-84

Grievance Procedures-tenure review....................................31
Grievance Procedure-arbitration ...................................82-84
Grievance Procedure-initiation ......................................... 82
Grievance Procedure-step one ......................................... 82
Grievance Procedure-step two.......................................... 83
Health Care Coverage ................................... 54-58, 111-121
Health Alliance Plan (HAP) .........................................56-57
Health Maintenance Organization (HMO)...........................56-57
Honorary Titles .......................................................... 7
Instructor-non tenured .................................................. 13
Instructor-review....................................................20-21
Insurance ............................................................54-61
Intellectual Property..................................................51-52
Internal Review Commission............................................ 30
In-Load Teaching Summer ............................................. 50
Job Security.............................................................. 15
Job Security-granting..................................................... 30
Keys .................................................................... 88
Layoff, Faculty Review ..............................................32-33
Layoff and Recall......................................................32-41
Layoff-order ............................................................ 34
Layoff-part time teaching ............................................... 39
Layoff Procedures ...................................................35-37
Leaves.................................................................72-80
Leaves With No Pay....................................................75-78
Leaves (FMLA) ................................................76,77, 109
Leaves With No Pay-application ......................................77-78
Leaves With No Pay-benefit eligibility ................................. 75
Leaves With No Pay-return ............................................. 78
Leaves With No Pay-failure to return .................................. 80
Leaves With No Pay-partial...........................................75-78
Leaves With No Pay-re-employment reviews ............................ 78
Leaves With Pay.......................................................68-75
Leaves With Pay-absence.............................................73-75
Leaves With Pay-insurance.............................................. 69
Leaves With Pay-replacements.......................................... 69
Leaves With Pay-travel expenses ....................................... 69
Lecturer Appointment..................................................6-7
Letter of Agreement .................................................... 91
Librarians-compensation ................................................ 81
Life Insurance ......................................................58-59
List of Unit.............................................................. 8
Long-term Disability...............................................60, 80-81
Management Practices...............................................11-12
Medical Savings Account ............................................... 57
Medical Waiver Payment............................................57-58
Non-tenured Employment ...........................................13-16
Notices and Addresses................................................... 90

Oakland-definition...........................................................................4
Oakland University William Beaumont School of Medicine
    (OUWBSOM).....................................................................5, 106
Offices..........................................................................................88
"Off-term"....................................................................................50
Online Instruction........................................................................51
Optional Life Insurance................................................................59
Optional Promotion......................................................................28
Other Qualified Adults and Individuals-benefits...........................61
Outside Professional Work......................................................43, 102
Over-ratio Layoff-................................................................32, 35-36
Paid Leaves.............................................................................68-75
Parking.........................................................................................88
Part-time Employment...................................................................6
Past Practices..........................................................................86-87
Pay Groups..............................................................................47-48
Personnel Records.............................................................84-85, 105
Position-shift Layoff................................................................33, 37
Primary Appointment......................................................................8
Professional Development and Research Leaves.......................72-73
Professional Liability Insurance....................................................59
Professional Misconduct...............................................................41
Professional Responsibilities...................................................43-44
Promotion, early...........................................................................28
Promotion, optional......................................................................28
Promotion-tenured faculty.......................................................29-30
Recall-layoff............................................................................38-41
Reduced Work Schedule Prior to Retirement...........................63-64
Reduction in Work Load................................................................81
Research Faculty......................................................................92-93
Research Fellowships and Grants..................................................72
Research Leaves......................................................................72-73
Retired Faculty re-employment.....................................................63
Retirement...............................................................................63-67
Retirement-définition....................................................................63
Retirement-Multiple Option Program.............................................62
Retirement-Oakland contribution...................................................62
Retirement-privileges and benefits...........................................64-67
Retirement-visiting faculty......................................................53, 61-62
Review-anonymous letters............................................................85
Review Schedule Change..............................................................15
Review Statement....................................................................16-20
Review While on Layoff................................................................31
Right to Know Act..................................................................103-104
Rights and Responsibilities...........................................................87
Sabbatical Leave.....................................................................70-72
Sabbatical Leaves-application procedure..................................71-72
Sabbatical Leaves-criteria.............................................................71
Sabbatical Leaves-postponement..................................................70
Salary.....................................................................................44-51
Salary Increases......................................................................48-50

Senior Research Scientist................................................................6
Special Instructor-non tenured......................................................14
Special Instructor-review..............................................................30
Special Instructor-title...................................................................6
Special Instructor-transfer to........................................................14
Special Lecturer Medical Programs...........................................53-54
Special Lecturer Salary............................................................53-54
Special Lecturer-title......................................................................6
Special Lecturer Tuition Benefit..............................................54, 62
Student Faculty Ratio...............................................................95-96
Summer Rate of Pay.................................................................50-51
Supplemental Retirement Plans.....................................................62
Supplies and Services..............................................................88-89
Suspension-non payment of dues.................................................10
Tenured Employment....................................................................15
Tenure Review Process............................................................15-30
Tenure Review Process-Grievance Procedures.............................31
Tenure Review Process-Grievance-Arbitrators.............................83
Titles-academic.........................................................................5-7
Titles-distinguished........................................................................7
Titles-emeritus (a).........................................................................7
Titles-honorary...............................................................................7
Travel.....................................................................................67-68
Travel-accident insurance.............................................................59
Travel Reimbursement Rates.........................................................97
Tuition Waiver.........................................................................61-62
Twelve Month Pay Option..............................................................54
University Calendar..............................................................87, 107
University Standards for Re-Employment, Promotion
    and Tenure...................................................15, 98-100
Vision Coverage............................................................................58
Visiting Faculty Benefits...............................................................53
Visiting Faculty Employment Periods..............................................6
Visiting Faculty Retirement......................................................53, 63
Visiting Faculty Salary.............................................................52-53

# EXHIBIT B

Incident on Tuesday, May 3, 2011

At approximately 4:25 pm on Tuesday, May 3, 2011 while working on a nursing syllabus a paper clipped packet of papers were tossed on my upper desk counter top followed by a voice saying "there's my receipts". As I looked up Professor Dorothy Hawthorne-Burdine had already turned around and was walking away from my desk. I immediately said, "excuse me Dorothy what are these receipts for'? Dorothy stopped but did not turn around at this point. I picked up the receipts, flipped through them, and asked again, "what are these receipts for Dorothy" (there were food receipts on a Hilton invoice along with a couple of loose receipts all paper clipped together). Dorothy did not respond. I continued to ask with Dorothy's back to me 'are these receipts for a conference'? Dorothy turned around and with her hand out raised her voice and shouted at me "give them back to me". I reached out to give them back to her while asking "Dorothy I just need to know if these receipts are from a conference and what is the name of the conference so that I can find all of the documentation". At this time Dorothy had turned around, took several steps toward me and grabbed the receipts from my hand and said "I don't remember the name of the conference" (even though she had just returned from the conference the day before). Dorothy then said "some of you clerical staff here are always making excuses about not wanting to do your job". Dorothy continued by saying ""you damned well know what they are for" I replied "no Dorothy I don't." She then said to me to write down a list of what you need" and I replied "if you will let me look at the receipts I can then tell you what is missing". Dorothy said to me "you're speaking to me like I am stupid, I told you to make me a list. You are speaking to an educated black woman with a PhD". Dorothy continued to yell and rumble and would not allow me to get a word in. I finally was able to say "no Dorothy I just need to look over the receipts to see what you are submitting and find out how everything was paid for DPV or credit card". Dorothy continued to ramble about how tired she is of this university. She went on telling me that I was out of line to question her (all which was in a yelling voice, out in public for everyone to hear and see). Suddenly Sherry Abernathy walked up and asked "what is going on"? I started to explain to Sherry what had just transpired and Dorothy interrupted by saying "She (meaning me) is talking to me as if I was stupid". Sherry said "No, no, no she (meaning me) is only trying to figure out what all of this is for". Sherry stood near Dorothy with her eyes opened real wide and slightly shook her head while under her breath said to me "don't say anything"). The entire time Dorothy was rambling about how tired she is that no one will do as she says. Dorothy then told Sherry out loud in front of everyone that Sherry needs to teach her clerical staff how to talk to faculty. Sherry kept telling Dorothy "okay, okay, don't worry I'll take care of it for you". Dorothy handed the receipts to Sherry. As I attempted to speak to Sherry pointing out the receipts did not include the hotel invoice, flight information, conference information, or parking Dorothy interrupted me and said, this is what I am talking about she (referring to me) will not allow me to finish a sentence she acts like I am stupid. Sherry replied "no one is saying you are stupid". Dorothy walked off mumbling. Sherry then walked from in front of my desk to around the side of my desk placed her hand on my forearm saying "its okay you didn't do anything". Sherry said everything was placed on the PCard to avoid problems

**DOCUMENT 3**

with Dorothy.  Sherry continued to tell me there is no way I would have known that.  Sherry asked me to prepare a Travel Expense Summary Form and she would get any additional information I needed.

This entire situation took place out in the open with Jennifer Fuller hearing the entire conversation.  Dean Schott-Baer heard the yelling and came out of her office to see what was going on and turned around and walked back into her office.  Eilene Lohmeier could hear the yelling but stayed in her office.

After Sherry left I went into Dean Schott-Baer's office.  Eilene Lohmeier was in with the Dean and I said "I'm sorry Darlene but I am not going to allow Dorothy to bully and yell at me as she does others in the School of Nursing.  Dr. Schott-Baer's reply was "you shouldn't have too".  I then left for the day.



Leigh Dzwik <settlemo@oakland.edu>

# Re

5 messages

---

**Bonnie Koch <bkoch@oakland.edu>**                                    Thu, Jun 2, 2011 at 7:57 AM
To: Leigh Settlemoir Dzwik <settlemo@oakland.edu>
Cc: bkoch@oakland.edu

Hi Leigh,

I would like to share with you what occurred yesterday June 1, 2011 with Professor Dorothy Hawthorne-Burdine. Professor Hawthorne-Burdine walked through our mail room towards me carrying a black cart in her one hand. She glared at me when you walked past my desk and proceeded on towards Eilene Lohmeier's office. She turned around and glared at me while she walked back to the doorway of the mail room. At the same time a student walked in and asked if I would place an envelope in Professor Barbara Penprase's mailbox. As I stood up I noticed Professor Hawthorne-Burdine standing in the middle of the doorway to the mail room staring at me. I proceeded around my desk while the student was standing there and went towards the mail room. Professor Hawthorne-Burdine was still standing in the middle of the doorway staring at me. As I approached Professor Hawthorne-Burdine I said 'excuse me' but she would not move. I then said 'excuse me Dorothy' and again she would not move only to continue to stared at me. So I turned away and walked around the suite to the opposite side the mail room, entered doorway, and placed the envelope in Professor Penprase's mailbox. As I turned to walk back to my desk I noticed Professor Hawthorne-Burdine was now standing in front of the printer inside the mail room staring at me. I walked along the file cabinets making sure to keep my distance from Professor Hawthorne-Burdine and exited the mail room right in front on my desk. I informed the student the envelope was in Professor Penprase's mailbox and she was all set. I wished the student a nice day and returned to my desk. When I looked in the mail room Professor Hawthorne-Burdine was still in front of the printer staring at me.

Leigh, Professor Hawthorne-Burdine really scares me. I have no idea why she continues anytime she sees me to stare at me. I try to avoid her whenever possible but when a student is present sometimes I have to cross paths with her. Any thoughts on how to handle this issue?


