UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOROTHY HAWTHORNE-BURDINE,

    Plaintiff,

        v.

OAKLAND UNIVERSITY, ET AL.,

    Defendants.

_____/

Case No. 15-cv-13285

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ANTHONY P. PATTI

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO
DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT [12] AND
GRANTING MEDICOLEGAL'S MOTION TO DISMISS [14]**

**I. INTRODUCTION**

On September 16, 2015, Plaintiff Dorothy Hawthorne-Burdine ("Plaintiff"),

filed her Complaint against Oakland University, Oakland University Police

Department, Medicolegal Services, LLC, 28 individually named defendants, and

Does 1–100 (collectively, "Defendants"). Dkt. No. 1. On September 23, 2015,

Plaintiff filed a 57 page, 300 paragraph First Amended Complaint, alleging

Oakland University discriminated against her on the basis of disability, race, and

age in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.

§ 12101 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), as

amended, 42 U.S.C. § 1981a, 42 U.S.C. § 1981; and the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. § 623. Dkt. No. 4. Plaintiff also alleges

-1-

various state law claims, including violations of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws Ann. § 37.2101, *et seq.*; and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws Ann. § 37.1101, *et seq. Id.*

This matter is before the Court on Defendants' Motion to Dismiss and/or Motion for Summary Judgment, filed on October 29, 2015. Dkt. No. 12. Defendant Medicolegal Services, LCC filed a separate Motion to Dismiss on October 30, 2015. Dkt. No. 14. Plaintiff filed a response brief on December 7, 2015, Dkt. No. 24.[1] For the reasons discussed herein, Court will **GRANT** Defendants' Motion to Dismiss and/or Motion for Summary Judgment [12] and **DENY** Medicolegal's Motion to Dismiss [14] as **MOOT**.

## II. BACKGROUND

### A. Plaintiff's Employment at Oakland University

Plaintiff is an African-American female who is currently 63 years old. Dkt. No. 4, p. 2, ¶ 1 (Pg. ID No. 58). Plaintiff was hired by Oakland University in August 2010 as an Associate Professor in the School of Nursing. *Id.* Plaintiff's

---

[1] Several docket entries were stricken from the record for untimely submission. Since Plaintiff's response to Medicolegal's Motion to Dismiss was among the stricken entries, the Court did not review or consider Medicolegal's reply to the stricken response.

employment consisted of her teaching two terms—fall and winter—in an eight month academic year for four years, ending in 2014. *Id*. at ¶¶ 43–44, 47.

During the first year of Plaintiff's employment, things quickly soured between her and the School of Nursing staff. *See id*. at ¶ 88. In June 2011, Plaintiff was called to a meeting with the Assistant Vice President for Academic Affairs, the Interim Dean, and the Executive Director of the American Association of University Professors (AAUP).[2] Dkt. No. 12, p. 10 (Pg. ID No. 254). The meeting was to address Plaintiff's confrontational behavior towards administrative staff, who Plaintiff felt treated her with disrespect because they called her by her first name, and Plaintiff's refusal to complete required forms. *See id*.; Dkt. No. 4, p. 17, ¶ 88 (Pg. ID No. 73). Defendants allege that a police officer, posted outside the meeting room, had been tempted to intervene due to Plaintiff's volume. *See* Dkt. No. 12-2, p. 3 (Pg. ID No. 279); Dkt. No. 4, p. 18, ¶ 96 (Pg. ID No. 74).

The interim dean issued a letter to Plaintiff, apprising her about performance deficiencies. Dkt. No. 12-3, pp. 2–3 (Pg. ID No. 281–82). The letter also served to remind Plaintiff that Oakland University required her to complete external grant applications,[3] comply with the faculty travel and reimbursement process, and

---

[2] At all times during her employment at Oakland University, Plaintiff was represented by the AAUP, a union, and was a party to a Collective Bargaining Agreement (CBA). Dkt. No. 12, p. 10 (Pg. ID No. 254).

[3] Plaintiff admits that she did not complete external grant applications, stating it was a "waste of [her] time," because although Oakland University required the

abstain from intimidating, threatening, or harassing any persons. *Id*. A follow-up letter was sent in July 2011, summarizing the meeting and noting that Plaintiff "made it clear that [she had] no intention of following Oakland University policies or procedures or interacting with faculty and staff in a meaningful, professional manner." Dkt. No. 12-4, pp. 2–3 (Pg. ID No. 284–85). Plaintiff was asked to reconsider her position. *Id*.

Adversarial incidents continued to occur after the summer 2011 meeting. In October 2011, the Chair of the Nursing Committee on Advancement and Promotion (NCAP) reported that Plaintiff had verbally abused other attendees, including one incident in which Plaintiff started screaming "get out" repeatedly at another attendee.[4] Dkt. No. 12-5, p. 1 (Pg. ID No. 287). In March 2013, Plaintiff told the Assistant Dean of the School of Nursing to "get [her] ignorant ass out of [Plaintiff's] office,"[5] after the Assistant Dean attempted to limit Plaintiff's interaction with a faculty candidate to keep the process similar for all applicants. Dkt. No. 12-6, p. 2 (Pg. ID No. 289). The Associate Dean also reported being

---

applications, the National Institute of Health did not. *See* Dkt. No. 4, p. 20, ¶¶ 106–07 (Pg. ID No. 76).

[4] For her part, Plaintiff asserts that she was not the only faculty member to engage in such unprofessional behavior—just the first to be disciplined for it. *See* Dkt. No. 4, pp. 15–16, ¶¶ 76–80 (Pg. ID No. 71–71).