Bonnie Koch
Administrative Secretary
School of Nursing
Oakland University
428 O'Dowd Hall
Rochester, MI 48309
Email: bkoch@oakland.edu
(O) (248) 370-3497
(F) (248) 370-4279

---

**Leigh Settlemoir Dzwik <settlemo@oakland.edu>**                      Thu, Jun 2, 2011 at 9:33 AM
To: Bonnie Koch <bkoch@oakland.edu>

Bonnie,

Thank you for your prompt email. Please let me review and get back with you.

Leigh

[Quoted text hidden]

—

**DOCUMENT 4**

Leigh Settlemoir Dzwik
Assistant VP for Academic HR
Office of Academic Affairs
Oakland University
517 Wilson Hall
Rochester, MI 48309-4401
(248) 370-2922
FAX (248) 370-4210

---

**settlemo@oakland.edu <settlemo@oakland.edu>**                   **Thu, Jun 2, 2011 at 10:52 AM**
Reply-To: settlemo@oakland.edu
To: Bonnie Koch <bkoch@oakland.edu>

Bonnie, did anyone else see/hear this incident?

> **From:** Bonnie Koch <bkoch@oakland.edu>
> **Date:** Thu, 2 Jun 2011 07:57:54 -0400
> **To:** Leigh Settlemoir Dzwik<settlemo@oakland.edu>
> **Cc:** <bkoch@oakland.edu>
> **Subject:** Re
>
> [Quoted text hidden]

---

**Bonnie Koch <bkoch@oakland.edu>**                               **Thu, Jun 2, 2011 at 11:36 AM**
To: settlemo@oakland.edu

Leigh,

No, the individual who sits next to me was out of the office yesterday.  Eilene Lohmeier was at lunch.  Being summer semester very few faculty are here.
[Quoted text hidden]

---

**Bonnie Koch <bkoch@oakland.edu>**                               **Thu, Jun 2, 2011 at 11:39 AM**
To: Leigh Settlemoir Dzwik <settlemo@oakland.edu>

Leigh,

I feel as though Professor Hawthorne-Burdine first makes sure no one else is around when something of this sort happens.  Just as yesterday, she first walked past me, walked past Eilene Lohmeier's office and looked inside and then turned around and came back to me.

---------- Forwarded message ----------
From: **Bonnie Koch** <bkoch@oakland.edu>
[Quoted text hidden]

[Quoted text hidden].



Leigh Dzwik <settlemo@oakland.edu>

# Fwd: Requested interaction with Dorothy
1 message

**F Darlene Schott-Baer <schottba@oakland.edu>**
To: Leigh Settlemoir Dzwik <settlemo@oakland.edu>

Mon, Jun 13, 2011 at 12:23 PM

Leigh, FYI. Darlene

---------- Forwarded message ----------
From: **Marisa Ferrari <ferrari2@oakland.edu>**
Date: Mon, Jun 13, 2011 at 12:17 PM
Subject: Requested interaction with Dorothy
To: F Darlene Schott-Baer <schottba@oakland.edu>

Please see attached

--
Marisa Ferrari, DNP, RN
Assistant Professor
Director, MSN-Clinical Nurse Leadership program
Oakland University
School of Nursing
460 O'Dowd Hall
Rochester, MI 48309
(248) 370-4489
(586) 246-8522 (c)

--
Darlene Schott-Baer Ph.D., R.N.
Interim Dean and Professor
Oakland University
School of Nursing
428 O'Dowd Hall
Rochester, MI 48309-4401
248-370-4081
schottba@oakland.edu

 **dorothy outburst.docx**
11K

**DOCUMENT 6**

On November 30, 2010 at approximately noon, I was approached by Dorothy and was asked how appointments such as Director's were assigned. I explained that they were appointed by the dean, usually to tenured faculty. Dorothy ten discussed that she felt these positions should be posted and go through human resources. She then stated that especially since the director of undergraduate programs was totally unqualified. She stated that Sarah Newton was unprofessional, unethical and yelled and screamed at her students.

I informed Dorothy that Sarah had elected by students for the apple award, and that she had excellent student evaluations. I also informed Dorothy that my office was next to Sarah's for 5 years....and that I had never heard her act in either an unprofessional or unethical way. And although my communication style is different than hers.....I have never heard her yell at students.

Dorothy became angry and indicated that I was lying....that I must have heard something.  I explained to Dorothy that she had crossed the line and needed to apologize for calling me a liar. That although we disagreed – that didn't mean I was a liar. Dorothy indicated that she would not apologize and that she knew I was a liar.

She then walked away and screamed from her office door (while pointing at me)..."right there is a liar!" I again asked for her apology.... She shook her head and again screamed "liar"

# EXHIBIT C

**June 14, 2011 meeting with Dorothy Hawthorne-Burdine (Associate Professor SON), Leigh Settlemoore Dzwik (Asst Vice Pres/Academic HR Academic Affairs, Scott Barns (Executive Director AAUP), Darlene Schott-Baer (Interim Dean) 2 pm-4:30 pm, DCR SON**

Discussion centered around 3 issues related to Professor Hawthorne-Burdine's performance:

1) Interactions with a staff member over completion of travel documents necessary for reimbursement for conference;
2) Completion of required EGA form for submission of external grants;
3) Demeanor during interactions with staff and faculty.

When Dorothy first came into the Dean's conference room, I greeted her, "Hello, Dorothy". She promptly became agitated: I do not know her well enough to address her by her first name, she announced, and she insisted upon being addressed henceforth as "Dr. Hawthorne". She emphasized several times during the meeting that only her family and people she identified may use her given name—all others must call her "Dr. Hawthorne".

Leigh S-D afforded Dorothy an opportunity to express her frustrations about the SON and processes within the university. Dorothy straightaway blamed others for the issues 1) – 3) listed above. She insisted specifically that the *contretemps* about travel documents was solely Bonnie Koch's fault: Bonnie is "only staff" and should not address faculty disrespectfully.

Regarding the EGA form: Dorothy absolutely refused to complete it; were she to do so, she stated, she would be doing "other people's" work, because an e-mail from Brad Roth informed her that the government does not require the EGA form. Dorothy flatly declared: not only will she *never* complete the form, she will not even submit grants in the future. [It is the responsibility of non-tenured faculty to submit grants and do research in order to be tenured.] She further stated that she doesn't need to send grants from OU. I asked whether she recalled that, in a conversation following the new-faculty breakfast, I had explicitly requested that she complete the EGA form as required by university policy. Dorothy replied: yes, she remembered the conversation, but since we had already discussed the matter, completion of the EGA form was a dead issue and should not be brought up again. I reminded her that during the same conversation she had responded to my request by advising me that since I, as Interim Dean, didn't have anything else to do, I could complete the EGA form in her stead. Dorothy dismissed this reminder with the remark that she is too busy to be bothered with the EGA form—others should fill it out if they want it done. She was also very critical of Bonnie Kwit in the grants office, her complaints escalating as the meeting progressed.

Dorothy consistently deflected criticism of her own demeanor toward faculty and staff by imputing belligerent behavior to others, especially to secretary Bonnie Koch. Asked specifically about the occasion on which secretary Koch broached the topic of travel documents, Dorothy noted: upon hearing Dorothy speak loudly to Bonnie, Assistant Dean Abernathy came out of her own office, took the forms from Dorothy, and stated that she herself [Abernathy] would "take care of it". Dorothy repeatedly asked whether hers was the only loud voice reported. Eventually, declaring the subject passé, she announced that she does not want to hear about travel documents again.

Dorothy made insulting references to Leigh S-D's "fat legs" during the meeting and, toward the conclusion, again became agitated, repeatedly thrusting her finger at me and referring to me as *"that woman"*. She characterized the meeting itself and the issues raised therein as conforming to a pattern of "aggravated harassment." Other deans, she claimed, would have afforded her the benefit of a new-faculty orientation, apparently having forgotten that I had conducted just such an orientation on August 20, 2010.

The meeting lasted 2 ½ hours. Dorothy frequently repeated herself and raised several topics (growing up in a family of 13 children, her relationship with her father, prior employment settings) irrelevant to the issues at hand. She cited several schools/universities, and nursing administrators, as functioning better than OU/SON. Finally, she stated outright that as a black PhD with many years' teaching experience, she is "a hot commodity" who can get a job anywhere.

Dorothy was so obstreperous during the meeting that the next day, several staff and faculty members inquired about whether everything was ok. Likewise, a police officer posted outside the meeting room afterward stated that because Dorothy was so loud, he had twice been tempted to intervene.

# EXHIBIT D



**Office of the Dean**

School of Nursing
Rochester, Michigan  48309-4401
(248) 370-4081  Fax: (248) 370-4279

June 14, 2011

Professor Dorothy Hawthorne-Burdine
Associate Professor of Nursing
School of Nursing
Oakland University

Dear Professor Hawthorne-Burdine:

Please accept this letter as an evaluation of your performance pursuant to Paragraph 67 of the 2009-2012 Agreement between Oakland University and the Oakland University Chapter, American Association of University Professors (Agreement).

It has been determined that the performance of your professional responsibilities is seriously deficient in the following areas, and it is requested that you take the indicated remedial actions:

1.  <u>Deficiency</u>:  Not completing the University's External Grant Application (EGA) in order to receive approvals to submit funding proposals.

    <u>Action</u>:  Complete the University's External Grant Application when requesting to submit funding proposals (see attachments "4.1-Fiscal Responsibilities of Principal Investigators", and "6.1-Preparation, Review and Submission of Sponsored Project Proposals").  This action must commence immediately.

2.  <u>Deficiency</u>:  Not following the Faculty Travel and Reimbursement Process.

    <u>Action</u>:  The Faculty Travel and Reimbursement Process in the School of Nursing (see attached) must be followed to ensure compliance with University Policies and Procedures and to assure proper reimbursement of expenses.

3.  <u>Deficiency</u>:  Creating a disturbance in the SON administrative suite outside the Dean's Office  (specifically, in relation to travel reimbursement) that caused employees to come out of their offices and report the incident to Human Resources.

    <u>Action</u>:  Follow all Oakland University ordinances, including 6.02:

    *No person shall engage in any  activity, individually or in concert with others, which causes or constitutes a disturbance, noise, riot, obstruction, or disruption which*

**DOCUMENT 8**

*obstructs or interferes with the free movement of persons about the campus or which interferes with the free, normal, and uninterrupted use of the campus for educational programs, business activities, and related residential, food service, and recreational activities, nor shall any person in any way intimidate, harass, threaten, or assault any person engaged in lawful activities on the campus. This action must commence immediately.*

Consistent with Paragraph 67 of the Agreement, Oakland is not, by this letter, instituting any disciplinary or discharge action against you pursuant to Paragraph 65 of the Agreement. However, if you fail to take the requested action, Oakland will initiate those disciplinary and/or discharge procedures.

Finally, please be advised that within 30 days of the date of this letter, you or Oakland may request the Faculty Re-employment and Promotion Committee (FRPC) to review Oakland's statements regarding your performance and report to Oakland and yourself as to whether: (1) your performance is in fact deficient; (2) whether the suggested corrective measures are appropriate to cure the alleged deficiencies; (3) whether the proposed penalties for failure to cure the deficiencies are appropriate; and (4) any modifications it would recommend regarding the actions Oakland wishes you to take to remediate cure the deficiencies and the penalties Oakland would impose if you fail to take the requested action. If an evaluation request is made to the FRPC, the FRPC shall make a written report to Oakland and yourself within 30 days of the date on which the request was made. If the FRPC fails to make its report within the thirty-day period, Oakland may proceed as if such report was timely made. Oakland shall then have the right to take any action with regard to you that it determines to be in the best interest of Oakland.

Any action taken by Oakland to impose penalties against you as a result of this evaluation procedure will be subject to the "just cause" standards of Paragraph 65, the required notification of Paragraph 66 and to the grievance procedure provided in the Agreement.