[5] There is some dispute as to whether the actual statement was "get your ignorant black ass out of my office," Dkt. No. 12, p. 11 (Pg. ID No. 255), or "get your ignorant ass out of my office," Dkt. No. 4, p. 22, ¶ 123, but both sides concede that the general statement was made.

frightened of Plaintiff's explosive behavior and that Plaintiff told other employees that the Associate Dean was a "bitch." *Id*. Plaintiff disputes that she ever called the Associate Dean a "bitch," and claims that the Associate Dean could not be frightened of Plaintiff because they went out to lunch and Plaintiff paid. Dkt. No. 4, pp. 23–24, ¶ 130 (Pg. ID No. 79–80).

In June 2013, the Oakland University Police Department reviewed concerns expressed by various staff members about Plaintiff's behavior. Dkt. No. 12, p. 11 (Pg. ID No. 255). According to the reports submitted to the police department, three witnesses reported concerns about their interactions with Plaintiff. Dkt. No. 12-7, pp. 2–3 (Pg. ID No. 291–92). Plaintiff was described to police as exhibiting "very aggressive behavior," causing fear and discomfort to her colleagues, and making threats against a co-worker. *Id*. ("[Plaintiff] has stated that she does not like [her colleague] and that one day she will 'tear her apart' and 'no one will be able to pull her off.' ") Despite the behavior exhibited by Plaintiff, it was determined that she was not yet a security threat.*See id*.

### B. Plaintiff's Request for Disability Accommodation

In August 2013, Plaintiff alleges that the Associate Provost denied her request for disability accommodation submitted on May 16, 2013.[6] Dkt. No. 4, p.

---

[6] Plaintiff's Complaint does not provide any insight into exactly what accommodation she sought. She lists a number of ailments, including: an endocrine

30, ¶ 170. The Associate Provost instructed Plaintiff to work with administrators in the School of Nursing on her accommodations. *Id*. at ¶ 172. Plaintiff believed that this "indicated that the University would take no further action," and thus was not an adequate accommodation. *Id*.

## C. Removal from Campus

The adversarial relationship between Plaintiff and her employer reached a climax in September 2013. A student in Plaintiff's Nursing 452 class recorded Plaintiff making a twenty-two minute long monologue during class about student grading[7] and lack of respect from prior students. *See* Dkt. No. 22.[8] The student reported that she recorded this class because it was the fourth class in which Plaintiff exhibited abnormal behavior. Dkt. No. 12, p. 13 (Pg. ID No. 257).

---

health disorder, type-2 diabetes, bilateral knee osteoarthritis, and morbid obesity. *See* Dkt. No. 4, p. 29, ¶¶ 159–63. Plaintiff appears to take issue with her assignment to supervise and teach students in clinical instruction off-campus, but does not detail her requested accommodation or how her disabilities hindered her from completing this assignment. *See id*. at ¶ 165.

[7] The students had not yet submitted any material to be graded in the course, so Plaintiff's comments were based off experiences from previous courses. *See* Dkt. No. 22.

[8] Plaintiff filed two CDs with the Court, after the Court granted her Motion for Leave to File Exhibits in the Traditional Manner. *See* Dkt. No. 20, 22. However, as these CDs were not filed properly as exhibits to a brief, it presents a challenge as to how the audio recording on the disks should be cited. Accordingly, when the Court cites to Dkt. No. 22, the certificate of service for the CDs' filing, the Court intends to cite the recording itself, which was mentioned in both Plaintiff and Defendants' filings.

Plaintiff's monologue seemed to focus on the "harsh and high level of student incivility" that Plaintiff claims to have previously experienced in teaching at Oakland University. *See* Dkt. No. 22. During her statements, Plaintiff said she could file grievances against her students, calling herself "the grievance queen," and notifying them that "nobody has ever won a grievance against [her]" and any colleagues that came up against her had backed off. *Id*. When a student spoke in opposition to Plaintiff's monologue, Plaintiff demanded to know the student's name and assured her that she would remember her. *Id*. After that point, Plaintiff interrupted any student who tried to speak against the monologue, saying "No— you listen to *me*" and "I don't know who you are and I don't want to know you." *Id*. If a student were to treat her with disrespect, Plaintiff stated she would "cut loose on them" and "lock the door and make them stay there" until she finished. *Id*. Plaintiff even seemed to acknowledge that the monologue was inappropriate, stating that she could not talk to the students that way if other professors were around to evaluate her classes in accordance with her tenure application. *See id.*

The student who made the recording went to the Dean's office to report the incident before the class ended. Dkt. No. 12, p. 13 (Pg. ID No. 257). The student later stated during arbitration that she "felt very disrespected and threatened" by Plaintiff, and that she no longer found Plaintiff's classroom to be "a safe place to learn." Dkt. No. 12-10, p. 3 (Pg. ID No. 303). Hearing a portion of the recording,

the Dean and Associate Dean went to meet with the Associate Provost about their concerns, avoiding Plaintiff on the way to the Provost's office. Dkt. No. 12, p. 13 (Pg. ID No. 257). The Associate Provost listened to all of the recordings and consulted with the Oakland University's General Counsel due to her concern that "[i]t didn't seem to [her] to be a safe, healthy environment." Dkt. No. 12-11, p. 2 (Pg. ID No. 306). The Associate Provost then spoke with the Chief of Police and it was recommended that the matter be referred to the Behavioral Concerns Committee (BCC). *Id*. at 2–3. The BCC had been established several years prior to prevent on-campus violence by "assessing and addressing the mental health needs of persons who may be at risk of campus violence by harming themselves or others." Dkt. No. 12, p, 12 (Pg. ID No. 256).