If you concur with the areas in which Oakland finds your performance deficient and the actions Oakland wishes you to take to cure the deficiency, you may, within 15 days of this letter, object to having further review by the FRPC, and Oakland may not then request the FRPC to review the charges.

Yours truly,

*Darlene Schott 73ae*

F. Darlene Schott-Baer Ph.D., R.N.
Interim Dean
School of Nursing

# EXHIBIT E




**Academic Human Resources**

517 Wilson Hall
Rochester, Michigan 48309-4496
(248) 370-2922  Fax: (248) 370-4210

July 14, 2011

Dr. Dorothy Hawthorne-Burdine
2654 Lantern Ln. Apt 102
Auburn Hills, MI 48326

Re:  Evaluation of Faculty Performance

Dear Dr. Hawthorne-Burdine,

Following up on my letter of June 6, 2011, we met on June 14, 2011 to clarify processes, procedures and roles, and specifically to note things such as applications for external funding and reimbursements for travel.  Also present at the meeting were Darlene Schott-Baer, Interim Dean of the School of Nursing, and Scott Barns, Executive Director of the American Association of University Professors, Oakland University Chapter.

Our discussion centered around three issues related to your performance: (1) completion of required external grant application forms, more specifically a budget for a grant; (2) completion of documentation necessary to reimburse you for travel expenses; and (3) your interactions with and demeanor toward other faculty and staff.

You expressed your frustrations about the School of Nursing's and Oakland University's processes, and cited several other schools and universities and nursing administrators as functioning better than the School of Nursing and Oakland University.  In that regard, you refused to complete the external grant application budget and declared that you will not submit grants in the future.  You also refused to discuss the documentation necessary to reimburse you for travel expenses.  Finally, you personally insulted both me and Interim Dean Schott-Baer.  Your obstreperousness was duly noted not only by me and Interim Dean Schott-Baer, but also by faculty and staff outside the meeting room.

You made it clear that you have no intention of following Oakland University policies or procedures or interacting with other faculty and staff in a meaningful, professional manner. We ask you now to reconsider your position.

Dr. Dorothy Hawthorne-Burdine
July 14, 2011
Page 2

All nursing faculty are expected to direct their efforts toward accomplishing the programmatic objectives and goals of the School of Nursing and the mission and long range vision of Oakland University.  As but one example, your intellectual contributions and efforts to apply for and successfully secure external grant funding is important to the School of Nursing, where research and other scholarly activities have traditionally been supported by grants. Those grants and that research contribute not only to your own scholarly growth, but also to the scholarly growth of the nursing discipline. Your goals should be aligned with those of the School of Nursing, and the methods you utilize to pursue those goals, your effectiveness in moving toward those goals, and the effectiveness of your interactions with your colleagues, are all important to your success and the success of the School of Nursing.  Please consider aligning your future performance with these expectations.

We look forward to your return to campus this Fall.

Sincerely,

Leigh Settlemoir Dzwik
Assistant Vice President for Academic Human Resources

C:      Scott Barns – AAUP
        F. Darlene Schott-Baer, Interim Dean, School of Nursing

# EXHIBIT F

*B*



School of Nursing

Rochester, Michigan 48309-4401
(248) 370-3497  Fax: (248) 370-4279

July 27, 2011

Leigh Settlemoir Dzwik, Assistant VP
Academic Human Resources
Oakland University, 517 Wilson Hall
Rochester, Michigan 48309-4496

**RE:** Response to Letter Dated July 14, 2011 Addressing Meeting of June 14, 2011

Dear Ms. Dzwik:

I noticed your use of the word "obstreperous". The last time I used the word "obstreperous"
was many years ago in one of my sociology courses where I referenced research findings as
evidence to describe to my students the traits of administrators and leaders embracing such a
word in their practice. I will give greater attention to the word "obstreperous" as I respond to
the issues you have raised in your letter. Therefore, in response to your letter dated July 14,
2011, I am addressing the three issues you raised as follows:

1.  You stated that I refused to complete the budget portion of the external grant application
    form (EGA). As I stated to you, the grant budget information for the EGA form
    provided by Bonnie Kwit was in err. (See attached July 6, 2011 email from Kathryn
    Wrench.) Bonnie Kwit's work on the budget was grossly wrong, thus,
    incomprehensible. As a result, we received the worst response from NIH reviewers that
    I have ever seen on a NIH grant application. Her work has negatively impacted my
    position to secure funding for my research work with African American girls stricken
    with a deadly genetic disorder – sickle-cell anemia. In addition, contrary to what Dr.
    Schott-Baer said about the EGA form being required by NIH for grant submission, other
    administrators at Oakland University and at NIH fail to support Dr. Schott-Baer's
    position.

    One Oakland University administrator agreed with me that the budget was in such bad
    shape, it would have been unreasonable for me to complete Bonnie Kwit's work on the
    budget portion of the EGA form. It was an obvious waste of my time. In the face of all
    of this evidence, you and Dr. Schott-Baer are still persistent in harassing me about
    entering erroneous numbers and signing my name on the EGA form to flawed budgetary
    information calculated by Bonnie Kwit. It is now even more obvious to me that you and
    Dr. Schott-Baer think the best use of my time is on nonsensical tasks, and if I do not
    "blindly" do as you say, then I have "obstreperous" behaviors. It terrifies me to think
    that Oakland University has policies and procedures that require grant-writing faculty to
    use valuable time on nonsensical tasks regardless of assessments made by reviewers of
    federal funding agencies and assessments made by their own faculty and administrators.
    I am pleased, however, that I have been asked to help develop a new EGA document.
    (See attached July 6 & 7 emails from Kathryn Wrench.)

2. You stated that I refused to discuss the documentation required for travel reimbursement. Dr. Sherry Abernathy, Assistant Dean, handled this issue after Bonnie Koch, Secretary in the School of Nursing, made it clear that it was not her job responsibility to complete the travel expense form for me. Completing a travel expense form is not a problem for me to do; I have always completed such forms at other universities for reimbursement of my travel expenses. Ms. Koch disdainfully bellowed, "I don't have to do this for you. I am doing this for you as a favor." Her yelling and fussing at me about the travel form and documentation was so harsh and disrespectful that it forced Dr. Schott-Baer and Dr. Abernathy out of their offices. I do not like confrontations, so I simply told Ms. Koch to return my travel receipts back to me. As I turned to leave with my travel receipts in my hand, Dr. Abernathy came to my side to assist me and said, "Give that to me. I will handle it." In contrast, Dr. Schott-Baer (who had also come out of her office, but before Dr. Abernathy came out of hers) went creeping down the hall as she stayed within earshot distance to listen to what was transpiring between Ms. Koch and me. It is now clear that Dr. Schott-Baer was sneaking to get information that she could use against me.

During the following six weeks between Dr. Schott-Baer's observation and her report at the June 14th meeting, she never approached me about my conversation with Ms. Koch. Instead, she went to the Provost's office to report it. I could easily ask, "Shouldn't I have had an opportunity to resolve this with Dr. Schott-Baer who is the Interim Dean of the School of Nursing at Oakland University?" The term "obstreperous" is an antiquated and embarrassingly negative word used by few modern-day administrators and has been used to show gross disrespect and to unduly sanction employees who fail to be controlled and "blindly" follow irrational and unethical policies and practices. In using this term, "obstreperous", I feel that you and Dr. Schott-Baer have inadvertently exposed the type of people you *really* are. This includes *your* antiquated administrative styles, *your* discriminatory actions, and *your* unethical, disregard for my due process.

Even with Dr. Abernathy's attempt to quietly handle Ms. Koch's loud, boisterous, and disruptive behaviors, Ms. Koch continued ranting after I had left. Yet, you have assessed my interaction with yourself, Ms. Koch, nursing faculty, and administrators as insulting and "obstreperous". I learned from you and Dr. Schott-Baer that Ms. Koch is to complete the travel expense form for **all** faculty. Consequently, this would also include me, since I am an Associate Professor here at the School of Nursing in Oakland University. However, Ms. Koch does not agree with you and Dr. Schott-Baer, and/or has taken exception since she clearly stated to me that she was not required to complete my travel expense form. Also, I learned from Dr. Schott-Baer that all of my travel documentation, including supporting documents, is kept in a file accessible to Ms. Koch.

From your statements, and those made by Dr. Schott-Baer, it was undeniably clear that I have been discriminated against by you, Ms. Koch, and Dr. Schott-Baer. You have assessed me as being "the problem" in regards to documents that I have already discussed and made available to clerical staff and administrators within the School of Nursing, and then you said that I refused to discuss the documentation necessary to support the travel reimbursement. Your position is absurd and irrational, and it has no supporting evidence. I could easily say that it is unclear to me how you describe my communication as being non-meaningful and unprofessional. However, your use of the term "obstreperous" makes things very clear and is in line with your demonstrated irrational and unjust administrative thinking and practices against me. Nevertheless, I still ask that you, Dr. Schott-Baer, and clerical staff in the School of Nursing now consider communicating and interacting with me in a professional, respectable, and rational manner.

3.  You stated that I am "insulting and obstreperous" in my demeanor toward other faculty and staff. To the contrary, I find this to be true about you, Dr. Schott-Baer, some faculty, and some staff. I state "some faculty and some staff", because not all people within the School of Nursing have insulted, disrespected, or been unkind to me in the ways that you, Dr. Schott-Baer, and Ms. Koch have. Apparently, you think that I should mindlessly stand by as you, Dr. Schott-Baer, Ms. Koch, and others insult me.

My home is in Pennsylvania, and my family members are in Florida. I was away from the state of Michigan and not officially on a summer contract with Oakland University during the time you and Dr. Schott-Baer **mandated** my presence at the June 14th meeting. As I stated to you during our meeting on June 14th, I am not in the best of health as a diabetic with hypertension and vascular insufficiency. In fact, my health suffered as a result of the round-trip travel from Pittsburgh to Rochester-Auburn Hills. The insulting and inconsiderate acts by you and by Dr. Schott-Baer have not only interfered with my health status, but my scholarly productivity during these summer months. I find your, and Dr. Schott-Baer's, demeanor and interactions with me not only be insulting, but disruptive and disrespectful in the worst kind of way, even worse than your administrative embracing of tenets associated with the use of the word "obstreperous". Respect is due to anyone. Yet, you, Dr. Schott-Baer, some faculty, and some staff, do not think I should be respected, which is extremely troubling to me. I ask that you, Dr. Schott-Baer, and clerical staff in nursing reconsider your positions on how you interact with me from this point forward.

As a nurse since 1974 and an academician since 1977, my goals have always been aligned with my profession and associated institution, but you write as if I am unaware of such professional attributes. I will continue to make contributions in my profession as I have always done. Dr. Schott-Baer stated during our meeting that I was the only Oakland University nursing faculty to submit a grant application to NIH for the academic year 2010-2011. It concerns me that Dr. Schott-Baer and other senior nursing faculty with doctorates are not making research contributions as primary principle investigators with the support of NIH. Oakland University is now classified as a research intensive institution. Nursing faculty at such universities seek NIH funding for support needed to address the goals and objectives of the nursing profession and of their parent university. I ask that you encourage Dr. Schott-Baer, Interim Dean of the School of Nursing here at Oakland University, and other nursing faculty with doctorates to reconsider their position as nonproductive scholars in submitting grant applications to NIH as the primary principle investigators in our research intensive institution.