The day after the class was recorded, the BCC convened to assess whether the recording constituted a threat to the University community.[9] *Id*. at 15. BCC members stated that, based on what they heard on the recording, Plaintiff had acted inappropriately and was "out of control." *Id*. at 15–16. A clinical psychologist who served on the BCC stated that he was concerned that Plaintiff's behavior represented "a psychotic break, a severe and intense manifestation of a personality disorder, [or] possibly a deterioration in cognitive functioning which impaired

---

[9] The Associate Provost, Chief of Police, Interim Vice President for Student Affairs, and Chairman of the BCC had each determined that the recording warranted BCC review prior to the BCC convening. Dkt. No. 12, p. 15 (Pg. ID No. 259).

judgement and impulse control." *Id*. at 17. He stated that any of those issues could potentially result in dangerous behavior. *Id*. The psychologist recommended that the BCC have Plaintiff evaluated "both psychiatrically and neuropsychologically out of concern for the appropriate diagnosis for what [Plaintiff] was experiencing and also in hopes of catching whatever it was before it got worse" and "threatened [Plaintiff's] health and well-being." *Id*.

The BCC recommended that (1) Plaintiff be temporarily relieved of teaching assignments; (2) Plaintiff complete neurological and psychological assessments; and (3) that Plaintiff be directed to remain off Oakland University's campus until the assessments were completed. *Id*. On September 27, 2013, the day after the BCC convened and two days after the recording was made, the Oakland University Police Department issued a *persona non grata* (PNG) order to Plaintiff on the BBC's recommendation. Dkt. No. 4, p. 31, ¶¶ 173–74 (Pg. ID No. 87). The PNG letter stated that Plaintiff "must complete both a neurological and psychological assessment," receiving satisfactory results, before the University would allow her back on campus. Dkt. No. 12-18, p. 2 (Pg. ID No. 312). Plaintiff received full pay and benefits during the time period she was removed from campus, and also worked part-time for University of Phoenix. Dkt. No. 12-14, pp. 2–3 (Pg. ID No. 314–15). However, Oakland University stated that it would convert her to unpaid

status unless she completed the medical evaluations. Dkt. No. 4, p. 33, ¶ 182 (Pg. ID No. 89).

### D. Plaintiff's Medical Evaluations

Plaintiff underwent three separate medical evaluations. First, Dr. Hermann Banks performed a neurological evaluation on Plaintiff on November 11, 2013. Dkt. No. 12-15, p. 2 (Pg. ID No. 317). Dr. Banks found that Plaintiff did not appear to present for Alzheimer's dementia, but also suggested Plaintiff undergo neuropsychological testing to determine if "any occult atypical dementias . . . could be manifesting as behavioral outbursts." *Id*. at p. 7. Next, Dr. Elliott Wolf performed a psychiatric examination on Plaintiff on November 14, 2013. Dkt. No. 12-16, p. 2 (Pg. ID No. 325). Dr. Wolf found Plaintiff to be dysphoric, but did not believe she harbored any suicidal, aggressive, or homicidal ideation, intent, or plan.[10] *Id*. at p. 8. Dr. Wolf further stated that Plaintiff "presented in clinical interview as defensive, angry, and paranoid," and that "she should be regarded as unfit to return to her teaching position at the present time." *Id*. at 8–9. Plaintiff's third and final examination took place on February 24, 2014 with Dr. John Baker. Dkt. No. 12-17, p. 2 (Pg. ID No. 334). Dr. Baker's findings suggested that Plaintiff's cognitive functioning had declined, and her ability to learn and recall

---

[10] In her Complaint, Plaintiff misattributed her own statements, quoted by Dr. Wolf in his psychiatric report, as though they were Dr. Wolf's examination findings. *See* Dkt. No. 4, p. 33, ¶ 186 (Pg. ID No. 89).

novel information was "far below expected levels given her personal history including education and professional development." *Id*. at p. 10. Nonetheless, since Plaintiff's overall functioning was within normal limits, Dr. Baker commented that her work place conflicts were likely resulting from Plaintiff's interpersonal style and limited insight, rather than a neuropsychological problem. *See id*. at 10–11. Dr. Baker did not find Plaintiff to be disabled or incapable of performing the duties of her job. *Id*. at 11.

In accordance with the findings that there was no underlying medical condition precipitating Plaintiff's behavior, Oakland University sent Plaintiff a letter regarding "Return to Duties and Evaluation of Faculty Performance" on July 2, 2014. Dkt. No. 12-18, pp. 2–4 (Pg. ID No. 346–48). The letter noted that she would be assigned to teach in fall semester 2014, but did not mention tenure. *See id*. at 2. Much of the letter focused on Plaintiff's behavior prior to her removal and Oakland University noted that it would take disciplinary action should this behavior continue. *Id*. at 3.

### E. Grievance and Arbitration Regarding Plaintiff's Removal

Several other events transpired during Plaintiff's removal from the campus. First, Plaintiff and her union filed a grievance against Oakland University,

-11-

asserting that her removal was improper. Dkt. No. 12, p. 20 (Pg. ID No. 264).[11] While the arbitration testimonies confirmed that Plaintiff had made no overt threats of harm or physical violence in the recording, Dkt. No. 4, p. 40, ¶ 222 (Pg. ID No. 96), the arbitrator determined that the BCC deliberated in good faith when they concluded Plaintiff represented a sufficient threat to the University, denying that part of Plaintiff's grievance. *See* Dkt. No. 12, p. 20 (Pg. ID No. 264). Nevertheless, the arbitrator sustained part of Plaintiff's grievance and determined that Oakland University should have notified Plaintiff prior to serving her with the PNG letter and removing her from campus. *See id.*

### F. Plaintiff's Tenure Application

During the time period in which Plaintiff was removed from campus, her application for tenure was recommended for denial by the two tenure-review advisory committees. Dkt. No. 4, p. 42, ¶ 231 (Pg. ID No. 98). Plaintiff was notified of their recommendations and provided rebuttal materials to the two committees in May 2014. Dkt. No. 4, p. 42, ¶ 233 (Pg. ID No. 98).