Kindly,

*Dorothy Hawthorne-Burdine*

Dorothy Hawthorne-Burdine, RN, PhD
Associate Professor, School of Nursing

CC:   Dr. Virinder K. Moudgil, Senior VP for Acad. Affairs & Provost for Acad. Affairs
      Dr. Darlene Schott-Baer, Nursing Professor and Interim Dean of Nursing
      Atty. Joi Cunningham, Director of Inclusion & Intercultural Initiatives
      Mr. Scott Barns, Executive Director, AAUP Affiliate Organization

Attachments:   Three Emails from Kathryn Wrench

# EXHIBIT G



### SCHOOL OF NURSING
### M E M O R A N D U M

DATE:     October 21, 2011

TO:       Kerri Schuiling, Dean, School of Nursing

FROM:     Karen S Dunn, Chair of NCAP

SUBJECT:  Dorothy Hawthorne-Burdine

Dear Dean Schuiling,

As Chair of NCAP, I feel it is my responsibility to inform you of two incidences during our NCAP meetings regarding Dorothy Hawthorne-Burdine. Before the last FA meeting, NCAP met briefly to choose who would be the outside reviewers for our tenure-track faculty up for review this year. Present at the meeting were Laura Pittiglio, Barbara Penprase, Dorothy Hawthorne-Burdine, and myself. Frances was an excused absent member. Barbara began the discussion because she was chosen at the last meeting to find outside reviewers for one candidate. As a result, she began the discussion by attempting to clarify the process. I am not sure why, but all of a sudden Dorothy starting attacking Barbara saying "get to the point" "I don't understand" "Why do you always take over every meeting" and continued to be verbally abusive to Barbara. Needless to say, we were all stunned at this behavior. Although I thought at this point Dorothy's behavior was unprofessional and inappropriate, I thought to give her the opportunity to apologize to Barbara thinking that she may have had a bad day. Unfortunately, this was not the case. At our meeting October 19, 2011, Frances was present at this one. Barbara began to tell Frances what we had done at the last meeting, and Dorothy again starting attacking Barbara stating rude comments like "I don't like you." This upset Barbara to the point where she got up and said she was leaving. Dorothy starting screaming "get out" over and over again so loud that Eilene Lohmeier heard her (we were in the DCR). It was at this point that Frances and I intervened and encouraged Barbara to stay and Dorothy to be professional and leave her personal opinions out of a working committee. I am hoping that these incidences will not impact the work of this committee as we are currently reviewing Fall candidate dossiers. I will keep you informed as we continue through this process, but I am recommending at this point that Executive Committee consider replacing Dorothy for our Winter reviews.

*Karen S Dunn*

Karen S Dunn, PhD, RN
Chair

**DOCUMENT 10**

# EXHIBIT H

**Dr. Dorothy Hawthorne Incident**

On Tuesday, March 26, 2013, the School of Nursing conducted Assistant Professor's interviews on the second floor in the Human Health Building at Oakland University. The prospective candidate completed her presentation around 12 noon and I overheard Dr. Dorothy Hawthorne talking with the candidate and telling the candidate to stop by her office before she leaves. On my way back to my office, approximately at 12:10 pm, I stopped by Dr. Hawthorne's office, to request that she limit talking with candidate in order to keep the process similar for all prospective candidates. Before, I could complete my request and reason for request, Dr. Hawthorne interrupted me very angrily and stated that she had every right to talk to the candidate. I tried to response but every time I tried Dr. Hawthorne interrupted with her loud contentious voice. I indicated to Dr. Hawthorne that I did not want to argue with her and she told me in a loud outraged voice to "get your ignorant black ass out of my office." I turned for the door very quickly and grabbed the door knob and stated "thank you" and quickly left Dr. Hawthorne's office.

This incident has made me very uncomfortable because it seems that Dr. Hawthorne was not in control of her emotions and her behavior towards me after this incident seems to display emotional instability. This situation could have easily turned into an altercation if I had not remained professional and exit abruptly. I'm worried and alarmed because she is going around telling employees that I'm a "bitch". One day, I came around the corner in the hallway on the third floor of the Human Health Building and I heard her mention my name and she repeating the word "bitch". Shortly after that incident, two School of Nursing employees asked me what happen with Dr. Hawthorne and told me she was calling me a "bitch". This frightens me because Dr. Hawthorne has displayed explosive behavior on several occasions not just with me but others.

Statement submitted by: Cheryl McPherson

**DOCUMENT 11**

# EXHIBIT I



**OAKLAND UNIVERSITY**
Powered by Google

---

## Fwd: Dorothy Hawthorne-Burdine

? messages

---

**Samuel Lucido** <lucido@oakland.edu>                                    Fri, Jun 14, 2013 at 11:56 AM
To: Michelle Piskulich <piskulic@oakland.edu>
Cc: mbgordon@oakland.edu, ross@oakland.edu, Shona Collins <collins2@oakland.edu>, John Beaghan
<beaghan@oakland.edu>, "Joi M. Cunningham" <cunning3@oakland.edu>

Michelle:

I believe the below summary adequately describes the various behavioral issues involving Professor Hawthorne-Burdine. At this time, the issues do not require immediate police attention or review by the Behavioral Concerns Committee.

Presently, it would appear more appropriate to deal with the issues from an employee performance focus. Please let me know if you need additional information or would like to discuss this matter further.

Chief

———— Forwarded message ————
From: **Mark Gordon** <mbgordon@oakland.edu>
Date: Fri, Jun 14, 2013 at 8:59 AM
Subject: Dorothy Hawthorne-Burdine
To: Chief Lucido <lucido@oakland.edu>
Cc: Terry Ross <ross@oakland.edu>

Chief,

Here is a status report of the possible behavioral concerns committee issue:

**Person of Concern:** Dorothy Hawthorne-Burdine - School of Nursing
**Witness:** Topaz Morrison
**Witness:** Cheryl McPherson
**Witness/Supervisor:** Gary Moore

According to witnesses, Hawthorne-Burdine is trying to obtain tenure status with the university and is under tremendous pressure to complete a research project. For the past six months to a year, she has been exhibiting very aggressive verbal behavior. Her verbal tirades are causing other co-workers to fear her and making them very uncomfortable. Again, according to witnesses, Hawthorne-Burdine thinks that everyone is out to get her and she believes she is being "picked on" due to her race. (she is African American)

Topaz Morrison has stated that she has heard Hawthorne-Burdine talk in a negative manner about Barbara Penprase, a co-worker. She has stated that she does not like Penprase and that one day she will "tear her apart" and "no one will be able to pull her off." Morrison also stated that she is constantly cornered by Hawthorne-Burdine and has to listen to her outbursts about how unhappy she is and how she perceives that everyone hates her.

Cheryl McPherson states that Hawthorne-Burdine acts in an aggressive manner toward her at times. McPherson advises that she has felt threatened by her on several occasions and has left the area just to get away from her. McPherson also added that she thinks that Hawthorne-Burdine may have something wrong medically as she

**DOCUMENT 14**

seems to forget things frequently.

Gary Moore stated that he has been told by other workers in his area that Hawthorne-Burdine has asked inappropriate questions to students in her class. As an example, she has asked female students how many abortions they have had.  She asked male students in one class when they had sex last and if they were currently carrying condoms.

Gary Moore is Hawthorne-Burdine's supervisor. When asked by Detective Collins why he has not counseled her on her past actions, Moore stated that he probably should have but as of this date, has not documented any of her behavior.

On June 13, I spoke with Joi Cunningham, Director of Inclusion/Intercultural Initiatives, about Hawthorne-Burdine. Joi is very familiar with her and has received complaints about her in the past.  Joi advises that Hawthorne-Burdine is a very dramatic personality and speaks with a loud voice.  She is animated in her mannerism and some people find her intimidating.  Joi stated that she does not feel Hawthorne-Burdine is a physical threat but rather is in need of discipline from an employment standing as oppose to a security threat.

After reviewing the above information, I am convinced that this is not an issue for the Behavior Concerns Committee.  This may be an issue for Academic Human Resources to review and address.

Please let me know if you need any further information

--
Captain Mark Gordon
Oakland University Police
Rochester, MI  48309-4401
(248) 370-3331

---

**Michelle Piskulich** <piskulic@oakland.edu>
To: Samuel Lucido <lucido@oakland.edu>

Fri, Jun 14, 2013 at 12:09 PM

Thank you, Chief.  I will pick it up from here.
[Quoted text hidden]
--
C. Michelle Piskulich
Associate Provost
Oakland University
Rochester, MI  48309
248-370-2190

# EXHIBIT J



**Police Department**
Office of the Chief of Police

Rochester, Michigan  48309-4401
(248) 370-3000  Fax: (248) 370-3043

September 27, 2013

**Hand Delivered**
Ms. Dorothy Hawthorne-Burdine
2654 Lantern Lane
Apt. 102
Auburn Hills, Michigan 48326

Dear Ms. Hawthorne-Burdine:

Please be advised that you are persona non grata on the Oakland University campus.  This means that you are restricted from, and may not enter upon, the entire Oakland University campus.  Failure to abide by this restriction will result in your arrest for criminal trespass.

The foregoing action is being taken as a result of your recent conduct in violation of Oakland University Ordinances including, but not limited to:

> 6.02 Unlawful Individual Activities. No person shall engage in any activity, individually or in concert with others, which causes or constitutes a disturbance, noise, riot, obstruction, or disruption which obstructs or interferes with the free movement of persons about the campus or which interferes with the free, normal, and uninterrupted use of the campus for educational programs, business activities, and related residential, food service, and recreational activities, **nor shall any person in any way intimidate, harass, threaten, or assault any person engaged in lawful activities on the campus.**

You may not have any contact or interaction with Oakland University students. You must complete both a neurological and a psychological assessment, the results of which must be satisfactory to the University before the University will consider allowing you to return to campus.  Please contact Associate Provost Michelle Piskulich at piskulic@oakland.edu or (248) 370-2190 to arrange for these assessments.

Although you may not enter upon the Oakland University campus, if necessary, you may communicate with the undersigned at lucido@oakland.edu or (248) 370-3000 or Associate Provost Michelle Piskulich at piskulic@oakland.edu or (248) 370-2190.

Very truly yours,

Samuel C. Lucido
Chief of Police

SCL/bcf

Hand Delivered
SCL
9-27-13

**DOCUMENT 2**

# EXHIBIT K

**Medicolegal Services, LLC**
29792 Telegraph Road, Suite 100
Southfield, MI 48034
Phone: (248) 352-6747
Fax: (248) 352-2761

November 13, 2013


Ms. Janine Dewitt
Oakland University
401 Wilson Hall
Rochester, MI 48309


Re:  Dorothy Hawthorne-Burdine
     Your Claim Number:
     Date of Injury:        9/27/2013
     Social Security:

Dear Ms. Dewitt:


I had the opportunity to perform an independent medical neurologic evaluation on Ms. Dorothy Hawthorne-Burdine on 11/11/2013. This examination was carried out for the purpose of evaluation only. It did not constitute a doctor/patient relationship, and no treatment recommendations were given. No medications were prescribed. The nature of the interview and examination was explained to the examinee, and the examinee understood the facts.


If more information becomes available at a later date, an additional service report reconsideration may be requested. Such information may or may not change the


**DOCUMENT 16**

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 2

opinion rendered in this evaluation. This opinion does not constitute, per se, a recommendation for specific claims or administrative functions to be made.

Prior to the onset of the physical examination, the examinee was informed to notify me of any pain, discomfort, numbness, or symptomatology produced by any maneuver.

The examinee understood the nature and purpose of this examination and was aware that a report of my findings and opinions would be sent to your attention.

## HISTORY

The examinee is a 61-year-old right-handed female seen for neurologic evaluation regarding fit for duty issues and to assess for an organic brain disorder. The claimant herself has no neurologic complaints; however, there was concern that she had episodes while teaching class where she went off on tangents and ranting. The claimant herself states that she is due for tenure in her professorship, and she was wondering if this examination was requested to be a means of denying her tenureship.