NCAP reviewed Plaintiff's tenure materials in January 2014. Dkt. No. 12-19, pp. 2–4 (Pg. ID No. 350–52). NCAP unanimously determined that Plaintiff met the criteria for teaching, instructing four different courses during the review period

---

[11] This grievance and the arbitration appear to have focused solely on Oakland University's removal of Plaintiff from campus, rather than on her tenure denial.

and serving as the faculty mentor for four graduate students. *Id*. at 2–3. However, NCAP also unanimously determined that Plaintiff did not meet the criteria for scholarship, since she did not have any peer-reviewed publications during the review period, gave a single podium presentation and seven poster presentations at peer-reviewed conferences, and submitted four grant applications to the National Institutes of Health (NIH), none of which were funded. *Id*. at 3. Plaintiff's scholarship was evaluated by two external (non-Oakland University faculty) reviewers, who stated that "her record of publications is less than one would expect" and that there was a "puzzling" gap in her productivity of published works that seemed to "focus on work done over a decade ago." *Id*. NCAP also evaluated her service requirement and unanimously determined that she did not meet the criteria. *Id*. at 4. Although Plaintiff was a respected member of the Senate Athletic Committee and the President Elect of the local chapter of Sigma Theta Tau International, the committee reported that Plaintiff had not submitted evidence of leadership contributions to the School of Nursing and University committees. *Id*. The Committee unanimously voted to deny tenure. *Id*.

In May 2014, the Faculty Re-employment and Promotion Committee (FRPC) also recommended by a vote of 9 to 0 that Plaintiff should not be granted tenure. Dkt. No. 12-20, pp. 2–3 (Pg. ID No. 354–55). FRPC noted Plaintiff's lack of peer-reviewed publications, stating her most recent articles were published a

decade earlier, in finding that she did not meet the scholarship criteria. *Id*. at 2. FRPC was unable to determine whether Plaintiff met the criteria for teaching, citing inconsistent evidence. *Id*. at 3. And differing from NCAP, FRCP determined that Plaintiff did meet the service criteria. *Id*. Nonetheless, weighing the three criteria, the committee did not recommend Plaintiff for reappointment with tenure. *Id*.

Accordingly, at the Board of Trustees meeting on August 12, 2014, Oakland University denied her tenure application and made a decision not to reemploy Plaintiff. Dkt. No. 12-21, p. 2 (Pg. ID No. 357). Plaintiff did not file a grievance to dispute her tenure application denial.

### G. Plaintiff's EEOC Charge and Subsequent Lawsuit

Finally, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) against Oakland University in June 2014, after being notified that the two committees recommended that she not be reemployed with tenure. Dkt. No. 4, pp. 44, ¶¶ 243–44 (Pg. ID No. 100). Plaintiff later supplemented this filing with a retaliation charge in September 2014 after the Board of Trustees determined that she should not be reemployed. *Id*. at 45, ¶ 251 (Pg. ID No. 101). Plaintiff filed the present complaint in federal court on September 16, 2015. Dkt. No. 1.

### III. LEGAL STANDARDS

#### A. FED. R. CIV. P. 12(b)(1)

When defendants seek to dismiss an action under Rules 12(b)(1) and 12(b)(6), the court is "bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Dismissals for lack of jurisdiction should generally be made without prejudice. *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005).

Under a Rule 12(b)(1) motion, the plaintiff bears the burden of proving jurisdiction in order to survive the motion. *Id.* Furthermore, on a Rule 12(b)(1) motion, unlike a Rule 12(b)(6) motion, the court is empowered to resolve factual disputes. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986).

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Whereas a facial attack is a challenge to the sufficiency of the pleading itself, a factual attack challenges the factual existence of subject matter jurisdiction. *Id.* Where the motion makes a facial attack, the court must construe the petition's allegations in the light most favorable to the non-moving part and take the material allegations as true. *Id.* Conversely, on a factual attack, there is no presumption of truthfulness applied to factual allegations,

allowing the court to "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id*.

### B. FED. R. CIV. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must comply with the pleading requirements of Federal Rule of Civil Procedure 8(a). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted) (quoting FED. R. CIV. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678–80 (2009) (applying the plausibility standard articulated in *Twombly*).

When considering a Rule 12(b)(6) motion to dismiss, the Court must construe the complaint in a light most favorable to the plaintiff and accept all of her factual allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir.

2008). However, the Court need not accept mere conclusory statements or legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322 (2007).

## C. FED. R. CIV. P. 56

Federal Rule of Civil Procedure 12(d) provides that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." The parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). A motion for summary judgment under Rule 56 can be filed "at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b).

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### D. Eleventh Amendment Immunity

The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." There are three exceptions to the bar of Eleventh Amendment immunity. *See Lawson v. Shelby Cty.*, 211 F.3d 331, 334–35 (6th Cir. 2000). First, a state may consent to be sued and waive its Eleventh Amendment protection. *Id.* at 334. Second, Congress may unequivocally state that it intends to abrogate state sovereign immunity through a valid exercise of power.

-18-

*Id.* at 334–35. Third, a federal court may enjoin a "state official" from violating federal law under the *Ex parte Young* exception. *Id.* at 335.

### E. Standards Regarding Pro Se Complaints

Pro se complaints are held to "less stringent standards" than those drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nonetheless, a court shall dismiss a case at any time if the court determines that the action is: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). A complaint is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A frivolous complaint may be "based on an indisputably meritless legal theory," rest on "clearly baseless" factual contentions, rely on "claims of infringement of a legal interest which clearly does not exist," or describe "fantastic or delusional scenarios." *Id.* at 327–28.