The examinee herself does not admit to any sort of cognitive problems that she is aware of. She denies any short-term memory loss. She denies any dementia. She denies any other acquaintances telling her that she has had cognitive deficits. She

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 3

denies any history of stroke or seizures. She denies any history of focal extremity weakness or numbness. To the examinee's knowledge, she denies any sort of neurologic problems. She also denies any history of any psychological disorder, although she states that she did feel depression when her father died, in the past.

PAST MEDICAL HISTORY

Her past medical history is significant for hypertension, diabetes, arthritis in both knees, obesity, and vascular insufficiency of the lower extremities.

MEDICATIONS

Medications include Lantus, Novolog, sliding scale insulin coverage, lisinopril, hydrochlorothiazide, and aspirin.

ALLERGIES

Allergies are to butazolidin, Pamelor, and Tegaderm.

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 4

SOCIAL HISTORY

Her social history is negative for tobacco or alcohol consumption.

EMPLOYMENT HISTORY

Her occupation is as a nursing professor. She states that she has a Ph.D. She has been a nurse since 1974, and she has been teaching nursing since the late 1970s.

PHYSICAL EXAMINATION

Her height is 61 inches, weight 250 pounds, blood pressure 148/102, and pulse 84.

In general, the examinee appears in no acute distress. Her pulses are regular and symmetric between both radial pulses.

NEUROLOGIC EXAMINATION

On mental status, the examinee appears awake and alert. She is oriented x3. She answers questions and follows directions appropriately. There is no right/left confusion. No aphasia or dysarthria. Naming is intact. She spells "world" forward and backwards

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 5

correctly. Serial 7's are intact. She remembers the current president as well as past presidents correctly. She recalls three out of three objects immediately and three out of three objects at five minutes.

CRANIAL NERVES II THROUGH XII: Pupils are equally round and reactive to light. Fundi are benign. Visual fields are full. Extraocular muscles are intact. There is no nystagmus. Facial sensation is intact. No facial asymmetry. Tongue and palate are midline. Shoulder shrug is 5/5. Hearing is grossly intact.

MOTOR: Motor examination reveals 5/5 strength throughout.

SENSATION: Sensations are intact to pinprick throughout. Temperature sensation is intact throughout.

COORDINATION: Coordination reveals no dysmetria on finger-to-nose testing.

REFLEXES: Deep tendon reflexes are 2/4 in both upper extremities and 1/4 in both lower extremities. Plantar response is flexor bilaterally.

GAIT: Gait is narrow based and nonataxic. Romberg is negative.

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 6

## DIAGNOSTIC IMPRESSION

As noted above, Ms. Hawthorne-Burdine was seen here for outbursts and inappropriate behaviors that occurred during her job at Oakland University.  At this time, on examination today, there is no evidence to diagnose her formally with dementia.  Other etiologies of this need to be first assessed for, such as primary behavioral problems, whether this be personality disorder or other psychogenic causes.  The claimant is due to undergo an evaluation with Dr. Elliott Wolf on 11/14/2013 for this matter; however, due to the concerning nature of these behavioral changes, neuropsychological testing should be also be performed to determine if there are any occult atypical dementias that could be manifesting as behavioral outbursts.  The presentation of Alzheimer's dementia does not particularly match the presentation with this claimant.  Alzheimer's dementia tends to initially start with short-term memory loss that can progress over time and does not typically begin with paranoid behavior or behavioral issues, although these can be features of this disease in its later and more advanced stages.  This pattern does not coincide with the pattern exhibited by this claimant.  There are no apparent short-term memory deficits that are known.  For this reason, neuropsychological testing should be strongly considered to determine if there is any occult atypical dementia that could be responsible for these issues.

Dorothy Hawthorne-Burdine
Hermann Banks, MD
November 13, 2013
Page 7


Thank you for allowing me to examine this claimant.  If you have any further questions,

please feel free to contact me.


I declare, under the penalties of perjury, that the information contained within this document

was prepared and is the work product of the undersigned and is true to the best of my

knowledge and information.  All of the opinions expressed in this report are made within a

reasonable degree of medical certainty.


Sincerely,


Hermann Banks, M.D.
Board Certified, Neurology

HB:db

# EXHIBIT L

MEDICOLEGAL SERVICES

Medicolegal Services, LLC
29792 Telegraph Road, Suite 100
Southfield, MI 48034
Phone: (248) 352-6747
Fax: (248) 352-2761

November 25, 2013

Ms. Janine Dewitt
Oakland University
401 Wilson Hall
Rochester, MI 48309

Re:   Dorothy Hawthorne-Burdine
      Your Claim Number:
      Date of Injury:        9/27/2013
      Social Security:       XXX-XX-9877

Dear Ms. Dewitt:

Dorothy Hawthorne-Burdine is a 61-year-old Associate Professor of Nursing employed by Oakland University who was seen at your request for an independent psychiatric examination in the Southfield, Michigan offices of Medicolegal Services on November 14, 2013 in order to assess her fitness for duty.

Prior to interviewing Ms. Hawthorne-Burdine, I reviewed the report of an independent neurologic examination conducted by Dr. Hermann Banks on November 11, 2013, plus the other documents which you provided, which included some correspondence regarding the claimant's behavior and attitude at work dating back to June 2013, a police report dated August 18, 2010, and a copy of a notice which apparently was

**DOCUMENT 17**

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 2

hand-delivered to Ms. Hawthorne-Burdine by Campus Police Chief Samuel Lucido on September 27, 2013, notifying her that she is now "persona non grata." During this examination, no doctor/patient relationship was established or treatment rendered. Ms. Hawthorne-Burdine understood the nature and purpose of this examination and she was aware that a report of my findings and opinions would be sent to your attention.

CLINICAL HISTORY

Dorothy Hawthorne-Burdine reported that Oakland University hired her in August 2010 as an Associate Professor in the Nursing Department and that she last worked on September 27, 2013, when she was notified that she was considered as of that date "persona non grata; that means they're dangerous." When I informed the claimant that I did not think that that's necessarily what persona non grata means, she argued quite vehemently that I was wrong and that it by definition is a term denoting dangerousness. She reported, "Chief Lucido came to my office at 11:23 in the morning. A student was there. Ms. Hawthorne-Burdine stated she did not even ask the police why they were there, and when asked why, she launched into a rambling narrative, including the fact that she was born in South Florida in 1952, and "I saw a lot of things which happened to black people." She continued on to say that she was one of 13 children and at some point I had to interrupt and redirect her, as was necessary from time to time during today's interview.

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 3

Upon notification from the police regarding her status at Oakland University, the claimant reported that she almost immediately began packing up her belongings in order to vacate her office, and later in the interview she indicated that she does not believe she will ever be able to return to work at Oakland University, and that she has begun to explore teaching positions at universities in Florida.

The claimant lives in an apartment in Rochester, Michigan with her only child, a 31-year-old daughter who is unemployed. The claimant's only marriage ended in divorce after five years. She stated that she has an active social life, but does not date. She stated that she enjoys reading (primarily news and political material) and she enjoys watching some programs on TV. She has a computer, which she uses for a variety of purposes. She denied the use of alcohol or recreational drugs.

Ms. Hawthorne-Burdine denied a disturbance of appetite or sleep. She denied symptoms of a psychiatric disorder and denied a history of any type of mental health treatment in the past.

Ms. Hawthorne-Burdine indicated that she had worked as a Nursing Professor at the University of Pittsburgh for six years before being recruited to work at Oakland University. She indicated that Oakland University offered her a much better benefit package and that was part of the inducement to relocate. Prior to the University of

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 4

Pittsburgh she had been at the University of Iowa. She stated that she found those work environments to be "very professional," but she indicated that upon arriving at Oakland University she found the people to be rude. She stated, "They would scream and yell at each other in meetings. I was shocked. It was the first time I ever saw that and I've been teaching since 1977." She voiced her beliefs that other professors in the Nursing Department are bullies, as are the administrators. She stated, "They're not comfortable with me because I'm independent and I stand up for myself." She assured me that she had been nominated for teaching awards by her students, although she had not yet received one. She mentioned several other Oakland University employees by name with respect to designating them as adversaries, and even spelled out some of their names for me as though she was involved in some type of legal brief. Several times she referred to one individual in particular, Michelle Piskulich, who she identified as an Associate Provost.

Ms. Hawthorne-Burdine was adamant that she had not been asked to present for this interview because the staff was concerned about her welfare, but instead "they're not concerned about my health; they're concerned about my tenure." The claimant stated that she is up for tenure in April 2014. She indicated that she has been teaching three courses to undergraduate and graduate nursing students. She reported that she has a $500,000 grant to study sickle-cell disease in low-income African-American girls, which has been an ongoing project in which she has been involved for several years. She did

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 5

state that she has some positive relationships in the workplace and that she has filed a grievance through her union.  In the latter part of the interview, Ms. Hawthorne-Burdine believes that she has been targeted because "I'm the only black Associate Professor in the nursing school."  She then went on to say that she believes that white faculty members favor white students and she stated that several black students have complained to her about this.

PAST HISTORY

Dorothy Hawthorne-Burdine reported that she was born in Lake Placid, Florida, the eighth of her parents' 13 children.  Her father died of a heart attack in 1985 and her mother died of a stroke in 2006.  The claimant has a PhD in nursing from the University of Florida.  She denied a history of military service, legal difficulties, or serious financial problems.

PAST MEDICAL HISTORY

Ms. Hawthorne-Burdine reported that she has insulin-dependent Type 2 diabetes and hypertension, for which she takes Lisinopril.  She is approximately four years post-menopausal, denied menopausal symptoms, and states that she takes no replacement female hormones.

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 6

## DOCUMENT REVIEW

Review of the report of the independent neurologic evaluation conducted by Dr. Hermann Banks on November 11, 2013 revealed that at that time the claimant denied neurologic or cognitive symptoms.  He made no diagnosis of neurologic disorder.

Review of the other documents cited above revealed that in August 2010, apparently shortly after beginning work at Oakland University, the claimant reported being assaulted.  Review of the other documents provided revealed observations made by either students and/or faculty at Oakland University attesting to verbal aggression and other inappropriate behavior in the workplace manifested by Ms. Hawthorne-Burdine.  In addition to the aforementioned written documents, I was provided with an MP-3 audio file, which was apparently recorded by a student in one of the claimant's classes and was of approximately nine minutes' duration.  It appears to be a recording of what might be termed a verbal outburst or tirade by Ms. Hawthorne-Burdine.

## MENTAL STATUS EXAMINATION

Dorothy Hawthorne-Burdine presented as an alert, fully oriented, older middle-aged African-American woman who seemed somewhat anxious and who presented in a rather argumentative and suspicious manner.  She was properly dressed, with good grooming and hygiene.  I would estimate her intellectual ability to be in the high-average range.  There was no clear evidence of cognitive impairment of an organic

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 7

type.  Ms. Hawthorne-Burdine certainly seemed dysphoric.  Not infrequently, she spoke rather loudly and at other times laughed rather nervously.  It was my impression that she was quite angry.  Although she did not voice any outlandish delusional thoughts, it was my impression that there was clearly a paranoid trend to her thinking.  There was no history or evidence of hallucinations.  There was no apparent indication of suicidal, aggressive, or homicidal ideation, intent, or plan.  Questions posed to Ms. Hawthorne-Burdine, regarding some of the observations of her contained in the written documents provided for review, invariably met with denials and counter-accusations.