### IV. DISCUSSION

### A. Oakland University Is Immune From Suit for ADA and ADEA Damages Claims Under the Eleventh Amendment

Oakland University is a state institution of higher education, established under the Michigan Constitution and Michigan statutory law. *See* Mich. Const. Art. 8, § 6; Mich. Comp. Laws § 390.151. Accordingly, the Eleventh Amendment's

protection of sovereign immunity applies to Oakland University. *See Richardson v. Wayne State Univ.*, 587 F. App'x 284, 286 (6th Cir. 2014) (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001)) (affirming the district court's grant of summary judgment on ADA and ADEA claims because the state university was protected by sovereign immunity); *Brooks v. Oakland Univ.*, No. 13-10701, 2013 WL 6191051 (E.D. Mich. Nov. 26, 2013) (finding plaintiff's Fair House Act claim against Oakland University was barred by the Eleventh Amendment and dismissing case with prejudice). Since the university has not waived immunity or consented to the suit, Plaintiff's ADA and ADEA claims, to the extent that they seek monetary damages, are barred by the Eleventh Amendment and must be dismissed. *See, e.g., Richardson*, 587 F. App'x at 286 (dismissing ADA and ADEA claims against an immune state university). Furthermore, Plaintiff's state claims under the ELCRA and PWDCRA must also be dismissed to the extent that they seek monetary damages. *Ernst*, 427 F.3d at 368 (holding that a "States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature"). Nonetheless, Plaintiff may[12] seek to enjoin state officials from violating federal law under the *Ex parte Young* exception. *Id*. at 367–68.

---

[12] Plaintiff contends that she is entitled to injunctive relief under *Ex parte Young*. However, *Ex parte Young* does not provide that a plaintiff may circumvent Eleventh Amendment immunity merely by requesting any form of equitable relief.

**B.  The Court Is Unable to Grant the Equitable Remedies Plaintiff Requests**

In her Amended Complaint, Plaintiff requests three forms of equitable relief: (1) "An injunction prohibiting any further acts of wrongdoing, discrimination, or retaliation"; (2) "An order prohibiting Defendant Oakland University . . . from requiring its employees to undergo neurological or psychological examinations without proof the examinations are job related and consistent with business necessity"; and (3) "Whatever equitable relief appears appropriate at the time of final judgment." Dkt. No. 4-1, p. 7 (Pg. ID No. 113).

A plaintiff must establish standing with respect to each type of relief sought. *Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015). "To establish standing for a forward-looking injunction, a party must show a 'threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical.' " *Id*. (quoting *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009)). Such standing depends on the likelihood of future harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). Past exposure to illegal conduct alone will not give rise to a present case or controversy unless it is accompanied by continuing, present effects. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). "Absent a sufficient likelihood that he will again be wronged in a

---

*See Edelman v. Jordan*, 415 U.S. 651, 667 (1974) ("equitable relief may be barred by the Eleventh Amendment").

similar way," a plaintiff does not have standing to seek injunctive relief. *Lyons*, 461 U.S. at 111; *see also Hange v. City of Mansfield, Ohio*, 257 F. App'x 887, 892 (6th Cir. 2007) (determining a plaintiff lacked standing to seek an injunction where there was no indication that the defendant engaged in a policy of issuing the punishment in question, or had any intention of subjecting the plaintiff to the punishment again).

To qualify under the *Ex parte Young* exception to Eleventh Amendment immunity, the relief sought should be prospective in nature, seeking merely to compel a state officer's compliance with federal law in the future. *Nelson v. Miller*, 170 F.3d 641, 646 (6th Cir. 1999).

### i. Plaintiff's Request That the Court Prohibit "Any Further Acts of Wrongdoing, Discrimination, or Retaliation" Cannot Be Granted

The first form of equitable relief Plaintiff requests cannot be granted because of her broad and all-encompassing request. "An injunction serves as a judicial declaration that a *specific* policy or proposed plan of action may be violative of the constitutional rights of others." *Coleman v. Dep't of Rehab. & Corr.*, 46 F. App'x 765, 772 (6th Cir. 2002) (emphasis added). Much like in *Coleman*, where the plaintiff wanted "an overbroad, blanket injunction enjoining the State of Ohio and the ODRC from violating prisoners' constitutional rights," *id.*, Plaintiff seeks an injunction prohibiting any defendant (presumably Oakland University) from "any

-22-

further acts of wrongdoing, discrimination, or retaliation." Dkt. No. 4-1, p. 7 (Pg. ID No. 113). She does not allege that defendants engaged in any deliberate or ongoing policy, nor does she state the constitutional right infringed by the alleged acts. Furthermore, Plaintiff does not have standing to request relief that solely serves to protect the constitutional rights of others. Thus, the form of relief Plaintiff seeks is unavailable.

### ii. Plaintiff Does Not Have Standing to Request That Oakland University Be Required to Demonstrate Proof that Medical Examinations Are Job-Related or Consistent with Business Necessity

Plaintiff's second request for equitable relief seeks a court order prohibiting Oakland University from requiring medical examinations without proof the examinations are job-related or consistent with business necessity. Dkt. No. 4-1, p. 7 (Pg. ID No. 113). Such an order, without the requirement of "proof," is already written into statute. *See* 42 U.S.C. § 12112(d)(4)(A). Specifically, the ADA provides that: "A covered entity shall not require a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.*

"The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat

to himself or others.' " *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Denman v. Davey Tree Expert Co.*, 266 Fed. App'x. 377, 379 (6th Cir. 2007)). The party who requires the examination must have "a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id*. An employer may request an examination, based on an objective inquiry, where an employee's "aberrant behavior" raises the concern of the employee's mental or emotional instability. *See id*. at 624–25 (citing *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 655 (2013) (noting that an examination was "job-related and consistent with business necessity" because an "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position")).