## PSYCHIATRIC DIAGNOSES

- Paranoid and Narcissistic Personality Traits, rule out Personality Disorder, rule out  Delusional Disorder
- Occupational problem


## DISCUSSION AND RECOMMENDATIONS

Dorothy Hawthorne-Burdine presented in clinical interview as defensive, angry, and paranoid, reminiscent of the way in which she was described in some of the documents provided for review.   Whether or not this manner of presentation represents a longstanding aspect of Ms. Hawthorne-Burdine's personality as opposed to being symptomatic of an acute problem is not clear to the undersigned.  She appears to be entirely lacking in insight when it comes to self-observation regarding her current

Dorothy Hawthorne-Burdine
Elliott Wolf, MD
November 25, 2013
Page 8

situation, and in my opinion she should be regarded as unfit to return to her teaching position at the present time. Basically, the claimant denies having any type of diagnosable psychiatric symptoms or problems, and therefore is not a candidate for therapeutic intervention. I doubt that she poses a threat of physical violence in the workplace, but I cannot, of course, guarantee that.

I hope my findings and opinion are clear, and trust that you will contact me in the event that you have further questions in this matter.

Sincerely,

Elliott M. Wolf, M.D.
Diplomate, American Board of Psychiatry and Neurology (Psychiatry)
EMW/mb

# EXHIBIT M

# PSYCHOLOGICAL SYSTEMS, INC.

32121 Woodward Ave.
Suite 201
Royal Oak, MI 48073
Phone (248) 398-2200
Fax   (248) 398-2280

*Specialists in Neuropsychology*
**W. John Baker, Ph.D., ABN**
**Diplomate, American Board of Professional Neuropsychology**
**Fellow, American College of Professional Neuropsychology**

March 10, 2014

**RE:   Dr. Dorothy Hawthorne-Burdine**
**Date of Birth:  04/01/1952**

It was my pleasure to see Dr. Dorothy Hawthorne-Burdine, for an independent neuropsychological evaluation. At your request, she was seen on February 24, 2014 to assess for the presence or absence of signs or symptoms consistent with cognitive decline or brain disturbance. Personality testing was also conducted to assess in an objective fashion Dr. Hawthorne-Burdine's emotional states and personality traits. At the start of my examination of Dr. Hawthorne-Burdine, I explained the nature of this evaluation. She understood that there was no confidential relationship and that you requested my assessment. It was made clear that I would not be assisting in her care or treatment planning.

**Recent History**

Dr. Hawthorne-Burdine stated that her last day of work was September 27, 2013. There was an apparent dispute between her and her employer, Oakland University. She said that these problems dated back about one and one-half years, beginning with small conflicts between Dr. Hawthorne-Burdine and the administration. She said these conflicts, though small, developed and accumulated leading to an adversarial relationship. She described these conflicts as "little things." She was able to give a detailed account of at least one incident in April 2013 where an administrator berated her for agreeing to speak with a person who was being considered for a position at the University. This verbal confrontation ended when Dr. Hawthorne-Burdine ordered the administrative person out of

her office. Dr. Hawthorne-Burdine was then called to the dean's office over this conflict. Dr. Hawthorne-Burdine told me that she was in the middle of preparing two Power Point presentations for a national conference. She had been given a deadline of that night and was not yet finished. She did, however, go to meet with the dean and tried to clarify the conflict between herself and Dr. Cheryl McPherson, the administrator with whom she had the earlier conflict.

According to Dr. Hawthorne-Burdine, in June of 2013 an investigation was begun by administration regarding Dr. Hawthorne-Burdine's conflicts with Dr. McPherson. This resulted in reports and hearings and lawyers getting involved. Dr. Hawthorne-Burdine saw these issues as being designed to get rid of her because, as she believes, she was either a threat to the staff or disruptive to the staff. She later found out about police investigation that the administration had requested. On September 27, 2013, while Dr. Hawthorne-Burdine was meeting with a student in her office, the Chief of University Police and a Captain in the Oakland University Police came to her door. She finished with the student and then met with the police officers for about four hours by her report. Dr. Hawthorne-Burdine was given an order that identified her as persona non grata, which she understood to mean that she had done something so bad that she was no longer welcome on the University grounds. She said that the police informed her that this had something to do with a student complaint. Dr. Hawthorne-Burdine packed up her office and removed her belongings. She has not been back to work since that time.

## Medical Treatment History

Dr. Hawthorne-Burdine receives her primary medical care from Dr. Walter Culver. The University sent her for an independent neurological examination with Dr. Hermann Banks and for an independent psychiatric evaluation with Dr. Elliot Wolf. Subsequent to Dr. Wolf's report of psychiatric disturbance, Dr. Hawthorne-Burdine's primary care physician referred her to Dr. Jolepalem a psychiatrist at St. Joseph's Mercy Hospital. Her current care is provided by Dr. Culver. Her medications are Lantus for diabetes, Lisinopril for hypertension, and NovoLog.

**Current Symptoms and Complaints**

I asked Dr. Hawthorne-Burdine about psychological or emotional symptoms that she might have developed as a result of this conflict, and she specifically denied symptoms of depression, anxiety, or panicky feelings. She did acknowledge feeling stressed over these events and her relationship with administrators. However, she also reported that during her last few months at work she experienced tightness or pressure sensation in her chest that she no longer experiences. By October 2013 her symptoms disappeared and she sees herself as more calm and happier than when working.

I asked Dr. Hawthorne-Burdine about her cognitive functioning. She denied any problems with memory, concentration, or thinking.

There are no reported changes in her sleep, appetite, or other functions.

Essentially, Dr. Hawthorne-Burdine presented with no symptoms or complaints.

**Background Information**

Dr. Hawthorne-Burdine is a 61-year old, Ph.D. educated professor of nursing. She was divorced in 1985 and has one 31-year old daughter with whom she lives in Auburn Hills, Michigan. Born in Sebring, Florida and raised by her parents in the same area, Dr. Hawthorne-Burdine is the 8th child in a sibship of 13. Her developmental history and early childhood were reported as normal. Her adolescence was uneventful. Her prior medical history was significant for hypertension and diabetes. There is no history of head injury, loss of consciousness, stroke, seizures, or heart disease. She does not drink or use drugs. Her prior mental health history was significant for psychiatric counseling following her divorce and father's death in 1985. Her educational history indicates that she graduated from high school in Florida. She earned a Bachelor of Arts degree from Florida A&M in 1970, a Master of Arts degree from University of Florida in 1977, and she earned her Ph.D. from the University of Florida in 1995. Dr. Hawthorne-Burdine's occupational history indicates that she was working at Oakland University as an associate professor in the nursing department for

approximately three years. She has held similar positions at other universities. She has not worked since September 27, 2013.

## Mental Status and Behavior Observations

Dr. Hawthorne-Burdine arrived for her appointment on time and alone. Dr. Hawthorne-Burdine's mental status examination was conducted via the clinical interview. Dr. Hawthorne-Burdine's physical appearance was that of a 5'2" tall, 255 pound, well groomed and well dressed individual. Her demeanor was pleasant and friendly. She was alert and fully oriented. Her gross attention and concentration was judged as normal, with no evidence of lapses throughout the entire interview. Dr. Hawthorne-Burdine's speech was spontaneous, fluent, well articulated, and judged to be of normal rate and volume. Her affect was full, bright, and appropriate. Her mood was cheerful. Her thought production was expansive, well organized, and logically connected.

Systematic observations of Dr. Hawthorne-Burdine's behavior were made by the technician during the testing sessions. Dr. Hawthorne-Burdine's motor and sensory functioning revealed no problems impacting test results. Her attitude toward the examiner was described as friendly. Dr. Hawthorne-Burdine's comprehension of instructions was achieved with occasional repeating. Her task persistence was rigid. Her response to difficult or challenging tasks was confident. She expressed mild frustration at times with more challenging tasks. Self-correction was noted and occasional encouragement was needed to assure adequate effort.

## Records Reviewed
**Independent Neurological Evaluation by Dr. Hermann Banks**
**Independent Psychiatric Evaluation by Dr. Elliot Wolf**
**Letters, Memoranda and E-mails from Oakland University regarding Dr.**
    **Hawthorne-Burdine and complaints or conflicts at work**

Dr. Hawthorne-Burdine was seen for an independent neurological evaluation by Dr. Banks on November 11, 2013. She presented with no neurological symptoms or complaints. Her neurological examination was entirely normal. With regard to complaints of outbursts and

inappropriate behaviors, Dr. Banks found no neurological explanation for this.   A psychiatric evaluation was also scheduled.

Dr. Wolf's report indicates that Dr. Hawthorne-Burdine was seen for an independent psychiatric evaluation on November 14, 2013. Dr. Wolf examined Dr. Hawthorne-Burdine, reviewed records, and offered diagnoses of paranoid and narcissistic personality traits, rule out personality disorder, rule out delusional disorder, with a secondary diagnosis of occupational problem. Dr. Wolf described Dr. Hawthorne-Burdine as defensive, angry, and paranoid.  Whether this was related to longstanding personality traits or symptomatic of an acute problem was unclear to Dr. Wolf. He felt that Dr. Hawthorne-Burdine lacked insight when it came to her circumstances and concluded "she should be regarded as unfit to return to her teaching position at the present time."  Based on Dr. Hawthorne-Burdine's denial of having any type of psychiatric symptoms or problems, she was not considered a candidate for therapeutic intervention.

## TESTS ADMINISTERED

Booklet Category Test (BCT)
Category Exemplar Examination
California Verbal Learning Test-II (CVLT-II)
Controlled Oral Word Association Test (COWAT)
Finger Tapping
Grip Strength
Grooved Pegboard
Medical Symptom Validity Test (MSVT)
Minnesota Multiphasic Personality Inventory - Second Edition-Restructured Form (MMPI-2-RF)
Reliable Digit Span (RDS)
Rey Complex Figure
Sensory Perceptual Examination (Single & Double-simultaneous Stimulation)
Symbol Digit Modalities Test (SDMT)
Test of Memory Malingering (TOMM)
Trail Making Test, Parts A & B
Wechsler Abbreviated Scale of Intelligence - Second Edition (WASI-II)
Wechsler Memory Scale-Third Edition-Abbreviated (WMS-IIIA)
Wechsler Test of Adult Reading (WTAR)

Hawthorne-Burdine, Dorothy
Neuropsychological Evaluation
Page 6

Wide Range Achievement Test-Third Edition (WRAT-3)
Wisconsin Card Sorting Test (WCST)

## ASSESSMENT AND ANALYSIS

*__Performance Validity Testing__* was examined throughout the evaluation with objective measures that have been validated as measures of performance effort while also shown to be insensitive to the effects of brain damage. Poor performance on these measures is indicative of poor effort. Dr. Hawthorne-Burdine scored in the acceptable range on 8 of the 9 measures contained in this battery. Her performance suggests adequate effort. The neuropsychological profile generated by this evaluation is judged valid and interpretable.

*__Intellectual Status__* was assessed with the Wechsler Abbreviated Scale of Intelligence - Second Edition (WASI-II). Dr. Hawthorne-Burdine achieved a Verbal Comprehension Index score of 98, a Perceptual Reasoning Index score of 77, and a Full Scale IQ of 85. This is not consistent with her performance on the WTAR (102). A comparison of verbal and nonverbal scales revealed significant strengths in language based abilities. The 21-point discrepancy between verbal and nonverbal abilities is statistically and clinically significant. While this may reflect longstanding areas of strengths and weaknesses, it may also suggest some gradual decline in mental processing.

*__Academic Achievement skills__* were assessed with the Wide Range Achievement Test- Third Revision (WRAT-3). She was able to read single words at a level exceeding 42% of the normative sample (high school equivalent). Her spelling skills were in the average range, exceeding 55% of her age-mates in the norm group. Dr. Hawthorne-Burdine's arithmetic skills were in the lower portion of the average range, and at the 25th percentile.