In the present case, Plaintiff has not alleged that she will be subjected to future medical evaluations, or that Oakland University has a deliberate or ongoing policy of requiring them. *See generally Papasan v. Allain*, 478 U.S. 265, 277–78 (1986) (detailing how *Young* focuses on current and ongoing violations of federal law). Indeed, Plaintiff states the opposite: She states that she was the first employee in her position to undergo such examination. Dkt. No. 4, p. 2, ¶ 3 (Pg. ID No. 58). Accordingly, Plaintiff does not have standing to seek this form of injunctive relief. Since Plaintiff's two specifically requested injunctions fail, only

those requests for monetary relief not prohibited by the Eleventh Amendment remain.

**C. The Court Will Dismiss Plaintiff's ADA Claims (Counts I, IV, and IX)**

    **i.  Plaintiff's ADA Claims Against Oakland University**

In Plaintiff's first claim, she appears to claim that Oakland University violated Title I of the ADA failing to provide a reasonable accommodation for her disability of diabetes.[13] *See* Dkt. No. 4, pp. 46–47, ¶¶ 254–256 (Pg. ID No. 102–03). In Plaintiff's fourth claim, she appears to claim that Oakland University illegally retaliated against her for filing an Equal Employment Opportunity Commission (EEOC) complaint, in which she alleged that she was discriminated against based on race, age, and disability. *See* Dkt. No. 4, pp. 46–47, ¶¶ 270–76 (Pg. ID No. 105–06). Finally, in Count IX,[14] Plaintiff alleges Oakland University, as well as all other defendants, violated the ADA through conduct related to Plaintiff's medical examinations and the university's failure to accommodate her and grant her tenure. *See* Dkt. No. 4-1, pp. 5–6, ¶¶ 299–300 (Pg. ID No. 111–12).

---

[13] Plaintiff states that she also has hypertension, bilateral knee osteoarthritis, and morbid obesity, but she does not state in her Complaint that these are the disabilities for which she sought accommodation. *See* Dkt. No. 4, p. 47, ¶ 256(e) (Pg. ID No. 103).

[14] Although Plaintiff's title for Count IX references a violation under the ELCRA and PWDCRA, her allegations in Count IX only cite an ADA violation. Thus, Plaintiff's Count IX will be analyzed accordingly as an ADA claim.

As discussed above, Oakland University is shielded from Plaintiff's ADA claims seeking any monetary relief by the Eleventh Amendment. Furthermore, since none of Plaintiff's requests for equitable relief satisfy the *Ex parte Young* exception, the Court lacks jurisdiction over her ADA claims against Oakland University. Accordingly, Plaintiff's Counts I and IV, as well as Count IX against Oakland University, are dismissed.

### ii.  Plaintiff's ADA Claim Against Individually Named Defendants

The only claim against the individually named defendants is Count IX, alleging that all 28 individuals violated the ADA through conduct related to Plaintiff's medical examinations and the university's failure to accommodate her and grant her tenure. *See* Dkt. No. 4-1, pp. 5–6, ¶¶ 299–300 (Pg. ID No. 111–12).

### A. The ADA Does Not Impose Individual Liability

The Sixth Circuit has held that the ADA and its sister civil rights statutes do not impose individual liability. *Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999) (citing *Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir. 1997)). Instead, only parties who meet the ADA's definition of "employer" may be held liable under the statute. *See id*. The ADA defines an "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person," with limited exceptions. 42 U.S.C. § 12111.

-26-

Other than Oakland University, none of the named defendants qualify under the ADA's definition of "employer." The eclectic group of named defendants includes members of the Board of Trustees, past and current university presidents, chiefs of the police department, fellow professors, administrative staff, and even a former student. *See* Dkt. No. 4, pp. 5–7 (Pg. ID No. 61–63). There are no facts pled that indicate any of these individuals had "15 or more employees," much less that Plaintiff was one of them. The closest any of the named defendants comes to liability under Plaintiff's ADA claim is that some of them may have supervised her during her employment at Oakland University, and thus Plaintiff could argue they are agents of the university. However, even that is an insufficient connection to provide for individual liability under the ADA, given existing Sixth Circuit precedent. *See Wathen*, 115 F.3d at 405 (rejecting the plaintiff's argument that supervising individuals were agents of the company and should be held individually liable for Title VII violations); *Hiler*, 177 F.3d at 546 ("[S]upervisors, sued in their individual capacities, are not included within the statutory definition of 'employer' under Title VII and its sister civil rights statutes, and accordingly cannot be held personally liable for discrimination.").

Accordingly, Defendants Mark Schussel, Richard DeVore, Richard Flynn, Michael Kramer, Scott Kunselman, Robert Robinson, Melissa Stolicker, W. David Tull, George Hynd, Victor Zambardi, Betty Youngblood, James Lentini, Mark

Gordon, Samuel Lucido, Glenn McIntosh, Nancy Schmitz, James Franklin, Cheryl Piskulich, Catherine Rush, Janine DeWitte, Kerri Schuiling, Gary Moore, Darlene Schott-Baer, Cheryl McPherson, Kathleen Spencer, Sarah Newton, John Kraus, and Carly Schatzberg are properly dismissed from this suit in their individual capacities, since they may not be held liable as "employers" for an alleged ADA violation.

### B. Plaintiff's ADA Claims Against Individuals In Their Official Capacities Are Claims Against the Governmental Entity Itself

Whether the individually named defendants are able to be held liable in their official capacities is a slightly more complicated issue for the Court to address. Although Plaintiff states in the Complaint that she seeks to hold "ALL" defendants liable in their official capacities, not all of the 28 individually named defendants have official capacities.