Taken together, Dr. Hawthorne-Burdine's IQ and achievement test scores suggest average cognitive development. These scores are below expectations based on her educational history. Dr. Hawthorne-Burdine's verbal reasoning abilities and academic skills appear below expectations based on her educational and vocational status. While it is more likely that these represent her long standing pattern of abilities, I cannot exclude the possibility of declining cognitive status.

### *Neuropsychological Status*

Dr. Hawthorne-Burdine's overall or global cognitive status was in the normal range. Her Average Impairment Rating (AIR) was 1.20, which is in the average range. She scored below average on 27% of the tests contained in this extensive test battery. On those tests that are most sensitive to acute or acquired brain disturbance, Dr. Hawthorne-Burdine scored in the normal range. She completed Trails B in 99 seconds. Her raw score on the oral version of SDMT was 52. She made only 57 errors on the Booklet Category Test.

*Learning and memory skills* were assessed with a number of measures. On the WMS-IIIA, Dr. Hawthorne-Burdine's Immediate Memory Index Score of 80 was in the lower portion of the low average range, exceeding 9% of the normal population. Her Delayed Memory Index Score of 82 was in the low average range and exceeded 12% of her same age peers. Her logical verbal memory was in the average range. Her delayed recall for the same material was mildly impaired. The difference between immediate and delayed recall was consistent with memory probleDr. Visual memory was assessed in the same manner. Dr. Hawthorne-Burdine's immediate score was in the mildly impaired range and her delayed score was mildly impaired as well. On a list-learning task (CVLT-II), Dr. Hawthorne-Burdine demonstrated a shallow learning curve consistent with weak verbal learning skills. Delayed recall of a list of words after five presentations was in the moderately impaired range. When recognition of the words on the list was assessed in a yes/no format, Dr. Hawthorne-Burdine correctly identified 15 words, with 21 false positive errors, giving her a d' score of -2.5. This performance is indicative of poor or incomplete effort.

Dr. Hawthorne-Burdine's *language skills* were in the normal range. Her reading and spelling skills were average. Her verbal fluency was in the average range. These findings were generally consistent with expectations based on Dr. Hawthorne-Burdine's achieved Verbal IQ but below her educational attainment.

*Visual spatial reasoning* (the ability to reason with geometric shapes and perceptual skills) was measured in the low average to mildly impaired range. On the WASI, her Block Design score

was in the borderline impaired range. On the Rey Complex Figure Test, Dr. Hawthorne-Burdine received a copy score of 27/36 (mildly impaired range).

*Executive skills* were assessed with measures of novel learning and mental flexibility. Verbal fluency was in the normal range. Mental speed and flexibility was intact. On the WCST, Dr. Hawthorne-Burdine achieved 6/6 categories, making 23 errors, only 12 of which were perseverative. These results are in the normal range.

*Motor skills* were assessed with simple measures taken with each hand. Grip strength testing revealed an average score for the dominant (right) hand of 31.5 kilograms (superior range). Her nondominant grip strength was 28.5 kilograms (average range). Elementary motor speed was assessed with the Finger Tapping test. She averaged 37.6 taps in 10-seconds with the dominant hand (superior range) and 42.3 taps with the nondominant hand (superior range). Fine motor dexterity was assessed with the Grooved Pegboard Test. Dr. Hawthorne-Burdine's performance with the dominant hand was in the average range (89 seconds). Her nondominant hand performance was in the average range (83 seconds). These results are normal. Sensory perceptual screening was normal.

## Psychological Status

Objective assessment of Dr. Hawthorne-Burdine's current emotional status was conducted with the MMPI-2-RF. Dr. Hawthorne-Burdine's responses to the validity scales indicate that the results are likely valid. There is no indication of inconsistent responding, over-responding, or defensiveness. Her RC scales profile was within normal limits. Mild elevation (still in the normal range) is noted on RC6. This subclinical elevation probably reflects the effect of the work place conflict. All other scales were normal. There is no indication of psychological disturbance, personality disorder, or abnormal reaction to stress.

## SUMMARY AND INTERPRETATION

Dr. Dorothy Hawthorne-Burdine is a 61-year old associate professor of nursing, who is

Hawthorne-Burdine, Dorothy
Neuropsychological Evaluation
Page 9

subject of a work place dispute. She has been dismissed from her job as a result of conflicts with coworkers and administrators in her department at Oakland University. She was referred for neuropsychological and psychological assessment to evaluate her current cognitive and emotional status regarding her interpersonal conflicts.

The results of this neuropsychological evaluation, though within normal limits, suggest some decline in cognitive functioning. Dr. Hawthorne-Burdine's ability to learn and recall novel information places her in the low average to mildly impaired range, far below expected levels given her personal history including education and professional development. There is no evidence of disturbance of executive functions. Mental speed, flexibility, novel problem solving, judgment and reasoning are all intact. Motor skills and sensory functioning are normal. Visual spatial skills appear mildly impaired. Performance validity measures indicate good effort and interview data reveals an absence of symptomatic complaints and strong motivation to perform well on testing.

In my best professional opinion, Dr. Hawthorne-Burdine's neuropsychological profile indicates mild decline in cognitive abilities primarily with regard to memory functioning. Her overall functioning is within normal limits. Though she does not appear to be disabled, this evaluation should serve as a baseline for future testing to monitor her status. If my assessment is correct, a gradual decline is expected. Follow up testing in one year's time will be instructive in this regard.

From a psychological standpoint, there is no psychological disturbance. There is no indication of personality disorder, emotional reaction to stress, or symptoms of depression or anxiety. Objective personality assessment yielded an entirely normal profile.

## **DIAGNOSTIC IMPRESSIONS**

- Age related cognitive changes versus early dementia.

Hawthorne-Burdine, Dorothy
Neuropsychological Evaluation
Page 10

## SPECIFIC COMMENTS AND RECOMMENDATIONS

1) With regard to work place conflicts, these are likely the result of Dr. Hawthorne-Burdine's interpersonal style and limited insight conflicting with the expectations and desires of her supervisors. This is a personality conflict. Dr. Hawthorne-Burdine is somewhat stubborn and her administrators find her hard to deal with. Dr. Hawthorne-Burdine lacks insight into this relationship though she has, of late, developed some understanding of her circumstances. By her own description, during the development of these conflicts she was largely unaware that anything was going on.

2) From a psychological perspective, Dr. Hawthorne-Burdine is not disabled and capable of functioning at her baseline level.

3) From a neuropsychological perspective, Dr. Hawthorne-Burdine's profile suggests some decline in her cognitive abilities. This may explain why she was having difficulty meeting the deadline for her Power Point presentations. I doubt that Dr. Hawthorne-Burdine has any insight into these factors. Generally speaking, individuals who are in the early phase of cognitive decline tend to be unaware of any changes. Certainly, her clinical presentation is consistent with this.

4) Because Dr. Hawthorne-Burdine's overall neurocognitive status is within normal limits, I do not see her as disabled or incapable of performing the duties of her job. However, I do anticipate a continued gradual decline that could result in disability before she reaches retirement age.

5) I recommend repeat neuropsychological testing in one year's time using the current data as baseline measure to determine whether or not there is any further decline in her neurocognitive status.

6) The issue at hand is essentially a work place dispute. Dr. Hawthorne-Burdine's employers have found her difficult to work with and they have sought a means to remove her from the

Hawthorne-Burdine, Dorothy
Neuropsychological Evaluation
Page 11

work place.  Dr. Hawthorne-Burdine sees nothing wrong in her behavior and has very little insight regarding her conflicts with administration.  However, I suspect that Dr. Hawthorne-Burdine's apparent mild decline in cognitive abilities may have had some role to play in her difficulties completing the Power Point assignment.

Thank you for the opportunity to contribute to the assessment of this individual.  If any records become available which might impact my findings and opinions, I would appreciate the opportunity to review them.  If you have any questions or concerns, please feel free to contact me at your convenience.

Very truly,

W. John Baker, Ph.D., ABN
Clinical Psychologist
Board Certified Clinical Neuropsychologist

cc: file

# EXHIBIT N



**OAKLAND**
**UNIVERSITY.**

Academic Human Resources

July 2, 2014

Dorothy Hawthorne-Burdine
Associate Professor of Nursing

Re: Return to Duties and Evaluation of Faculty Performance

Dear Dr. Hawthorne–Burdine:

On September 27, 2013 you were advised by the Oakland University Police Department that you were persona non grata on the Oakland University campus as a result of your conduct in violation of Oakland University Ordinances. More specifically, you were deemed persona non grata for engaging in activity that interfered with the free, normal and uninterrupted use of the campus for educational purposes, and intimidating, harassing, threatening or assaulting persons engaged in lawful activities on campus. Your conduct threatened the health, safety and welfare of students and others. On that date you were also told that you had to complete both a neurological and a psychological assessment, the results of which had to be satisfactory to the University before the University would consider allowing you to return to campus.

On December 20, 2013, your union representatives (AAUP) advised Oakland that it had invoked Appendix L of the 2012-2015 Agreement between Oakland University and the Oakland University Chapter of the American Association of University Professors (Agreement). Oakland was told that you would be seeking a second medical opinion pursuant to the Agreement (Second Opinion) in response to the results of Oakland's medical examination by Dr. Elliott Wolf (i.e. Dr. Wolf's opinion that you were unfit to return to your teaching position at that time).

Oakland acknowledges that you have now completed three assessments, with Dr. Hermann Banks, Dr. Elliott Wolfe, and Dr. W. John Baker (Oakland's Medical Opinions). Copies of those assessments have been provided to you and the AAUP. Although requested on several occasions, neither you nor the AAUP's counsel have ever provided or agreed to provide Oakland with a copy of the results of your Second Opinion.

The University has considered each of Oakland's Medical Opinions carefully. The Opinions indicate that there is no underlying medical condition that precipitated your behavior, and in that regard they are satisfactory enough to allow you to resume your teaching and other faculty duties without restrictions. You will be assigned to teach in Fall semester 2014. Please contact Joann Denby to make arrangements to have your computer connected and any other office needs necessary to prepare for instruction this Fall.

Dorothy Hawthorne-Burdine
Return to Duties and Evaluation of Faculty Performance
July 2, 2014
Page 2

Since there is no underlying medical condition that precipitated the behavior that resulted in your removal from campus, that behavior needs to be addressed. For about a year and a half before you were removed from campus, you exhibited very aggressive behavior, including verbal tirades that caused other AAUP bargaining unit faculty members, staff and administrators to feel threatened by you to the point of fear. Those individuals indicated that your aggressive behavior, such as openly threatening to kill another professor, increased steadily and bordered on violent behavior, causing them to fear for their own personal safety. In September 2013, a student complained about you berating and castigating students to such a degree that the University deemed it warranted consultation with the University's Behavior Concerns Committee. By terrorizing other faculty, students and staff, you undermined and interfered with Oakland's educational programs, thereby failing to fulfill your professional responsibilities under Article IX, paragraph 65 of the Agreement.

By terrorizing other faculty, students and staff, you also violated the basic tenets of your own profession. The AAUP's own *Statement on Professional Ethics* states in relevant part that professors avoid any exploitation, harassment, or discriminatory treatment of students, and as colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. Furthermore, the AAUP's own *Statement of the Association's Council: Freedom and Responsibility* states in relevant part that students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of the teacher-student relationship. Finally, the AAUP's own *Joint Statement on Rights and Freedoms of Students* states in relevant part that the freedom to learn depends upon appropriate opportunities and conditions in the classroom; in order to protect the freedom of students to learn, as well as enhance their participation in the life of the academic community, students should be free from exploitation or harassment.