However, it is not necessary for the Court to go through the process of determining, one by one, whether each defendant may be able to be sued in an official capacity. Because Oakland University received proper notice of the present suit, and responded with the other defendants, Oakland University is the real party of interest in this case. Official-capacity claims are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). An official-capacity claim is redundant where the entity is named as a

-28-

defendant. *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) (finding official-capacity suits against defendant agency's employees superfluous where the state and agency were also named as defendants).

Plaintiff has not raised any claims against the individually named defendants that have not also been raised against Oakland University. If the ADA allowed for a private right of action against a state for monetary damages, which it does not, any recovery would be paid by Oakland University. Because Oakland University, a governmental entity, is the real party of interest in this case, the redundant official capacity claims against the individually named defendants and unnamed Does are dismissed.

### C. Plaintiff's Claims Against the Oakland University Police Department and Medicolegal Services, LLC Must Be Dismissed

The Oakland University Police Department and Medicolegal Services, LLC, are also to be dismissed from the only claim against them, Count IX. Since the Oakland University Police Department does not exist as an entity separate from the University itself, Dkt. No. 12, p. 24 (Pg. ID No. 268), it cannot be sued in its own right.

Additionally, although Medicolegal Services, LLC may employ more than 15 people and otherwise fit within the ADA's definition of "employer," Plaintiff does not allege that Medicolegal was her employer. There are no facts alleged that

indicate that Oakland University delegated control over Plaintiff's employment to Medicolegal as the University's agent. *See Satterfield v. Tennessee*, 295 F.3d 611, 618 (6th Cir. 2002) (determining that the plaintiff could not show that defendants were his employers or agents for purposes of the ADA, where the plaintiff's employer delegate control over the plaintiff's employment opportunities to defendants). Thus Medicolegal Services cannot be subjected to liability under Title I of the ADA for Plaintiff's claims. Count IX against both the Oakland University Police Department and Medicolegal Services is dismissed.

### D. The Court Will Dismiss Plaintiff's Title VII Race Discrimination Claim Against Oakland University (Count II)

Plaintiff's second claim alleges that Oakland University discriminated against her on the basis of race by denying her the same rights enjoyed by those who were not African-American. *See* Dkt. No. 4, pp. 47–48, ¶¶ 257–62 (Pg. ID No. 103–04). In this claim, Plaintiff states that this violation arose from an adverse employment action she suffered when Oakland University's Board of Trustees terminated her in August 2014 after allegedly awarding her tenure in the July 2014 letter. *See id.* at ¶¶ 258–59; Dkt. No. 24, p. 10 (Pg. ID No. 400).

Defendants counter that the July 2014 letter was not a new employment contract and that Plaintiff's employment was governed by the rules in her union's

collective bargaining agreement. *See* Dkt. No. 12, p. 19, n.6 (Pg. ID No. 263). The

CBA states:

> Employment without tenure in the rank of associate professor for a person not previously employed by Oakland University as a faculty member shall be for an initial term of four years, after which an associate professor not granted tenure by Oakland shall not be re-employed as a full-time faculty member.

*Id*. at 20–21, n.7. Defendants additionally assert that Plaintiff was bound to file a

grievance within 30 days of her tenure denial. *Id*. at p. 29.

Despite Plaintiff labeling the July 2014 letter an "Employment Contract

Letter," Dkt. No. 4, p. 43, ¶¶ 236–39, the letter does not award Plaintiff tenure. *See*

Dkt. No. 12-18, pp. 2–4 (Pg. ID No. 346–48). The letter states, in relevant part:

> The Opinions indicate that there is no underlying medical condition that precipitated your behavior, and in that regard they are satisfactory enough to allow you to resume your teaching and other faculty duties without restrictions. You will be assigned to teach in.Fall [sic] semester 2014. Please contact Joann Denby to make arrangements to have your computer connected and any other office needs necessary to prepare for instruction this Fall.

*Id*. The majority of the letter focused on Plaintiff's past performance deficiencies,

with only the above three sentences mentioning continuing employment. *See id*.

Reviewing the plain meaning of the relevant sentences, the letter seems to

reference the continuation of a current contract ("*resume* your teaching and other

faculty duties"), rather than beginning a new contract. It is implausible to suggest

that this letter conveyed an award of tenure, since there is no mention of a tenure

-31-

award in the letter and Plaintiff had been previously notified that her tenure application was recommended for denial by the two reviewing committees.[15]

### i.  Standard of Review for Racial Discrimination Claims

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part: "It shall be an unlawful employment practice for an employer—(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2. "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

"[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). A corporate decision maker's statement that expresses a desire to remove employees in a protected

---

[15] It is also worth noting that, to the extent Plaintiff intends this claim to dispute the denial of her tenure application, Defendants argue that Plaintiff was covered by the CBA, which included a procedure for the filing of grievances. Dkt. No. 12, p. 29 (Pg. ID No. 273). Thus, Defendants also assert that Plaintiff failed to exhaust her administrative remedies. *Id.*

group or a facially discriminatory employment policy are each examples of direct evidence of discriminatory intent. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

When a plaintiff seeks to prove racial discrimination by circumstantial evidence, the court applies the *McDonnell Douglas* framework. *Cincinnati*, 215 F.3d at 572. First, a plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) that she was qualified for the job and performed her duties satisfactorily; (3) that despite her qualifications and performance, she suffered an adverse employment action; and (4) that she was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of the protected class. *Id.* at 572—73. If a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 573 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

If the defendant carries this burden, then the plaintiff must demonstrate that the reason offered by defendant was actually a pretext to hide unlawful discrimination. *Id.* "The plaintiff may establish that the proffered reason was a mere pretext by showing that (1) the stated reasons had no basis in fact; (2) the

stated reasons were not the actual reasons; and (3) that the stated reasons were insufficient to explain the defendant's action." *Id*.