Based upon the foregoing and pursuant to Article IX, paragraph 67 of the Agreement, Oakland has determined that a serious deficiency exists in your performance of your professional responsibilities. That behavior cannot be tolerated, and Oakland wants you to stop your aggressive behavior, stop your verbal tirades, stop berating and castigating students, and stop otherwise intimidating, harassing and threatening other faculty, students and staff. If you fail to stop, and continue such behavior, Oakland will proceed to take appropriate action including discipline and/or discharge pursuant to Article IX, paragraph 65 of the Agreement.

Please note that under the Agreement, within 30 days of your receipt of this letter, you may request the Faculty Re-employment and Promotion Committee (FRPC) to review the statements made by Oakland regarding your performance and report to Oakland and you as to whether (1) your performance is in fact deficient, (2) whether the suggested corrective measures are appropriate to cure the alleged deficiency, (3) whether the proposed penalties for failure to cure the deficiencies are appropriate, and (4) any modifications the FRPC would recommend. If you make an evaluation request to the FRPC, under the Agreement the FRPC is to make a written report to Oakland and you within 30 days of the date on which you made the request. If the FRPC fails to make its report within the thirty-day period, Oakland may proceed as if such report

Dorothy Hawthorne-Burdine
Return to Duties and Evaluation of Faculty Performance
July 2 , 2014
Page 3

was timely made. Oakland shall then have the right to take any action with regard to you that it determines to be in the best interest of the University. Any action taken by Oakland to impose penalties against you as a result of this evaluation procedure will be subject to the "just cause" standards of paragraph 65, the required notification of paragraph 66, and to the grievance procedure provided in this Agreement. If you concur with the areas in which Oakland has found your performance deficient and the actions Oakland wishes you to take to cure your performance deficiency, within 15 days of your receipt of this letter you may object to having further review by the FRPC, and Oakland may not then request the FRPC to review the charges.

Oakland strongly recommends that you reflect on your past behavior and consult with your AAUP representatives and others as appropriate to ensure that your past behavior is not repeated.

Sincerely,

C. Michelle Piskulich
Associate Provost

Cc:   Scott Barns, Executive Director, AAUP
      Mark Gordon, Chief of Police
      Gary Moore, Interim Dean of Nursing

# EXHIBIT O

**Response to AAUP October 18, 2013 Letter**

To:   Kevin Grimm

From:  C. Michelle Piskulich *CMPlQP*

Re:   Dorothy Hawthorne-Burdine

Date:  November 5, 2013

Thank you for your recent email regarding Professor Hawthorne-Burdine.

While we understand your concerns, we do not agree that the administration has taken action that does not conform to the procedures described in the Faculty Agreement.  You referenced Appendix L of the Faculty Agreement and stated that the Office of the Provost needs to require in writing, including specific reasons, and with notice to the AAUP, why the faculty member needs to undergo an examination.  You also stated that none of those conditions have been fulfilled.

Instead, we direct your attention to Paragraph 66 c. of the Faculty Agreement.  We attempted to schedule a meeting with you and Professor Hawthorne-Burdine in response to your October 14, 2013 letter, but you declined.  While we also disagree with the conclusions you summarily stated in that letter, the administration was prepared to meet with you to provide and discuss the information regarding the events that led to Professor Hawthorne-Burdine's removal from her duties and campus, and the conditions that she must fulfill before the University will consider allowing her to return.

Briefly, for about the last year and a half, Professor Hawthorne-Burdine has exhibited very aggressive behavior, including verbal tirades, which have caused other AAUP bargaining unit faculty members, staff and administrators to feel threatened by her to the point of fear.  Those individuals indicate that Professor Hawthorne-Burdine's aggressive behavior, such as openly threatening physical harm to another professor, has increased and borders on violent behavior, and that they are now afraid for their personal safety.

Most recently, a student reported Professor Hawthorne-Burdine berating and castigating students to such a degree that the University's Behavior Concerns Committee's was consulted.  That Committee's review led it to decide that Professor Hawthorne-Burdine should be removed immediately from her duties and campus pending further neurological and psychological assessment.

Professor Hawthorne-Burdine's conduct is evidence not only that she has failed to fulfill her professional responsibilities but also that faculty, staff and students are afraid of her and concerned for their own personal safety.

The University will not consider allowing Professor Hawthorne-Burdine to return to her duties or campus until neurological and psychological assessments are completed and appropriately evaluated.  You or Professor Hawthorne-Burdine must contact Associate Provost Michelle Piskulich at 248-370-2190 to make arrangements for the evaluations with physicians selected by the university.  Furthermore, unless she completes those assessments in a timely manner, the University will convert her employment to an unpaid status effective November 30, 2013.

If you have any questions, please feel free to call.

# EXHIBIT P

OAKLAND UNIVERSITY

NOV - 7 2013

## OAKLAND UNIVERSITY CHAPTER, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS

**RECEIVED**

### GRIEVANCE

NOV - 7 REC'D

Office of Provost and
Senior Vice President
for Academic Affairs

Grievance No. 2013-2

Dated: November 7, 2013

This Grievance is filed pursuant to Article IX, paragraphs 65 and 66, Article XXVIII, paragraph

203, Article XXXIII, paragraph 216, and Appendix L of the collective bargaining agreement on behalf of

the Association and Professor Dorothy Hawthorne-Burdine. The Association states as follows:

**FACTS:** On or about September 27, 2013, AAUP member Dorothy Hawthorne-Burdine ("Grievant")
was given a letter from the Oakland University Chief of Police. In this letter, it indicated that the
Grievant was "persona non grata" on the Oakland University campus. The police escorted her
from campus and she has been barred from returning without date. It also stated that she was not
to have any contact with University students. She was given no notice of the allegations against
her, nor was she given an opportunity to respond.

The removal from campus for some unknown reason was, in essence, a disciplinary suspension,
presumably with pay. However, no notice was provided to the Grievant or the Association.

Oakland University Ordinance 9.04 provides that a person can only be removed from campus
after they are afforded a hearing. The Grievant was not afforded such a hearing.

The Chief of Police also ordered her to complete a neurological and psychological assessment.
The Chief of Police ordered that this must be done prior to the University considering her return
to campus. There was no background given nor were reasons provided as to why such an
assessment is necessary. In addition, the Association did not receive any notice of request for the
assessment.

On or about October 14, 2013, Association President Kevin Grimm sent a letter to Michelle
Piskulich, Associate Provost. In the letter, President Grimm indicated that the Association and
the Grievant have not received any notice of what happened prompting the action against the
Grievant, why it has happened, or how it has happened.

Based on information and belief, Oakland continued to utilize the Grievant's course materials.
Such material is the intellectual property of the Grievant. In Grimm's October 14, 2013 letter, he
also stated that such use was unauthorized and requested that Oakland cease and desist from
using the Grievant's intellectual property. Grimm also requested information as to the reasons

that the Grievant was removed from campus and information regarding the process that led to her removal from campus. Oakland issued a response to this request on November 6, 2013, one day before expiration of the 30 day filing window specified in Article XXIV, paragraph 190 of the Agreement.

## CONTRACT PROVISIONS VIOLATED:

By the foregoing and other acts, Oakland has

1.  violated Article IX, paragraph 65 by disciplining the Grievant without just cause;

2.  violated Article IX, paragraph 66 section (c) by failing to provide notice to the Grievant and the Association prior to removing her from campus;

3.  violated Article IX, paragraph 66 section (d) by failing to state in writing to the grievant and the Association the reasons for the action taken against her;

4.  violated Article XXXIII, paragraph 216 by refusing to provide the Association the information it requested within a reasonable period of time;

5.  violated Article XXVIII, paragraph 203 by failing to maintain the existing procedures, policies, and practices established by Oakland when it did not adhere to the hearing provisions of Oakland University Ordinance 9.04 prior to removing the Grievant from campus.

6.  violated Appendix L – Medical Examinations and Dispute Resolution when the Chief of Police rather than the Office of the Provost ordered the Grievant to undergo a neurological and psychological assessment without providing notice to the Grievant or the Association of the specific reasons for the assessment.

## REMEDY REQUESTED:

The Association requests that its grievance be resolved as follows:

1.  That Oakland rescind the actions taken against the Grievant including the removal from campus, the order barring interaction with students, and the order for a neurological and psychological assessment.

2.  That Oakland provide necessary and requested information to the Association upon demand.

3.  That Oakland restore the Grievant to full employment duties and privileges.

4.  That Oakland take actions to ensure that the actions taken do not interfere with the Grievant's tenure review.

5. That the Association be reimbursed for all costs and attorney fees sustained in this matter.

6. That the Association and the Grievant be otherwise made whole.

The Association reserves the right to amend this grievance should additional information or facts come to light.

**ASSOCIATION**

BY _____

Kevin J. Murphy
Grievance Officer

# EXHIBIT Q

# MILLER COHEN, P.L.C.

ATTORNEYS AND COUNSELORS AT LAW

600 WEST LAFAYETTE BLVD.
FOURTH FLOOR
DETROIT, MICHIGAN 48226-0840

(313) 964-4454
FAX (313) 964-4490
TOLL FREE (IN MICHIGAN) 1-800-221-6021
E-MAIL: YOURLAWYERS@MILLERCOHEN.COM
WWW.MILLERCOHEN.COM

ALLEN PARK OFFICE:
6715 PARK AVENUE
ALLEN PARK, MICHIGAN 48101

(313) 383-2422

BRUCE A. MILLER
NORTON J. COHEN
RICHARD G. MACK, JR.
ANDREA HAMM
ROBERT D. FETTER
ADA VERLOREN
KEITH D. FLYNN
TERI L. DENNINGS
JACK W. SCHULZ

JOHANNA L. KONONEN
OF COUNSEL

April 10, 2014

**Sent Via Facsimile (313) 456-3681**

Administrative Law Judge
Julia Cardno Stern
Michigan Administrative Hearing System
3026 W Grand Blvd Ste 2-700
Detroit MI  48202

Re:     AAUP – Hawthorne-Burdine
Case No. C13K-184
Docket No. 13-016939-MERC

Dear Judge Stern:

The Oakland University Chapter of the American Association of University Professors is hereby withdrawing the above-referenced unfair labor practice charge.

Thank you for your attention to this matter.

Sincerely,

Robert D. Fetter

RDF/ddd

cc:     Bruce A. Miller
Kevin Grimm
Kevin Murphy
Daniel Bernard



# STATE OF MICHIGAN
## MICHIGAN ADMINISTRATIVE HEARING SYSTEM

| | |
|---|---|
| **IN THE MATTER OF:** | **Docket No.: 13-016939-MERC** |
| **Oakland University,**<br>**Respondent** | **Case No.:   C13 K-184** |
| **v** | **Agency:   Michigan Employment**<br>**Relations Commission** |
| **Oakland Chapter of the American**<br>**Association of University Professors,**<br>**Charging Party** | **Case Type:  MERC Unfair Labor**<br>**Practice** |

_____/

## ORDER ALLOWING WITHDRAWAL

The Michigan Administrative Hearing System is in receipt of a letter from Charging Party dated April 10, 2014, stating that it wishes to withdraw the charge filed in the above-entitled matter.

This is to notify all parties that the withdrawal request is hereby approved and this matter is closed.

**DATED: 4/16/2014**

Travis Calderwood
**ADMINISTRATIVE LAW JUDGE**
Direct correspondence to the ALJ at:
Michigan Administrative Hearing System
3026 W. Grand Boulevard
2nd Floor Annex, Suite 2-700
Detroit, Michigan 48202
Phone: 313.456.2712
FAX: 313.456.3681

COPY TO:
Robert D. Fetter
Daniel J. Bernard

13-016939-MERC