Since Plaintiff has not alleged any facts that establish direct discrimination, the Court will evaluate her claim to determine if she adequately pled a claim for circumstantial evidence of discrimination by the preponderance of the evidence. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).

### ii.    Plaintiff Fails to Satisfy the *McDonnell Douglas* Test

Plaintiff satisfies the first prong of the *McDonnell Douglas* test, because as an African-American, she is a member of a protected class. Second, there is no dispute that Plaintiff was qualified for her position as a professor of nursing. Nonetheless, it is unclear whether Plaintiff's performance was satisfactory—many of the facts indicate otherwise. For instance, Plaintiff does not dispute telling an Assistant Dean at the School of Nursing to "get [her] ignorant ass out of [Plaintiff's] office" or that she refused to complete forms required by her employer because they were "waste of [her] time." If Plaintiff did satisfy the second prong of the *McDonnell Douglas* test, Oakland University's decision to terminate employment in August 2014 would qualify as an adverse employment action under the third prong of the test. However, at the fourth and final step, Plaintiff's pleading fails. Nowhere in Plaintiff's Amended Complaint does she allege that she was replaced by a person outside of the protected class. Plaintiff merely alleges, in

-34-

a conclusory fashion, that Defendants denied her the same rights enjoyed by White individuals, Dkt. No. 4, p. 48, ¶ 260 (Pg. ID No. 104), without providing a short and plain statement regarding how the White individuals she mentioned were similarly situated to her. Accordingly, Plaintiff's Amended Complaint does not establish a *prima facie* case of discrimination.

Even if Plaintiff had stated a *prima facie* case, Oakland University has provided a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The Board of Trustees, in their August 2014 meeting, determined that Plaintiff should not be reemployed by Oakland University based on the recommendations of the two tenure-evaluation committees. *See* Dkt. No. 12-21, p. 2 (Pg. ID No. 357). Plaintiff would need to demonstrate that this reason was mere pretext to hide unlawful discrimination. "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Johnson*, 215 F.3d at 573 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993)). There is no material evidence in dispute that indicates the Board of Trustees' decision to not reemploy Plaintiff was mere pretext. In making their decision, the Board reviewed the two objective recommendations from promotions committees, each of which reached the same conclusion: that Plaintiff should not be reappointed with tenure. Plaintiff had not published in a decade, was rejected for the majority of grants for which she

applied, and received inconsistent teaching evaluations from students. There is no support for the argument that these reasons were not based in fact, were not actual reasons, or were insufficient to support the Board's determination. Had Plaintiff established a *prima facie* case of discrimination, Oakland University had sufficient non-pretextual reasons to decide not to reemploy Plaintiff.

Plaintiff's claim against Oakland University for Title VII racial discrimination is dismissed.

### E. The Court Will Dismiss Plaintiff's ADEA Claim Against Oakland University (Count III)

In Count III, Plaintiff alleges that Oakland University discriminated against her based on age. *See* Dkt. No. 4, pp. 48–49 (Pg. ID No. 104–05). She alleges that she was 61 years old at the time that Oakland University made her a *persona non grata*, and that younger faculty were given preferential treatment over her in course assignment. *See id.* at ¶¶ 263–69.

Similar to Plaintiff's ADA claims above, her ADEA claim against Oakland University is barred by sovereign immunity. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 92 (2000) (holding that "the ADEA does not validly abrogate the States' sovereign immunity"). Since her injunctive requests do not satisfy the *Ex parte Young* exception, the Court will dismiss Count III.

**F. The Court Will Dismiss Plaintiff's Elliott-Larsen Civil Rights Act Claims Against Oakland University (Counts V–VIII)**

In Counts V–VIII, Plaintiff alleges that Defendant Oakland University discriminated and retaliated against her based on disability, race, and age in violation of the Elliott-Larsen Civil Rights Act. *See* Dkt. No. 4, p. 50 (Pg. ID. No. 106); Dkt. No. 4-1, pp. 1–5 (Pg. ID No. 107–11). Although the Court may, under 28 U.S.C. § 1367, exercise supplemental jurisdiction over the state law claims ancillary to the relief sought, for the reasons set forth below, the Court declines to exercise supplemental jurisdiction over Counts V–VIII and will dismiss these claims.

Under the standard enunciated in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), and codified in 28 U.S.C. § 1367(c), this Court has broad discretion to exercise its supplemental jurisdiction. Even where the district court "arguably ha[s] supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), the [district] court has discretion to decline to exercise its supplemental jurisdiction where the state law claims predominate or where it has dismissed plaintiff's federal claims." *Cirasuola v. Westrin*, 124 F.3d 196, *1 (6th Cir. 1997).

Section 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over related state claims if:

(1)    the claim raises a novel or complex issue of State law,
(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

-37-

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The United States Supreme Court has stated that:

> Our decisions have established that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons . . . Accordingly, we have indicated that district courts should deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine.

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997) (internal citations and quotations omitted).

In this instance, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims because the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Accordingly, the Court will dismiss Plaintiff's Counts V–VIII without prejudice.

## V. CONCLUSION

For the reasons discussed, the Court **HEREBY GRANTS** Defendants' Motion to Dismiss and/or Motion for Summary Judgment [12]. Additionally, the Court **GRANTS** Medicolegal's Motion to Dismiss [14]. Counts I–IV and IX are dismissed with prejudice and Counts V–VIII are dismissed without prejudice.

IT IS SO ORDERED.

Dated:  January 27, 2016

/s/Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge